UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CHRISTOPHER MICHAEL POSEY, SR., Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | <u>CLASS ACTION COMPLAINT</u> |
| v. | <u>JURY TRIAL DEMANDED</u> |
| BROOKDALE SENIOR LIVING INC., LUCINDA M. BAIER, T. ANDREW SMITH, and STEVEN E. SWAIN, | |
| Defendants. | |

Plaintiff Christopher Michael Posey, Sr. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Brookdale Senior Living Inc. ("Brookdale" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Brookdale securities between August 10, 2016 and April 29, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Brookdale is headquartered in Brentwood, Tennessee. The Company is the nation's largest senior-living community operator, with $4 billion in reported revenue in 2019.

3. As of February 1, 2020, Brookdale owned 356 communities, leased 307 communities, managed seventy-seven communities on behalf of third parties, and three communities for which it has an equity interest. The Company operates independent living, assisted living and dementia-care communities and continuing care retirement centers ("CCRCs"). Through its ancillary services programs, the Company also offers a range of outpatient therapy, home health, personalized living and hospice services.

4. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Brookdale's financial performance was sustained by, among other things, the Company's purposeful understaffing of its senior living communities; (ii) the foregoing conduct subjected Brookdale to an increased risk of litigation and, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; (iii) as a result, the

2

Company's financial results were unsustainable; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On April 30, 2020, *Nashville Business Journal* reported that a proposed class action lawsuit had been filed against Brookdale in this Judicial District, which accused the Company of, among other things, purposeful "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks since at least April 24, 2016.  According to the lawsuit, Brookdale misled residents and their families when it promised to provide basic care and daily living services.  The lawsuit also claims that the proposed class of plaintiffs "have not received the care and services they paid for."  The lawsuit asks for damages and for Brookdale to "stop the unlawful and fraudulent practices."

6.     On this news, Brookdale's stock price fell $0.56 per share, or 15.22%, over two trading sessions, closing at $3.12 per share on May 1, 2020.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Brookdale is headquartered in this Judicial

3

District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Brookdale securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Brookdale is a Delaware corporation with principal executive offices located at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027.  The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "BKD."

14.     Defendant Lucinda "Cindy" M. Baier ("Baier") has served as Brookdale's President, Chief Executive Officer ("CEO"), and a Director of the Company since February 2018.  Baier also served as the Company's Chief Financial Officer ("CFO") from before the start of the Class Period until March 2018.

15.     Defendant T. Andrew Smith ("Smith") served as Brookdale's CEO from before the start of the Class Period until February 2018.

16.     Defendant Steven E. Swain ("Swain") has served as Brookdale's Executive Vice President and CFO since September 2018.

4

17.     Defendants Baier, Smith, and Swain are sometimes referred to herein as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of Brookdale's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Brookdale's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Brookdale, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

19.     Brookdale and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## Background

20.     Brookdale is the nation's largest senior-living community operator.  The Company had $4 billion in reported revenue in 2019, making it one of Nashville's largest publicly traded healthcare companies.

21.     As of February 1, 2020, Brookdale owned 356 communities, leased 307 communities, managed seventy-seven communities on behalf of third parties, and three communities for which it has an equity interest.  The Company operates independent living, assisted living and dementia-care communities and CCRCs.  Through its ancillary services

5

programs, the Company also offers a range of outpatient therapy, home health, personalized living and hospice services.

**Materially False and Misleading Statements Issued During the Class Period**

22. The Class Period begins on August 10, 2016. On August 9, 2016, during after-market hours, Brookdale filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2016 (the "2Q16 10-Q"). For the quarter, Brookdale reported a net loss of $35.45 million, or $0.19 per diluted share, on total revenue of $1.26 billion.

23. In comparing resident fees for the three months ended June 30, 2016, to the three months ended June 30, 2015, the 2Q16 10-Q represented, in relevant part, that "[r]esident fee revenue increased $10.6 million, or 1.0%, over the prior year period primarily as a result of an increase in the average monthly revenue per unit compared to the prior year period"; and that, "[d]uring the current period, revenues grew 1.6% at the 933 communities [Brookdale] owned or leased during both full periods with a 3.0% increase in the average monthly revenue per unit (excluding amortization of entrance fee revenue)."

24. In comparing facility operating expense for the three months ended June 30, 2016, to the three months ended June 30, 2015, the 2Q16 10-Q represented, in relevant part, that "[f]acility operating expense decreased over the prior year period primarily due to the impact of disposition and lease termination activity since the beginning of the prior year period and a $13.7 million decrease in insurance expense from changes in estimates," which "was partially offset by increases in salaries and wages due to wage rate increases."

25. In comparing general and administrative expense for the three months ended June 30, 2016, to the three months ended June 30, 2015, the 2Q16 10-Q represented, in relevant part,

6

that "[g]eneral and administrative expense increased $1.2 million, or 1.3%, over the prior year period primarily as a result of an increase in salaries and wages due to wage rate and bonus accrual increases and an increase in non-cash stock-based compensation expense," which "was partially offset by a decrease in integration, transaction, transaction-related and strategic project costs."

26.     In comparing costs incurred on behalf of managed communities for the three months ended June 30, 2016, to the three months ended June 30, 2015, the 2Q16 10-Q represented, in relevant part, that "[c]osts incurred on behalf of managed communities increased $6.7 million, or 3.7%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full periods."

27.     In addition to discussing these financial metrics, the 2Q16 10-Q also touted the purported quality of Brookdale's senior care services and facilities, stating, in relevant part, that "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents"; that, "[a]s of June 30, 2016, [Brookdale had] . . . the ability to serve approximately 107,000 residents"; that Brookdale "offer[s] [its] residents access to a full continuum of services across the most attractive sectors of the senior living industry"; that Brookdale's "senior living communities offer residents a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)"; and that "[b]y providing residents with a range of service options as their needs change, [Brookdale] provide[s] greater continuity of care."

7

28.     Appended as an exhibit to the 2Q16 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Smith and Baier certified that "[t]he [2Q16 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2Q16 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

29.     On February 15, 2017, Brookdale filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K").  For 2016, Brookdale reported a net loss of $404.40 million, or $2.18 per diluted share, on total revenue of $4.98 billion.

30.     In comparing resident fees for full year 2016 to full year 2015, the 2016 10-K represented, in relevant part, that "[r]esident fee revenue decreased $8.5 million, or (0.2)%, compared to the prior year primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year and a 130 basis point decrease in occupancy at the 876 communities [Brookdale] owned or leased during both full periods," which "was partially offset by a 3.1% increase in RevPOR," *i.e.*, average monthly senior housing resident fee revenues per occupied unit, "at these communities compared to the prior year"; that "[t]otal RevPAR for the consolidated portfolio also increased by 3.0% compared to the prior year"; and that "[t]he 81 communities disposed of subsequent to the beginning of the prior year generated $126.2 million of revenue during 2016 compared to $202.0 million of revenue in the prior year."

31.     In comparing facility operating expense for full year 2016 to full year 2015, the 2016 10-K represented, in relevant part, that "[f]acility operating expense increased $10.5 million, or 0.4%, over the prior year primarily due to a $46.5 million increase in salaries and

8

wages due to wage rate increases at the 876 communities [Brookdale] owned or leased during both full periods," as well as "$18.4 million of expense increases for [Brookdale's] ancillary services in connection with higher home health and hospice average daily census," which "was partially offset by disposition activity, through sales and lease terminations, since the beginning of the prior year and a $35.4 million decrease in insurance expense from changes in estimates"; and that "[t]he 81 communities disposed of subsequent to the beginning of the prior year, either through sales or lease terminations, incurred $99.6 million of facility operating expenses during 2016 compared to $164.5 million of facility operating expenses in the prior year."

32.     In comparing general and administrative expense for full year 2016 to full year 2015, the 2016 10-K represented, in relevant part, that "[g]eneral and administrative expense decreased $57.2 million, or 15.4%, over the prior year primarily due to a $61.5 million decrease in integration, transaction-related and strategic project costs"; and that "[t]his decrease was partially offset by an increase in salaries and wages due to wage rate increases."

33.     In comparing costs incurred on behalf of managed communities for full year 2016 to full year 2015, the 2016 10-K represented, in relevant part, that "[c]osts incurred on behalf of managed communities increased $14.3 million, or 2.0%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full years."

34.     In addition to discussing these financial metrics, the 2016 10-K also contained substantively the same statements as referenced in ¶ 27 *supra* with respect to the purported quality of Brookdale's senior care services and facilities.

35.     With respect to Brookdale's operating procedures that contribute to the care afforded to each of its various senior care facilities, the 2016 10-K represented, in relevant part,

9

that Defendants "have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which [they] believe have contributed to high levels of customer service"; that Brookdale "ha[s] centralized accounting, finance and other operating functions in [its] support centers so that, consistent with [its] operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations"; that Brookdale "implement[s] effective budgeting and financial controls at each community, and establish[es] standardized training and operations procedures"; and that Brookdale has "established company-wide policies and procedures relating to, among other things: resident care; community design and community operations; . . . risk management; development of employee training materials and programs; . . . the hiring and training of management and other community-based personnel; [and] compliance with applicable local and state regulatory requirements."

36. With respect to community staffing and training, the 2016 10-K represented, in relevant part, that "[e]ach community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance"; that "[d]epending upon the size of the community, each Executive Director is supported by a community staff member who is directly responsible for day-to-day care of the residents and either community staff or regional support"; that "[o]ther key positions supporting each community may include individuals responsible for food service, healthcare services, therapy services, activities, housekeeping, and engineering"; and that Defendants "believe that quality of care and operating efficiency can be maximized by direct resident and staff contact."

37.     With respect to quality assurance, the 2016 10-K represented, in relevant part, that Defendants "maintain quality assurance programs at each of [their] communities through [their] corporate and regional staff"; that Defendants' "quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that [they] provide"; that Defendants' "quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis," and "cover [*inter alia*] . . . quality of resident care . . . observance of residents in their daily living activities; and compliance with government regulations"; and that Defendants' "quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents."

38.     In addition to these assurances, the 2016 10-K contained generic, boilerplate representations concerning risks related to "[i]ncreases in the cost and availability of labor, including increased competition for or a shortage of skilled personnel, increased wage pressures or increased union activity, [which] would have an adverse effect on [Brookdale's] business, results of operations and cash flow." For example, the 2016 10-K stated, in relevant part, that Brookdale's "success depends on [its] ability to retain and attract skilled management personnel who are responsible for the day-to-day operations of each of [its] communities"; that "[i]ncreased competition for or a shortage of nurses, therapists or other trained personnel, or general inflationary pressures may require that [Defendants] enhance [their] pay and benefits package to compete effectively for such personnel"; that Defendants "have experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that Defendants "may not be able to offset such added costs resulting from

11

competitive, inflationary or regulatory pressures by increasing the rates [they] charge to [their] residents or [their] service charges, which would negatively impact [their] results of operations and cash flow"; that "[t]urnover rates and the magnitude of the shortage of nurses, therapists or other trained personnel varies substantially from market to market"; that, "[i]f [Defendants] fail to attract and retain qualified and skilled personnel, [their] ability to conduct [their] business operations effectively, [their] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Defendants'] community personnel could divert management attention, lead to increases in [their] labor costs and/or reduce [their] flexibility with respect to certain workplace rules"; and that, "[i]f [Defendants] experience an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [them], or if [they] otherwise experience an increase in [their] staffing and labor costs, [their] results of operations and cash flow would be negatively affected." Plainly, the foregoing risk warnings were generic "catch-all" provisions that were not tailored to Brookdale's actual known risks with respect to the chronically understaffed condition of its senior living communities.

39. Appended as an exhibit to the 2016 10-K were signed SOX certifications, wherein Defendants Smith and Baier certified that "[t]he [2016 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2016 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

40. On February 22, 2018, Brookdale filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K"). For 2017, Brookdale reported a net loss of $571.42 million, or $3.07 per diluted share, on total revenue of $4.75 billion.

41.     In comparing resident fees for full year 2017 to full year 2016, the 2017 10-K represented, in relevant part, that "[r]esident fee revenue decreased $388.5 million, or 9.3%, compared to the prior year primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year"; that "[w]eighted average occupancy decreased 130 basis points at the 766 communities [Brookdale] owned or leased during both full periods, which reflects the impact of new competition in [their] markets"; that "[t]he 165 communities disposed of subsequent to the beginning of the prior year . . . generated $172.6 million of revenue during the current year period compared to $543.3 million of revenue in the prior year period"; that "[t]he decrease in resident fee revenue was partially offset by a 2.5% increase in RevPOR"; and that "[t]otal RevPAR for the consolidated portfolio also increased by 1.6% compared to the prior year."

42.     In comparing facility operating expense for full year 2017 to full year 2016, the 2017 10-K represented, in relevant part, that "[f]acility operating expense decreased $197.2 million, or 7.0%, over the prior year," which was "primarily due to disposition activity, through sales and lease terminations, of 165 communities since the beginning of the prior year period, which incurred $135.0 million of facility operating expenses during the current year compared to $413.1 million of facility operating expenses in the prior year"; and that "[t]hese decreases were partially offset by an increase in salaries and wages arising from wage rate increases at the communities [Brookdale] operated during both full years," as well as "a $23.3 million increase in insurance expense related to positive changes in the prior year to estimates in general liability and professional liability and workers compensation expenses."

43.     In comparing general and administrative expense for full year 2017 to full year 2016, the 2017 10-K represented, in relevant part, that "[g]eneral and administrative expense

decreased $58.0 million, or 18.5%, over the prior year primarily due to a $47.4 million decrease in integration, transaction-related and strategic project costs," which included, *inter alia*, "[s]trategic project costs for 2016 [that] include[d] costs associated with strategic projects related to refining [Brookdale's] strategy, building out enterprise-wide capabilities (including EMR roll-out projects) and reducing costs and achieving synergies by capitalizing on scale"; and that "a reduction in corporate associate headcount resulted in decreased salaries and wage expenses in the current year."

44.     In comparing costs incurred on behalf of managed communities for full year 2017 to full year 2016, the 2017 10-K represented, in relevant part, that "[c]osts incurred on behalf of managed communities increased $153.5 million, or 20.8%, primarily due to [Brookdale's] entry into management agreements with the Blackstone Venture."

45.     In addition to discussing these financial metrics, the 2017 10-K also contained substantively the same statements as referenced in ¶ 27 *supra* with respect to the purported quality of Brookdale's senior care services and facilities.

46.     The 2017 10-K also contained substantively the same statements as referenced in ¶¶ 35-38 *supra* with respect to Brookdale's operating procedures that contribute to the care afforded to each of its various senior care facilities, community staffing and training, and quality assurance; and which contained generic, boilerplate representations concerning risks related to the cost and availability of labor, which were plainly generic "catch-all" provisions that were not tailored to Brookdale's actual known risks with respect to the chronically understaffed condition of its senior living communities.

47.     Appended as an exhibit to the 2017 10-K were signed SOX certifications, wherein Defendants Smith and Baier certified that "[t]he [2017 10-K] fully complies with the

requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

48.     On February 14, 2019, Brookdale filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K"). For 2018, Brookdale reported a net loss of $528.26 million, or $2.82 per diluted share, on total revenue of $4.53 billion.

49.     In comparing resident fees for full year 2018 to full year 2017, the 2018 10-K represented, in relevant part, that "[r]esident fee revenue decreased $330.9 million, or 8.8%, compared to the prior year primarily due to disposition activity through sales and lease terminations of 219 communities since the beginning of the prior year," which "was partially offset by $32.3 million of revenue for four communities acquired during 2018"; that "[t]he increases to RevPAR," *i.e.*, average monthly senior housing resident fee revenues per available unit, "and RevPOR for the consolidated portfolio are primarily due to the disposition of communities with lower RevPOR since the beginning of the prior year period"; that "RevPOR at the 664 communities [Brookdale] owned or leased during both full years increased by 1.2%"; that "[w]eighted average occupancy decreased 90 basis points at the 664 communities [Brookdale] owned or leased during both full years, which reflects the impact of new competition in [Brookdale's] markets"; and that "RevPOR increased at communities that [Defendants] owned or leased during both full years primarily as a result of in-place rent increases and lower discounting."

50.     In comparing facility operating expense for full year 2018 to full year 2017, the 2018 10-K represented, in relevant part, that "[f]acility operating expense decreased $148.8

million, or 5.7%, over the prior year primarily due to disposition activity through sales and lease terminations of 219 communities since the beginning of the prior year" that "incurred $207.8 million of facility operating expense during 2018 compared to $453.4 million of facility operating expense in the prior year"; that "[t]he decrease was partially offset by an increase in labor expense at the communities [Brookdale] operated during both full years and by $17.9 million of facility operating expense for four communities acquired during 2018"; that "[f]acility operating expense at the 664 communities [Brookdale] operated during both full years increased 4.6%, over the prior year, reflecting the impact of [Brookdale's] investment in salaries and benefits and a tight labor market during 2018"; that Defendants "expect that [their] labor investments will continue into 2019"; and that "costs for information technology systems and insurance expenses increased at the communities [Brookdale] operated during both full years."

51. In comparing general and administrative expense for full year 2018 to full year 2017, the 2018 10-K represented, in relevant part, that "[g]eneral and administrative expense decreased $5.0 million, or 1.9%, over the prior year," which was "primarily due to a decrease in salaries and wages expense as a result of a reduction in [Brookdale's] corporate associate headcount pursuant to the initiative to scale our general and administrative costs in connection with our portfolio optimization strategy"; and that "[g]eneral and administrative expense included severance costs and retention costs of $12.3 million and $6.5 million, respectively, in 2018."

52. In comparing costs incurred on behalf of managed communities for full year 2018 to full year 2017, the 2018 10-K represented, in relevant part, that "[c]osts incurred on behalf of managed communities increased $119.1 million, or 13.4%, primarily due to [Brookdale's] entry into management agreements with the Blackstone Venture and the transition of communities

16

previously leased from HCP and Welltower into the management services segment on an interim basis"; that "costs incurred on behalf of managed communities increased as a result of increases in salaries and wages and other facility operating expense at the communities managed in both full years and due to the impact of the adoption of ASU 2014-09, Revenue from Contracts with Customers on January 1, 2018 under the modified retrospective approach"; and that "[t]he impact to each of revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $46.1 million for 2018."

53. In addition to discussing these financial metrics, the 2018 10-K also contained substantively the same statements as referenced in ¶ 27 *supra* with respect to the purported quality of Brookdale's senior care services and facilities.

54. The 2018 10-K also contained substantively the same statements as referenced in ¶¶ 35-38 *supra* with respect to Brookdale's operating procedures that contribute to the care afforded to each of its various senior care facilities, community staffing and training, and quality assurance; and which contained generic, boilerplate representations concerning risks related to the cost and availability of labor, which were plainly generic "catch-all" provisions that were not tailored to Brookdale's actual known risks with respect to the chronically understaffed condition of its senior living communities.

55. Appended as an exhibit to the 2018 10-K were signed SOX certifications, wherein Defendants Baier and Swain certified that "[t]he [2018 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

56.     On November 5, 2019, Brookdale hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the quarter ended September 30, 2019.  In response to a question regarding wage pressures, Defendant Baier stated, in relevant part:

> Now turning your first question of what do we -- what are we doing to deal with the wage pressures. However, the first and most important thing is a true focus on controlling overtime and contract labor. Now we have to get to the root cause of what drove this up and in 2019, and in Q3 in particular. One of the things that we've seen is it's the tightest labor market in the last 50 years. ***And so making sure that we've got appropriate staff in our communities is the most important thing that we can do.***

(Emphasis added.)

57.     On February 19, 2020, Brookdale filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K").  For 2019, Brookdale reported a net loss of $267.93 million, or $1.44 per diluted share, on total revenue of $4.06 billion.

58.     In comparing resident fees for full year 2019 to full year 2018, the 2019 10-K represented, in relevant part, that "[t]he decrease in total revenue was primarily attributable to the disposition of 135 communities through sales of owned communities and lease terminations since the beginning of the prior year, which resulted in $336.5 million less in resident fees during the year ended December 31, 2019 compared to the prior year"; and that this "was partially offset by a 1.9% increase in same community resident fee revenue and RevPAR, resulting from a 2.9% increase in same community RevPOR and an 80 basis points decrease in same community weighted average occupancy."

59.     In comparing facility operating expense for full year 2019 to full year 2018, the 2019 10-K represented, in relevant part, that "[t]he decrease in facility operating expense was

primarily attributable to the disposition of communities since the beginning of the prior year, which resulted in $234.2 million less in facility operating expense during the year ended December 31, 2019"; and that this "was partially offset by a 5.1% increase in same community facility operating expense, which was primarily due to an increase in labor expense arising from planned wage rate increases and an increase in employee benefit expense and increases in insurance and advertising costs compared to the prior year."

60.      In comparing general and administrative expense for full year 2019 to full year 2018, the 2019 10-K represented, in relevant part, that "[t]he decrease in general and administrative expense was primarily attributable to a decrease in transaction and organizational restructuring costs, a reduction in [Brookdale's] corporate associate headcount since the beginning of the prior year as [Defendants] scaled [their] general and administrative costs in connection with community dispositions, and lower professional fees."

61.      In comparing costs incurred on behalf of managed communities for full year 2019 to full year 2018, the 2019 10-K represented, in relevant part, that "[t]he decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period."

62.      In addition to discussing these financial metrics, the 2019 10-K also contained substantively the same statements as referenced in ¶ 27 *supra* with respect to the purported quality Brookdale's senior care services and facilities.

63.      The 2019 10-K also contained substantively the same statements as referenced in ¶¶ 35-38 *supra* with respect to Brookdale's operating procedures that contribute to the care afforded to each of its various senior care facilities, community staffing and training, and quality assurance; and which contained generic, boilerplate representations concerning risks related to

19

the cost and availability of labor, which were plainly generic "catch-all" provisions that were not tailored to Brookdale's actual known risks with respect to the chronically understaffed condition of its senior living communities.

64.     Appended as an exhibit to the 2019 10-K were signed SOX certifications, wherein Defendants Baier and Swain certified that "[t]he [2019 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

65.     The statements referenced in ¶¶ 22-64 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Brookdale's financial performance was sustained by, among other things, the Company's purposeful understaffing of its senior living communities; (ii) the foregoing conduct subjected Brookdale to an increased risk of litigation and, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; (iii) as a result, the Company's financial results were unsustainable; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

66.     On April 30, 2020, *Nashville Business Journal* reported that a proposed class action lawsuit had been filed against Brookdale in this Judicial District, which accused the Company of, among other things, purposeful "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks since at least April 24, 2016.  According to the lawsuit,

filed on April 24, 2020 under style of *Gunza v. Brookdale Senior Living, Inc.*, 3:20-cv-00353 (M.D. Tenn.) (the "*Gunza* Lawsuit"), Brookdale misled residents and their families when it promised basic care and daily living services. The lawsuit also claims that the proposed class of plaintiffs "have not received the care and services they paid for," and asks for damages and for Brookdale to "stop the unlawful and fraudulent practices." Specifically, the *Gunza* Lawsuit alleged, among other things, that:

> [ ] BROOKDALE determines, limits, and controls the day-to-day staffing levels at its assisted living facilities from its corporate headquarters in Brentwood, Tennessee and, thus, determined, limited, and controlled the amount of care/service time available and provided to residents on a day-to-day basis at its facilities.

> [ ] BROOKDALE uses a computer program it designed, developed and controls, the Service Alignment Software, to determine, limit, and control the amount of care/service time available and provided to residents on a day-to-day basis at its facilities. As described above, the Service Alignment Software determines the number of staffing hours on a per-day basis in each of its facilities that are purportedly required to deliver the collective care services to residents by quantifying the total daily counts of each type of care service and multiplying each total count by an assumed average amount of labor task time BROOKDALE claims is required for each respective service.

> [ ] BROOKDALE's exercise of control and domination over the day-to-day staffing and budgeted hours at its facilities is further evidenced by the fact that it keeps its method and labor task time inputs for computing daily staffing levels secret from assisted living facility level employees. BROOKDALE does not even allow its executive directors at each facility to know its method and labor time inputs used to compute daily staffing levels or to access the Service Alignment Software algorithms or source code. Furthermore, executive directors and facility level staff cannot modify the corporate-determined staffing levels without express permission from several layers of BROOKDALE corporate management. Any such request for permission to modify or customize must be documented.

> [ ] Only the highest corporate officers at BROOKDALE have access to or authority to modify the logic, algorithms, source code, task counts, and task times used in its Service Alignment Software.

> [ ] As a result, BROOKDALE has systematically short-staffed its assisted living facilities on a day-to-day basis, employing a fundamentally flawed and automated process, purposefully created and mandated to achieve budget objectives and to

21

satisfy predetermined financial performance thresholds rather than meeting residents' needs by, among other things, embedding flawed assumptions into its staffing software to underestimate required staffing levels.

The foregoing allegations clearly implicated Brookdale's highest levels of management, stating that they had exclusive control over the systems used to determine staffing levels, which were not directly and/or primarily tied to the needs of its senior residents.

67.     After *Nashville Business Journal* reported the filing of the *Gunza* Lawsuit, Brookdale's stock price fell $0.56 per share, or 15.22%, over two trading sessions, closing at $3.12 per share on May 1, 2020.

68.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

69.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Brookdale securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

70.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Brookdale securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

22

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Brookdale or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

71. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

72. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

73. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Brookdale;

- whether the Individual Defendants caused Brookdale to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Brookdale securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

23

74. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

75. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Brookdale securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Brookdale securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

76. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

77. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

24

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

78.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

79.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

80.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Brookdale securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Brookdale securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

81.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Brookdale securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Brookdale's finances and business prospects.

82. By virtue of their positions at Brookdale, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

83. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Brookdale, the Individual Defendants had knowledge of the details of Brookdale's internal affairs.

84. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Brookdale. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Brookdale's

businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Brookdale securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Brookdale's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Brookdale securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

85. During the Class Period, Brookdale securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Brookdale securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Brookdale securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Brookdale securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

86. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

88. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89. During the Class Period, the Individual Defendants participated in the operation and management of Brookdale, and conducted and participated, directly and indirectly, in the conduct of Brookdale's business affairs. Because of their senior positions, they knew the adverse non-public information about Brookdale's misstatement of income and expenses and false financial statements.

90. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Brookdale's financial condition and results of operations, and to correct promptly any public statements issued by Brookdale which had become materially false or misleading.

91. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Brookdale disseminated in the marketplace during the Class Period concerning Brookdale's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Brookdale to engage in the

Case 3:20-cv-00543   Document 1   Filed 06/25/20   Page 28 of 30 PageID #: 28

wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Brookdale within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Brookdale securities.

92. Each of the Individual Defendants, therefore, acted as a controlling person of Brookdale. By reason of their senior management positions and/or being directors of Brookdale, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Brookdale to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Brookdale and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

93. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Brookdale.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

29

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 25, 2020

Respectfully submitted,

**s**/*Paul Kent Bramlett*
Paul Kent Bramlett TN #7387/MS #4291
Robert Preston Bramlett TN #25895
**BRAMLETT LAW OFFICES**
P. O. BOX 150734
Nashville, TN 37215-0734
Telephone:      615.248.2828
Facsimile:      866.816.4116
PKNASHLAW@aol.com
Robert@BramlettLawOffices.com


**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac* to be filed)
J. Alexander Hood II (*pro hac* to be filed)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (*pro hac* to be filed)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com


*Attorneys for Plaintiff*

30