# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CHRISTOPHER MICHAEL POSEY SR.,
Individually and on Behalf of All Others
Similarly Situated,

                                    Plaintiff,

         v.

 BROOKDALE SENIOR LIVING INC.,
 LUCINDA M. BAIER, T. ANDREW SMITH.
 and STEVEN E. SWAIN

                                    Defendants.

No. 3:20-cv-00543

# AMENDED COMPLAINT FOR VIOLATIONS
# OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

I.      Summary of the Action ................................................................................................ 1

II.     Jurisdiction and Venue .............................................................................................. 6

III.    Parties ....................................................................................................................... 7

        A.  Lead Plaintiff ................................................................................................. 7

        B.  Defendants ..................................................................................................... 7

        C.  Relevant Non-Parties .................................................................................... 8

IV.     Additional Factual Allegations ............................................................................... 10

        A.  Company Background and Brookdale's Reliance on Its Assisted Living and Memory Care Segments To Generate the Majority of its Annual Revenue .............................. 10

        B.  Brookdale's Operations are Centralized Out of its Corporate Headquarters .............. 14

        C.  Brookdale Induces Consumers to Reside at Its Facilities by Promising Services Superior to Competitors with Sufficient Staffing to Create a "Home-Like" Environment Capable of Meeting Basic Care and Daily Living Needs .................... 17

        D.  In Connection with its 2014 Acquisition of Emeritus, Brookdale's Stock Price Steadily Declines as the Company Saddles itself with High Debt Levels and Outdated, Dilapidated Facilities ................................................................................. 20

        E.  Brookdale's Financial Results Further Suffer as Occupancy Declines Due to Increased Competition as Residents Favor Competitor's Newer, Updated Facilities 25

        F.  Brookdale Employs a Companywide Strategy of Decreasing Staffing at its Facilities Below What is Necessary to Provide Adequate Care in Order to Boost its Bottom Line and Meet Financial Forecasts ........................................................... 28

            i.    Brookdale Manipulates its SAS System To Understaff Its Facilities ................. 29

            ii.   Brookdale Controlled and Limited Its Budget to Deny Staff Increases And Achieve Financial Performance Goals .......................................... 37

            iii.  Brookdale Incentivizes Employees to Acquiesce to its Understaffing By Rewarding Them With Bonus Incentives ..................................... 42

        G.  Brookdale Residents File Complaints and Regulators Issue Violations Relating to Inadequate Staffing, Poor Services and Safety Concerns ........................... 43

        H.  The Gunza Lawsuit is Filed, Exposing Brookdale's Understaffing for the First Time ..................................................................................................... 54

V.      Defendants' Materially False and Misleading Statements ................................................ 57

        A.  Material False and Misleading Statements Regarding Staffing and the Quality of Resident Services ........................................................................ 58

            i.    Misstatements that Brookdale Was Increasing Community Staffing Levels ...... 58

            ii.   Misrepresentations Concerning Executive Directors' Control Over Decision-Making at Their Facilities ................................................... 60

ii

iii. Misrepresentations that Brookdale Provided the Highest Quality of Service and Care for its Residents............................................................................. 66

iv. Misrepresentations Concerning Improved Resident Experience by Providing and Retaining Top Quality Staffing ........................................................ 75

v. Misrepresentations Concerning Purported Individually Tailored Personal Care Service Options to "Perfectly Suit Their Needs" ................................. 83

vi. Misrepresentations that Brookdale Offered "Home-Like" and 24-Hour Services that the Company Wasn't Actually Providing Due to Severe Understaffing...... 95

vii. Materially False and Misleading Statements Concerning Compliance with Internal Policies ............................................................................. 107

viii. Materially False and misleading Statements Concerning An Increase in Occupancy .................................................................................... 112

VI. The Truth is Revealed ...................................................................................... 115

VII. Plaintiff's Allegations Create a Strong Inference of Scienter............................................ 119

A. Defendants Knew or Recklessly Disregarded that their Statements Were False When Made ............................................................................................... 120

i. The Individual Defendants Had Knowledge of Understaffing and Resident Care Because Defendant Baier Visited Local Communities and Was "Hands On".. 120

ii. The Individual Defendants Were Aware of Regulatory Violations Because They Frequently Monitored Reports Concerning Such Violations ............................ 122

iii. The Individual Defendants Were Aware Of Staffing and Quality of Care Issues Because They Controlled SAS, the Budget, and Staffing Determinations ....... 123

iv. The Individual Defendants Had Knowledge of Brookdale's Understaffing Because Brookdale Has Been Subject to Numerous Lawsuits and Citations for Violating Laws, Understaffing, and Not Providing Quality Care .................... 125

v. Defendants' Violations of Brookdale's Own Internal Policies Supports Scienter .................................................................................... 128

vi. The Individual Defendants Were Aware that Facilities Were Understaffed Because Senior Living Facilities and SAS Were a Highly Material Aspect of the Company's Business Operations and its "Core" Business................................ 129

B. Defendants' Motive to Commit the Alleged Fraud .................................................. 130

i. Defendants Were Motivated to Commit the Alleged Fraud to Avoid Violating the Company's Debt Covenants .............................................................. 130

ii. Defendants Were Motivated to Commit the Alleged Fraud to Meet Their Lucrative Bonus Targets................................................................... 134

iii. Defendants Were Motivated to Secure and Protect Their Positions From Shareholder Activists..................................................................... 138

VIII. Loss Causation .............................................................................................. 142

IX. Presumption of Reliance: the Fraud on the Market Presumption of Reliance Applies ..... 144

iii

X.    The Statutory Safe Harbor and Bespeaks Caution Doctrine Do Not Apply ...................... 146

XI.   Class Action Allegations ................................................................................................. 147

COUNT I ....................................................................................................................................... 148

COUNT II ...................................................................................................................................... 150

PRAYER FOR RELIEF ............................................................................................................... 152

JURY DEMAND ........................................................................................................................... 152

Court-appointed Lead Plaintiff Daniel Martin Struve ("Plaintiff") brings this action against Brookdale Senior Living ("Brookdale" or the "Company"), Lucinda "Cindy" M. Baier ("Baier"), T. Andrew Smith ("Smith"), and Steven E. Swain ("Swain" and collectively, the "Defendants") pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of themselves and all other persons similarly situated who purchased or otherwise acquired Brookdale securities between August 9, 2016 and April 29, 2020, inclusive (the "Class Period"), and were damaged thereby.

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of their undersigned Lead Counsel, which included, among other things, review and analysis of: (i) Brookdale's public filings with the U.S. Securities and Exchange Commission ("SEC") and websites of local and state regulatory agencies; (ii) Brookdale's other public statements, including press releases and investor conference calls; (iii) interviews with confidential witnesses with firsthand knowledge of the allegations herein; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Brookdale and the industry in which it operates; and (v) court filings in other related actions. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     SUMMARY OF THE ACTION

1.      With over 740 communities in 45 states and over $4 billion in revenue, Brookdale is the largest operator of senior living communities in the United States. Brookdale offers a variety of community options for senior living depending on a resident's needs, including independent

1

living, assisted living, memory care and skilled nursing. Brookdale touts that in each of these communities, "you or your loved one can feel at home."

2.      Throughout the Class Period, Brookdale painted a vivid picture of its communities as offering only the highest quality of resident care, which focused on a "personalized approach" for residents that were performed by staff who provided "*24-hour assistance* with activities of daily life to mid-acuity frail and elderly residents." Brookdale emphasized that its number one priority was "protecting" its senior residents stating, "*as you would expect, protecting the seniors that we serve is our most important priority*" and "*you can enjoy peace of mind knowing we have staff onsite 24 hours a day, seven days a week, just in case you need us*." Thus, "*[w]hen you move into a Brookdale assisted living community, you can enjoy a life rich in quality care,* genuine friendships and fun activities."

3.      For many years Brookdale enjoyed dominating the local markets where it operated. Beginning in 2016, however, new senior living communities began popping up across the nation at an expedited pace due to the increasing demand for senior care. Unlike Brookdale, the communities being built by competitors were brand new and attracted many residents who otherwise would have resided at Brookdale instead. As Brookdale's levels of occupancy declined, it began enforcing a Company-wide strategy to reduce staffing in an effort to reduce expenses and improve the bottom line.

4.      According to confidential witnesses, Brookdale intentionally understaffed its facilities using a system called the Service Alignment System ("SAS"). Brookdale touted SAS as its proprietary software that set it apart from competition. Essentially, when new residents arrived at Brookdale, the residents' care needs were entered into SAS, which calculated a total number of labor hours required for each community. Staffing for each community was based on this number,

regardless of any other factors. As confidential witnesses explain, SAS was programed to *undercalculate* the number of labor hours needed to provide adequate resident care because the system failed to account for everyday variables, such as patient falls or other human factors, extra trips to the bathrooms or providing residents with cups of coffee and other services to enhance their experience. This resulted in understaffing at nearly every Brookdale community. Yet Defendants falsely represented to the market that "[w]e are continuing to work on our service alignment labor model **which help us make sure that we've got the right labor in the communities to match to the acuity of the residents' needs**."

5.     Further, while Brookdale represented that its local executive directors were given decision making authority for each of its communities – *i.e.* "**We will make decisions closer to our customers by empowering our executive directors with more local decision rights**" – according to confidential witnesses, this statement was false. Rather, the executive directors had very limited authority over the communities and no say whatsoever about community staffing. Rather, Brookdale was structured so that staffing needs could only be approved at the corporate level. Thus, as explained by confidential witnesses, when caregivers or staff raised understaffing issues or requested additional staff, these requests required corporate approval. While Brookdale stated it was "adding community level support staff to lighten the burden of the job responsibilities," confidential witnesses explain that requests for additional staffing were repeatedly denied regardless of need.

6.     The resulting degree of insufficient staffing was startling. In some instances, no supervisors were present for an entire night shift. In other instances, only one caregiver was on duty to care for *100 residents* on *three different floors*. When residents hit their call lights for help, staff would not respond for *hours*. In one instance, a resident who fell and broke her bones waited

*22 hours* before her call light was answered. In another instance, a resident was locked on a bus for days before being discovered, at which point the resident had passed away. In yet another instance, a resident with dementia was left unsupervised and wandered out of the facility at night, unnoticed, and was found deceased the next morning.  The number and severity of resident injury and death as a result of Brookdale being understaffed is alarming and overwhelming.

7.     Ultimately, Brookdale was focused on one thing only: its bottom line, earning it the name "Brookdale Crookdale" by those who were aware of its true practices. The Individual Defendants were aware of the staffing issues at Brookdale's facilities because all staffing and budgets for the local communities were determined at the corporate level. Defendant Baier even visited Brookdale's facilities firsthand to shadow caregivers and staff in direct response to concerns raised by communities about understaffing.  Thus, defendant Baier personally witnessed the degree of inadequate staffing and resident care.

8.     Further, Brookdale received an insurmountable number of citations from local and state authorities for regulatory violations throughout the Class Period. These violations detail the injuries, deaths, and lack of supervision found at Brookdale's communities across the nation stemming from staffing and quality of care violations. As a result of these violations, Brookdale received "deficiency reports" that were ultimately "resolved through a plan of corrective action relating to the community's operations."

9.     Not only were the Individual Defendants aware of their staffing violations from the issuance of citations, but Brookdale conducted its own "community inspections . . . on a regular basis" to inspect, among other things, "quality of resident care" and "compliance with government regulations." The results of such inspections were uploaded into a Continuous Quality

Improvement Program accessible by the Brookdale corporate office, including the Individual Defendants.

10.     While Brookdale's egregious violations were well known within the Company, resulting in frequent staff turnover, the public remained unaware due to Brookdale's repeated representations that it was focused on providing the best care for its residents. Indeed, throughout the Class Period, Brookdale continuously touted its wide range of services offered, including "attention and assistance with medication support, bathing, dressing, cooking and other tasks throughout the day." Unlike competitors, Brookdale touted that it offered a wide range of services while providing "*a talented team of associates dedicated to providing high-quality care and services to our residents and patients*" with "*24-hour assistance*." This high-quality service was highlighted as starting with a personal assessment of every resident to determine the residents' needs. Assessments were purportedly continuously updated so that residents can "age-in-place" at Brookdale.

11.     Brookdale kept its chronic understaffing practices hidden from investors for years until, on April 30, 2020, the truth was revealed when multiple local and national news sources published stories detailing a consumer class action complaint filed by George Gunza in the U.S. District Court for the Middle District of Tennessee. These articles revealed to the market for the first time that Brookdale had "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks." Noting that the complaint was brought on behalf of resident with firsthand knowledge of the operations, one article stated, in part:

> *[The Gunza Complaint] alleges that Brookdale participated in "systemic unfair and deceptive" trade practices and breaches of contract beginning in April 2016 by engaging in "inherently flawed and deceptive" staffing practices, and then misleading residents and families through misrepresentations and misleading statements in marketing materials and residency agreements. The suit further*

*alleges that "every resident, regardless of need level, was deprived of services that were needed and paid for based on inadequate staffing levels.*

*. . . .*

*The complaint states that Brookdale, through its marketing and sales materials, promised tailored services to meet the individualized needs of its residents but "systematically and willfully understaffed its facility to boost its profitability." Residents and families, the complaint states, were misled that communities would meet basic care needs and daily living services.*

*According to the complaint, Brookdale used its own service agreement software algorithm to enforce corporate-determined staffing levels rather than using personal service assessments of each resident's care and service needs. Residents and families allegedly were misled by resident agreements that indicated facilities would meet basic care needs and daily living services — some for additional fees — based on those PSAs.*

*The suit asserts that Brookdale determines, limits and controls day-to-day staffing levels at its communities from its corporate headquarters.* Executive directors at each facility are not permitted to modify those staffing levels without permission "from several layers of Brookdale corporate management," the complaint maintains.

"*As a result, Brookdale has systematically short-staffed its assisted living facilities on a day-to-day basis, employing a fundamentally flawed and automated process, purposefully created and mandated to achieve budget objectives and to satisfy predetermined financial performance thresholds rather than meeting residents' needs by, among other things, embedding flawed assumptions into its staffing software to underestimate required staffing levels,*" the complaint reads.

12. On this news, Brookdale's stock price fell from a closing price of $3.68 on April 29, 2020 to a closing price of $3.61 per share on April 30, 2020 and continued to drop until reaching a closing price of $2.92 on May 5, 2020.

## II.    JURISDICTION AND VENUE

13. The claims asserted herein arise pursuant to Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated therein, 17 C.F.R. § 240.10b-5.

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 27 of the Exchange Act, 15 U.S.C. §78aa. In connection with the acts, conduct and other

6

wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange. Brookdale trades in an efficient market on the New York Stock Exchange ("NYSE").

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in this District.  Additionally, Brookdale maintains executive offices in this District at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027.

## III.     PARTIES

### A.     Lead Plaintiff

16.     Court-appointed Lead Plaintiff Daniel Martin Struve purchased Brookdale common stock during the Class Period at artificially inflated prices and was damaged thereby, as previously set forth in the PSLRA certification accompanying Plaintiff's motion for appointment as lead plaintiff (ECF No. 19-2), incorporated herein by reference.

### B.     Defendants

17.     Defendant Brookdale is a Delaware corporation with principal executive offices located at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027. The Company's common stock trades in an efficient market on the NYSE under the ticker symbol "BKD."

18.     Defendant Lucinda "Cindy" M. Baier ("Baier") has served as Brookdale's President, Chief Executive Officer ("CEO"), and a Director of the Company since February 2018. Baier also served as the Company's Chief Financial Officer ("CFO") from December 2015 until she became CEO.

7

19.     Defendant T. Andrew Smith ("Smith") served as Brookdale's CEO from 2013 until February 2018.

20.     Defendant Steven E. Swain ("Swain") has served as Brookdale's Executive Vice President and CFO since September 2018.

21.     Defendants Baier, Smith, and Swain are sometimes referred to herein as the "Individual Defendants."

22.     The Individual Defendants possessed the power and authority to control the contents of Brookdale's filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, and other market communications. The Individual Defendants were provided with copies of Brookdale's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Brookdale, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

23.     Brookdale and the Individual Defendants are collectively referred to herein as "Defendants."

**C.     Relevant Non-Parties**

24.     CW1, was a former Executive Director with Brookdale from November 2017 until July 2019, and an Area Director with Brookdale from January 2014 until January 2017. Prior to January 2014, CW1 worked for the Emeritus Corporation until it was acquired by Brookdale in

2014. In CW1's role as Executive Director, he[1] oversaw the overall operations of the communities in Oregon, including in Lebanon, Tualatin, and Keizer, and was responsible for the overall operations of those communities. As Executive Director, CW1 reported to Ron Clark, the District Director of Operations, until he left. CW1 then reported to Renee Brooks, the District Director of Operations. Brooks and Clark reported to the Vice President of Operations, Randy Cyphers, who reported to several different West Coast Presidents, including Steve Flynt, who reported to the Vice President of Operations, Yvonne McLaughlin. McLaughlin reported to the CEO.

25.     CW2 was a former employee of Brookdale from 2006 until November 2018, who most recently served as Executive Director for one community and oversaw five others in Tucson, Arizona. CW2 occasionally traveled to Nevada to oversee communities there as well. CW2 reported to Frankie Knighton, Vice President of Operations.

26.     CW3 was a former Executive Director with a Brookdale facility in Kansas from April 2017 until October 2019. CW3's facility was licensed for 29 rooms and 34 people and housed assisted living, long term care, and hospice residents. As Executive Director, CW3 was responsive for overseeing nursing, dining, maintenance, staff, and activities in his community. CW3 reported to Ray Leisure, the District Director of Operations, until Leisure was promoted to Vice President, Regional Operations. CW3 then reported to Jennifer Shaw, who reported to the Vice President of the region.

27.     CW4 was a former employee of Brookdale from August 2016 to April 2019. CW4 was a former District Director of Operations and District Director of Sales at Brookdale who provided support to 12 properties in the Colorado market. As District Director, CW4 reported to Regional Vice President, Frankie Knighton. Frankie Knighton reported to President of the West

---

[1] All CWs are referred to in the masculine to maintain confidentiality.

Division, Steve Flynt, who reported to the CEO, defendant Baier. CW4 reported to Vice President of Sales, Laura Schmid while working in sales, who reported to Steve Flynt.

28.    CW5 was a former of employee of Brookdale since 2013, when he joined as an Executive Director for a community located in Denver, Colorado. In 2017, CW5 was promoted to District Director of Operations, a position he held until he left the Company in 2019. As Executive Director, CW5 explained that he was responsible for the day-today operations of the community and everything that happened, including the quality of care, occupancy, hiring, firing, supervising department heads, and sales, among other things. As District Director, CW5 stated that he had 11 to 12 communities in his portfolio that he was responsible for overseeing, including managing the Executive Directors at each community. In both of these roles, CW5 reported to Mike Kreiger, Ray Oborn, and then Frankie Knighton, who were all Regional Vice Presidents. Knighton reported to the C-Suite.

## IV.    ADDITIONAL FACTUAL ALLEGATIONS[2]

### A.    Company Background and Brookdale's Reliance on Its Assisted Living and Memory Care Segments To Generate the Majority of its Annual Revenue

29.    Brookdale was formed in 2005 through the merger of Brookdale Living Communities, Inc. and Alterra Healthcare Facilities Corp. On November 22, 2005, Brookdale initiated its Initial Public Offering ("IPO") of common stock in which it sold 11,072,000 shares for proceeds of $116.3 million.

30.    Since its IPO, Brookdale has experienced rapid growth through an aggressive acquisition strategy: (i) on July 25, 2006, the Company acquired American Retirement Corporation, another leading senior living provider, for $1.2 billion; (ii) on September 1, 2011, Brookdale acquired Horizon Bay, the ninth largest operator of senior living facilities, for $10.7

---

[2] Unless otherwise indicated, all emphasis is added and internal quotations omitted.

10

million; and (iii) just three years later, on July 31, 2014, Brookdale acquired Emeritus Corporation, the second largest operator of senior living facilities, for $2.8 billion, adding 493 communities to Brookdale's inventory of facilities as well as its entry into ten new states. To finance these acquisitions, Brookdale borrowed substantial amounts of cash and agreed to assume large amounts of debt held by the acquired company, resulting in Brookdale becoming highly leveraged and on the verge of violating the financial covenants in its debt agreements throughout the Class Period.

31.    As a result of its aggressive acquisition strategy, throughout the Class Period, Brookdale described itself as "the largest operator of senior living communities in the United States" boasting 743 communities located in 45 states and "the ability to serve approximately 65,000 residents." As of February 1, 2020, Brookdale owned 356 communities, leased 307 communities, managed 77 communities on behalf of third parties, and had 3 communities for which it has an equity interest. The Company reported over $4 billion in revenue for 2019, making it one of Nashville's largest publicly traded healthcare companies.

32.    Brookdale currently operates in five business segments: (1) Independent Living; (2) Assisted Living and Memory Care; (3) Continuing Care Retirement Communities ("CCRC"); (4) Health Care Services; and (5) Management Services—with Assisted Living and Memory Care accounting for more than one half of the Company's annual revenue. Brookdale's business segments provide the following services:

- Independent Living: Brookdale's independent living communities are primarily designed for middle to upper income seniors who desire a change in lifestyle within a residential environment. The majority of the Company's independent living communities consist of both independent and assisted living units in a single community, which allows residents to age-in-place. Each independent living community purportedly provides residents with basic services such as dining service options, 24-hour emergency response, housekeeping, and recreational activities. Communities that include assisted living purportedly also provide personal care and convenience service options to provide assistance with ADLs. Residents with cognitive

11

or physical frailties and higher level service needs are purportedly provided supplemental services in their own units and have a dedicated assisted living staff and separate assisted living dining rooms and activity areas.

- <u>Assisted Living and Memory Care</u>: Assisted living and memory care communities purportedly offer housing and 24-hour assistance with ADLs to mid-acuity and frail elderly residents. Residents at Brookdale's assisted living and memory care communities are eligible to receive the basic care level, which purportedly includes ongoing health assessments, three meals per day and snacks, 24-hour staff assistance, coordination of special diets planned by a registered dietitian, assistance with coordination of physician care, social and recreational activities, housekeeping, and personal laundry services. Residents at the memory care units who typically require higher levels of personal care and purportedly can receive specialized services including assistance with ADLs, behavior management, and an activities program.

- <u>CCRCs</u>: Brookdale's CCRCs are large communities that purportedly offer a variety of living arrangements and services to accommodate all levels of physical ability and health. Defendants claim that "most" of the Company's CCRCs "have independent living, assisted living, and skilled nursing available on one campus or within the immediate area, and some also include memory care services."

- <u>Health Care Services</u>: Brookdale's Health Care Services purportedly include home health, hospice, and outpatient therapy services, as well as education and wellness programs, to residents of its communities and seniors living outside of the communities. Brookdale's services purportedly include skilled nursing and inpatient healthcare services in its skilled nursing units.

- <u>Management Services</u>: Brookdale receives management fees generally determined by an agreed upon percentage of gross revenues (as defined in the management arrangement), as well as reimbursed expenses, which represent the reimbursement of certain expenses incurred on behalf of the owners. Most of its management arrangements are interim arrangements entered into in connection with prior lease terminations that may be terminated by either party on notice and without reason, have a remaining term of approximately one year or less, or may be terminated by the owner within the next year.

33. Through its ancillary services programs, the Company also offers a range of outpatient therapy, home health, personalized living and hospice services.

34.     When residents join a Brookdale community, their resident fee is based on the services required. Brookdale offers the following service option to residents: (1) Basic Services, including dining service options, laundry and linen services, transportation, 24-hour emergency response, housekeeping, recreational activities, and wellness assessments; (2) Personal Service Assessments "to determine the personal services you require"; and (3) Personal Services for which Brookdale charges additional monthly fees, including physical assistance, staff supervision with medications, nutrition (tray service, dietary restrictions, and feeding assistance), dressing and grooming, personal hygiene, bathing/showering, toileting, and/or transferring out of bed or chair.[3]

35.     The Assisted Living and Memory Care segment comprise approximately 50% of the total units (or apartments) within each community:

| Segment | Communities | Units | % of Total Units | Average Number of Units per Community |
|---------|-------------|-------|------------------|----------------------------------------|
| Independent Living | 68 | 12,514 | 17.3% | 184 |
| Assisted Living and Memory Care | 573 | 35,956 | 49.8% | 63 |
| CCCRCs | 22 | 5,711 | 7.9% | 260 |
| Management Services | 100 | 18,086 | 25.0% | 181 |
| **TOTAL** | 763 | 72,267 | 100% | 95 |

36.     As demonstrated in the chart below, throughout the Class Period, Brookdale generated more than 50% of its annual revenue from its Assisted Living and Memory Care business segment. Moreover, approximately 80% of its resident fee revenue was generated from

---

[3] *See Gunza v. Brookdale Senior Living, Inc.*, No. 3:20-cv-00353 (M.D. Tenn.), Dkt No. 1, Class Action Complaint (hereinafter, "*Gunza*")

13

private pay customers, while 16% came from government reimbursement programs (primarily Medicare) and 4.0% from other payor sources:

| Segments (in thousands) | Resident and Management Fee Revenue | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2017 | | 2016 | |
| Independent Living | $544,558 | 16.7% | $599,977 | 17.0% | $465,419 6 | 13.8% | $679,503 | 13.7% |
| Assisted Living and Memory Care | $1,815,934 | 55.6% | $1,995,851 | 56.8% | $2,210,688 | 46.6% | $2,419,459 | 48.6% |
| CCRCs | $402,175 | 12.3% | $416,408 | 11.8% | $468,994 | 9.9% | $592,826 | 11.9% |
| Health Care Services | $447,260 | 13.7% | $436,975 | 12.4% | $446,262 | 9.4% | $476,833 | 9.6% |
| Management Services | $57,108 | 1.7% | $71,986 | 2.0% | $966,976 | 20.4% | $808,359 | 16.2% |
| Total resident and management fee revenue | $3,267,039 | 100% | $3,521,197 | 100% | $4,747,116 | 100% | $4,976,980 | 100% |

37.    According to Brookdale, its major publicly traded senior housing competitors are Capital Senior Living Corporation and Five Star Senior Living, Inc. In private senior housing, Brookdale identifies its major top competitors as Holiday Retirement, Life Care Services, LLC, Atria Senior Living Inc., Senior Lifestyle Corp., and Sunrise Senior Living, LLC, as well as a large number of not-for-profit entities.

**B.    Brookdale's Operations are Centralized Out of its Corporate Headquarters**

38.    Brookdale's operations are centralized and run entirely out of its corporate headquarters in Brentwood, Tennessee. In its annual reports filed with the SEC, Brookdale admits that the Company centralizes all business functions impacting its assisted living facilities at the corporate headquarters:

14

*We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials*, which we believe have contributed to high levels of customer service and to improved facility operating margins. *We have centralized accounting, finance and other operating functions in our support centers so that, consistent with our operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations. We have established company-wide policies and procedures* relating to, among other things: resident care; community design and community operations; billings and collections; accounts payable; finance and accounting; risk management; development of employee training materials and programs; marketing activities; the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements; and implementation of our acquisition, development and leasing plans.[4]

\*\*\*

In addition, *we have and will continue to consolidate corporate functions* such as accounting, *finance,* human resources, legal, information technology and *marketing.*[5]

\*\*\*

*We have developed a centralized support infrastructure and services platform*, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as human resources, finance, accounting, legal, information technology and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, *we have established centralized operations groups to support all of our product lines and communities* in areas such as training, regulatory affairs, asset management, dining and procurement.[6]

---

[4] *See* Brookdale's annual report filed on Form 10-K for the fiscal year 2015; Brookdale's annual report filed on Form 10-K for the fiscal year 2016; Brookdale's annual report filed on Form 10-K for the fiscal year 2017; Brookdale's annual report filed on Form 10-K for the fiscal year 2018.

[5] *See* Brookdale's *See* Brookdale's annual report filed on Form 10-K for the fiscal year 2014; Brookdale's annual report filed on Form 10-K for the fiscal year 2016; Brookdale's annual report filed on Form 10-K for the fiscal year 2017; Brookdale's annual report filed on Form 10-K for the fiscal year 2018.; Brookdale's annual report filed on Form 10-K for the fiscal year 2015; Brookdale's annual report filed on Form 10-K for the fiscal year 2016; Brookdale's annual report filed on Form 10-K for the fiscal year 2017; Brookdale's annual report filed on Form 10-K for the fiscal year 2018.

[6] *See Id.*

39.     Brookdale similarly represented in various court filings that a majority of its executive and administrative functions are located at its Tennessee headquarters and all final decisions regarding the Company's operations of its communities are made from Brookdale's corporate headquarters: "***Brookdale's corporate officers, based out of Brentwood, TN, direct, control, and coordinate Brookdale's services and overall business operations for its locations throughout the United States.***"[7]

40.     For instance, the Company makes all decisions regarding staffing, budgets, and marketing materials at the corporate level. The Company's 2019 Definitive Proxy Statement, confirmed that the "Board and management" were in charge of the "budgeting process."

41.     Specifically, the budget for each community was set by the corporate financial planning and analysis teams ("FP&A"), which determined and preloaded the budgets onto its internal server. Once the budget was preloaded, each assisted living facility had one week to review the budget and respond to the Regional Vice President, Regional Director or Operations, and corporate FP&A with any comments or requests for changes. All changes and final approval of the budgets were made at the corporate level.

42.     As further detailed herein Section IV.F, staffing decisions for Brookdale's communities input into the budget were based on a uniform system, Service Alignment Software ("SAS"), a program that was developed, controlled, and maintained at Brookdale's corporate headquarters.

43.     According to Defendants' public filings:

*This system [SAS] is critical to the daily operations of Brookdale* and its independent subsidiaries who operate individual communities *and represents the*

---

[7] *See Edwards v. Brookdale Senior Living, Inc*., No. 2:16-cv-08191-BRO-JPR (C.D. Cal.), Dkt No. 1, Defendants' Notice of Removal of Action to Federal Court, ¶ 11.

16

*core of Brookdale's business. The Service Alignment System is also completely unique to Brookdale and distinguishes it from its competitors in the industry*.

44.     Thus, the SAS was a critical tool used in Brookdale's corporate budgeting process.

**C.      Brookdale Induces Consumers to Reside at Its Facilities by Promising Services Superior to Competitors with Sufficient Staffing to Create a "Home-Like" Environment Capable of Meeting Basic Care and Daily Living Needs**

45.     The primary market of the senior living industry is individuals age 80 and older. Brookdale's stated vision is "to enable those we serve to live well by offering the most integrated and highest-quality healthcare and wellness platform in the senior living industry." To carry out its vision, the Company's purported overall strategy is "to be the first choice in senior living by being the nation's most trusted and effective senior living provider and employer."

46.     Brookdale promises its residents that it will provide tailored services that meet the individualized and personal needs of its residents. The Company's senior living communities purport to offer residents "a supportive home-like setting, assistance with activities of daily living ('ADLs'), such as eating, bathing, dressing, toileting, transferring/walking, and licensed skilled nursing services."

47.     Brookdale marketed its home-like, individualized services through online advertisements to induce potential residents to come to their facilities. For example, Brookdale's website states:

> At Brookdale, we believe in delivering senior care ***that's tailored to you and your loved one based on those unique needs and desires***. That's why we provide a variety of options. ***This personalized approach ensures that you and your family get exactly what you need without paying for what you don't.***[8]

*       *       *

> When it comes to certain daily tasks, like bathing, getting dressed or personal grooming, is your loved one able to accomplish them safely? If they struggle to

---

[8] This representation appeared on Brookdale's website no later than August 8, 2017.

perform daily tasks, then assisted living might just be the right fit. ***At an assisted living community, caring staff members are available to help them accomplish these tasks,*** making life a lot easier than if they were living alone. This service provides peace of mind for them, as well as you. There's no need to take a chance on their health and safety, because ***our team of medical professionals can lend the right level of support that they need throughout the day.***[9]

*       *       *

***These communities often have programs and team members in place who can provide support with everything from assistance with daily living and basic care to recreational activities and transportation***.[10]

48.     At the time a new resident joins the Brookdale community, they are required to conduct a Personal Services Assessment ("PSA") to determine the requisite level of individualized care and services needed. The PSA is then used to place the resident in a "Care Group" based on the resident's needs.

49.     There are two categories of "Care Groups": Choice Personal Services and Comprehensive Care Options. Choice Personal Services includes providing for needs related to medication, nutrition, dressing and grooming, showering or bathing, bathroom assistance, escort and mobility and service coordination. Comprehensive Care Options include providing services to meet more serious assess needs, including chronic condition management, respiratory equipment, nebulizer nutrition, dressing and grooming needs for residents who cannot stand, bathroom assistance needs for residents who are catheterized, incontinent or cannot stand, two person or mechanical lifts, cognitive/psychosocial needs caused by memory loss, cognitive impairment and dangerous behavior reluctance to accept care, behavior management, wound care, smoking assistance and pet care.

---

[9] *See Gunza supra* n. (representing this statement appeared during the Class Period).
[10] *See Gunza supra* n. (representing this statement appeared during the Class Period).

18

50.     The PSA creates an expectation to consumers and investors that the residents will be allocated appropriate staffing to meet their needs based on the results of the PSA. Indeed, in its public website disclosures, Brookdale touts the benefits of the PSA and claims residents "can enjoy peace of mind knowing *we have staff onsite 24 hours a day, seven days a week, just in case you need us*:"

51.     Brookdale's website further touts:

When you decide to make your home at Brookdale, *one of the first things we'll do is work together to create a personalized service assessment.*

This gives us a chance to get to know who you are and how we can help you make the most of this season of life. It also gives you a chance to let us know what you want help with and what you would rather do on your own.

As part of this assessment, you'll help us know what programs and routines will work best for you. Maybe that means you need some help with things like managing medication and getting dressed in the morning. Or it might mean we help out with the kinds of food you need to eat to stay happy and healthy. Or it may just mean *you can enjoy peace of mind knowing we have staff onsite 24 hours a day, seven days a week, just in case you need us*.

*The best part of having a personalized plan is that you only pay for the care you need*.[11]

52.     Brookdale promises that the PSAs enable Brookdale to deliver "exceptional care and service" by finding out "exactly what your loved one needs" and determining the amount of staff required to deliver that care. Brookdale continuously reinforces this message. For example, as of at least April 23, 2020, Brookdale's website states:

Forget the cliché stories you've heard about seniors sitting around falling asleep to sit-com reruns. *When you move into a Brookdale assisted living community, you can enjoy a life rich in quality care*, genuine friendships and fun activities.

---

[11] www.Brookdale.com (last visited 11/16/20)

53. Reiterating its purported personalized and high-quality care, Brookdale further represents:

> *At Brookdale, you can expect us to be a trusted partner by listening and understanding your needs*, discussing potential solutions and options, mutually determining the right thing to do and working with you to take action together. Then *we customize a solution that puts the life you want within reach*. It is our job to provide solutions for the unmet needs of those who seek senior living solutions. We do this with 741 retirement communities serving around 65,000 residents (as of February, 2020), and with a wide range of innovative programs and services. We also offer a range of home health, hospice and outpatient therapy services to around 20,000 patients as of that date. Brookdale associates' passion, courage and true sense of partnership make Brookdale what it is. More than a company, it is a calling.

54. In the Company's uniform Resident Agreement, Brookdale similarly promises residents it will provide the services and assistance required for each resident as indicated by their PSA.

55. The PSA's are used to determine monthly fees—the greater the care needs as determined by the PSA, the higher the monthly fee according to the Care Group they are placed in.

56. Based on Brookdale's representations, residents and their families are led to believe that Brookdale offers high quality care and staffing to meet the needs of its residents.

**D.** **In Connection with its 2014 Acquisition of Emeritus, Brookdale's Stock Price Steadily Declines as the Company Saddles itself with High Debt Levels and Outdated, Dilapidated Facilities**

57. In connection with its acquisition of Emeritus in 2014, Brookdale acquired a number of outdated, dilapidated buildings that the market valued as decreasing shareholder value because they required significant capital investment. Indeed, since the Emeritus acquisition in 2014, Brookdale's stock has steadily declined:



58. Brookdale did not make those critically needed capital investments which caused a decline in its business performance and public valuation because there were a tremendous amount of inventory of dated properties, which drove perspective residents to competitor communities. As described by one comment posted on Indeed.com in March 2016, Brookdale had '"Cruise ship pricing with Motel 6 environment.' The perfect epitome of this company!" Upon information and believe, the buildings acquired from Emeritus were in horrible condition and understaffed.

59. CW5 similarly believed that Brookdale was unprepared and sold a bill of goods with respect to the Emeritus acquisition. CW5 stated that Blackstone[12] acquired a lot of Emeritus properties that had a lot of capital expenditure requirements and Brookdale would rarely spend money on a capital improvement. CW5 further stated that the Emeritus acquisition caused Brookdale to double in size overnight and the Company was not ready for that.

60. A February 9, 2016 article in Modern Healthcare noted that Brookdale ended 2015 with "flat revenue and a drop in occupancy as the company struggled to digest its $2.8 billion

---

[12] Brookdale and Blackstone Real Estate Partners VII L.P. ("Blackstone") entered into a joint venture in November of 2016 whereby Brookdale agreed to manage the properties owned by the joint venture.

21

acquisition of Emeritus Corp."[13] The article explained the backlash since the acquisition, concluding that the deal was "disruptive" due to employee turnover and falling occupancy, which led to shareholder activists gaining seats on the Board:

> Nashville-based Brookdale acquired Seattle-based Emeritus Corp. in a July 2014 deal that added 10 states to the company's portfolio. ***But the deal proved disruptive. Brookdale struggled with turnover of key employee and falling occupancy**. **Activist investors Sandell Asset Management, unhappy with the company's performance, last year pushed for a real estate transaction and eventually won seats on the board.***
>
> Brookdale directors—including two added to the board last year under an agreement with hedge fund Sandell Asset Management—have reviewed operations and endorsed the company's existing organization and long-term strategy, Brookdale CEO Andy Smith said on the call.
>
> Investors reacted to the news with a selloff and Brookdale's stock fell took a "surprising" dive on the news no real estate deal is in the works, Frank Morgan, an analyst with RBC Capital Market, said in an investor note following the company's earnings call.
>
> In light of the stock's recent weak performance, "we believed the market was already pricing this in, and are surprised by the magnitude of the selloff," he wrote. ***Brookdale's stock was already down 50% in the last six months, a sharper decline than the S&P 500, which has fallen 12% during the period, Morgan noted***.[14]

61. During the Class Period, and due in part to the Emeritus acquisition, Brookdale updated its operational strategy. In 2016, Brookdale undertook a review of its organizational effectiveness stating that it had "completed the final cutover waves of integration activities" in 2015 from the Emeritus acquisition, and "[w]ith integration activities largely completed" the Company purportedly "undertook a comprehensive review of [its] organizational effectiveness as part of updating [its] strategy."

---

[13] Melanie Evans, *Emeritus deal drags down Brookdale Senior Living results*, MODERN HEALTHCARE, Feb. 9, 2016, *available at* https://www.modernhealthcare.com/article/20160209/NEWS/160209855/emeritus-deal-drags-down-brookdale-senior-living-results.
[14] *Id.*

62.     As a result of the review, Brookdale claims to have adopted a refined strategy in 2016 to achieve consistent operational excellence in its core business. Execution of this strategy was purportedly intended to maximize the value of Brookdale's existing platform and to build the foundation for further growth. Pursuant to this strategy, the Company set forth the following "key priorities": (i) "*Enhance our customer and associate experience*"; (ii) "*Improve our marketing and sales processes*"; (iii) "*Simplify our organization*"; (iv) "*Optimize our portfolio and leverage scale*"; and (v) "*Innovate for growth.*" (Emphasis in original).

63.     As part of its new business strategy, Brookdale began disposing of certain owned or leased communities and restructuring leases. From 2016 through 2018, Brookdale described its strategy as resulting in the following:

> From 2016 through 2018, we disposed of an aggregate of 75 owned communities (5,396 units) as a result of these initiatives and other transactions (50 in 2016, 3 in 2017 and 22 in 2018). We also entered into agreements with our largest lessors that restructured a significant portion of our triple-net lease obligations. As a result of the transactions with HCP, Inc. announced in 2016 and 2017 and Ventas, Inc. and Welltower Inc. announced in 2018, as well as other lease expirations and terminations, our triple-net lease obligations on an aggregate of 201 communities (19,816 unites) were terminated from 2016 to 2018 (7 in 2016, 105 in 2017 and 89 in 2018). During this period we also sold our ownership interests in seven unconsolidated ventures and acquired six communities that we previously leased or managed. As of December 31, 2018, we owned 344 communities, leased 343 communities, managed 18 communities (7,426 units) on behalf of unconsolidated ventures, and managed 187 communities (20,361 units) on behalf of third parties.

64.     In early 2018, Brookdale announced a new "core operational strategy" that would purportedly "provide[] the best opportunity for [Brookdale] to create stockholder value." Brookdale described this strategy as follows:

> As a result of these initiatives and other lease restructuring, expiration and termination activity, and other transactions, since January 1, 2018 through February 1, 2020 we have:
>
> •     restructured our triple-net lease portfolios with our three largest lessors;

23

- terminated our triple-net lease obligations on an aggregate of 99 communities;

- acquired 32 formerly-leased or managed communities;

- disposed of an aggregate of 36 owned communities generating $288.3 million of proceeds, net of related debt and transaction costs;

- sold substantially all of our ownership interests in unconsolidated ventures, including our entry fee CCRC venture; and

- reduced our management of communities on behalf of former unconsolidated ventures and third parties.

65. As part of Brookdale's strategic changes, it also made changes in its leadership in February 2018. As detailed by the Company:

> In February 2018, the Board made several key decisions regarding Brookdale's path to delivering long-term value to our stockholders. At that time, we announced that the Board had concluded a lengthy strategic review process and that we would execute on a turnaround strategy under new leadership. Three former directors departed the Board, the Board appointed me as Non-Executive Chairman, and we appointed Lucinda M. Baier as our new President and Chief Executive Officer.

66. Specifically, as part of the strategic review, the Company announced that President and CEO Andy Smith would resign at the end of the month to be succeeded by defendant Lucinda Baier, who was CFO at the time. Additionally, Lee Wielansky was elected non-executive Coard chairman, replacing Executive Chairman Daniel Decker, who was retiring from the Board. William Petty, Jr. also informed the Board that he was retiring effective February 21, 2018. Bryan Richardson, Brookdale's Executive Vice President and Chief Administrative Officer, was also announced as leaving the Company effective March 9, 2018.

67. In fact, CW1 recalled that when Baier became CEO, Baier was 100 percent hands on and it was full force that she was going to get the business to make money.

68.     On August 10, 2018, Brookdale further announced that defendant Swain would join the Company as its Executive VP and CFO. Prior to joining Brookdale, defendant Swain had worked as the CFO for the DISH Network Corporation since October 2014.

**E.      Brookdale's Financial Results Further Suffer as Occupancy Declines Due to Increased Competition as Residents Favor Competitor's Newer, Updated Facilities**

69.     Exacerbating matters, the senior living industry in which Brookdale operates is highly competitive. Since 2016, the industry has experienced an unprecedented number of new facilities being opened. The increase in facilities is due to the fact that demand for senior care is expected to rapidly increase, as the 65 and older population is expected to continue growing to 16 percent in 2020, up from 13 percent in 2010. According to an Industry Market Research Report, as of 2018, the American senior care business industry revenue is expected to grow at an annualized rate of 3.3% to $92.8 billion. Based on this projected increase in need, the senior care industry has seen an unprecedented number of competitors entering the marketplace.

70.     As more newer facilities opened, occupancy at existing facilities, such as Brookdale's facilities, experienced a decrease in occupancy. According to data from the National Investment Center for the Seniors Housing & Care Industry ("NIC"), industry occupancy began to decrease in 2016 as a result of new competitor openings and oversupply, which Brookdale disclosed in its SEC filings "adversely affected" Brookdale's "occupancy, revenues, results of operations, and cash flow."

71.     The entry of competition created difficulties for Brookdale, not only because there were additional facilities for prospective residents to choose from, but also because these competing facilities were brand new, unlike many of Brookdale's older outdated facilities. The

25

Company's financial results were further impacted, including as a result of having to increase

discounts and offers to compete with competitor discounts:

> During fiscal 2016, we have focused on growing our occupancy while increasing
> rate over the prior year. ***During the third quarter of fiscal 2016, we experienced
> an adverse change in the competitive environment for our consolidated senior
> housing portfolio, with significant new competition opening in several of our
> markets***. The increase in competition was more heavily concentrated in our mid-
> sized markets. ***To address such competition, we have increased our use of
> discounts and incentives in order to maintain occupancy, which has impacted
> rate growth in certain markets.*** Despite our use of discounts and incentives, ***our
> growth rate of occupancy has not met our expectations***, particularly in mid-sized
> markets facing new competition.

72.     During the Company's November 1, 2016 third quarter earnings call, Defendant

Smith explained that the competition was the cause for a reduction in Brookdale's guidance:

> Good morning, and thanks for joining us. As always, we appreciate your interest in
> Brookdale. ***We're disappointed with our results for the quarter and with the fact
> that we have revised our guidance for the year. While we made progress in
> occupancy, rate, cash generation and on a number of fronts, we misjudged the
> effect of new competition in certain of our markets and our results were lower
> than we expected. Our management team and our board are laser focused on and
> acting with urgency to improve our operating results and to optimize our
> portfolio.***

73.     Defendant Smith further stated that the amount of competition was unexpected and

exceeded prior competition levels:

> While we have achieved a number of milestones in our turnaround strategy, it is
> taking longer than we expected to generate our planned level of improvement. As
> the second half of the year has unfolded, it has become increasingly clear that there
> have been several unfavorable developments in the competitive environment that
> have slowed our progress. ***During the third quarter, we experienced the highest
> amount of new competitors opening within 20 minutes of our communities than
> we have seen in many years. The number of openings in the quarter whose timing
> can be difficult to predict exceeded our projections***. Importantly, the market mix
> of new openings also changed. New openings in our larger metropolitan markets
> were consistent with recent averages. But new openings in our midsized markets
> were at the highest level in over a decade. For example, in the third quarter, using
> the markets defined by NIC as secondary or additional markets, new competitor
> openings within 20 minutes of a Brookdale community were more than double the
> level that we saw last year. At the same time, the number of our communities that

26

faced multiple competitor openings in these midsized markets, impacted us more than we anticipated. Our occupancy in markets like the NIC's secondary and additional markets, which represent more than 30% of our total units, only increased a little north of 10 basis points sequentially, which is well below our seasonal norms. We also did not get as much great rate growth in the quarter as we anticipated. In the markets with new competition, we were compelled to use more discounts and incentives to maintain occupancy. Although our same community revenue per unit increased 3.2%, it nevertheless fell short of our expectations due to this increased use of incentives. Based on our history, we fully expect that these midsized markets will regain strength. New competition is generally an intermediate term headwind and we are normally able to recorder within 12 months or so.

74.     Although the Company stated in November of 2016 that it "expect[ed] this elevated competitive environment to continue for the next several quarters," every year the Company pushed this timeline further. In 2019, the Company reported that it expected competitive pressures to continue "through 2019," reporting that

> ***Elevated rates of competitive new openings and pressures on our occupancy and rate growth continued through 2019***. On an industry basis, data from NIC shows that net absorption of units, a marker of demand, for the third quarter of 2019 was the highest single quarter since 2006. Projections from NIC, as applied to our product mix, suggest that annual absorption will be around equilibrium with new supply during 2020.

75.     As a result of increased competition adversely impacting Brookdale's bottom line, there was a huge push towards bringing new residents in and increasing occupancy.

76.     CW5 confirmed this was the case, recalling that there was pressure to bring people in and Brookdale would move residents in at all costs. During the last three months of CW5's tenure, it was all about getting move-ins. CW5 recalled the pressure on Executive Directors, District Directors and Sales was unfortunate, unfair and unethical. For example, CW5 stated that Brookdale moved residents into assisted living communities whose acuity was too high and thus they needed more care than what was typically provided by assisted living. Yet, if there were no facilities available to provide the needed care, the residents were moved into assisted living so

Brookdale could meet monthly occupancy goals even though they could not be properly cared for. The residents would then be moved out two weeks later when another room freed up.

77.     CW5 said that because Brookdale was publicly traded and had to report its occupancy numbers to "The Street," the Company pushed move-ins to occur by the end of the month, placing them in an inappropriate facility that could not provide the necessary level of care based on their acuity. CW5 recalled that Laura Schmid, the VP of Sales and Marketing, and Steve Flynt, the President of Operations, were driving these sales tactics and believed the sales pushes were coming from defendants Smith and Baier.

78.     CW5's account of move-ins being at the end of the month is consistent with what the Defendants reported. For instance, on May 6, 2020, Brookdale held an earnings call to discuss its first quarter 2020 results. During that call, defendant Baier stated: "So most of our move-ins occur at the end of the month."

79.     CW5's account is further confirmed by regulatory violations Brookdale received for not providing adequate services that match the acuity needs of patients. For example, on February 7, 2017, Brookdale's Brea community in California was cited by the State of California Health and Human Services Agency for "fail[ing] to provide the appropriate care and supervision" for a "resident [who] required closer supervision especially during the night time due to falls and wandering behaviors." The facility was cited as being deficient because "if a facility chooses to accept a particular resident for care, the facility shall be responsible for meeting the resident's needs as identified in the pre-admission appraisal."[15]

F.      **Brookdale Employs a Companywide Strategy of Decreasing Staffing at its Facilities Below What is Necessary to Provide Adequate Care in Order to Boost its Bottom Line and Meet Financial Forecasts**

---

[15] https://www.ccld.dss.ca.gov/transparencyapi/api/FacilityReports?facNum=306003639&inx=4

80.     It is well known that salary expenses relating to staffing Brookdale's facilities is one of the highest expenses in the annual budget. Indeed, CW1 confirmed that it is well known that staffing is the highest expense at any facility. As disclosed in the Company's 2019 Form 10-K, accrued salaries, wages and vacation is the highest cost, representing 46% and 42% of total accrued expenses for 2019 and 2018, respectively. As Brookdale further recognizes, "our financial results may be negatively impacted by increasing salaries, wages, and benefits costs for our associates."

81.     In order to compensate for Brookdale's decrease in occupancy and meet financial forecasts, Defendants orchestrated a comprehensive, undisclosed Company-wide policy to reduce salary expense by materially reducing staffing at its communities in order to increase profits and meet financial forecasts. As set forth herein, throughout the Class Period, Brookdale systemically understaffed its facilities, refused to increase staffing despite requests from its local communities, and refused to allocate additional budget towards staffing.

82.     Brookdale set and maintained its inadequate staffing levels through two primary means: (1) its manipulation of SAS, which determined the number of staffing needed at each facility; and (2) creation of a Company-wide budget based on SAS without money set aside for additional staffing needs. Brookdale enticed its employees to remain within those unreasonable limits by offering lucrative bonuses to those who complied.

**i.     Brookdale Manipulates its SAS System To Understaff Its Facilities**

83.     Throughout the Class Period, Brookdale utilized SAS to determine staffing needs. The SAS system is used Company-wide to determine the number of staffing hours needed at each community by quantifying the total daily counts of each type of care service provided and

multiplying each total count by an assumed average amount of labor time required for the respective service.

84.     The SAS system was supposed to be based on two categories of information: (1) assumptions regarding the amount of time required to perform daily living services, which were purportedly based on time studies Brookdale conducted; and (2) algorithms and a source code to purportedly take the results of the time studies, as well as the assessed needs of the residents and other parameters and factors, to set the number of required staffing hours on a daily basis.

85.     A declaration by Steven Boisen ("Boisen Declaration"), a Divisional Director of Service Alignment for Brookdale's southeast division, filed in a separate litigation against Brookdale, titled *Runton v. Brookdale Senior Living, Inc.*, No. 17-CV-60664 (M.D. Fla. 2017),[16] confirmed the SAS was supposed to inform the staffing budget. According to Boisen's LinkedIn profile, as Divisional Director of Service Alignment, Boisen's responsibilities included "[a]nalyz[ing] labor reports and provid[ing] guidance on staffing recommendations," among other things.[17] According to the Boisen Declaration, as of at least 2017, Boisen was responsible for training Executive Directors on the SAS system, which was "designed to support decision-making at the local level." The Boisen Declaration represents in relevant part:

> The Service Alignment System is a highly proprietary operating platform that is designed to support decision-making at the local level, . . . . This system is critical to daily operations of Brookdale and its independent subsidiaries who operate individual communities and represents the core of Brookdale's business.

86.     The Boisen Declaration described how benchmarks were established using the system, explaining in part:

> In general, a time study identifies an estimated time it takes to complete each particular task that a community's staff undertakes in providing care to residents.

---

[16] The Boisen Declaration was filed in the *Runton* action on February 1, 2018. Dkt. No. 94-2.
[17] *See Runton*, Dkt. No. 94-3 (linked-in profile of Steven Boisen).

During the five years since the inception of the Service Alignment Software, Brookdale has conducted numerous time studies to determine an expected time to complete various tasks associated with meeting resident care needs on specific variables and factors that Brookdale has identified through its institutional experience. These data points are then taken into account by the Service Alignment System, along with other sever other [sic] variables, to establish benchmarks that assist local communities in making staffing determinations.

87.     The Boisen Declaration further confirms that the time variables are only available

and known to those at the corporate level:

Brookdale's time studies are not publicly available and, in fact, are even not generally available within Brookdale or its independent subsidiaries. ***For example, Community-level associates and executive directors do not have access to Brookdale's time studies***.

88.     According to the Boisen Declaration, SAS is "comprised of unique algorithms and

source code" that only limited individuals at the corporate level have knowledge of:

***The development of the Service Alignment Software's underlying algorithms and source code was performed by a very limited set of Brookdale's own personnel***. This development occurred at Brookdale's direction and according to its strict specifications under the confines of confidentiality.

[] Since its development, significant efforts have been taken by Brookdale to maintain the secrecy of the Service Alignment Software. Neither the Service Alignment Software nor the reports generated from this system are publicly available. ***Access to the Service Alignment System is limited to appropriate decision makers and to those individuals directly involved in staffing decisions.*** And the platforms in each community where the Service Alignment Software is accessible are password protected and restricted to those individual department heads who have a particular need for access. Each person who has access must first be approved and the access granted is limited to only that information which is necessary to that person's job function and for the time frame necessary for that person to perform his or her duties. Furthermore, those limited people who are granted access can only do so from a properly registered computer. Moreover, ***no one at the community level have access to the underlying algorithms and source codes for the program.*** These are highly confidential.

89.     The Boisen Declaration further explained that various reports were generated from

SAS. One such report was the labor detail report:

[T]he data maintained within and analyzed by Service Alignment Software provides the ability to general a number of reports. ***One such report is known as a labor detail report, which is a daily report that identifies and compares the staffing benchmarks generated by the Service Alignment System (based, in part, on the acuity reports) to actual staffing levels derived directly from staff timecards.*** Brookdale has the ability to generate historical labor detail reports dating to when a facility began using the Service Alignment Program.

90.     As explained below, the labor detail and other reports were used to monitor staff hours and ensure that no one worked overtime, which would take away from Brookdale's bottom line. Indeed, throughout the Class Period, Defendants manipulated the inputs to SAS to cause SAS to generate underestimated staffing needs for every community and/or ignored SAS output and understaffed the communities. Defendants accomplished this by inputting into SAS false and inaccurate assumptions about the time required to carry out personal needs services and/or the amount of services to be provided to the collective resident population and by simply not providing the necessary staff to meet resident needs.[18] The end result was insufficient staffing to deliver Brookdale's promised services.

91.     When caregivers were not able to perform all the residents' services during their shifts, they requested additional staffing, a request that could only be approved at the corporate level. Requests for additional and adequate staffing, however, were never granted. Instead, Brookdale knowingly and purposefully used SAS to chronically understaff its facilities. Multiple former employees provide corroborating accounts.

92.     For instance, according to CW3, each resident underwent an assessment, the results of which were entered into SAS. The SAS program would then tell them how much care a resident needed per hour and how much staff was needed for the day. CW3 said every metric was assessed including dietary needs, ability to go to the bathroom and shower, among others. According to

---

[18] *See Gunza v. Brookdale Senior Living,* No. 3:20-cv-00353 (M.D. Tenn.), Dkt. No. 1.

CW3, his community was not staffed appropriately and there was a lack of care for residents because they were not allowed to hire additional staff based on the numbers provided by SAS. CW3 said that even if they entered someone with super heavy care needs into SAS, it still would not move the needle sufficiently to generate the need for additional staff.

93. CW3 recalled that a resident would pull a call light for assistance but no one would come to help. CW3 recalled receiving a call from a family who told him that their mother needed to go to the bathroom for the past two hours but no one came. That resident had to call her family because she needed help. CW3 stated that things like this happened all the time because the facility did not have enough staff. CW3 further explained that if a resident needed two caregivers to help them and one caregiver was busy, the resident couldn't be helped until the second caregiver was free. CW3 explained that he had over 30 people in the community, but was only allowed 2.5 people per shift. As a result, CW3 stated that each caregiver had 15 people assigned to them.

94. CW4 similarly explained that staffing determinations were based on resident acuity – the minutes tied to the specific needs of a resident. CW4 stated the levels of acuity were determined by the Health & Wellness Director, who conducted the Personal Care Assessment. Care levels were determined by finding out the average points for a resident. CW4 stated the information was captured in SAS.

95. CW2 further confirmed that staffing was determined by acuity level and the acuity report generated by SAS. CW2 explained that everything was timed and pre-allocated - for example, it takes five minutes to take a resident to the bathroom, seven minutes to help a resident with a shower, etc. CW2 explained, however, that the timing did not account for human factors. For example, CW2 stated that taking an elderly person to the bathroom, if they resisted, takes longer than five minutes.

33

96.     CW2 also explained that the communities he worked in had high acuity and activities of daily living, or "ADL". Residents needed a lot of assistance with ADL, such as dressing, going to the bathroom, and taking a shower. Yet CW2 stated Brookdale did not have enough staff - there was only one caregiver for every 40 residents.

97.     CW1 similarly recalled that staffing was determined by care need. For example, CW1 stated that if Resident A requires help with showers, meds, and transfers, that information would be entered into SAS. The information of every resident would similarly be uploaded to the system. CW1 said that SAS would then spit out the number of minutes it takes to help the residents, which would determine the number of staff needed. CW1 explained, however, that resident care is a fluid process and that while a resident may only need 15 minutes of care, if they have a fall, they would then need 60 minutes of care instead. CW1 further explained that you can't say every single shower is going to take 30 minutes. There may be someone who had a stroke and then fell and they are scared to death to take a shower. Assisting that resident is probably going to take an hour and 15 minutes. Yet SAS did not allow for such variances in care.

98.     According to CW1, staff at his level could not change the data input into SAS - only those at the corporate level could make changes. CW1 added that financial analysts from the "home office" along with Regional Directors were involved in the data inputs in SAS. Those home office employees, however, did not understand what was necessary to provide the required resident care or that modifications needed to be frequently made due to a resident's change in circumstances. Thus, SAS was not designed to update for such changes.

99.     As CW1 explained, residents with cognition deficits may not understand that they should not get up after a fall because they may fall again. That would require caregivers to provide one-on-one care to that person to prevent them from falling again. According to CW1 there was

no way to immediately go into SAS and change someone's service needs in real time if they just had a fall.

100. CW1 further confirmed that long-term staffing needs required approval from corporate as well. Before any increases in staffing could be approved, CW1 recalled that a team of people from corporate had to visit the facility and follow caregivers around on their shift to look for "opportunities" to shift workloads around in order to prevent bringing on additional staff. For example, CW1 recalled that a caregiver got coffee for five residents every day, which took an extra 15 minutes of their day. These 15 minutes were not included in SAS. Instead of hiring more staff, CW1 said the corporate team said dining should be responsible for providing coffee, and the caregiver could only get coffee if, and when, the resident asked for it. CW1 also described how the caregivers were supposed to engage in housecleaning and clean the residents' rooms on a daily basis, but CW1 stated there was no way caregivers could provide these services without an increase in housekeeping. If staff worked overtime, CW1 said he would have to answer for it. CW1 explained that the response was never to get more staffing, it was only how to tweak things and justify the SAS numbers. CW1 thought that this nickel and diming on minutes led to staff turnover because caregivers were left to run around like crazy trying to take care of residents. CW1 explained that Brookdale would burn and churn nurses who became frustrated as a result of understaffing.

101. CW1 further explained that the Executive Directors received monthly reports via email from Renee Brooks or the Regional Directors of Clinical Operations, Deanne Moore, showing total minutes spent on providing care by staff person at a particular facility. If the Executive Director in charge of a facility, including himself, was over its budgeted minutes, the Executive Director had to provide a reason for being over to the Regional Directors of Operations

35

and the Regional Director of Nursing. CW1 stated he was never asked why the budget was over or if he needed more staffing. Instead, it was all about controlling costs and the bottom line rather than helping the community.

102.　According to CW1, the corporate office was well aware that facilities were experiencing systemic staffing shortages.　In spring or summer of 2018, CW1 recalled that defendant Baier visited certain communities in Oregon, including CW1's facility, to witness the problems with inadequate staffing firsthand.

103.　CW5 similarly thought the Brookdale communities were understaffed and that SAS was not a good method for determining staffing for communities. CW5 stated that SAS flowed out of Brookdale's corporate offices and there was a whole department of service alignment experts who told them what to do via data, reports, and numbers.

104.　CW5 stated that SAS was all about getting in and getting the job done and it did not care about the residents. While CW5 stated the Personal Care Assessments were conducted to determine labor and staffing, he thought they were mostly there to nickel and dime the residents. CW5 thought most of the staffing came from SAS. CW5 further stated that Brookdale was about cutting its staffing and it was all about numbers. CW5 elaborated that staffing cuts were made at the community level and included caregivers, nurses, dietary people, and activities. CW5 was constantly being told to cut staff by Steve Flynt, Frankie Knighton, and Ray Oborn. CW5 believes the directives came from the C-Suite, meaning defendants Baier and Smith.

105.　CW5 further stated that he attended calls with Steve Flynt and Frankie Knighton, as well as some clinical care people and corporate people to discuss labor, staffing and overtime and how to reduce them. According to CW5, during these calls, Flynt, Knight, and the other individuals looked at labor schedules and asked the Executive Directors and District Directors of

Operations to reduce overtime and staff. CW5 stated that Flynt and Knight used a program to monitor and analyze hours spent where they compared actual hours with those budgeted by SAS to get a positive or negative variance.

106.    CW5 stated that the understaffing had a negative impact on care where some residents did not receive the care they paid for.

### ii. Brookdale Controlled and Limited Its Budget to Deny Staff Increases And Achieve Financial Performance Goals

107.    Brookdale limited staffing at local communities by controlling their budget. The budget for each community was set by the corporate FP&A group, which determined and preloaded the budgets onto its internal server. Once the budget was preloaded, each assisted living facility had one week to review the budget and respond to the Regional Vice President, Regional Director of Operations, and corporate FP&A with any comments or requests for changes. The employees working at the facilities would only have read access, meaning they could not change any of the preloaded amounts. All changes and final approval of the budgets were made at the corporate level.[19]

108.    The budgets were set once a year and could not be changed. The budgets did not allow for extra staff, and even if budgets increased based on an increase in residents, additional staff was still not provided. The budgets were also strictly enforced and any deviation had to be approved by Defendants. If the local communities did not stay within that budget, they were required to explain why they were outside the budget through frequent meetings and calls.

109.    According to CW2, the budget was based on the previous year and current consensus, or number of residents. If your building was 40 percent occupied at the time the budget

---

[19] *See Gunza, supra* n. 18.

was made, the budget was made based on that 40 percent. If your occupancy increased to 90 percent over the course of the year, you still had to work within the old budget. No adjustments were made even though costs went up because you had more people to care for. CW2 stated staffing levels had to remain the same in order to keep in line with the budget for monthly salaries.

110.    CW2 stated that every month he received a financial report from corporate containing wages and associated tax expense budgets. The Executive Directors were told they could not go above those numbers or they would receive a call from the District supervisor and have to explain why they were over budget. CW2 stated when he was a Regional Director, he would have to question the Executive Directors as to why they were over budget.

111.    CW2 also explained that everything was centered on the community's Net Operating Income ("NOI").[20] Communities had to make their NOI every month or would have to write reports explaining why they went over budget and how they planned to cut costs. CW2 stated that typically, costs for staffing and food budgets were cut.

112.    CW2 further recalled that he was given a budget for the year in March, three months after the year had already begun, instead of December of the prior year. Thus, by the time CW2 received the budget, he was already three months in the hole because he only just learned where the budget had been cut. CW2 stated that he received what was known as a "Red Light, Green Light Report." This was a monthly excel spreadsheet that was color coded. Green meant you were within your budget, yellow meant you better watch these areas, and red was over budget. CW2 said if you were over budget, there was an area for you to write the reason you were over budget.

113.    CW2 further recalled that a majority of the new Emeritus buildings acquired by Brookdale were Medicaid recipients whose acuity needs were high. Brookdale only received a flat

---

[20] Net Operating Income is used interchangeably with Facility Operating Income.

rate to cover their care and the Brookdale communities were told to stay within the staffing and budget numbers, but those numbers were not realistic. CW2 recalled that they needed more staff to adequately care for those people but the communities were not allowed to hire.

114.    CW4 similarly explained that as a District Director of Sales and District Director of Operations he was involved in the budgeting process. CW4 recalled that budgeting started with the community team and the Executive Director who would submit what they wanted for the budget. CW4 would then analyze the requests and lay out what the Executive Directors were asking for and why. The budget then went to Frankie Knighton, the Regional VP, followed by Steve Flynt, the President of the Western Division, for approval. Steve Flynt reported to defendant Baier. CW4 stated that Flynt would always find a way to make cuts so some of the requested budget was eliminated. CW4 further believes that Defendant Baier and Mary Sue Patchett, the EVP of Community and Field Operations, were also involved in finalizing budgets.

115.    According to CW4, the goal at Brookdale was to have high operating margins. CW4 recalled that Flynt would enforce the budget and if there were overages, CW4 would have to have weekly calls with Knighton and Flynt to provide an explanation for the overage. CW4 stated there was a CRM system, Brookdale's lead database platform, to log into to see where budget overages were occurring, and he would have calls with the Executive Directors in his district if they were not meeting Net Operating Income. The CRM included information such as all sales (leads), occupancy trends, overtime, and overage of spend. Overtime had to be kept to 2% or under in order to achieve NOI. CW4 stated that defendants Baier, Smith and Swain had access to CRM.

116.    CW4 also stated that throughout CW4's tenure, Patchett held monthly calls with district leaders to discuss occupancy leaders, residency, NOI most gain to date, staffing, and overtime. CW4 recalled that Patchett would point out double dippers – communities that were

running over on staffing and overtime. CW4 stated if you were identified as a double dipper you had to constantly be on calls with corporate to discuss it. CW4 recalled that defendant Baier would participate on these calls.

117. CW5 believed that Brookdale started to make up the difference in its losses by cutting expenses, including food costs, staffing and supplies. The Company's financial statements confirm CW5's account - Brookdale reported net losses for the years-ended December 31, 2017, 2018 and 2019 of ($571.6), ($528.4) and ($268.5) million, respectively.

118. CW5 stated they were cutting costs at Brookdale. CW5 stated that he would be asked for his input at budget time by the Regional Vice Presidents and financial people at the corporate office, and then him and the Executive Directors would submit their budget requests. CW5 stated that the budget was approved or modified at the corporate level. A couple of weeks later, he received a budget back that did not look anything like what he had requested. CW5 said the budgets were cut to the bone and were not realistic to properly run an assisted living community. CW5 stated that the budgets were a joke, similar to SAS.

119. CW5 further recalled that if communities were over budget there was a lot of screaming and the hammer came down, meaning there were more operations calls with the Executive Directors about negative variances and they were going to get back in line. CW5 recalled that there was a lot of pressure to get things back in alignment with the budget, particularly from Frankie Knighton.

120. CW5 further stated that weekly calls with the Executive Directors were held about the movie-ins and there was a push to achieve the forecasted move-in numbers. CW5 stated that Schmid and Yvonne McLaughlin would participate on those calls.

40

121.    CW5 also believed that resident care was impacted by Brookdale's initiatives related to home health services. CW5 explained that each community previously had a therapist within the community who provided physical, occupational and speech therapy to residents. CW5 recalled a huge initiative to get rid of that and develop a home health agency within Brookdale. The districts were directed to drive business through the home health agency but Brookdale was incapable of managing that business. CW5 stated that it eroded the quality of care Brookdale could provide to residents and was a big issue in Colorado. As with Brookdale's management of the Emeritus acquisition, CW5 thought Brookdale was not good at managing the home health business. CW5 stated that he thought the services were inadequate and did not start in a timely manner and that there was an overall lack of follow-up

122.    According to CW1, he was only involved in the budget process once, otherwise the budget was made and finalized without Executive Director approval or input. CW1 thought that was insane because the Executive Directors were the ones running the facilities. CW1 stated that throughout his tenure, he received his budget telling him what his goals were for the year. CW1 further recalled that he would have meetings with his director once a month or quarterly to discuss the budget. CW1 stated he knew exactly where he was at any given month and year based on the reports he was sent from his director, which closely monitored the facilities' operating performance.

123.    CW1 explained that his regionals would have to report the budget information up the chain. CW1 believes that the Divisional Presidents had meetings with corporate every 3 to 6 months about the budget. Prior to defendant Baier becoming CEO, CW1 believed the Division Presidents most likely met semi-annually or quarterly. CW1 explained that once defendant Baier

41

became CEO, she was hyper-focused on showing instantaneous growth and there was increased oversight on occupancy and expenses once defendant Baier arrived.

124.     CW1 stated that every January Brookdale increased its fees on rent and level of care. While CW1 proposed suggested increases, it was ultimately someone above her who would decide the number, even if it was not what CW1 suggested. Residents then received a letter stating the increase in rent and care, which was sometimes as much as ten percent. CW1 stated the letter would have his name on it even though he had never seen it before. CW1 also recalled that despite increasing resident fees. Brookdale did not increase staffing. CW1 further added that Brookdale would cut staff and costs and try to sell prospective residents on the performance of a community. While the community looked good on paper, no staff and no money was invested on community upkeep.

### iii. Brookdale Incentivizes Employees to Acquiesce to its Understaffing By Rewarding Them With Bonus Incentives

125.     To entice its employees to stay at or below Brookdale's limits for staffing and expenses, Brookdale created and implemented a lucrative bonus and incentive program tied to meeting or exceeding Brookdale's financial performance targets. These programs provided facility department heads and Brookdale's senior management significant bonuses for staying at or below Brookdale's budgeted expense limits—the largest of which was staffing. If a communities Net Operating Income was better than projected, there would be a percentage of that bonus, usually around March of that year.

126.     CW1 confirmed that there was a bonus structure at Brookdale based on of total revenue for that year and other factors, such as regulatory compliance. This was available to certain positions, including Executive Directors, Registered Nurses, and those at the Vice President level.

42

The bonus would go up depending on your position and how much your facility made. According to CW1, the bonus structure allowed you to make good money if you met your goals.

127. CW2 similarly stated that bonuses were given out in March and depended on the NOI for the prior year.

128. CW4 similarly reported that there was a bonus incentive tied to meeting or exceeding financial targets but they were only give to management and not caregivers. CW4 stated there were three or four metrics that determined someone's bonus. CW4 stated he would get a full 20% bonus if he hit NOI, kept overtime under control, had positive reviews, etc. If CW4 did not hit all the metrics he would receive some percentage of that.

129. CW5 confirmed there was a structure based on budgets and NOI and that Executive Directors had their eye on NOI rather than the quality outcomes for residents. CW5 stated that bonuses were a percentage of NOI along with other factors, such as occupancy and management, but that it mainly boiled down to NOI.

130. Accordingly, Defendants were able to enforce the limited staffing numbers determined by SAS by enticing its Executive Directors and other community managers to stay within their bonus goals. By promising a lucrative bonus, these individuals were more likely to enforce corporate's denial of staffing requests and keep staff overtime hours to a minimum to meet their NOI.

G. **Brookdale Residents File Complaints and Regulators Issue Violations Relating to Inadequate Staffing, Poor Services and Safety Concerns**

131. As a provider of senior living healthcare in 45 states, Brookdale is subject to extensive federal, state and local regulations concerning a variety of its operations. This includes laws and regulations impacting licensure, protecting consumers against deceptive practices, the management of property and equipment, and the management of operations, such as fire, health,

43

and safety laws and regulations, and privacy laws. Brookdale is also subject to federal and state laws governing Medicare and Medicaid, which regulate allowable costs, pricing, quality of services (including appropriate staffing levels), quality of care, food service, resident rights (including abuse and neglect) and fraud. There are further federal and state residents' rights statutes and regulations that Brookdale must comply with, as well as Anti-Kickback and physicians' referral ("Stark") laws, and safety and health standards set by the Occupational Safety and Health Administration.

132.     Given the pervasive understaffing and inadequate care at Brookdale's facilities, Brookdale received countless citations for violating numerous staffing and quality of care laws and regulations.   For example, throughout the Class Period, numerous reports of inadequate staffing were issued by the California Department of Social Services' Community Care Licensing Division ("Community Care Licensing"), the state agency that regulates assisted living facilities. This includes, but by no means is limited to, the following examples of citations and complaints:

  i.    In June 2016, Brookdale's Oceanside facility received a citation because it only had two caregivers on duty during daytime hours in the assisted living part of its facility.[21]

  ii.   In November 2016, a licensing inspector found that even though a resident at Brookdale's Cherry Hills facility was paying for regular incontinence checks, she was left lying on the floor for an extended amount of time after a fall because staff failed to check on her.[22]

  iii.  On December 24, 2016, 20 residents at Brookdale's Palm Springs facility missed their meds because there was no med tech on duty, leading to a citation from the Community Care Licensing.[23]

---

[21] *See* California Department of Social Services, https://www.ccld.dss.ca.gov/carefacilitysearch/.
[22] *See Id.*
[23] *See Stiner v. Brookdale Senior Living, Inc. et al.*, No. 17-cv-03962 (N.D. Cal.), Dkt No. 52 (Second Amended Complaint for Declaratory and Injunctive Relief).

44

iv. During a January 2017 visit at Brookdale's Orangevale facility, a licensing inspector tested an emergency call pendant and found it took over 45 minutes for facility staff to respond.[24]

v. In February 2017, a personnel report Brookdale filed with Community Care Licensing indicated that Fountaingrove, a facility in Sonoma County, was understaffed for the night shift from 10p.m to 6 a.m. The schedule filed lists only four resident caregivers assigned to the night shift, three of whom only work three days a week, with the result that in many instances there were as few as one resident caregiver on duty during the night shift to care for approximately 100 residents on three floors.[25]

vi. In March 2017, the Community Care Licensing cited a Brookdale facility in Santa Cruz County after a licensing inspector found that the facility did not have adequate staff to meet its residents' needs.[26]

vii. In March 2017, the Community Care Licensing cited Brookdale's Fountaingrove facility after a review of the pendant system revealed many instances of extremely lengthy response times, noting in particular a pendant pressed at 5:23 p.m. which was not answered for over 39 minutes and a pendant set off at 5:45 p.m. to which staff did not respond for one hour and 27 minutes.[27]

viii. In 2018, Community Care Licensing issued a citation to Brookdale's Corona facility after a licensing inspector found "that there are not enough staff present" as there were only 2 staff present for three days on the night shift. Later in the year, Community Care Licensing issued a similar citation when there was not sufficient staff present to attend to the needs of the patients in the dining hall.[28]

133. Similar violations were reported throughout the country and by other regulatory bodies, some of which resulted in civil fines and penalties. For example, the following are just some examples of statements of deficiency Brookdale received:

i. On September 8, 2016, the Oregon Department of Human Services issued a violation for Brookdale's Geary Street facility in Oregon for having "failed to adequately assist Resident #1 and Resident #2 with toileting services in a timely manner. Residents had to wait up to 44 minutes after

---

[24] *See id.*

[25] *See Id.*

[26] *See* California Department of Social Services, https://www.ccld.dss.ca.gov/carefacilitysearch/.

[27] *See Stiner, supra* n.23.

[28] *See* California Department of Social Services, https://www.ccld.dss.ca.gov/carefacilitysearch/.

45

pressing their call light. This failure is a violation of Oregon Administrative Rules."[29]

ii. On May 24, 2017, the Colorado Department of Public Health & Environment issued a citation for Brookdale's Boulder Creek facility for having "failed to employ sufficient staff to ensure the provision of service necessary to meet the needs of two sample residents." The citation found that several residents waited anywhere from between ten minutes to over an hour before staff responded to resident calls. According to the citation, one resident was told to go to the bathroom in his/her incontinence brief because there was not enough staff to help the resident use the toilet. When interviewing the staff, the staff stated "[w]e need more staff. Some residents need more time and we don't have enough staff to attend to everyone." The staff further reported that "residents[] that need extra help, like a two person transfer, they take from the others (who need less assistance) and the others have to wait."[30]

iii. On July 31, 2017, California's Health and Human Services Agency issued a citation for Brookdale's Mirage Inn, finding insufficient staffing and a failure to provide timely medical treatment. The citation stated that a civil penalty was issued.[31]

iv. On August 23, 2017, Florida's Agency for Healthcare Administration found that "staff d[id] not respond when the call light [wa]s activated" and "a record review of the facility's Resident Council Committee Meeting minutes for the past 6 months in addition to the facility's Grievance Log for the past 6 months shows that the residents are constantly bring [sic] up the topic of staffing and the call light system response time every month without any resolution." The deficiency report also found a "failure to maintain [sic] a pest free environment," noting the Department of Health inspection had already issued citations for pest issues.[32]

v. On December 11, 2017, the Colorado Department of Health and Environment issued a citation for Brookdale's Boulder Creek facility in Colorado for untimely responses to resident call times.[33]

vi. On May 31, 2018, the California Department of Social Services issued a citation for Brookdale's North Fremont facility in California, finding a "fail[ure] to ensure adequate staffing is present to meet the needs of the

---

[29] *See* Ltclicensing.oregeon.gov.

[30] *See* https://www.colorado.gov/pacific/cdphe/find-and-compare-facilities.

[31] *See* https://www.ccld.dss.ca.gov/transparencyapi/api/FacilityReports?facNum=336410691&inx=8

[32] *See* http://apps.ahca.myflorida.com/dm_web/DMWeb_Docs/8132998.pdf.

[33] *See* https://www.colorado.gov/pacific/cdphe/find-and-compare-facilities.

residents" and that "[s]taff admits to ongoing issues with insufficient staff." The citation was a result of one resident being left alone with a food tray when the resident required assistance while eating, and later that day observing the same resident laying in dried feces. This was a "repeat violation within 12 month period" resulting in an "immediate civil penalty" of $1,000.[34]

vii. On July 1, 2019, California's Health and Human Services Agency issued a citation for Brookdale's Loma Linda facility in California for having "failed to meet resident's needs." According to the investigation report, there was a power outage and a resident who was on 24 hour oxygen did not have an emergency supply of oxygen, despite paying for an emergency supply. The resident called for help at 10p.m. but care staff never came. At approximately 12a.m. the resident called 911.[35]

134.    Further reports of neglected care or resident deaths were rampant throughout the Class Period at other Brookdale facilities, including:

i. In November 2016, a resident in the Brookdale Paso Robles facility pushed her emergency pendant after falling in her room. The resident waited 22 hours on the floor with broken bones until staff finally found her.[36]

ii. In November 2016, a resident at Brookdale's Fountaingrove facility fell, injured her head, pressed her call pendant, and waited thirty minutes bleeding profusely from her head before staff arrived. She died 10 days later.[37]

iii. In January 2017 a former resident of Brookdale's Fountaingrove waited three hours for staff to respond to a call.[38]

135.    There were also instances of resident deaths that could have been avoided. For example, on July 27, 2016, a 90-year-old resident named Bonnie Walker was shown in a video recording walking out of a Brookdale facility in South Carolina. Ms. Walker had dementia but was

---

[34]*See* https://www.ccld.dss.ca.gov/transparencyapi/api/FacilityReports?facNum=015601255&inx=12.
[35]*See* https://www.ccld.dss.ca.gov/transparencyapi/api/FacilityReports?facNum=366409010&inx=13
[36] *See Stiner, supra n.* 23.
[37] *See Id.*
[38] *See Id.*

placed in a facility not suited for dementia patients. Until Ms. Walker could be moved to a unit that better suited her needs, Brookdale had a treatment plan in place that required her to be watched around the clock due to her dementia. When Brookdale's door security bell chimed at 12:15 a.m., however, no one was watching Ms. Walker and none of the staff noticed her leave. Ms. Walker wandered out back where there was a pond with alligators. When Ms. Walker was not present the next morning, staff when to look for her and found parts of her body in the pond.[39]

136. The Department of Health and Environmental Control ("DHEC") investigated the incident and found that the facility staff did not follow their own guidelines to conduct night checks on the resident, a plan that was put in place when Ms. Walker had wandered off before. In fact, just days prior she had left the facility "looking to go home."

137. At the time of the investigation of Ms. Walker's death, the DHEC had followed up on 15 complaints against Brookdale since 2013 alleging that the facility accepted people beyond its capacity to serve, that the response time to resident calls was poor, that necessary records were not kept, and that medications were not given correctly. Eight of these investigations ended in a citation.

138. Another example of a preventable death also occurred in August 2016 in Tulsa, Oklahoma. Brookdale staff took nine residents for a drive around town, which they did weekly. It was a 90degree day. When they returned Friday evening, the residents got off the bus and the bus was locked up for the weekend. However, only eight residents got off the bus and one resident, Mary Schelct, was locked in the van and perished. Ms. Schelcht was ultimately found by her own daughter after a search of the facility came up empty. According to reports, Ms. Schelcht was

---

[39] *See* https://www.postandcourier.com/news/charleston-assisted-living-facility-where-woman-was-killed-by-nearby-alligator-could-face-enforcement-from/article_537435a2-624c-11e7-9288-8b8d44af7005.html.

found in the stairwell of the bus, indicating she was trying to get out of the bus but was unable to do so because it was locked.

139. After investigating this incident, the State Department of Health filed a report that found the facility neglected to provide supervision to prevent Ms. Schelcht's death. Brookdale consequently set new policies and procedures with respect to taking residents off campus, such as counts on and off the bus, family permissions, and approvals for who drove the bus.

140. In addition to violations, throughout the Class Period, Brookdale faced accusations of understaffing in numerous lawsuits highlighting Brookdale's common practice of charging residents for services they do not receive.

141. For example, on March 24, 2017, a former employee filed a lawsuit against Brookdale, titled *Rejuso v. Brookdale Senior Living Communities, Inc.*, Case No. BC655101, Dkt. No. 1 (Cal. Super. Ct. 2017). The lawsuit alleged that the plaintiff was assigned to provide one-on-one care for residents who were paying for that extra care option. The plaintiff alleged that one such resident required one-on-one attention in excess of six hours. When Brookdale began scheduling the plaintiff's care with that of multiple residents, the plaintiff complained to her supervisor. The supervisor stated she had no choice but to help multiple patients at the same time because the facility was understaffed. This allegedly resulted in a reduction of the plaintiff's hours to only one hour per week.

142. On April 4, 2017, a class action lawsuit was filed against Brookdale, titled *Runton v. Brookdale Senior Living, Inc.*, No. 17-CV-60664 (S.D. Fla. 2017) ("*Runton*") alleging violations of the Florida Deceptive and Unfair Trade Practices Act, Section 501.201, *et seq.*, breaches of contract, and other violations of Florida state law. The violations primarily concerned understaffing in Florida senior living facilities that were operated by Brookdale, including that

49

there were staffing shortages despite having contracted for more personalized care according to each resident's PSA. The plaintiff in *Runton* alleged that Brookdale misrepresented the level of care that a resident would receive by not having the level of staffing that the residents required. Gloria Runton, the named plaintiff, alleged that she was charged extra fees for personal care, with the amount increasing drastically for increased personalized care throughout her residency at a Brookdale facility. Ms. Runton alleged that she did not receive increased care despite being charged more by Brookdale and that Brookdale ignored or refused her repeated requests to provide her personal documentation to her. Among other things, *Runton* alleges that Brookdale controlled the staffing levels from their corporate headquarters in Brentwood, Tennessee, implementing a uniform corporate policy of controlling staffing levels based solely on corporate profits as opposed to the individualized staffing needs at each facility. *See generally Runton*, Dkt. No. 1.

143. On July 10, 2017, the court denied Brookdale's motion to dismiss, crediting the plaintiff's allegations, *see id.*, Dkt. No. 36, and granted in part a motion for judgment based on the pleadings on February 2, 2018, *see id.*, Dkt. No. 97. The parties settled the litigation prior to trial, which was approved by the court on March 23, 2020. *See* Dkt. No. 156.

144. On July 13, 2017, a class action complaint was filed in the Northern District of California alleging violations of consumer protection laws, among other violations, against Brookdale, titled *Stiner v. Brookdale Senior Living, et al.*, No. 4:17-cv-03962. The action was brought on behalf of nine named plaintiffs, each of whom were residents at a Brookdale facility and received inadequate care due to a lack of staffing. The complaint alleged that "corporate policy and procedure of providing pre-determined staffing at its facilities precludes BROOKDALE from providing the care and services residents have been promised and places all residents at substantial risk that they will not receive the care and services that they have paid for on any given day."

50

145.     For instance, named plaintiff Stacia Stiner alleged that, among other things: (i) she had to wait anywhere from 10 minutes to an hour for staff to respond and take her to the use the bathroom, sometimes causing her to urinate in her bed; (ii) she frequently had to call the outside line when staff did not respond to her call pendant; and (iii) due to short-staffing, caregivers often left her in the middle of assisting her with bathing or toileting because they had to respond to call pendants or because they had left another resident on the commode to respond to Stiner. According to another named plaintiff, Ralph Schmidt, he waited 20-30 minutes when he used the call button to summon an escort for each meal, and his apartment was rarely clean despite paying for cleaning services. Schmidt also alleged that he was previously a resident of Emeritus and thought the care he received there would remain the same when it was acquired by Brookdale, but it did not. Art Linstrom, yet another named plaintiff, alleged, among other things, he required special dietary needs for his diabetes, which was a service he paid for. Brookdale's understaffing, however, meant there were too few caregivers to pay attention to his diet so he received oversized meals that were not appropriate for someone with diabetes, causing him to gain 20 pounds, which exacerbated his difficulty walking, put him at risk for complications from diabetes, among other consequences. Lindstrom further alleged that he paid for physical therapy but the physical therapist left six months after he arrived at Brookdale and a replacement was never hired.

146.     On October 16, 2018, an individual plaintiff sued Brookdale and defendant Baier, later removing the action to federal court on February 21, 2019. *See Johnson v. BLC Lexington SNF, LLC d/b/a Brookdale Richmond Place SNF*, 5:19-CV-00064 (E.D. Ky. 2019). The operative complaint brought claims of negligence, breach of contract, fraud, misrepresentations, and other related claims. As alleged in the third amended complaint filed on March 15, 2019, as a result of understaffing, the plaintiff suffered physical injuries such as poor hygiene, failure to have a

surgical wound cleaned, contracting infections, including Methicillin-resistant Staphylococcus aureus, unnecessary pain and suffering, loss of dignity, emotional distress, and hospitalization. *Id.* at Dkt. No. 1. The plaintiff alleged that the defendants engaged in a fraudulent scheme in which they misrepresented the number of staff and the care a resident would receive.

147. On May 3, 2019, another class action lawsuit was filed on behalf of current or former Brookdale residents of facilities located in North Carolina and Florida, titled *Bright v. Brookdale Senior Living, Inc.*, 3:19-cv-374 (M.D. Tenn. 2019) ("*Bright*"). *Bright* similarly involved claims of understaffing, alleging "a scheme of understaffing and coverup through misrepresentations, misleading statements, and concealment of material facts." *Id.* Dkt. No. 1. The lawsuit alleges that rather than using their advertised PSA system, Brookdale used its SAS system to staff facilities. The plaintiff alleged that SAS was based on false assumptions, including that the time required for tasks was based on faulty time studies, and that Brookdale deliberately underestimated the time required by each service which allowed Brookdale to reduce labor costs and achieve its financial performance thresholds. Additionally, the lawsuit alleges local facilities are prohibited from making staffing decisions without corporate approval.

148. One of the named plaintiffs, Leonard Foote, was alleged to have paid more for personalized services. Mr. Foote suffered from memory and cognitive problems, had a pacemaker and coronary artery disease, all of which required additional care. While a resident, however, Brookdale staff failed to bring Mr. Foote to his required appointments as it promised due to understaffing. After Brookdale failed to bring Mr. Foote to an appointment that was needed for his pacemaker, Mr. Foote passed away.

149. Similarly, a second named plaintiff in *Bright*, Jean Howard, allegedly paid more for personalized services at a facility in North Carolina but Brookdale failed to routinely administer

52

her medication, causing a decline in her physical and mental health. Despite receiving questions and complaints from Ms. Howard, her doctor, and her son regarding her medication not being administered to her, Brookdale refused to alter their behavior.

150. The confidential witnesses also recall instances of noncompliance with laws or regulations.

151. According to CW2, compliance with local and state regulations was the responsibility of the Executive Director at that community. CW2 recalled that the Medicaid buildings they acquired from Emeritus were infested with bed bugs, which were expensive to treat and never go away. CW2 stated it was not within his budget to treat the building every month. While CW2 wanted to treat the whole building, the Regional Director told him to only spray the room where the infestation was reported.

152. CW1 elaborated that with respect to regulatory compliance, audits, checks and site visits were conducted by the Regional Director of Operations and the Regional Director of Nursing. Among other things, CW1 explained that the site visits were supposed to look at high touch residents, service plans, and whether residents were receiving the right number of minutes of care. The audits were a minimum of three days. CW1 recalled that there were issues with site visits from the Regional Nurse and that there were communities that had problems and compliance issues but did not have recent visits from the Regional Nurse. CW1 was not sure why certain communities would have compliance issues visit after visit yet no one would check up on them. CW1 said Brookdale was quick to blame the Executive Directors when there were issues but if visits were occurring every quarter as they were supposed to then that would not have been happening. CW1 wondered if someone is supposed to be submitting a report a site visit and they hadn't, why wasn't anyone following up on that?

53

153.     According to CW1, after a site visit an email was sent out identifying what issues were supposed to be revisited on a daily basis. CW1 explained that after the email was sent, Regional directors were supposed to call on a weekly basis to ensure the necessary changes were made within 30 days from the initial visit. CW1 explained that these follow-up calls never occurred and that was why there continued to be violations related to staffing. CW1 added that issues with staffing were rarely tracked in emails. Brookdale was strategic and HR would set up calls rather than put things in writing. CW1 explained that everyone knew that Brookdale had their fair share of lawsuits so they would call instead of putting things in writing. CW1 added that Brookdale was internally referred to as "Brookdale Crookdale."

### H.     The Gunza Lawsuit is Filed, Exposing Brookdale's Understaffing for the First Time

154.     On April 24, 2020, Plaintiff George Gunza filed a consumer class action against Brookdale in the U.S. District Court for the Middle District of Tennessee, which exposed Brookdale for, among other things, "systemic unfair and deceptive trade practices and breaches of contract" since April 24, 2016. *See Gunza v. Brookdale Senior Living,* No. 3:20-cv-00353 (M.D. Tenn.), Dkt. No. 1. What was previously hidden from investors would soon come to light as the result of this lawsuit's firsthand account of what occurred behind closed doors.

155.     As alleged in the complaint, Brookdale promised tailored services to meet the individualized and personal needs of residents, touting there was "an army of passionate associates" to provide such services. The plaintiff alleged that the sales and marketing and Residency Agreements led consumers to believe that residents would be provided enough staff in its facilities to deliver the basic care and living services as required and determined by Brookdale's

assessment program. As identified in the complaint, some of these misrepresentations include the following statements posted on Brookdale's website:[40]

> (a) [W]e make every effort to ease your loved one into a comfortable and enjoyable lifestyle, ***offering individually tailored personal care options to perfectly suit their needs.***

> (b) Your health is our top priority, and we have programs in place to help you maintain and stay on top of your health. Here are some care services you'd likely find at our assisted living communities: ***A personalized service assessment and plan where we evaluate your individual needs and then create a custom care plan tailored to you.***

> (c) Brookdale will ***assess your needs*** and help you chose the services **you need**.

> (d) Our **trained caregivers provide attention and assistance** with medication support, bathing, dressing, cooking and other tasks **throughout the day**. Our staff will also coordinate services with outside healthcare providers and monitor residents to ensure they are healthy. **So your loved one gets the care they need** while enjoying the quality of life they've earned.

> (e) **Trained caregivers provide assisted living care by providing assistance** with medication management, activities of daily living, engaging programming, and coordination with outside healthcare providers.

> (f) At an assisted living community, ***caring staff members* are available to help them accomplish these tasks,** making life a lot easier than if they were living alone. This service provides peace of mind for them, as well as you. There's no need to take a chance on their health and safety, because ***our team of medical professionals can lend the right level of support that they need throughout the day***.

> (g) The Brookdale approach provides services that are ***tailored to each individual's unique needs***, a way of life created to enrich the lives of others – with compassion, respect, excellence and integrity. In this way, we can make daily life easier for our residents, ***by offering the desired service and care as their needs and preferences dictate. By customizing personal care offerings for the individual***, we help to ease assisted living residents through lifestyle transitions that complement their vision for all the places they would still like their lives to go.

> (h) At Brookdale, we are **committed to listening to your needs**, understanding the life you want for yourself or your loved one, and ***then partnering with you to customize a solution*** for all the places you still want your life to go.

---

[40] Emphasis in original.

(i) The first step towards determining the right senior living option is to **understand you and your family's needs.**

(j) [W]e believe in delivering senior care that's **tailored to you** and your loved one **based on those unique needs** and desires. That's why we provide a variety of options. **This personalized approach ensures that you and your family get exactly what you need....**

(k) [We] cannot provide **exceptional care and service** until we find out exactly what it is that your **loved one needs.**

(l) **We start with a detailed assessment**, listing the specifics of your loved one's level of care.

156. Contrary to such representations, the complaint alleges that:

> **[E]very day that the hours of time required to provide all basic care and daily life services to residents in a BROOKDALE facility exceeded the amount of actual staff time available to provide these services,** residents could not have received the promised levels of care and daily living services.

157. The complaint alleges that the plaintiff and members of the class encountered willful understaffing to boost profitability, including:

> **[A] system of chronically understaffed assisted living facilities that routinely and as a matter of practice fail to provide sufficient staffing that correlates to the service needs of its resident populations** in order to provide the most basic level of promised care and daily living services.
>
> ***
>
> Instead, **BROOKDALE has systemically and willfully understaffed its facilities to boost its profitability**.

158. Indeed, *Gunza* alleges that rather than use the PSA system to determine staff and labor hours to meet resident needs, Brookdale used the SAS system to dilute and underestimate actual staffing times.

> At the heart of this scheme was BROOKDALE's method of determining and limiting staffing levels at its facilities. **Rather than providing the amount of staff and labor hours required to meet resident service needs as determined by its PSA system, BROOKDALE used a staffing algorithm known as its Service Alignment Software to dilute and underestimate the staffing time actually needed**.

56

In other words, ***BROOKDALE's Service Alignment Software systematically underestimates the staffing needs*** at each facility by, inter alia, ***deliberately embedding false and inaccurate assumptions about the time required to carry out personal need services and/or the amount of services to be provided*** to its collective resident populations.

159. According the complaint, SAS was used to "justify understaffing in order to meet pre-determined labor budgets designed to achieve corporate profit objectives and financial performance thresholders."

160. The *Gunza* lawsuit alleges that Brookdale's corporate headquarters exercised absolute control over these actions:

> ***From its corporate headquarters in Brentwood Tennessee, Brookdale exercises absolute and exclusive control over staffing determinations at its facilities,*** monitoring each facility's staffing and budgetary compliance and measuring any variance in the corporate determined budge on a frequent or daily basis. ***Moreover, BROOKDALE prohibits its facilities from making staffing decisions at the local level or modifying BROOKDALE's corporate determined staffing levels without corporate approval.*** BROOKDALE did not disclose and has affirmatively concealed these crucial and material facts from residents, including Plaintiff, the proposed Class Members, their family members, and the members of the consuming public who may consider admission to a Brookdale facility.

161. As a result of the foregoing, *Gunza* sought declaratory and injunctive relief under North Carolina law and alleged violations of the North Carolina Unfair and Deceptive Trade Practices Act, breach of contract, unjust enrichment, and tortious interference with a contractual relationship.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS[41]

162. In order to conceal the Company's systemic understaffing and poor quality of care, throughout the Class Period, Defendants issued a series of pervasive and material misstatements

---

[41] All false and misleading statements are identified in this section by bold and italicized font.

and omitted material facts in the Company's public filings, press releases, conference calls, investor presentations and other documents.

163. Specifically, Defendants made materially false and misleading statements concerning: (i) staffing levels and the quality of care of resident services; (ii) compliance with internal policies and local, state, and federal laws and regulations; and (iii) increased occupancy. These material misstatements and omissions created the false impression that Brookdale was appropriately staffing its facilities, meeting the high quality of care promised to residents, and achieving revenue based on occupancy in line with its benchmarks. This false impression caused the Company's stock price to be artificially inflated throughout the Class Period.

## A. Material False and Misleading Statements Regarding Staffing and the Quality of Resident Services

164. Throughout the Class Period, Defendants made materially false and misleading statements concerning the quality of healthcare and services that were provided to residents at Brookdale facilities. Defendants repeatedly touted that Brookdale provided "the highest quality service, care and living accommodations" and that they were sufficiently staffed to provide such care. In reality, Brookdale intentionally understaffed its facilities, resulting in a low quality of care and inability to provide timely services paid for by the residents. This resulted in resident injuries, neglect, and sometimes death.

### i. Misstatements that Brookdale Was Increasing Community Staffing Levels

165. Defendants made materially false and misleading statements that Brookdale was increasing support staff. For example, on November 1, 2016, Brookdale filed a Form 8-K with the SEC, attaching as an exhibit a press release dated November 1, 2016 ("November 1, 2016 Press Release") and an exhibit titled "Supplemental Information" ("3Q16 Presentation"). In connection with the November 1, 2016 Press Release, Brookdale also held an investor conference call to

58

discuss the Company's third quarter 2016 financial results (the "3Q16 Call"). Defendants Baer and Smith participated on the call. During the Q&A portion of the 3Q16 Call, Defendant Baier stated:

> *We are continuing to work on our service alignment labor model which help us make sure that we've got the right labor in the communities to match to the acuity of the residents' needs and that helps us offset some of the labor pressure, to make sure that you're matching labor appropriately to need*.

166. The statements above were materially false and misleading when made because Brookdale was intentionally and systemically understaffing its facilities through the use of SAS, which was programmed to, and did, provide an insufficient number of caregivers to perform the resident services and care that was promised. The inadequacy and undervaluing of labor hours needed per resident were well-known defects of SAS but when requests for additional staff were made, they would be denied. Thus, contrary to Defendants' statement, Brookdale was not using the SAS to ensure it got the right labor at each facility. Rather, according to the confidential witnesses and complaints filed by residents, the opposite was true—Defendants were using the SAS to reduce staff thereby ensuring Brookdale did not have the right labor needs to match acuity in order to meet its forecasts.

167. On February 13, 2017, Brookdale filed a Form 8-K with the SEC, attaching as an exhibit a press release dated the same ("February 13, 2017 Press Release") as well as a presentation with "Supplemental Information" ("4Q16 Presentation"). In connection with the February 13, 2017 Press Release, Brookdale also held an investor conference call on February 14, 2017 to discuss the Company's fourth quarter 2016 financial results (the "4Q16 Call"). Defendants Baier and Smith participated on the call.

168. During the 4Q16 Call, Defendant Smith stated that Brookdale was adding staff:

59

First, we are focused on our programs to reduce turnover and to retain key community management. We continue to work to simplify and support these roles. We have assessed the compensation of those leaders and continue to make appropriate adjustments, as I described previously. ***And we are adding community level support staff to lighten the burden of the job responsibilities.*** We've made progress in lowering turnover, but we certainly have room to continue to improve.

169.    Defendant Baier also represented during the 4Q16 Call that the Company was investing in community level associates:

There are 2 factors beyond the transactions that are impacting senior housing on the expense side. The first is pressure on our labor costs in our senior housing business. While minimum wage is expected to have a small impact on us in 2017, approximately $2.5 million, we are experiencing higher wage costs in both hiring and for retention. ***In addition, we are investing in additional community level support associates as part of our initiative to retain key community leadership***. Overall, we expect compensation adjusted for the impact of dispositions to increase by 5.5% to 6% driven by increased salary and wages, normalized bonus and increased health benefits costs.

170.    The statements in ¶¶168-69 above were materially false and misleading when made because Brookdale was not adding or investing in staff at the community level. In fact, when Brookdale's employees requested that additional staff be hired due to inadequate staffing, those requests were consistently denied and the Company looked for ways to cut corners in order to avoid hiring additional people. The policy against hiring at the community level was so strong that if employees were even allowed to work overtime then they would have to answer to the higher ups.

### ii.    Misrepresentations Concerning Executive Directors' Control Over Decision-Making at Their Facilities

171.    The 3Q16 Form 10-Q set forth the Company's purported 2016 strategic goals, which falsely claimed Defendants were prioritizing customer needs at a local level as part of Brookdale's strategic goals:

With integration activities largely completed, during 2016 we undertook a comprehensive review of our organizational effectiveness to develop a refined

three-year strategy designed *to further our mission to enrich the lives of those we serve with compassion, respect, excellence, and integrity, to maximize the value of our existing platform,* and to build the foundation for further growth. During the three months ended September 30, 2016, we completed this review and adopted a refined strategy:    to achieve consistent operational excellence in our core businesses.

We have identified five key priorities for which we have developed initiatives or plan to develop initiatives to support our strategy and have created a transformation process to develop cross-functional initiatives directly tied to key priorities. These five priorities include:

• *Enhance our customer and associate experience.  With this priority, we intend to simplify the role of the executive directors of our communities to allow them to focus on our customers and associates, to improve our model for* recruiting and *retaining community associates,* to implement new talent development and training programs, *and to implement a system to gauge and improve the quality of our relationships with our customers and associates.*

• *Improve our marketing and sales processes*.  We intend to design and implement a network sales model, to implement a new lead management system, and to segment our communities to align operating standards with optimal market positions.

• *Simplify our organization*.  *We are actively identifying and executing on initiatives to simplify our organization in order to align our structure around our customers' priorities while improving our operational effectiveness and efficiency*.

• *Optimize our portfolio and leverage scale*.  Our initiatives will focus on maximizing the value and performance of our ancillary services, optimizing our community portfolio through selective dispositions, capturing synergies from our scale, and making strategic and cost effective capital expenditure investments.

• *Innovate for growth*.  We intend to evaluate, test and implement innovations that enhance customer and associate experience and to explore models to drive new economics.

We believe that successful execution upon our strategy and the initiatives supporting our strategy will enable us to grow stockholder value *and better fulfill our mission by reaching and satisfying more customers, building improved relationships between us, our associates and our customers*, and by improving the quality and durability of our cash flow, improving liquidity and reducing our debt and lease leverage.

172.    On February 15, 2017, Brookdale filed its Annual Report on Form 10-K with the SEC for year ended December 31, 2016 ("2016 Form 10-K"), which was signed by Defendants Baier and Smith. The 2016 Form 10-K contained a similar representation as the 3Q16 Form 10-Q and elaborated on Brookdale's purported goals, stating:

> We have identified five key priorities for which we have developed initiatives or are developing initiatives to support our strategy and have created a transformation process to develop cross-functional initiatives directly tied to key priorities. These five priorities include:
>
> - *Enhance our customer and associate experience.* ***With this priority, we are simplifying the role of the executive directors of our communities to allow them to focus on our customers and associates, improving our model for*** recruiting and ***retaining community associates,*** implementing new talent development and training programs, ***and will continue to implement an expanded system to gauge and improve the quality of our relationships with our customers and associates.***
>
>                              *       *       *
>
> - *Simplify our organization.* ***We are actively identifying and executing on initiatives to simplify our organization in order to align our structure around our customers' priorities while improving our operational effectiveness and efficiency. Through our realignment efforts, we have reduced spans and layers in our organization to increase accountability and bring decision making closer to our customers.*** We also plan to continue to establish corporate shared service centers of excellence to reduce costs and improve our effectiveness.    We expect that our organizational simplification and streamlining efforts will lead to opportunities for general and administrative expense efficiencies. . . .

173.    The statements above that decisions would now be made at the local level by executive directors were materially false and misleading when made because Executive Directors: (i) had no control over local decisions concerning staffing, as all staffing decisions were dictated and approved by the corporate office; (ii) had no control over the local budget, as the budget was dictated and approved by corporate; (iii) would have to explain any deviations from staffing or budgets to the corporate office; and, accordingly, (iv) lacked any control over the major decisions impacting the quality of care of residents.

62

174.     On February 22, 2018, Brookdale filed a Form 8-K with the SEC, attaching as an exhibit a press release dated February 22, 2018 ("February 22, 2018 Press Release") as well as a presentation with "Supplemental Information" ("4Q17 Presentation").

175.     In connection with the February 22, 2018 Press Release, Brookdale held an investor conference call on February 22, 2018 to discuss the Company's fourth quarter and full year 2018 financial results (the "4Q17 Call"). Defendant Baier participated on the call as President and CEO and falsely reiterated Brookdale's purported focus on high-quality care and investment in retaining associates, adding that Brookdale was focusing on its residents by giving local executive directors more control over decisions when, in fact, executive directors had no control over the most important decisions such as the budget and staffing:

> Let me turn to the operations next. Our operating focus will be based on 3 tenets: first, ***attract, engage, develop and retain the best associates***. ***Second, our resident and family trust and endorsement by providing valued, high-quality care and personalized service***, which in turn leaves us to our third tenet, which is to drive attractive long-term returns for our shareholders. We plan to return to our strong foundation, while we will differentiate ourselves based on caring associates who create passionate advocates and generate referrals. It's about winning locally while leveraging our industry-leading scale and experience.
>
> ***On the surface, you may not see this as a big change from what we said in the past, but the reality is, our focus is very different. We will make decisions closer to our customers by empowering our executive directors with more local decision rights***. We are also changing how we allocate our resources. This is about improving our ability to operate by narrowing our focus. You can't be the best of anything when you're trying to do everything. But we will stop trying to do so much and we will eliminate anything that distracts us from our mission. ***We will make sure that our associates are able to focus only on what matters most, our residents.***
>
> \*       \*       \*
>
> ***Second, our strategy improved our focus on our residents and patients***. ***Our unwavering commitment is to our customers. We will continue our work on enhancing our customer value proposition, differentiating based on quality,***

***choice, personalized services*** and associates who care. We will raise Brookdale's profile on a local level with potential customers and their adult children. ***We will concentrate on customer satisfaction*** because we know through improving Net Promoter Score, work that delighted our residents, correlates with higher performance. We've identified the need to change our sales and marketing national versus local mix and intend to implement other changes we've identified to improve our performance. For example, we have initiatives to improve our lead management, pursuing the most productive channels, improving our initial response and follow up on those leads and marketing in a local targeted manner. At the same time, we are discontinuing well-meaning initiatives that distract from the things that matter most.

176.    The statements above that resident care decisions would be made at the local level by Executive Directors were materially false and misleading when made because Executive Directors: (i) had no control over local decisions concerning staffing, as all staffing decisions were dictated and approved by the corporate office; (ii) had no control over the local budget, as the budget was dictated and approved by corporate; (iii) would have to explain any deviations from staffing or budgets to the corporate office; and, accordingly, (iv) lacked any control over the major decisions impacting the quality of care of residents.

177.    Further, the statements above concerning "high quality" and "quality" care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  Further, in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some

64

residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "high quality."

178. On May 7, 2018, Brookdale filed a Form 8-K with the SEC, attaching as an exhibit a press release dated May 7, 2018 ("May 7, 2018 Press Release") as well as a presentation with "Supplemental Information" ("1Q18 Presentation"). In connection with the May 7, 2018 Press Release, Brookdale also held an investor conference call on May 8, 2018 to discuss the Company's first quarter 2018 financial results (the "1Q18 Call"). Defendant Baier participated on the call as well as Teresa Sparks, Brookdale' interim CFO.

179. During the 1Q18 Call, Defendant Baier falsely reiterated that executive directors were "empowered" with local decision-making:

> I'll now turn to some drivers to reduce controllable move-outs. Our goal is to make decisions as close to the customer as we can, while capturing the benefits of scale. ***Our operations leadership team is empowering our Executive Directors with more local decision [ rights ] so that they can take care of the community as if they owned it. For example, they're reallocating resources during low-contact time periods to look at ways to enhance our facility's focus. I'm committed to spending time in our communities every month to ensure that our communities have what they need to succeed***. ***During my visits, I've seen evidence*** that our culture of winning locally is starting to be revitalized with a focus on differentiating Brookdale, ***based on caring, quality, personalized service to our residents***. The Brookdale team is actively pursuing all 3 of our strategic priorities. So let me provide the highlights for the third priority, our shareholders.

180.    The statements above that decisions would be made at the local level by Executive Directors were materially false and misleading when made because Executive Directors: (i) had no control over local decisions concerning staffing, as all staffing decisions were dictated and approved by the corporate office; (ii) had no control over the local budget, as the budget was dictated and approved by corporate; (iii) would have to explain any deviations from staffing or budgets to the corporate office; and, accordingly, (iv) lacked any control over the major decisions impacting the quality of care of residents.

### iii.    Misrepresentations that Brookdale Provided the Highest Quality of Service and Care for its Residents

181.    On August 9, 2016, the first day of the Class Period, Brookdale filed a Form 8-K with the SEC, attaching as an exhibit a press release dated August 8, 2016 ("August 9, 2016 Press Release") and an exhibit titled "Supplemental Information" ("2Q16 Presentation").

182.    The 2Q16 Presentation stated:

Brookdale Senior Living Inc. ("Brookdale") is the leading operator of senior living communities throughout the United States. *The Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents.*

183.    On August 9, 2016, after market close, Brookdale filed its quarterly report on Form 10-Q for the period ended June 30, 2016 with the SEC ("2Q16 Form 10-Q"), signed by defendants Baier and Smith. An identical statement as that in ¶__ appeared in the 2Q16 Form 10-Q.

184.    An identical statement as ¶182 also appeared in subsequent quarterly reports on Form 10-Q, including: the quarterly report on Form 10-Q for the period ended September 30, 2016 filed on November 3, 2016 ("3Q16 Form 10-Q"); the quarterly report on Form 10-Q for the period ended March 31, 2017 filed on May 10, 2017 ("1Q17 Form 10-Q"); the quarterly report on Form 10-Q for the period ended June 30, 2017 filed on August 8, 2017 ("2Q17 Form 10-Q"); and

66

the quarterly report on Form 10-Q for the period ended September 20, 2017 filed on November 7, 2017 ("3Q17 Form 10-Q"). Each of these Form 10-Qs were signed by Defendants Baier and Smith. An identical representation also appeared in a press release dated February 13, 2017. The press release was attached as an exhibit to a Form 8-K filed with the SEC on February 13, 2017 ("February 13, 2017 Press Release"). Specifically, Defendants stated:

> Brookdale Senior Living Inc. ("Brookdale" or the "Company") is the leading operator of senior living communities throughout the United States. ***The Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents***.

185. The statement in ¶184 appeared in the following: the quarterly report on Form 10-Q for the period ended March 31, 2018 filed on n May 8, 2018 ("1Q18 Form 10-Q"); the quarterly report on Form 10-Q for the period ended June 30, 2018 filed with the SEC on August 7, 2018 ("2Q18 Form 10-Q"); and the quarterly report on Form 10-Q for the period ended September 30, 2018 filed on November 6, 2018 ("3Q18 Form 10-Q"). Defendants Baier and Teresa Sparks signed the 1Q18 Form 10-Q and 2Q18 Form 10-Q. Defendants Baier and Swain signed the 3Q18 Form 10-Q.

186. Further, a nearly identical representation as that in ¶184, appeared in the: quarterly report on Form 10-Q for the period ended March 31, 2019 filed on May 7, 2019 ("1Q19 Form 10-Q"); the quarterly report on Form 10-Q for the period ended June 30, 2019 filed on August 6, 2019 ("2Q19 Form 10-Q"); and the quarterly report on Form 10-Q for the period ended September 30, 2019 filed on November 5, 2019 ("3Q19 Form 10-Q"). These were signed by Defendants Baier and Swain. The 1Q19, 2Q19, and 3Q19 Form 10-Qs falsely represented:

> Brookdale Senior Living Inc. ("Brookdale" or the "Company") is an operator of senior living communities throughout the United States. ***The Company is committed to providing senior living solutions primarily within properties that***

67

*are designed, purpose-built, and operated to provide quality service, care, and living accommodations for residents*.

187. The statements above concerning "high quality" and "quality" care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "quality" or "high quality."

188. The November 1, 2016 Press Release quoted defendant Smith as touting the Company's purported "consistent quality service," commenting:

> We grew average occupancy by 40 basis points sequentially. However, during the quarter we saw an unprecedented number of new competitive openings in our mid-sized markets that caused us to fall short of our revenue expectations. ***We are focused on*** regaining market share and improved profitability through ***providing***

*consistent quality service, positioning our products properly and improving sales execution*.

189.    The statements above concerning "consistent quality service" of care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care Accordingly, Brookdale's level of care was far from consistent or quality.

190.    On May 8, 2017, Brookdale filed a Form 8-K with the SEC, attaching as an exhibit a press release dated May 8, 2017 ("May 8, 2017 Press Release") as well as a presentation titled "Supplemental Information" ("1Q17 Presentation"). In connection with the May 8, 2017 Press Release, Brookdale also held an investor conference call on May 9, 2017 to discuss the Company's first quarter 2017 financial results (the "1Q17 Call"). Defendants Baier and Smith participated on the call.

69

191.    During the 1Q17 Call, Defendant Smith similarly highlighted Brookdale's purported "high-quality" care:

> Right. Thank you, Dan. As Dan mentioned, our management and board are focused on maximizing shareholder value. While we are exploring the options and alternatives available to us, we are also fully committed to driving the operational improvements in our business that will increase shareholder value, ***while also providing high-quality care to our residents*** and strong opportunities for our associates.

192.    The statements above concerning "high quality" care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "high quality."

193.    Defendant Baier further emphasized Brookdale's purported focus on quality care during the 1Q18 Call, stating:

Turning to our second strategic priority. ***We believe that providing quality care to our residents will improve RevPAR***.[42] As covered widely by the media, this was an extremely difficult flu season, especially for more frail seniors. While you can't directly correlate to flu specific deaths, in the first quarter 2018, death rates were up compared to a more normal flu season. Teresa will provide more details in the financial section.

*Taking care of our residents is paramount. Because Brookdale is the leader, we have robust and industry-leading protocols to appropriately protect our residents*. This includes infection control processes, vaccination programs, containment of illnesses when they occur and temporarily stopping visits and new move-ins if there is a concern in a community. Our teams work diligently to maintain [ leaves ] during this time and went out to future resident homes to do the initial assessment. This is an example of how we focus on what we control, which leads me to our sales and marketing efforts.

194.    On June 5, 2018, Defendant Baier presented at the Jefferies 2018 Healthcare Conference ("2018 Jefferies Presentation"). Defendant Baier reiterated:

The second element of our strategy is to generate resident referrals by creating passionate advocates **by delivering high-quality valued service to our residents.**

195.    The statements above concerning "high quality" care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents or no caregiver at all.  As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some

---

[42] RevPar or average monthly senior housing resident fee revenues per available unit, is defined by the Company as resident fee revenues, excluding Health Care Services segment revenue and entrance fee amortization, for the corresponding portfolio for the period, divided by the weighted average number of available units in the corresponding portfolio for the period, divided by the number of months in the period.

residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "quality" or "high quality."

196.    On August 5, 2019, Brookdale field a Form 8-K with the SEC, attaching as an exhibit a press release dated August 5, 2019 ("August 5, 2019 Press Release") as well as a presentation with "Supplemental Information" ("2Q19 Presentation"). In connection with the August 6, 2019 Press Release, Brookdale also held an investor conference call on August 6, 2019 to discuss the Company's second quarter 2019 financial results (the "2Q19 Call"). Defendants Baier and Swain participated on the call.

197.    During the 2Q19 Call, Defendant Baier once again emphasized Brookdale's purported "high-quality care," adding that such care was performed by "a talented team" that Brookdale "focus[ed] on retaining":

> At Brookdale, there is simply no substitute for great people who genuinely care, do the right thing and *serve our residents and patients with high-quality care*. Our associates do extraordinary things every single day. That is why the foundation of our strategy is to win locally, which relies on having a talented team of associates *dedicated to providing high-quality care and services to our residents and patients*. We're pleased that we continue to see positive associate metrics showing our strategy is working as *we focus first on retaining our high-quality group of associates*.

198.    The statements above concerning "high quality" care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities

so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "high quality."

199. Moreover, the statements above concerning a "focus first on retaining" staff were materially false and misleading because: (i) Defendants cut staff and refused to hire additional staff in an effort to cut expenses, no matter how short-staffed the facilities already were; (ii) Defendants programed SAS output to purposefully require less staff; (iii) the budget was created at the corporate level and Defendants' refused to adjust the budget to allow for additional staff, even after receiving more resident fees; and (iv) primarily as a result of operating with so few staff, there was a high turnover rate of employees due to employee dissatisfaction.

200.    On July 16, 2019, the Company filed a Schedule 14A with the SEC ("July 2019 Schedule A"), commenting on a letter received from stockholder activist, Land & Buildings. Therein, the Company stated:

> The Company's business and operating performance has improved, and ***we are providing quality service and care to residents and patients***. . . ..

201.    The statements above concerning "quality" care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. .Accordingly, Brookdale's level of care was far from quality.

202.    On November 4, 2019, Brookdale filed a Form 8-K with the SEC, attaching as an exhibit a press release dated November 4, 2019 ("November 4, 2019 Press Release") as well as a presentation with "Supplemental Information" ("3Q19 Presentation"). In connection with the

November 4, 2019 Press Release, Brookdale also held an investor conference call on November 5, 2019 to discuss the Company's third quarter 2019 financial results (the "3Q19 Call"). Defendants Baier and Swain participated on the call.

203.    During the 3Q19 Call, Defendant Baier repeated:

Even so, we still believe in our continued pricing power *based on delivering high-quality care and services to our residents.*

204.    The statements above concerning "quality" care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "quality."

### iv.    Misrepresentations Concerning Improved Resident Experience by Providing and Retaining Top Quality Staffing

75

205. Defendants continued to make similar false and misleading representations regarding Brookdale's purported high quality of care throughout the Class Period. For example, in connection with the August 9, 2016 Press Release, Brookdale also held an investor conference call to discuss the Company's second quarter 2016 financial results (the "2Q16 Call"). Defendants Baer and Smith participated on the call. During the 2Q16 Call, Defendant Smith emphasized that Brookdale was investing in its associates and focusing on its residents:

> *Our primary focus is on operational excellence*, further developing our competitive advantages to improve performance in the fundamental drivers of our business. *Operationally, we're focused on 3 key elements: first, consistently delivering a great resident and family experience*. *We have recently enhanced our resident experience programming, which we call the Brookdale Experience. This program includes operational and customer service standards,* technology, training, programming and Net Promoter Score measurement. *The goal of this program is to provide our associates with the tools for delivering a great resident and family experience, along with the method for measurement and feedback to ensure that we're delivering on that promise.*
>
> *Our secondary operational focus is* attracting and *retaining the best talent. The quality and longevity of community-level leadership drives each community success*. And so we are very excited about work that is underway to formalize proprietary customized leadership model and leadership development program throughout the company. The program is the result of extensive in-depth investigation and analysis related to Brookdale's culture and thought leadership. And its design will connect leaders at all levels with the company's strategy and is still a common focus.
>
> In the last quarter, we formalized the process to nurture our internal leaders. We are identifying our high-potential performers and surrounding them with mentors, coaches and development plans to help them succeed not only today, but also at higher levels in the organization. This will help ensure that we are developing our leaders and creating better engagement with those associates, which, as I'm sure you know, leads to better job satisfaction and better retention.
>
> *And the third element of our operations focus is to sell the value that we offer,* so we're focused on sales. In April, we enhanced our Brookdale School of Sales, and over 150 sales associates have already participated in it. *This new training focuses on the customer, of course, and on the customer's journey. People do not make snap judgments when it comes to senior living.* In this training program, our sales associates are challenged to identify where the customers are in their journey and then to work with them to build a tangible and practical plan that meets their needs.

76

We know that moving into seniors housing is a difficult decision for seniors and their families. Helping to clarify the solution and working as a partner increases comfort levels for all involved.

206.    The statements above were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was not providing a great resident experience.

207.    Moreover, the statements above that Brookdale was focused on "retaining the best talent" were materially false and misleading because: (i) Defendants cut staff and refused to hire additional staff in an effort to cut expenses, no matter how short-staffed the facilities already were; (ii) Defendants programed SAS output to purposefully require less staff; (iii) the budget was created at the corporate level and refused to adjust for additional staff even after receiving more

resident fees; and (iv) partially as a result of operating with so few staff, there was a high turnover rate of employees due to employee dissatisfaction.

208.     During the 3Q16 Call, Defendant Smith similarly represented that Brookdale delivered a "great customer experience":

> As we look to our near-term outlook, we are disappointed that our progress, while still positive is slower than we anticipated. However, we are confident that the initiatives that we have in place are taking us down the right path. The long-term opportunity is obvious. The need for seniors to use services like ours will only grow. ***We believe in our plan because, first, it delivers a great customer experience. We are continuing and expanding our market segmentation efforts to create the right product for different customer needs***. We are continuing to differentiate the programming in our communities to better meet the marketplace. Second, we are simplifying and streamlining the business. As I just discussed, we are making good progress on our asset disposition program and in our efforts to exit or restructure leases. Again, we intend to aggressively pursue these opportunities as we move forward. We are also beginning to make headway on reducing our overhead as we previously committed. And third, our plan is to attract and retain the best talent. We are excited with the hiring of Cedric Coco as our new Chief People Officer. He comes with a background in large diverse organizations and he will enhance our capabilities to attract, retain and develop our organization's human resources. We are showing progress with the initiative to reduce associate turnover. For example, health and wellness director turnover declined from the second quarter to the third quarter based on some adjustments we have made around that position. But we recognize the need to improve our performance even further, and we remain confident that we will do so.

209.     The statements above concerning "great customer experience" and offering products for individual customer needs were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Further, rather than offering the "right" product for customer needs, and in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive

78

assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was not providing a great customer experience.

210.    On May 16, 2018, Defendant Baier presented at the Bank of America Merrill Lynch 2018 Healthcare Conference ("2018 BofA Presentation"). Defendant Baier once again emphasized Brookdale's purported focus on providing high quality care and the best service to residents:

> We're very pleased to be the largest senior living provider in the U.S., and *we have a mission that is all around serving seniors*. So it's a fabulous business to be a part of. Our objective is to be the nation's first choice in senior living. *That's about providing the best service for seniors to help them live the best lives possible*, and we have recently made a pivot in our strategy. . . .
>
> Our intention is to win based on having the best team in the business. *So our first strategic priority is about attracting, engaging, retaining and developing the best team in the industry*. That matters because this is a relationship-driven business. When we have the best people in the industry, it results in the best results in the industry. *The second part of the plan is around earning resident and family trust and endorsements by providing valued high-quality care.* Now trust is really important when you're dealing with seniors. The best seniors refer their friends, which is good for occupancy and also good for our investors. That brings us to the third leg of our strategy to take action to provide attractive long-term returns to our shareholders, and we'll talk about that in just a minute.

211.    On March 15, 2018, Defendant Baier presented at the Barclays Healthcare Conference ("2018 Barclays Presentation"). At the 2018 Barclays Presentation, Defendant Baier

stated: "***Well, as you would expect, protecting the seniors that we serve is our most important priority.***"

212.   The statements above concerning the "priority" of "protecting" seniors were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  Further, in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale was putting itself first rather than protecting is seniors.

213.   Moreover, the statements above that Brookdale was focused on "retaining" the best team were materially false and misleading because: (i) Defendants cut staff and refused to hire additional staff in an effort to cut expenses, no matter how short-staffed the facilities already were;

(ii) Defendants programed SAS output to purposefully require less staff; (iii) the budget was created at the corporate level and refused to adjust for additional staff even after receiving more resident fees; and (iv) primarily as a result of operating with so few staff, there was a high turnover rate of employees due to employee dissatisfaction.

214.    On May 16, 2018, Defendant Baier presented at the Bank of America Merrill Lynch 2018 Healthcare Conference ("2018 BofA Presentation"). During the 2018 BofA Presentation, Defendant Baier stated:

> Our focus is on trying to lock our teams down to make sure that they are paid appropriately, ***to make sure that we remove any barriers to them doing their jobs*** and that they are very engaged with us. Now that's not to say that somebody won't be attracted to a brand-new shiny building and a really high, above-market pay package, but we are doing everything we can to protect our people.

215.    Defendants' representations above concerning "retaining the best associates" and "removing any barriers" for them to do their job false and misleading when made because: (i) Defendants cut staff and refused to hire additional staff in an effort to cut expenses, no matter how short-staffed the facilities already were; (ii) Defendants programed SAS output to purposefully require less staff; (iii) the budget was created at the corporate level and Defendants refused to adjust for additional staff even after receiving more resident fees; and (iv) primarily as a result of operating with so few staff, there was a high turnover rate of employees due to employee dissatisfaction

216.    On November 5, 2018, Brookdale filed a Form 8-K with the SEC, attaching as an exhibit a press release dated the same ("November 5, 2018 Press Release") as well as a presentation with "Supplemental Information" ("3Q18 Presentation"). In connection with the November 5, 2018 Press Release, Brookdale also held an investor conference call on November 6, 2018 to discuss the Company's second quarter 2018 financial results (the "3Q18 Call"). Defendants Baier

and Swain participated on the call. During the 3Q18 Call, Defendant Baier similarly focused on the purported high-quality service delivered:

> Brookdale's top priority is the turnaround strategy to drive operational improvement. I will now share the progress were making to turn around our business by winning locally. Let me remind you of our 3 strategic priorities: to write attractive long-term returns to our shareholders; ***by attracting and retaining the best associates; and earning resident and family trust by delivering high-quality care and services***, which creates Brookdale advocates and generates future resident referrals.
>
> *     *     *
>
> ***We are a company providing health care and services, so that our country's seniors, possibly your mom or dad, can live the best life that is possible for them***. We are a company that believes in the balance of mission and margin, and I imagine, if you are an investor, that you also believe in both.

217.    The statements above concerning the "high quality" care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  Further, in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix)

resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale was putting itself first rather than protecting is seniors.

218.    Moreover, the statements above that Brookdale was focused on "retaining" the best associates were materially false and misleading because: (i) Defendants cut staff and refused to hire additional staff in an effort to cut expenses, no matter how short-staffed the facilities already were; (ii) Defendants programed SAS output to purposefully require less staff; (iii) the budget was created at the corporate level and Defendants refused to adjust for additional staff even after receiving more resident fees; and (iv) primarily as a result of operating with so few staff, there was a high turnover rate of employees due to employee dissatisfaction.

> v.    **Misrepresentations Concerning Purported Individually Tailored Personal Care Service Options to "Perfectly Suit Their Needs"**

219.    In connection with the May 8, 2017 Press Release, Brookdale also held an investor conference call on May 9, 2017 to discuss the Company's first quarter 2017 financial results (the "1Q17 Call"). Defendants Baier and Smith participated on the call. During the 1Q17 Call, Defendant Smith falsely stated that Brookdale put its residents first:

> And finally, we continue our portfolio-optimization work to dispose of communities that aren't consistent with our strategy or our return expectations. ***Our goal is to have a portfolio that will enrich the lives of our residents*** while providing strong long-term returns for our shareholders.

220.    The 1Q18 Form 10-Q, 2Q18 Form 10-Q, 3Q18 Form 10-Q similarly stated:

> *Residents, Patients and Their Families*. ***Brookdale continues to be driven by its mission—to enrich the lives of those we serve with compassion, respect, excellence and integrity***—and we believe this continued focus is essential to create value for all of our stakeholders. ***This strategic priority includes enhancing our organizational alignment to foster an environment where our associates can focus on providing valued, high quality care and personalized service.*** We intend

83

to win locally through our targeted sales and marketing efforts by differentiating our community and service offerings based on quality, a portfolio of choices, and personalized service delivered by caring associates.

221.     The statements above were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  Further, in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "high quality" or personalized.

222.     On February 22, 2018, Brookdale filed its Annual Report on Form 10-K with the SEC for year ended December 31, 2017 ("2017 Form 10-K"), which was signed by defendants

Baier and Smith. The 2017 Form 10-K falsely represented that Brookdale was focused on providing "high quality care and personalized service" stating:

> *Residents, Patients and Their Families*. Brookdale continues to be driven by its mission—to enrich the lives of those we serve with compassion, respect, excellence and integrity—and we believe this continued focus is essential to create value for all of our stakeholders. ***This strategic priority includes enhancing our organizational alignment to foster an environment where our associates can focus on providing valued, high quality care and personalized service***. We intend to win locally through our targeted sales and marketing efforts by differentiating our community and service offerings ***based on quality***, a portfolio of choices, and ***personalized service delivered by caring associates.***

223.    The statements above "high quality" and "personalized" care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all. Further, rather than provide personalized care, and in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have

been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "high quality" or "personalized."

224.     During the 2018 Barclays Presentation, Defendant Baier emphasized Brookdale's purported focus on its residents and providing high quality care, stating:

> We have a very focused operational strategy. We're a mission-driven business, *our associates are attracted to serving our seniors.* Our vision is to be the nation's first choice in senior living, and we plan to do that by winning locally. *We will differentiate by providing choice, by providing high quality, by providing personalized service with caring associates.* That will give us the ability to capture our industry-leading scale and experience.
>
> *     *     *
>
> *For our residents, it's about earning resident and family trust and endorsements by providing high-quality care and personalized service. The personalized service is a key part of our mission because if mom has her choice, she wants to stay at home. Our job is to show that she can have a better life by having a supportive environment provided by either independent living, assisted living or memory care.*

225.     The statements above concerning personalized and high quality care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  Further, rather than provide personalized care, and in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents

86

were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "high quality" or personalized.

226.    On May 7, 2018, Brookdale filed a Form 8-K with the SEC, attaching as an exhibit a press release dated May 7, 2018 ("May 7, 2018 Press Release") as well as a presentation with "Supplemental Information" ("1Q18 Presentation"). In connection with the May 7, 2018 Press Release, Brookdale also held an investor conference call on May 8, 2018 to discuss the Company's first quarter 2018 financial results (the "1Q18 Call"). Defendant Baier participated on the call as well as Teresa Sparks, Brookdale's interim CFO.

227.    During the 1Q18 Call, Defendant Baier again reiterated Brookdale's focus to retain staff and provide high quality and personalized care:

> I've now been in the CEO seat for just over 2 months and want you to know that our strategy is consistent with what I announced in late February. Our top priority remains the operational turnaround based on 3 strategic priorities: First, attract, engage, develop and retain the best associates; ***second, earn resident and family trust and endorsement by providing valued, high-quality care and personalized service***, which, in turn, will lead us to our third priority, to drive attractive, long-term returns for our shareholders.

228.    On June 5, 2018, Defendant Baier presented at the Jefferies 2018 Healthcare Conference ("2018 Jefferies Presentation"). At the 2018 Jefferies Presentation, Defendant Baier stated:

But what we're really excited about is the fact that we've been able to energize our local teams, our executive directors, our Health & Wellness directors, our sales directors and to win locally. So we've told our CEO -- our EDs that they are the CEO of their own community. And what that allows them to do is to win in an ultra-local business while capitalizing on the benefits that Brookdale has. ***Some of the scale that we have allows them to have best-in-class programming for memory care.*** It allows them to buy food cheaper, ***it allows them to take care of their residents better, because we can take all of the learning of our company and get the best outcomes for our seniors***.

229.  The statements above were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  Further, rather than provide personalized care, and in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "high quality" or personalized.

230.    On August 6, 2018, Brookdale filed a Form 8-K with the SEC, attaching as an exhibit a press release dated August 6, 2018 ("August 6, 2018 Press Release") as well as a presentation with "Supplemental Information" ("2Q18 Presentation"). In connection with the August 6, 2018 Press Release, Brookdale also held an investor conference call on August 7, 2018 to discuss the Company's second quarter 2018 financial results (the "2Q18 Call"). Defendants Baier and Sparks participated on the call.

231.    Defendant Baier reiterated during the 2Q18 Call that Brookdale's focus on quality care:

> Now let's turn to discuss the progress we're making to turn around our business by winning locally. Let me remind you of our 3 strategic priorities: First, attract and retain the best associates; ***second, earn resident and family trust by delivering high-quality care and services*** to create Brookdale advocates and generate future resident referrals; and third, drive attractive long-term returns for our shareholders.
>
> Let me start with our associates priority. ***The top 3 leaders in each community set the standard for the rest of their teams to provide the best service to residents*** and win locally. Therefore, it is critical that we have the field teams supporting and coaching the top leaders in our communities. At the beginning of the second quarter, we reduced the number of regions and improved the span of control. By the beginning of June, we had also completed the vertical realignment of our sales organization so community-level sales associates now report to sales leadership. In June, our contact center implemented extended hours and now operate 7 days a week.

232.    On September 17, 2018, Brookdale filed a presentation with the SEC titled "Investor Update September 2018" ("September 2018 Presentation"). The September 2018 Presentation similarly claimed that Brookdale's "Mission" was purportedly "***Enriching the lives of those we serve with compassion respect, excellence and integrity***." The presentation stated the Company's "Strategy" was "***Win Locally by providing choices for high quality care & personalized service by caring associates while leveraging industry leading scale and***

89

*experience*." The "Plan" included "***Earn resident and family trust and endorsements by***
***providing valued high quality care and personalized service.***"

233. The statements above were materially false and misleading when made because
Brookdale intentionally and systemically understaffed its facilities so that there were not enough
caregivers to perform the services and care that was promised to residents or required to meet even
the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only
1 caregiver per 100 residents, or no caregiver at all. Further, rather than provide personalized care,
and in order to increase occupancy, residents were placed in facilities regardless of whether those
facilities could provide sufficient care for their level of acuity. As a result of its understaffing,
numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive
assistance after pushing a call light, sometimes waiting almost an entire day before receiving a
response; (ii) residents were not checked on at night, resulting in some residents wandering out of
a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise
injured went hours or days before being found; (v) residents wandered outside the facility without
anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was
reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix)
resident deaths resulted. The severity of this lack of care is further evidenced by the countless
number of citations and lawsuits that have been filed against Brookdale for violating local, state,
and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's
level of care was far from "high quality" or "personalized" to enrich residents' lives.

234. On February 14, 2019, Brookdale filed its Annual Report on Form 10-K with the
SEC for year ended December 31, 2018 ("2018 Form 10-K"), which was signed by Defendants
Baier and Swain. The 2018 Form 10-K further boasted "personalized service by caring associates"

when, in fact, Defendants knew or recklessly disregarded that Brookdale was woefully understaffed and, thus, was incapable of providing personalized services:

> ***Our strategy is to win locally by providing choices for high quality care and personalized service by caring associates*** while leveraging our industry-leading scale and experience. We believe that successfully executing on our strategy will improve our operations and provide attractive long-term returns to our stockholders.

235. On March 13, 2019 Defendant Swain presented at the Barclays global Healthcare Conference ("2019 Barclays Presentation"). Defendant Swain repeated, "***Earn the family and the residence trust*** and win locally and effectively use our scale."

236. The statements above were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all. Further, rather than provide personalized care, and in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless

91

number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "high quality" or earning resident trust.

237.    The 2019 Form 10-K stated under strategy:

> **Continued Operational Improvement and Simplification.** We are focused on our core senior living communities and intend to continue to drive improvements in our senior living portfolio by winning locally. ***Through our "win locally" initiative, we intend to provide choices for high quality care and personalized service by caring associates while leveraging our industry-leading scale and experience***. Such efforts include improvements to our sales and marketing process, prioritizing communities with the most opportunities for ***improvement, and ensuring that our communities are ready for new competition. We also continue to focus on attracting, engaging, developing, and retaining the best associates*** by maintaining a compelling value proposition in the areas of compensation, leadership, career development, and meaningful work. We believe engaged associates lead to an enhanced resident experience, lower turnover, and, ultimately, improved operations*. To sharpen our focus on our core senior living operations, we are (and have been) executing on initiatives to reduce the complexity of our business and to ensure appropriate risk-reward tradeoffs in our highly regulated product lines. Such initiatives include exiting our entry fee CCRC business and continuing to optimize our management services business.
> . . . .
> **Expansion of Healthcare and Service Platform.** *Our vision is to enable those we serve to live well by offering the most integrated and highest-quality healthcare and wellness platform in the senior living industry*.

238.    The statements above concerning "high quality" and "personalized" care were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  Further, in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that:

(i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "high quality" or personalized.

239. During the Class Period, Defendants further made several material misrepresentations on Brookdale's website regarding its quality of care, including the following:

- At Brookdale, we believe in delivering senior care that's *tailored to you* and your loved one based on those **unique needs** and desires. That's why we provide a variety of options. This *personalized approach ensures that you and your family get exactly what you need* without paying for what you don't.[43]

- [W]e make every effort to ease your loved one into a comfortable and enjoyable lifestyle, *offering individually tailored personal care options to perfectly suit their needs.*[44]

- *Your health is our top priority*, and we have programs in place to help you maintain and stay on top of your health. Here are some care services you'd likely find at our assisted living communities: *A personalized service assessment and plan where we evaluate your individual needs and then create a custom care plan tailored to you.*[45]

- *Our trained caregivers provide attention and assistance with medication support, bathing, dressing, cooking and other tasks throughout the day*.

---

[43] This representation appeared no later than August 8, 2017.
[44] This representation appeared no later than August 22, 2017.
[45] This representation appeared no later than October 21, 2017.

Our staff will also coordinate services with outside healthcare providers and monitor residents to ensure they are healthy. ***So your loved one gets the care they need while enjoying the quality of life they've earned***.[46]

- ***Trained caregivers provide assisted living care by providing assistance with medication management, activities of daily living, engaging programming, and coordination with outside healthcare providers***.[47]

- At an assisted living community, ***caring staff members are available to help them accomplish these tasks, making life a lot easier than if they were living alone***. ***This service provides peace of mind for them, as well as you. There's no need to take a chance on their health and safety, because our team of medical professionals can lend the right level of support that they need throughout the day***.[48]

- [W]e believe in delivering senior care that's ***tailored to you*** and your loved one ***based on those unique needs*** and desires. That's why we provide a variety of options. ***This personalized approach ensures that you and your family get exactly what you need....***[49]

- Forget the cliché stories you've heard about seniors sitting around falling asleep to sit-com reruns. ***When you move into a Brookdale assisted living community, you can enjoy a life rich in quality care***, genuine friendships and fun activities.[50]

240.    The statements above concerning "personalized" care to provide "a life rich in quality care" were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  Further, rather than provide personalized care, and in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could

---

[46] *See Gunza, supra* n. 18.
[47] *See Gunza, supra* n. 18.
[48] *See Gunza, supra* n. 18.
[49] *See Gunza, supra* n. 18.
[50] This representation appeared no later than April 23, 2020.

provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care. Accordingly, Brookdale's level of care was far from "high quality" or "personalized" to enrich the residents' lives.

vi. **Misrepresentations that Brookdale Offered "Home-Like" and 24-Hour Services that the Company Wasn't Actually Providing Due to Severe Understaffing**

241.    Defendants further touted that Brookdale was able to offer specific services, such as 24-hour assistance and home-like services when, in fact, it could not provide such services due to severe understaffing. For example, the 2Q16 Form 10-Q represented that Brookdale provided 24-hours assistance:

> *Assisted Living*.  ***The Company's Assisted Living segment*** includes owned or leased communities ***that offer*** housing and ***24-hour assistance with activities of daily life to mid-acuity frail and elderly residents***. Assisted living communities include both freestanding, multi-story communities and freestanding single story communities. The Company also operates memory care communities, which are freestanding assisted living communities specially designed for residents with Alzheimer's disease and other dementias.

242.     An identical representation appeared in the 3Q16 Form 10-Q, 1Q17 Form 10-Q, 2Q17 Form 10-Q, 3Q17 Form 10-Q, 1Q18 Form 10-Q, 2Q18 Form 10-Q, and 3Q18 Form 10-Q.

243.     Further, a substantially similar representation to ¶241 appeared in the 1Q19 Form 10-Q and 2Q19 Form 10-Q, but referred to Assisted Living as Assisted Living and Memory Care:

> *Assisted Living and Memory Care.* **The Company's Assisted Living and Memory Care segment** includes owned or leased communities that ***offer housing and 24-hour assistance with activities of daily life to mid-acuity frail and elderly residents.*** Assisted living and memory care communities include both freestanding, multi-story communities and freestanding, single story communities. The Company also provides memory care services at freestanding memory care communities that are specially designed for residents with Alzheimer's and other dementias.

244.     The statements above were materially false and misleading when made because Brookdale did not provide 24-hour assistance due to the fact it was understaffed, as evidenced by the fact: (i) call lights went unanswered for an entire day in some instances before receiving a response from staff ; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents, even those with plans to be constantly monitored, wandered outside the facility without anyone noticing; and (iv) residents missed doctors' appointments because there was no staff. Further, Brookdale is the subject of countless lawsuits and has received numerous citations for violation laws local, state, and federal laws as a result of not having an adequate number of caregivers to care for the number of residents.

245.     In addition to 24-hour assistance, Defendants continued to tout other purported services offered by Brookdale, including a "home-like" setting. The 2Q16 Form 10-Q stated, for example:

> We believe that we are positioned to take advantage of favorable demographic trends and future supply-demand dynamics in the senior living industry. We also believe that we operate in the most attractive sectors of the senior living industry with opportunities to increase our revenues through providing a combination of housing, hospitality services, ancillary services and health care services. ***Our senior living communities offer residents a supportive "home-like" setting, assistance***

*with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking) and, in certain communities, licensed skilled nursing services.* We also provide ancillary services, including therapy and home health services, to our residents. Our strategy is to be the leading provider of senior living solutions, built on a large and growing senior housing platform. *By providing residents with a range of service options as their needs change, we provide greater continuity of care, enabling seniors to "age-in-place" and thereby maintain residency with us for a longer period of time. The ability of residents to age-in-place is also beneficial to our residents and their families who are concerned with care decisions for their elderly relatives.*

246.    A substantially similar representations appeared in the 3Q16 Form 10-Q, stating:

We intend to be the leading provider of senior living solutions, and we believe that we are positioned to take advantage of favorable demographic trends and future supply-demand dynamics in the senior living industry. We also believe that we operate in the most attractive sectors of the senior living industry with opportunities to increase our revenues through providing a combination of housing, hospitality services, ancillary services and health care services. *Our senior living communities offer residents a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking) and, in certain communities, licensed skilled nursing services.* We also provide ancillary services, including therapy and home health services, to our residents. *By providing residents with a range of service options as their needs change, we provide greater continuity of care, enabling seniors to "age-in-place" and thereby maintain residency with us for a longer period of time. The ability of residents to age-in-place is also beneficial to our residents and their families who are concerned with care decisions for their elderly relatives*

247.    A substantially similarly representation as ¶¶245-46 also appeared in the 1Q17

Form 10-Q, 2Q17 Form 10-Q, and 3Q17 Form 10-Q, stating;

We intend to be the leading provider of senior living solutions, and we believe that we are positioned to take advantage of favorable demographic trends over time. We also believe that we operate in the most attractive sectors of the senior living industry with opportunities to increase our revenues through providing a combination of housing, hospitality services, ancillary services and health care services. *Our senior living communities offer residents a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking) and, in certain communities, licensed skilled nursing services.* We also provide ancillary services, including outpatient therapy, home health services and hospice services, to our residents. *By providing residents with a range of service options as their needs change, we provide greater continuity of care, enabling seniors to "age-in-place" and thereby maintain residency with us for a longer period of time. The ability of residents to age-in-place is also*

*beneficial to our residents and their families who are concerned with care decisions for their elderly relatives.*

248.     A substantially similar representation as ¶¶245-47 appeared in the 1Q18 Form 10-Q, 2Q18 Form 10-Q, and 3Q18 Form 10-Q, stating:

> We believe that we operate in the most attractive sectors of the senior living industry, and our goal is to be the first choice in senior living by being the nation's most trusted and effective senior living provider and employer. Our community and service offerings combine housing, health care, hospitality, and ancillary services. *Our senior living communities offer residents a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking and, in certain communities, licensed skilled nursing services.* We also provide ancillary services, including home health, hospice and outpatient therapy services to residents of many of our communities and to seniors living outside of our communities. *By providing residents with a range of service options as their needs change, we provide greater continuity of care, enabling seniors to "age-in-place," which we believe enables them to maintain residency with us for a longer period of time. The ability of residents to age-in-place is also beneficial to our residents and their families who are concerned with care decisions for their elderly relatives.* With our platform of a range of community and service offerings, we believe that we are positioned to take advantage of favorable demographic trends over time.

249.     A similar representation also appeared in the 1Q19 Form 10-Q, stating:

> *Our goal is to be the first choice in senior living by being the nation's most trusted and effective senior living provider and employer.* With our range of community and service offerings, we believe that we are positioned to take advantage of favorable demographic trends over time. Our community and service offerings combine housing with hospitality and healthcare services. *Our senior living communities offer residents a supportive home-like setting, assistance with activities of daily living such as eating, bathing, dressing, toileting, and transferring/walking and, in certain communities, licensed skilled nursing services.* We also provide home health, hospice, and outpatient therapy services to residents of many of our communities and to seniors living outside of our communities. *By providing residents with a range of service options as their needs change, we provide greater continuity of care, enabling seniors to age-in-place, which we believe enables them to maintain residency with us for a longer period of time. The ability of residents to age-in-place is also beneficial to our residents and their families who are concerned with care decisions for their elderly relatives*.

250.     An identical representation as ¶249 appeared in the 2Q19 Form 10-Q but updated for as of June 30, 2019.

251.    A similar representation to that in ¶249 appeared in the 2016 Form 10-K, stating:

***Our senior living communities offer residents a supportive home-like setting, assistance with activities of daily living ("ADLs") (such as eating, bathing, dressing, toileting and transferring/walking) and, in certain communities, licensed skilled nursing services.*** We also provide ancillary services, including outpatient therapy, home health services and hospice services, to our residents. ***By providing residents with a range of service options as their needs change, we provide greater continuity of care, enabling seniors to "age-in-place" and thereby maintain residency with us for a longer period of time. The ability of residents to age-in-place is also beneficial to our residents and their families who are concerned with care decisions for their elderly relatives.***

252.    A substantially similar representation as ¶251 appeared in the 2017 Form 10-K:

***Our senior living communities offer residents a supportive home-like setting, assistance with activities of daily living ("ADL") such as eating, bathing, dressing, toileting and transferring/walking and, in certain communities, licensed skilled nursing services.*** We also provide ancillary services, including home health, hospice and outpatient therapy services to residents of many of our communities and to seniors living outside of our communities. ***By providing residents with a range of service options as their needs change, we provide greater continuity of care, enabling seniors to "age-in-place," which we believe enables them to maintain residency with us for a longer period of time. The ability of residents to age-in-place is also beneficial to our residents and their families who are concerned with care decisions for their elderly relatives***. With our platform of a range of community and service offerings, we believe that we are positioned to take advantage of favorable demographic trends over time.

253.    An identical representation as the one in ¶252 also appeared in the 2018 Form 10-K and 2019 Form 10-K.

254.    The statements above were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100 residents, or no caregiver at all.  Further, in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and

99

lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care.

255.    In addition, the 2016 Form 10-K touted the purported specific services offered by Brookdale, stating:

*Retirement Centers*

Our retirement center communities are primarily designed for middle to upper income seniors generally age 75 and older who desire an upscale residential environment ***providing the highest quality of service.***   The majority of our retirement center communities consist of both independent and assisted living units in a single community, which ***allows residents to "age-in-place" by providing them with a continuum of senior independent and assisted living services***. While the number varies depending upon the particular community, as of December 31, 2016 approximately 78.2% of all of the units at our retirement center communities are independent living units, with the balance of units licensed for assisted living.

Our retirement center communities are large multi-story buildings containing on average 189 units with extensive common areas and amenities. Residents may choose from studio, one-bedroom and two-bedroom units, depending upon the specific community.  ***Each retirement center community provides residents with basic services such as meal service, 24-hour emergency response, housekeeping, concierge services, transportation and recreational activities***. ***Most of these communities also offer custom tailored supplemental care services at an additional charge, which may include medication reminders, check-in services and escort and companion services.***

100

*In addition to the basic services, our retirement center communities that include assisted living also provide residents with supplemental care service options to provide assistance with ADLs.* The levels of care provided to residents vary from community to community depending, among other things, upon the licensing requirements and healthcare regulations of the state in which the community is located.

*Residents in our retirement center communities are able to maintain their residency for an extended period of time due to the range of service options available to residents (not including skilled nursing) as their needs change. Residents with cognitive or physical frailties and higher level service needs are accommodated with supplemental services in their own units or, in certain communities, are cared for in a more structured and supervised environment on a separate wing or floor. These communities also generally have a dedicated assisted living staff, including nurses at the majority of communities, and separate assisted living dining rooms and activity areas*.

Retirement center communities that we own or lease are included in our Retirement Centers segment, and retirement center communities for which we provide management services for third parties or unconsolidated ventures in which we have an ownership interest are included in our Management Services segment. As of December 31, 2016, our Retirement Center segment consisted of 93 retirement center communities with 17,094 units, representing 16.5% of our total senior living capacity, and 36 retirement center communities with 7,275 units were included in our Management Services segment, representing 7.0% of our total senior living capacity. In the aggregate, these retirement center communities represented 23.5% of our total senior living capacity.

*Assisted Living*

*Our assisted living communities offer housing and 24-hour assistance with ADLs to mid-acuity frail and elderly residents*. Our assisted living communities include both freestanding, multi-story communities with more than 50 beds and smaller, freestanding single story communities with less than 50 beds. Depending upon the specific location, the community may include (i) private studio, one-bedroom and one-bedroom deluxe apartments, or (ii) individual rooms for one or two residents in wings or "neighborhoods" scaled to a single-family home, which includes a living room, dining room, patio or enclosed porch, laundry room and personal care area, as well as a caregiver work station.

We also operate memory care communities, which are freestanding assisted living communities specially designed for residents with Alzheimer's disease and other dementias requiring the attention, personal care and services needed to help cognitively impaired residents maintain a higher quality of life. Our memory care communities have from 8 to 75 beds and some are part of a campus setting which includes a freestanding assisted living community.

101

*All residents at our assisted living and memory care communities receive the basic care level, which includes ongoing health assessments, three meals per day and snacks, coordination of special diets planned by a registered dietitian, assistance with coordination of physician care, social and recreational activities, housekeeping and personal laundry services.* In some locations we offer our residents exercise programs and programs designed to address issues associated with early stages of Alzheimer's and other forms of dementia. *In addition, we offer at additional cost, higher levels of personal care services to residents at these communities who are very physically frail or experiencing early stages of Alzheimer's disease or other dementia and who require more frequent or intensive physical assistance or increased personal care and supervision due to cognitive impairments.*

256.  The 2017 Form 10-K contained an identical representation as that in ¶255 but updated for fiscal year 2017.

257.  The 2018 Form 10-K contained a similar representation, stating:

*Independent Living Communities*

Our independent living communities are primarily designed for middle to upper income seniors who desire an upscale residential environment providing the highest quality of service. A number of our independent living residents relocate to one of our communities in order to be in a metropolitan area that is closer to their adult children. The majority of our independent living communities consist of both independent and assisted living units in a single community, *which allows residents to age-in-place by providing them with a continuum of senior independent and assisted living services*. While the number varies depending upon the particular community, as of December 31, 2018 approximately 78.5% of all of the units at our independent living communities were independent living units, with the balance of the units licensed for assisted living and memory care.

\*　　\*　　\*

*Each independent living community provides residents with basic services such as meal service, 24-hour emergency response, housekeeping, concierge services, transportation and recreational activities. Most of these communities also offer custom tailored personal care services at an additional charge, which may include medication reminders, check-in services and escort and companion services*.

*In addition to the basic services, our independent living communities that include assisted living also provide residents with personal care service options to provide assistance with ADLs*. The levels of care provided to residents vary

102

from community to community depending, among other things, upon the licensing requirements and healthcare regulations of the state in which the community is located.

*Residents in our independent living communities are able to maintain their residency for an extended period of time due to the range of service options available to residents (not including skilled nursing) as their needs change. Residents with cognitive or physical frailties and higher level service needs are accommodated with supplemental services in their own units or, in certain communities, are cared for in a more structured and supervised environment on a separate wing or floor. These communities also generally have a dedicated assisted living staff and separate assisted living dining rooms and activity areas.*

*Assisted Living and Memory Care Communities*

*Our assisted living and memory care communities offer housing and 24-hour assistance with ADLs to mid-acuity frail and elderly residents.* Residents typically enter an assisted living or memory care community due to a relatively immediate need for services that may have been triggered by a medical event. Our assisted living and memory care communities include both freestanding, multi-story communities with more than 50 beds, and smaller, freestanding single story communities. Depending upon the specific location, the community may include (i) private studio, one-bedroom and one-bedroom deluxe apartments, or (ii) individual rooms for one or two residents in wings or "neighborhoods" scaled to a single-family home, which includes a living room, dining room, patio or enclosed porch, laundry room and personal care area, as well as a caregiver work station.

We also provide memory care services at freestanding memory care communities that are specially designed for residents with Alzheimer's and other dementias. Our freestanding memory care communities have approximately 20 to 70 beds and some are part of a campus-like setting which includes a freestanding assisted living community. As of December 31, 2018, we provide memory care services at 462 of our communities, aggregating 11,860 memory care units across our segments. These communities include 115 freestanding memory care communities with 4,473 units included in our Assisted Living and Memory Care segment.

*All residents at our assisted living and memory care communities are eligible to receive the basic care level, which includes ongoing health assessments, three meals per day and snacks, coordination of special diets planned by a registered dietitian, assistance with coordination of physician care, social and recreational activities, housekeeping and personal laundry services.* In some locations we offer our residents exercise programs and programs designed to address issues associated with early stages of Alzheimer's and other dementias. *In addition, we offer at additional cost, higher levels of personal care services to residents at these communities who are very physically frail or who require more frequent*

*or intensive physical assistance or increased personal care and supervision due to cognitive impairments.*

258.    The 2019 Form 10-K contained a substantially similar representation, stating:

**Independent Living Communities**

Our independent living communities are primarily designed for middle to upper income seniors who desire a change in lifestyle within a residential environment *to live life to the fullest.* A number of our independent living residents relocate to one of our communities in order to be in a metropolitan area that is closer to their adult children. *The majority of our independent living communities consist of both independent and assisted living units in a single community, which allows residents to age-in-place by providing them with a broad continuum of senior independent and assisted living services.* While the number varies depending upon the particular community, as of December 31, 2019 approximately 80% of all of the units at our independent living communities were independent living units, with the balance of the units licensed for assisted living and memory care.

Our independent living communities generally are large multi-story buildings averaging 184 units with extensive common areas and amenities. Residents may choose from studio, one-bedroom, and two-bedroom units, depending upon the specific community. *Each independent living community provides residents with basic services such as dining service options, 24-hour emergency response, housekeeping, and recreational activities. Most of these communities also offer custom tailored concierge and personal assistance/private duty services at an additional charge, which may include medication reminders, check-in, transportation, shopping, escort, and companion services*.

*In addition to the basic services, our independent living communities that include assisted living also provide residents with personal care and convenience service options to provide assistance with ADLs. The levels of care provided to residents vary from community to community depending, among other things, upon the licensing requirements and healthcare regulations of the state in which the community is located.*

*Residents in our independent living communities are able to maintain their residency for an extended period of time due to the range of service options available (not including skilled nursing). Residents with cognitive or physical frailties and higher level service needs are accommodated with supplemental services in their own units or, in certain communities, are cared for in a more structured and supervised environment on a separate wing or floor. These communities also generally have a dedicated assisted living staff and separate assisted living dining rooms and activity areas.*

**Assisted Living and Memory Care Communities**

104

***Our assisted living and memory care communities offer housing and 24-hour assistance with ADLs to mid-acuity and frail elderly residents.*** Residents typically enter an assisted living or memory care community due to a relatively immediate need for services that may have been triggered by a medical event. Our assisted living and memory care communities include both freestanding, multi-story communities with more than 50 beds, and smaller, freestanding, single story communities. Depending upon the specific location, the community may include (i) private studio, one-bedroom, and one-bedroom deluxe apartments, or (ii) individual rooms for one or two residents in wings or "neighborhoods" scaled to a single-family home, which includes a living room, dining room, patio or enclosed porch, laundry room, and personal care area, as well as a caregiver work station.

We also provide memory care services at freestanding memory care communities that are specially designed for residents with dementia, including Alzheimer's disease and other forms of cognitive impairment. Our freestanding memory care communities have approximately 20 to 70 beds and some are part of a campus-like setting which includes a freestanding assisted living community. As of December 31, 2019, we provide memory care services at 392 of our communities, aggregating 10,350 memory care units across our segments. These communities include 112 freestanding memory care communities with 4,347 units included in our Assisted Living and Memory Care segment.

***All residents at our assisted living and memory care communities are eligible to receive the basic care level, which includes ongoing health assessments, three meals per day and snacks, 24-hour staff assistance, coordination of special diets planned by a registered dietitian, assistance with coordination of physician care, social and recreational activities, housekeeping, and personal laundry services. In some locations we offer our residents exercise programs and programs designed to address issues associated with early stages of Alzheimer's disease and other dementias. For an additional cost at these communities, we offer higher levels of personal care services to residents who are more physically frail or require more frequent or intensive physical assistance or increased personal care and supervision due to cognitive impairments.***

***As a result of their progressive decline in cognitive abilities, residents at our memory care units typically require higher levels of personal care and services than in assisted living and therefore pay higher monthly service fees. Specialized services include assistance with ADLs, behavior management, and an activities program, the goal of which is to provide a normalized environment that supports residents' remaining functional abilities.***

259.    The statements above were materially false and misleading when made because

Brookdale did not provide residents with services to age-in-place due to the fact it was

understaffed, as evidenced by the fact: (i) call lights went unanswered for an entire day in some instances before receiving a response from staff ; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents, even those with plans to be constantly monitored, wandered outside the facility without anyone noticing; and (iv) residents missed doctors' appointments because there was no staff. Further, Brookdale is the subject of countless lawsuits and has received numerous citations for violation laws local, state, and federal laws as a result of not having an adequate number of caregivers to care for the number of residents.

260.　　Among Brookdale's competitive strengths, the 2016 Form 10-K identified, in part, the following:

> *Ability to provide a broad spectrum of care.* Given our diverse mix of retirement centers, assisted living communities and CCRCs, as well as our ancillary services offerings, ***we are able to meet a wide range of our customers' needs. We believe that we are one of the few companies in the senior living industry with this capability and the only company that does so at scale on a national basis***. We believe that our multiple product offerings create marketing synergies and cross-selling opportunities.

261.　　The 2017 Form 10-K, 2018 Form 10-K, and 2019 Form 10-K contained identical representations

262.　　The statements above, including that Brookdale offered the "full continuum of services", a "supportive home-like setting," "assistance with activities of daily living" "such as eating, bathing, dressing, toileting, and transferring/walking and . . . licensed skilled nursing services," were materially false and misleading when made because Brookdale intentionally and systemically understaffed its facilities so that there were not enough caregivers to perform the services and care that was promised to residents or required to meet even the most basic needs. Brookdale's staffing was so deficient that, in some instances, there was only 1 caregiver per 100

residents, or no caregiver at all. Further, in order to increase occupancy, residents were placed in facilities regardless of whether those facilities could provide sufficient care for their level of acuity. As a result of its understaffing, numerous instances of neglect and lack of care occurred, including that: (i) residents did not receive assistance after pushing a call light, sometimes waiting almost an entire day before receiving a response; (ii) residents were not checked on at night, resulting in some residents wandering out of a facility unnoticed; (iii) residents were unsupervised; (iv) residents who fell or were otherwise injured went hours or days before being found; (v) residents wandered outside the facility without anyone noticing; (vi) residents missed doctors' appointments; (vii) resident one-on-one care was reduced; (viii) residents did not receive the medications as prescribed; and, in some instances, (ix) resident deaths resulted. The severity of this lack of care is further evidenced by the countless number of citations and lawsuits that have been filed against Brookdale for violating local, state, and federal laws as a result of its understaffing and poor resident care.

### vii. Materially False and Misleading Statements Concerning Compliance with Internal Policies

263. Throughout the Class Period, Defendants represented that Brookdale was in compliance with its own internal polices, including those that mandate certain staffing and care requirements. These statements were materially false and misleading because Brookdale was in violation of such polices, as a result of its understaffing and in ability to adequately perform basic services for its guests. These violations resulted in numerous citations by state authorities and lawsuits.

264. For example, the 2016 Form 10-K misrepresented that Brookdale had implemented its own policies and procedures to ensure adequate and high levels of care in addition to local and state laws and regulations. For example, the 2016 Form 10-K stated:

***We have implemented intensive standards, policies and procedures and systems,*** including detailed staff manuals and training materials***, which we believe have contributed to high levels of customer service***. We have centralized accounting, finance and other operating functions in our support centers so that, consistent with our operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations. Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, energy and insurance, implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures. ***We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations;*** billing and collections; accounts payable; finance and accounting; risk management; development of employee training materials and programs; marketing activities; the hiring and training of management and other community-based personnel; ***compliance with applicable local and state regulatory requirements;*** and implementation of our acquisition, development and leasing plans.

265.     The 2017 Form 10-K similarly stated:

***We have implemented intensive standards, policies and procedures and systems,*** including detailed staff manuals and training materials, ***which we believe have contributed to high levels of customer service.*** Further, we believe our centralized support infrastructure allows our community-based leaders and personnel to focus on resident care and family connections. Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, supplies and insurance, implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures. ***We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations***; billing and collections; accounts payable; finance and accounting; risk management; development of employee training materials and programs; marketing activities; the hiring and training of management and other community-based personnel; ***compliance with applicable local and state regulatory requirements;*** and implementation of our acquisition, development and leasing plans.

266.     The 2018 Form 10-K similarly stated:

***Operations Overview***

***We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service.*** Further, we believe our centralized support infrastructure allows our community-based leaders and personnel to focus on resident care and family connections.

108

*Consolidated Corporate Operations Support*

We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established centralized operations groups to support all of our product lines and communities in areas such as training, ***regulatory affairs***, asset management, dining and procurement. ***We have also established company-wide policies and procedures relating to, among other things: resident care***; community design and community operations; billing and collections; accounts payable; finance and accounting; risk management; development of employee training materials and programs; marketing activities; the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements; and implementation of our acquisition, development and leasing plans.

267.     The 2019 Form 10-K contained a substantially similar representation, stating:

**Operations Overview**

***We have implemented intensive standards, policies and procedures, and systems, including detailed staff resources and training materials, which we believe have contributed to high levels of customer service.*** Further, we believe our centralized support infrastructure allows our community-based leaders and personnel to focus on resident care and family connections.

**Consolidated Corporate Operations Support**

We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology, and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established centralized operations groups to support all of our product lines and communities in areas such as training, ***regulatory affairs***, asset management, dining, clinical services, sales, customer engagement, marketing, and procurement. ***We have also established company-wide policies and procedures relating to, among other things: resident care;*** community design and community operations; billing and collections; accounts payable; finance and accounting; risk management;

109

development of associate training materials and programs; advertising and marketing activities; the hiring and training of management and other community-based personnel; *compliance with applicable local and state regulatory requirements;* and implementation of our acquisition, development, and leasing plans.

268.    The 2016 Form 10-K further stated that Brookdale maintains a quality assurance program that conducts inspections to monitor the quality of service:

*Quality Assurance*

**We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis. These inspections cover** the appearance of the exterior and grounds; **the appearance and cleanliness of the interior**; the professionalism and friendliness of staff; **quality of resident care (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program;** observance of residents in their daily living activities; **and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.**

**In order to foster a sense of community as well as to respond to residents' needs and desires, at many of our communities, we have established a resident council or other resident advisory committee that meets monthly with the Executive Director of the community.** Separate resident committees also exist at many of these communities for food service, activities, marketing and hospitality. These committees promote resident involvement and satisfaction and **enable community management to be more responsive to the residents' needs and desires**.

269.    The 2017 Form 10-K contained an identical representation. A substantially similar representation appeared in the 2018 Form 10-K, stating:

*Quality Assurance*

**We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis. These inspections cover** the appearance of the exterior and grounds; **the**

110

*appearance and cleanliness of the interior*; the professionalism and friendliness of staff; *quality of resident care (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program;* observance of residents in their daily living activities; *and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents*.

*In order to foster a sense of community as well as to respond to residents' needs and desires, at many of our communities, we have established a resident council or other resident advisory committee that meets monthly with the Executive Director of the community.* Separate resident committees also exist at many of these communities for food service, activities, marketing and hospitality. These committees promote resident involvement and satisfaction and *enable community management to be more responsive to the residents' needs and desires*.

270.     The 2019 Form 10-K contained a nearly identical representation as ¶¶268-69

stating:

**Quality Assurance**

*We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction through the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis. These inspections cover* the appearance of the exterior and grounds; *the appearance and cleanliness of the interior*; the professionalism and friendliness of staff; *quality of resident care (including assisted living services, nursing care, therapy, and home health programs); the quality of activities and the dining program;* observance of residents in their daily living activities; and compliance with government regulations. *Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services we provide to residents.*

*In order to foster a sense of belonging and engagement, as well as to respond to residents' needs and desires, at many of our communities, we have established a resident council or other resident advisory committees that meet at least monthly with the Executive Director of the community.* Separate resident committees also exist at many of these communities for food service, activities, marketing, and hospitality. These committees *promote resident involvement and satisfaction and enable community management to be more responsive to their residents' needs and desires.*

111

271. The statements above concerning compliance with Brookdale's own internal policies and procedure and quality assurance were materially false and misleading when made because: (i) Brookdale was violating its own policies and procedures by not providing adequate staffing as residents were promised, which resulted in inadequate care and, in certain instances, patient injury or death; (ii) Brookdale was not performing its quality assurance inspections; and (iii) when Brookdale did perform a quality assurance inspection, multiple violations and compliance issues were found, including violations of regulations, yet according to CW1 and CW5, nothing was done to enforce the Company's internal policies or to correct such problems.

### viii. Materially False and misleading Statements Concerning An Increase in Occupancy

272. Throughout the Class Period, Defendants made material misrepresentations that occupancy had increased at Brookdale's facilities but failed to disclose that the occupancy only increased because Defendants induced new residents with false promises of high quality care with sufficient staffing to allow the resident to age in place. For example, The November 1, 2016 Press Release reported:

> *Weighted average same-community senior housing occupancy increased 40 basis points from the second quarter of 2016*, and senior housing same community average monthly revenue per occupied unit increased 3.2% from the third quarter of 2015.

273. During the 3Q16 Call, Defendant Baier stated:

> *Our third quarter 2016 average occupancy for the consolidated senior housing portfolio was 86.2% versus 85.8% in second quarter 2016, a 40 basis points sequential increase.* Our revenue growth continues to be impacted by lower year-over-year occupancy. Our weighted average occupancy for third quarter 2016 was 50 basis points lower than Quarter 4 of 2015. At the same time, the year-over-year same-store occupancy decline narrowed to 100 basis points in the third quarter compared to 120 basis points in the second quarter. As we said before, we expected to make more progress on occupancy but the impact of new supply in our midsized market was greater than we expected it to be. We are continuing to achieve solid year-over-year rate growth. Our third quarter 2016 same community revenue per occupied unit increased 3.2% on a year-over-year basis. We continue to see a decent

pricing environment in the aggregate, with the ability to pass on cost effectively and a system in place that routinely updates resident fee charges when acuity rises. However, given the competitive environment, we increased the use of our discounts and incentives in certain markets, which negatively impacted our rate growth, resulting in being below our expectations of our revenue rate growth. As you would expect, the lower-than-expected occupancy and rate resulted in lower revenue growth than we anticipated.

274.    With respect to the Senior Housing segment, the May 8, 2017 Press Release stated:

Same community revenue for the consolidated senior housing portfolio for the three months ended March 31, 2017 increased 0.8% over the corresponding period in 2016. *Same community RevPAR increased 0.8% in the first quarter of 2017 from the first quarter of 2016, driven by an increase in same community RevPOR of 2.0% and a decline in weighted average unit occupancy of 100 basis points.* Consolidated same community facility operating expenses for the first quarter of 2017 increased by 0.1% over the first quarter of 2016, evidencing strong cost controls. As a result, same community operating income for the consolidated senior housing portfolio for the first quarter of 2017 increased by 2.0% from the first quarter of 2016, to $298.0 million.

275.    The statements above were materially false and misleading when made because: (i) Defendants failed to disclose that Brookdale increased occupancy by inducing residents to come to Brookdale's facilities with false promises of a high quality of services and care, sufficient staffing, and superior quality of life so they could age in place; (ii) Brookdale rushed residents into its facilities with the wrong and usually insufficient level of care in order to report higher occupancy; (iii) the residents that were rushed in only lasted a couple weeks before having to move out because their level of acuity could not be met; and, as a result, (iv) Brookdale was not experiencing an increase in occupancy.

276. In November 5, 2018 Press Release, defendant Baier is quoted as touting Brookdale's occupancy as exceeding the industry:

Lucinda ("Cindy") Baier, Brookdale's President and CEO, said "For the third quarter on a sequential basis, *we were pleased to have outperformed the industry in occupancy growth. On a year-over-year basis, senior housing RevPAR improved 2.9%, driven by our Retirement Centers improvements of 5.8% in RevPAR and 190 bps in occupancy*. The Retirement Centers outperformed the

113

industry and benefited from our community portfolio optimization. While the industry will continue to face headwinds from oversupply and a tight labor market, we remain focused on improving what we control. We are executing our turnaround strategy and making investments in our associates to build the best team in the industry. We believe that this strategy will allow us to deliver our mission to more seniors and provide long-term value to our shareholders.

277. With respect to the Senior Housing segment, the 2Q19 Form 10-Q reported an increase in weighted occupancy:

The decrease in the segment's resident fees was primarily attributable to the disposition of 17 communities since the beginning of the prior year period, which resulted in $29.2 million less in resident fees during the three months ended June 30, 2019 compared to the prior year period. The decrease in resident fees was partially offset by the increase in the segment's same community RevPAR, comprised of a 2.7% increase in same community RevPOR and a 5*0 basis points increase in same community weighted average occupancy*. The increase in the segment's same community RevPOR was primarily the result of in-place rent increases.

278. In connection with the February 18, 2020 Press Release, Brookdale also held an investor conference call on February 19, 2019 to discuss the Company's fourth quarter and full year 2019 financial results (the "4Q19 Call"). Defendants Baier and Swain participated on the call. Defendant Baier commented:

*Focusing on the fourth quarter 2019, NIC senior housing occupancy increased 20 basis points on a sequential basis. Brookdale again exceeded NIC by increasing 30 basis points on a same-community basis*. Brookdale's RevPAR, on a same-community basis, increased 20 basis points sequentially. On a year-over-year basis, RevPAR grew 2.1% for the fourth quarter and 1.9% for the full year. This is strong evidence that our strategy to turn around senior living operations, drive top line growth and win locally has been and will continue to be successful.

279. Defendant Swain also reported on operating results during the 4Q19 Call, stating:

Thank you, Cindy. Last year, we delivered on significant milestones. This momentum will set us up for EBITDA growth in 2020. I'll provide highlights as they relate to the fourth quarter and full year 2019 financial results, then I'll provide you with the building blocks to deliver 2020 guidance. Starting with 2019, we achieved full year financial results within or better than our original guidance ranges despite a very competitive market. Annual same-community revenue grew

114

1.9% year-over-year, and fourth quarter revenue increased both sequentially and on a year-over-year basis. ***Brookdale delivered the best in-year occupancy improvement since before the Emeritus merger 5 years ago as same-community occupancy increased sequentially in the third and fourth quarters***.

***

Starting with senior housing, same-community fourth quarter revenue improved 2.1% compared to the prior year quarter, and for the full year, improved 1.9%. Our focus on improving rate growth in 2019 drove stronger financial results. We passed through larger in-place rent increases by linking them to higher labor investments. We also maintained overall price discipline while flexing pricing in select markets when necessary to remain competitive. Because of these actions, 2019 annual RevPOR increased 2.9% compared to last year's annual increase of 1.2%. For the segments, independent living revenue growth was 1.1% for the fourth quarter and 2.5% annually compared to the prior year periods. This growth was largely driven by rate increases. ***For the full year, independent living occupancy increased 10 basis points***. While it remains a tough competitive environment for independent living, we're excited that we were able to grow occupancy.

280.     The statements above were materially false and misleading when made because: (i) Defendants failed to disclose that Brookdale increased occupancy by inducing residents to come to Brookdale's facilities with false promises of a high quality of services and care, sufficient staffing, and superior quality of life so they could age in place; (ii) Brookdale rushed residents into its facilities with the wrong and usually insufficient level of care in order to report higher occupancy; (iii) the residents that were rushed in only lasted a couple weeks before having to move out because their level of acuity could not be met; and, as a result, (iv) Brookdale was not experiencing an increase in occupancy.

## VI.     THE TRUTH IS REVEALED

281.     On April 30, 2020, the *Nashville Business Journal*, which has a national audience of 14.6 million monthly unique online visitors, 1.3 million weekly print readers, and 213,000 annual event attendees, published an article titled "Lawsuit accuses Brentwood health care giant of deception, understaffing," which publicly reported for the first time that a proposed class action

115

lawsuit had been filed by a Brookdale resident against Brookdale accusing the Company of, among other things, purposeful "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks since at least April 24, 2016. Plaintiff Gunza was a resident of Brookdale's Reynolds Road facility and experienced first-hand the Company's grossly inadequate staffing.

282. Specifically, the article stated:

Weeks after announcing plans to hire thousands of workers, Brookdale Senior Living Inc. is facing allegations of understaffing.

*In a proposed class-action lawsuit filed in the U.S. District Court of Middle Tennessee, the Brentwood-based senior-living operator is accused of purposeful "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks.* According to the filing, Brookdale misled residents and their families when it promised basic care and daily living services.

*The lawsuit claims that the proposed class of plaintiffs* — who are current and former residents of 56 Brookdale facilities in North Carolina — *"have not received the care and services they paid for." The lawsuit asks for damages and for Brookdale to "stop the unlawful and fraudulent practices*."

Brookdale has yet to file a response but denied the claims in an emailed statement:

"The health and wellbeing of our residents is Brookdale's top priority. We absolutely disagree with the allegations in the suit and believe the complaint is completely without merit."

Brookdale (NYSE: BKD) is the nation's largest senior-living community operator, with more than 750 facilities in 45 states. The company reported $4 billion of revenue in 2019, making it one of Nashville's largest publicly traded health care companies, according to Nashville Business Journal research.

The company has approximately 38,400 full-time employees nationwide, according to its 2019 earnings report filed with the U.S. Securities and Exchange Commission.

283. The *Gunza* lawsuit also caught the attention of McKnight's Senior Living, a national media brand, which published an April 30, 2020 article titled "Brookdale says lawsuit questioning marketing materials, residency agreements 'completely without merit.'" The McKnight article stated:

116

*The country's largest senior living company is facing a potential class-action lawsuit over alleged unfair trade practices and alleged failure to provide promised services at dozens of its assisted living communities*.

*The complaint, filed April 24 in the U.S. District Court of the Middle District of Tennessee, Nashville Division, claims that Brentwood, TN-based Brookdale Senior Living misled residents and their families about personalized services and staffing levels at its assisted living communities through its marketing materials and residency agreements.* Brookdale disagrees.

"The health and wellbeing of our residents is Brookdale's top priority," Heather Hunter, a senior public relations specialist at Brookdale, told *McKnight's Senior Living*. "We absolutely disagree with the allegations in the suit and believe the complaint is completely without merit."

The company operated at least 56 communities in North Carolina during the time period covered by the lawsuit. The complaint anticipates that more than 5,000 current and former residents could be part of the class action status if it is certified.

The suit is being brought under the North Carolina Uniform Declaratory Judgment Act and the North Carolina Unfair and Deceptive Trade Practices Act.

*It alleges that Brookdale participated in "systemic unfair and deceptive" trade practices and breaches of contract beginning in April 2016 by engaging in "inherently flawed and deceptive" staffing practices, and then misleading residents and families through misrepresentations and misleading statements in marketing materials and residency agreements. The suit further alleges that "every resident, regardless of need level, was deprived of services that were needed and paid for based on inadequate staffing levels.*

The complaint was filed by Peggy Fisher on behalf of her brother George Gunza, a resident of <u>Brookdale Reynolda Road</u>, an assisted living community in Winston-Salem, NC. Fisher, acting power of attorney, withdrew Gunza from the community in May 2018 as a result of staffing she said was insufficient to meet her brother's needs.

*The complaint states that Brookdale, through its marketing and sales materials, promised tailored services to meet the individualized needs of its residents but "systematically and willfully understaffed its facility to boost its profitability." Residents and families, the complaint states, were misled that communities would meet basic care needs and daily living services*.

*According to the complaint, Brookdale used its own service agreement software algorithm to enforce corporate-determined staffing levels rather than using personal service assessments of each resident's care and service needs. Residents and families allegedly were misled by resident agreements that indicated facilities would meet basic care needs and daily living services — some for additional fees — based on those PSAs*.

117

*The suit asserts that Brookdale determines, limits and controls day-to-day staffing levels at its communities from its corporate headquarters*. Executive directors at each facility are not permitted to modify those staffing levels without permission "from several layers of Brookdale corporate management," the complaint maintains.

"*As a result, Brookdale has systematically short-staffed its assisted living facilities on a day-to-day basis, employing a fundamentally flawed and automated process, purposefully created and mandated to achieve budget objectives and to satisfy predetermined financial performance thresholds rather than meeting residents' needs by, among other things, embedding flawed assumptions into its staffing software to underestimate required staffing levels*," the complaint reads.

Christa L. Collins, lead counsel for Gunza and Fisher, cited strict court rules in declining comment on the suit.

This is the second recent lawsuit accusing the company of understaffing. Another suit, filed in 2017 in California, was thought to be the first class-action lawsuit against an assisted living operator to be brought under the ADA. Potential damages in that case could exceed $45 million, as the lawsuit is seeking a minimum of $9,000 for each affected resident and more than 5,000 residents of Brookdale communities in California could become part of the class.

284. An article in the NashvillePost also reported on the *Gunza* lawsuit on April 30, 2020, stating:

A putative class-action lawsuit has been filed against Brookdale Senior Living alleging its leaders have willfully understaffed facilities to boost profits.

A group of elderly and disabled residents from nearly 56 Brookdale facilities are members of the proposed class claiming the Brentwood-based company "engaged in a scheme of understaffing and coverup through misrepresentations, misleading statements, omissions and concealment of material facts, and the inherently flawed and deceptive staffing practices" from April 2016 to now.

The group accuses the company of limiting care levels through a staffing algorithm from its corporate headquarters rather than using an individualized approach from patient assessments to determine how many workers are needed to provide care at each facility.

"As described by Brookdale, its Service Alignment Software consists of two main categories of data. First, it includes assumptions regarding the amount of time required to perform daily living services which are purportedly based on time studies Brookdale itself conducted; and the aggregate assess care needs of all residents. Second, the Service Alignment Software consists of algorithms and a source code "which takes the results of the time studies, as well as the assessed

118

needs of the residents and other parameters and factors" to set the number of staffing hours on a daily basis," the complaint reads, saying the use of the algorithm is faulty and flawed.

The lawsuit was filed last week in federal court and class certification has not yet been granted. The case has been referred to the magistrate judge for case management and Brookdale has not yet filed a response. In a comment to the Post, Brookdale vice president of communications Julie Davis said:

"We were pleased with the court's overall decision to enforce arbitration. We firmly believe this case is completely without merit and will continue to defend ourselves vigorously."

285. Upon the reporting of the filing of the *Gunza* complaint and its allegations of understaffing, Brookdale's stock price fell from a closing price of $3.68 on April 29, 2020 to a closing price of $3.61 per share on April 30, 2020, and continued to drop until reaching a closing price of $2.92 on May 5, 2020.

## VII. PLAINTIFF'S ALLEGATIONS CREATE A STRONG INFERENCE OF SCIENTER

286. As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

287. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Brookdale and, thus, controlled the information disseminated to the investing public in the Company's press releases, investor conference calls, and SEC filings. As a result, each could

falsify the information that reached the public about the Company's business, performance, and quality of care.

288.     Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes herein to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to Brookdale as the Individual Defendants were among the Company's most senior management and were acting within the scope of their employment.

### A.     Defendants Knew or Recklessly Disregarded that their Statements Were False When Made

289.     As discussed below, the Individual Defendants knew that Brookdale was severely understaffed and not able to provide the quality of care it contracted to residents because: (i) Defendants personally visited and shadowed employees at the community level to witness firsthand Brookdale's inadequate staffing; (ii) Brookdale frequently monitored reports concerning regulatory compliance at each facility; (iii) Brookdale has received voluminous citations and been named as a defendant in numerous lawsuits for violating laws and regulations concerning its chronic understaffing; (iv) Defendants controlled and manipulated SAS, the budget, and staffing determinations; (v) Brookdale violated its own internal policies; and (vi) Brookdale's senior assisted living and memory care segment and SAS system were its core operations;

#### i.     The Individual Defendants Had Knowledge of Understaffing and Resident Care Because Defendant Baier Visited Local Communities and Was "Hands On"

290.     The Individual Defendants were aware of the staffing issues and the inability to meet resident needs because Defendant Baier visited local communities and shadowed various staff members to see firsthand the staffing issues in communities.

291.     According to CW1, it was known company-wide that defendant Baier was very involved and very hands on from the minute she started as CEO. CW1 recalled that in approximately the spring or summer of 2018, defendant Baier and other executives, including Chief Compliance Officer John Blackwood, went to Oregon to visit Brookdale's communities including CW1's. CW1 recalled that defendant Baier conducted the visit so that Baier could see why the communities in Oregon were having such big staffing issues.

292.     In fact, Baier was aware that the entire Portland region had serious understaffing issues so she personally went to the communities in that region to see the nature and extent of the issues and targeted the facilities that had the worst problems, such as CW1s and the one in Wilsonville. CW1 stated that defendant Baier visited the community in Wilsonville where Baier shadowed a housekeeper. CW1 recalled that Baier's visit was posted over the internal internet at Brookdale. According to CW1, defendant Baier had full knowledge that Brookdale's facilities were grossly understaffed from her visits.

293.     Defendant Baier's own representations corroborate CW1's account. According to defendant Baier, her site visits were not limited to Oregon. Rather, as stated during the 1Q18 Call, these visits occurred on a monthly basis:

> I'll now turn to some drivers to reduce controllable move-outs. Our goal is to make decisions as close to the customer as we can, while capturing the benefits of scale. Our operations leadership team is empowering our Executive Directors with more local decision [ rights ] so that they can take care of the community as if they owned it. For example, they're reallocating resources during low-contact time periods to look at ways to enhance our facility's focus. ***I'm committed to spending time in our communities every month to ensure that our communities have what they need to succeed***. ***During my visits, I've seen evidence*** that our culture of winning locally is starting to be revitalized with a focus on differentiating Brookdale, ***based on caring, quality, personalized service to our residents.*** The Brookdale team is actively pursuing all 3 of our strategic priorities. So let me provide the highlights for the third priority, our shareholders.

294.    Accordingly, by virtue of these visits, defendant Baier was well aware that SAS was undervaluing the time needed for staff to care for residents, resulting in inadequate care.

### ii.    The Individual Defendants Were Aware of Regulatory Violations Because They Frequently Monitored Reports Concerning Such Violations

295.    The Individual Defendants were aware that Brookdale's facilities were violating numerous local, state, and federal regulations, as well as its own policies, due to understaffing and inadequate care because they closely monitored and tracked compliance. As explained in the Company's annual reports on form 10-K, Brookdale has quality assurance inspections "***conducted by corporate staff***" at its communities on a regular basis to purportedly ensure the care of residents and compliance with regulations are met:

> ***Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis***. These inspections cover the appearance of the exterior and grounds; ***the appearance and cleanliness of the interior;*** the professionalism and friendliness of staff; ***quality of resident care (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; observance of residents in their daily living activities; and compliance with government regulations.*** Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.

296.    According to CW1, there was an internal quality system called Continuous Quality Improvement program, or CQI, where Brookdale would upload site visit reports. CW1 explained that any kind of site visit, regardless of the nature of the visit, was uploaded to CQI. This included site visits from the Regional Director of Operations and the Regional Director of Nursing for compliance, audits, and checks. CW1 stated that everyone had access to CQI, including Vice Presidents, Senior Vice Presidents. CW1 recalled that visit after visit there would be compliance issues at certain communities. CW1 believed the information reported in CQI would have been reported to the Baier, Smith, and Swain.

297.     Upon information and belief, CQI also included quarterly report cards that looked at local, state and federal regulations and whether there were deficiencies within Brookdale's communities, including with respect to staffing.

298.     Accordingly, through quality assurance inspections and Defendants access to CQI and its compliance reports, the Individual Defendants were aware of Brookdale's violations throughout the Class Period.

### iii. The Individual Defendants Were Aware Of Staffing and Quality of Care Issues Because They Controlled SAS, the Budget, and Staffing Determinations

299.     The Individual Defendants had knowledge of Brookdale's understaffing and resulting inadequate quality of care because they controlled staffing decisions, including by accessing and controlling SAS, controlling budget determinations, and having final say on staffing requests.

300.     First, Defendants were aware that Brookdale's facilities were not adequately staffed through SAS. The SAS system was designed at the corporate level and only the highest individuals in the Company could access it or have knowledge of how it works. As attested to in the Boisen Declaration, the time studies and algorithms that SAS used were "not generally available within Brookdale or its independent subsidiaries," "Community-level associates and executive directors do not have access to Brookdale's time studies," the "development of the Service Alignment Software's underlying algorithms and source code was performed by a very limited set of Brookdale's own personnel," and "no one at the community level have access to the underlying algorithms and source codes for the program." The Boisen Declaration further attested to the fact that ***"[a]ccess to the Service Alignment System is limited to appropriate decision makers and***

*those individuals directly involved in staffing decisions*." Moreover, as represented in the Boisen Declaration, SAS was Brookdale's prized possession and of great importance to the Company:

> *This system [SAS] is critical to the daily operations of Brookdale* and its independent subsidiaries who operate individual communities *and represents the core of Brookdale's business. The Service Alignment System is also completely unique to Brookdale and distinguishes it from its competitors in the industry*.

301.    As defendant Baier conceded during the 3Q16 Call, the Defendants were the ones working in SAS:

> *We are continuing to work on our service alignment labor model which help us make sure that we've got the right labor in the communities to match to the acuity of the residents' needs and that helps us offset some of the labor pressure, to make sure that you're matching labor appropriately to need*.

302.    Confidential witnesses further confirm that SAS was operated and controlled at the corporate level. For example, CW1 stated that only those at the corporate level could manipulate SAS and that long-term staffing needs required approval from corporate. CW5 confirmed that SAS flowed out of corporate offices.

303.    With nearly exclusive possession and control of SAS and the time studies and algorithms used therein, and given that the Defendants had ultimate authority over approving or denying the numerous staffing requests they received, the Individual Defendants were aware that SAS was allotting labor hours significantly below realistic expectations for the care that residents needed and paid to receive.

304.    Second, similar to SAS, budgets also were created at the highest level at Brookdale and then dictated to each local community. *See* Section IV.F.ii. As explained in Brookdale's 2020 Definitive Proxy filed on May 18, 2020, "The Board and management use this measure [Resident Fee Revenue, FOI,] *in the budgeting process* and when evaluating our results." The 2020 Definitive Proxy further referred to other metrics that the "board and management *use . . . in the*

*budgeting process*" and that the "board and management team['s]" focus on metrics such as move-outs and occupancy. Not only did they create the budget, but any deviation from the budget required approval at the corporate level.

305. That the Individual Defendants were involved in approving and setting the budget is further confirmed by confidential witnesses. For example, CW4 stated that Defendant Baier was involved in finalizing the budget and that defendant Baier participated in monthly calls discussing occupancy, residency, NOI most gain to date, staffing, and overtime. CW4 further stated that defendants Baier, Smith and Swain had access to CRM, which included information such as all sales (leads), occupancy trends, overtime, and overage of spend. CW5 similarly stated that the budget was approved or modified at the corporate level. Further, the Individual Defendants were closely monitoring the budget in order to obtain lucrative bonus awards, as set forth below Section VII.B.ii.

306. Lastly, any changes to staffing required corporate approval. For example, CW1 recalled that long term staffing needs required corporate approval. CW5 stated that he believed the directives to cut staff came from the C-Suite, meaning defendants Baier and Smith.

307. Accordingly, as CFOs of the Company, Defendants Baier and Swain would have approved and/or created the budget and were well aware that its SAS system was understaffing its facilities across the nation, resulting in a reduced quality of care to residents, yet they declined to approve additional staffing.

  **iv.**  **The Individual Defendants Had Knowledge of Brookdale's Understaffing Because Brookdale Has Been Subject to Numerous Lawsuits and Citations for Violating Laws, Understaffing, and Not Providing Quality Care**

308. Prior to and throughout the Class Period, Brookdale has been named in countless lawsuits and cited for numerous regulatory violations stemming from Brookdale's systemic

understaffing and inadequate quality of care, some of which were the result of deaths of Brookdale residents. As set forth in Section IV.G above, Brookdale has been cited as violating laws and regulations and has multiple lawsuits against it for misrepresenting the level of care and number of staff available at its facilities. The deficiency reports repeatedly found that Brookdale's facilities were not adequately staffed and, due to such understaffing, they did not respond within a reasonable time to resident calls. *Id.* Further, the investigation and findings in the deficiency reports often included statements from staff commenting the incident(s) that resulted in the fine. Time and time again, staff member were quoted, or summarized, in the citation as stating they were unable to fully perform their job duties because the facility did not have enough staff. *See* ¶¶132-33, 137, 139.

309.    As Brookdale admits, throughout the Class Period, it's facilities were the subject of "unannounced surveys or inspections . . .  annually or bi-annually, or following a regulator's receipt of a complaint about the provider." As represented by Brookdale, the Company received reports from regulators after such inspections documenting Brookdale's violations: "From time to time in the ordinary course of business, *we receive deficiency reports from state and federal regulatory bodies resulting from such inspections or surveys*." Further, the receipt of deficiency reports by Brookdale in "most" instances were "resolved through a plan of corrective action relating to the community's operations." As Chief Operating Officers and Chief Financial Officers of the Company, the Individual Defendants were aware of each of these regulatory reports and violations and the resulting community compliance changes that were implemented.

310.    Additionally, the Individual Defendants were aware as a result of repeated lawsuits naming Brookdale as a defendant. *See* ¶¶141-49. These lawsuits alleged time and time again that Brookdale's SAS system was manipulated to intentionally understaff its facilities, Brookdale did

126

not have sufficient staffing to meet its residents' needs, residents were not receiving quality care, and, as a result, patients did not receive the care they paid for and in some instances died. In fact, the Individual Defendants have been named among some of the defendants in these lawsuits. For example, the *Johnson* litigation initiated on February 21, 2019 names Defendant Baier as a defendant, alleging that defendant Baier engaged in a fraudulent scheme to misrepresent the number of staff and care a resident at Brookdale receives. *See* ¶146. As a named defendant, Defendant Baier was aware of the *Johnson* lawsuit and its allegations.

311.     Similarly, according to a public post on Indeed.com, one family member of a neglected resident contacted defendant Andrew Smith directly to notify him of the neglect. The Indeed post states as follows:

> Although it's been awhile since this post and many others, I wanted to inform anyone who may be interested, ***on Oct. 4, 2017, I sent a letter to Andrew Smith along with 52 others regarding their neglect of the elder. My Mother was a victim like so many.*** I am doing my best to expose them. My letter was mailed to anyone and everyone you can think of, as well as ALL the proper government agencies (for what that's worth), newspapers, magazines, organizations who care about the elder, news stations and specific reporters, to name a few. I pointed out their only concern was for money, etc. and the salary/compensation Andrew Smith drew (salary.com). My Mother went to the Lohmans Crossing facility in Lakeway, Austin area, Texas. You can read what happened to her on my public Facebook post, Brenda Chapman. I became sick to say the least over her treatment as well as others I've read about online. My concern now lies with those currently in these facilities! This monster of a Corp. and L.L.C. Needs to be investigated and stopped immediately before there are more victims. Adult Protective Services has also been notified. I've been contacted by the Attorney General who informed me they were in receipt of my letter and I had sent it to all of the appropriate people. I do not plan to let this issue continue to be swept under the table while these "people" get wealthier and wealthier by taking advantage of the elders because it's so easy for them, obviously, I can be contacted at \*\*\*\*\*\*\*\*\*\*\* if anyone cares to.

312.     Moreover, the Individual Defendants knew of these violations, complaints, and lawsuits as a result of having to change, modify, and approve internal procedures to theoretically prevent future violations. As Brookdale acknowledges "***Most inspection deficiencies are resolved***

*through an agreed-to plan of corrective action relating to the community's operations.*" For example, as described in ¶¶138-40, after a resident was locked in a bus over a 90 degree weekend and passed away, and the Department of Health issued a report finding Brookdale failed to supervise the resident, Brookdale changed its policies and procedures with respect to taking residents off campus. According to Brookdale's 2019 Form 10-K, any such changes must be done at the corporate level given Brookdale's centralized operations:

> *We have implemented intensive standards, policies and procedures, and systems, including detailed staff resources and training materials,* which we believe have contributed to high levels of customer service. Further, *we believe our centralized support infrastructure* allows our community-based leaders and personnel to focus on resident care and family connections.
>
> ***
>
> *We have developed a centralized support infrastructure and services platform,* which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology, and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. *In addition, we have established centralized operations groups to support all of our product lines and communities in areas such as training, regulatory affairs,* asset management, dining, clinical services, sales, customer engagement, marketing, and procurement. *We have also established company-wide policies and procedures relating to, among other things: resident care;* community design and *community operations*; billing and collections; accounts payable; finance and accounting; risk management; *development of associate training materials and programs*; advertising and marketing activities; *the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements;* and implementation of our acquisition, development, and leasing plans.

313.    Moreover, the volume, severity, and frequency of the violations and lawsuits involving Brookdale supports the Individual Defendants' knowledge or, at a minimum, their reckless disregard of such violations and understaffing.

### v.    Defendants' Violations of Brookdale's Own Internal Policies Supports Scienter

128

314. Brookdale's internal policy requires compliance with applicable state and local regulatory requirements:

> ***We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations;*** billing and collections; accounts payable; finance and accounting; risk management; development of employee training materials and programs; marketing activities; the hiring and training of management and other community-based personnel; ***compliance with applicable local and state regulatory requirements;*** and implementation of our acquisition, development and leasing plans.

315. Defendants violated their internal policy by not ensuring appropriate resident care and failing to comply with applicable laws. As discussed above, Brookdale has even been cited for specifically violating its own policies by not conducting night checks. *See, e.g.,* ¶136. Accordingly, the Individual Defendants had knew that Brookdale's communities were understaffed and residents were not receive quality care.

### vi. The Individual Defendants Were Aware that Facilities Were Understaffed Because Senior Living Facilities and SAS Were a Highly Material Aspect of the Company's Business Operations and its "Core" Business

316. As alleged herein, during the Class Period, Brookdale's senior assisted living and memory care segments comprised approximately 50% of the Company's total units within each community. For the year ended December 31, 2019, Brookdale generated approximately 56% of its annual revenue from its Assisted Living and Memory Care business segment alone.

317. Further, the SAS system that determined staffing was the prized possession of the Company that only its highest officers had access to. As conceded in the Boisen Declaration,

> ***This system [SAS] is critical to the daily operations of Brookdale*** and its independent subsidiaries who operate individual communities ***and represents the core of Brookdale's business.*** The Service Alignment System is also completely unique to Brookdale and distinguishes it from its competitors in the industry.

129

318.    Consequently, Brookdale's assisted living and memory care business segments, including the SAS program used to determine staffing needs, constituted the Company's "core business operations" and a "vital corporate function" that Brookdale's most senior executives are reasonably presumed to have knowledge of its performance as a matter of law.

**B.      Defendants' Motive to Commit the Alleged Fraud**

**i.      Defendants Were Motivated to Commit the Alleged Fraud to Avoid Violating the Company's Debt Covenants**

319.    As discussed above, Brookdale's aggressive acquisition strategy resulted in the accumulation of massive amounts of debt used to finance those acquisitions. In connection with its July 31, 2014 acquisition of Emeritus, alone, Brookdale assumed $1.4 billion of principal mortgage debt. According to the 2014 Form 10-K:

> The aggregate acquisition-date fair value of the consideration transferred in the [Emeritus] Merger was approximately $3.0 billion which consisted of the issuance of 47.6 million shares of the Company's common stock with a fair value of approximately $1.6 billion upon the cancellation of all shares of Emeritus' common stock and stock options, as well as the Company's **assumption of approximately $1.4 billion aggregate principal amount of existing mortgage indebtedness** of Emeritus. The fair value of the 47.6 million common shares issued was determined based on the closing market price of the Company's common shares on July 31, 2014, the effective date of the Merger.

320.    Moreover, as demonstrated in the chart below, according to Brookdale's 2014 Form 10-K, Emeritus contributed an additional $4 billion to the Company's debt load, while only adding $28 million in cash:

| Purchase Price Allocation | (in millions) |
|---|---|
| Cash and Cash Equivalents | $28 |
| Property Plant & Equipment and Leasehold intangibles | 5,506 |
| Goodwill | 639 |
| Other Intangible Assets, net | 259 |
| Other Assets, net | 308 |
| Trade Accounts Payable and Accrued Expenses | (297) |

130

| | |
|---|---|
| *Long-term Debt* | *(1,5,16)* |
| *Capital and Financing Lease Obligations* | *(2,692)* |
| Deferred Tax Liability | (337) |
| Other Liabilities | (248) |
| Noncontrolling Interest | (1) |
| Fair Value of Brookdale Common Stock Issue | $1,649 |

321. The overall effect on the Company's debt from the Emeritus acquisition was to increase its overall net debt load by over $3.5 billion. According to the Company's financial statements, prior to and during the Class Period, Brookdale reported the following debt on its balances sheet:

| Year-ended December 31, (in millions) | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| Current Portion of Long-Term Debt | $168.6 | $156.1 | $173.5 | $145.6 | $495.4 | $294.4 | $339.4 |
| Current Portion of Financing Leases | $33.4 | $112.3 | $62.2 | 69.6 | 107.1 | $23.1 | $63.1 |
| Current Portion of Operating Leases | | $-- | $-- | $-- | $-- | $-- | $193.6 |
| Long-term Debt (net) | $2,138.2 | $3,341 | $3,459.4 | $3,375.3 | $3,414 | $3,215.7 | $3,345.8 |
| Financing Leases (net) | $266.5 | $2,436.9 | $2,427.4 | $1,164.5 | $2,415.9 | $771.4 | $851.3 |
| Operating Leases (net) | | $-- | $-- | $-- | $-- | $1,277.2 | $-- |
| Credit Line | $30 | $100 | $310 | $-- | $-- | $-- | $-- |
| **TOTAL** | $2,636.7 | $6,146.3 | $6,432.5 | $4,755 | $6,432.4 | $5,581.8 | $4,793.2 |

131

322.    Brookdale's credit agreements in effect throughout the Class period, required that

Brookdale comply with certain covenants and ratios. As stated in the Company's Form 10Ks:

> **Our debt and lease documents contain financial and other covenants, including covenants that limit or restrict our operations and activities (including our ability to borrow additional funds and engage in certain transactions without consent of the applicable lender or lessor); any default under such documents could result in the acceleration of our indebtedness and lease obligations, the foreclosure of our mortgaged communities, the termination of our leasehold interests, and/or cross-defaults under our other debt or lease documents, any of which could materially and adversely impact our capital structure, financial condition, results of operations, cash flow, and liquidity and interfere with our ability to pursue our strategy.**

> Certain of our debt and lease documents contain restrictions and financial covenants, such as those **requiring** us to maintain prescribed minimum net worth and stockholders' equity levels and debt service and lease coverage ratios, and requiring us not to exceed prescribed leverage ratios, in each case on a consolidated, portfolio-wide, multi-community, single-community, and/or entity basis... In addition, our debt and lease documents generally contain non-financial covenants, such as those requiring us to comply with Medicare or Medicaid provider requirements.[51]

323.    The financial covenants in the Company's line of credit agreements required

Brookdale to maintain a Consolidated Fixed Charge Coverage Ratio "for any period of four

consecutive calendar quarters ending on the last day of any calendar quarter" of equal to or greater

than 1.20 to 1.00 for 2014 through 2018 and of equal to or greater than 1.10 to 1.00 for 2019 to

the present and a Consolidated Tangible Net Worth ratio as of the end of any calendar quarter" of

"equal to or greater than $1,000,000,000."

---

[51] According to the Company's 10-K:

> Net worth is generally calculated as stockholders' equity, as calculated in accordance with accounting principles generally accepted in the United States, or GAAP, and in certain circumstances, reduced by intangible assets or liabilities or increased by deferred gains from sale-leaseback transactions and deferred entrance fee revenue. The debt service and lease coverage ratios are generally calculated as revenues less operating expenses, including an implied management fee and a reserve for capital expenditures, divided by the debt (principal and interest) or lease payment.

324.     For the years-ended December 31, 2017, 2018 and 2019, Brookdale reported Tangible Net Worth of $1.5 billion (down from $2.1 billion in 2016), $1.02 billion and $.696 billion, respectively. Accordingly, Brookdale was prohibited from borrowing from its credit facility in 2018 and 2019 because the Company was not (or barely) in compliance with the Net Worth requirement.

325.     This forced Defendants to borrow from other sources. As disclosed in Brookdale's 2019 10-K, in 2019, the Company borrowed $111.1 million of debt secured by the non-recourse first mortgages on 14 communities and $160.3 million of debt secured by the non-recourse first mortgages on five communities. Similarly, in 2018, the Company borrowed $247.6 million of debt secured by the non-recourse first mortgages on 11 communities and $327.0 million of debt secured by the non-recourse first mortgages on 28 communities.

326.     Moreover, the Company's Master Transactions and Cooperation Agreements and Master Lease and Security Agreements effective during the Class Period required Brookdale to comply with certain financial ratios, including the (i) Net Debt to EBITDA Ratio; and (ii) Lease Coverage Ratio, among others. Defendants did not publicly disclose the specific ratios requirements, instead redacting them with "[***]" because the disclosure of such information is purportedly "not material" and "would likely cause competitive harm."[52]

327.     Of course, Defendants' real reason for excluding such information was to conceal from investors how dangerously close the Company was to violating multiple financial covenants

---

[52] *See, e.g.*, Ex. 10.1.1 to the Company's 2019 Form 10-K, filed on February 19, 2020, stating "**Information identified by "[***]" has been excluded from this exhibit pursuant to Item 601(b)(10) of Regulation S-K because it is both not material would likely cause competitive harm to the registrant if publicly disclosed.**

or alerting investors to the fact that but for Brookdale's cost-cutting, the Company would be in violation of its covenants.

328.    Indeed, if investors caught wind that Brookdale failed to comply with the above covenants constituting an "event of default," they would likely sell their Brookdale securities before creditors began accelerating full payment of the outstanding debt—a bill Brookdale could not afford to pay given its cash balance of only $240 million and years' worth of net losses. Indeed, Brookdale reported net losses for the years-ended December 31, 2016, 2017, 2018 and 2019 of ($404.6), ($571.6), ($528.4) and ($268.5) million, respectively.

329.    A default on its debt would likely drive Brookdale into bankruptcy. As stated in the Company's Form 10-Ks during the Class Period:

> Furthermore, our debt and leases are secured by our communities and, in certain cases, a guaranty by us and/or one or more of our subsidiaries. Therefore, if an event of default has occurred under any of our debt or lease documents, subject to cure provisions in certain instances, the respective lender or lessor would have the right to declare all the related outstanding amounts of indebtedness or cash lease obligations immediately due and payable, to foreclose on our mortgaged communities, to terminate our leasehold interests, to foreclose on other collateral securing the indebtedness and leases, to discontinue our operation of leased communities, and/or to pursue other remedies available to such lender or lessor. Further, an event of default could trigger cross-default provisions in our other debt and lease documents (including documents with other lenders or lessors). We cannot provide assurance that we would be able to pay the debt or lease obligations if they became due upon acceleration following an event of default.

330.    The only way Defendants were able to avoid defaulting on the Company's debt was to employ the scheme alleged herein and slash Brookdale's largest expense—salaries—by grossly understaffing its facilities.

### ii.    Defendants Were Motivated to Commit the Alleged Fraud to Meet Their Lucrative Bonus Targets

331.    According to Brookdale's Form 14(a) Proxy Statements, throughout the Class Period, the Individual Defendants' annual compensation was comprised of a: (i) base salary; (ii)

target annual incentive cash bonus; and (iii) time-based and performance-based restricted shares. The target annual incentive cash bonus was tied directly to the Company's budget:

> Performance goals were chosen **to focus our leaders on execution of our operational turnaround strategy and were generally cascaded to our corporate, divisional, and community leadership**. Target levels were generally reflective of our 2019 budget approved by the Board….

332.     Throughout the Class Period, Defendants' annual incentive cash bonuses were based upon the following four criteria: (i) Resident Fee Revenue; (2) Facility Operating Income ("FOI"); (3) Combined Adjusted Free Cash Flow; and (4) individual strategic objectives. As demonstrated in the chart below, in 2018, coinciding with Defendants' implementation of its restructuring plan, Defendants changed the weighting of the four bonus criteria to weight 40%, or nearly one half of Defendants' bonuses, on *facility operating income*, or FOI.

|  | **2019** | **2018** | **2017** | **2016** |
|---|---|---|---|---|
| Resident Fee Revenue | 10% | 10% | 10% | 15% |
| Facility Operating Income | 40% | 40% | 20% | 20% |
| Combined Adjusted Free Cash Flow | 10% | 20% | 40% | 60% |
| Strategic Objectives | 40% | 30% | 30% | 25% |
| **TOTAL** | 100% | 100% | 100% | 100% |

333.     FOI is defined as "consolidated resident fee revenue less facility operating expense" and reflects "the net result of [Brookdale's] revenue and the facility operating expenses of [its] consolidated senior housing portfolio and Health Care Services segment, which are the largest drivers of [the Company's] financial results and which management has the ability to impact on a day-to-day basis." Moreover, according to the Company's 2020 Proxy Statement, "[t]he Board

and management use this measure in the budgeting process and when evaluating our results."
Accordingly, FOI was a critical metric closely monitored by the Individual Defendants.

334.    Defendants changed the incentive structure in 2018 to weigh 40%, or nearly one
half of Defendants' bonuses, on the performance of the facilities to coincide with Brookdale's
restructuring plan put in place to remedy years' of poor financial results.

335.    As discussed above, Defendants went about meeting their bonus goals by slashing
critical facility personnel to meet the budget and bonus targets. Cutting personnel is the easiest and
fastest way to cut costs and increase profitability because salary expense is indisputably the single
largest cost of running a company.

336.    Defendants' plan worked. As demonstrated in the charts below, after aggressively
implementing the SAS system and reducing salary expense, Defendants more than doubled their
prior year bonuses. For the year-ended December 31, 2019, Defendant Baier received an incentive
bonus of $657,295 as compared to $281,023 in the prior year. Defendant Swain received an
incentive bonus of $275,545 for 2019 as compared to $46,038 for 2018. Moreover, Defendants
achieved a significant increase in their bonuses because they achieved some portion of the targets
for the corporate objectives in 2019 whereas they did not achieve any of the corporate objectives
in 2018:

| Measure | Weighting | Achievement / Payout |
| --- | --- | --- |
| Resident Fee Revenue | 10% | 106% |
| Facility Operating Income | 40% | 29% |
| Combined Adjusted Free Cash Flow | 10% | 103% |

| Strategic Objectives | 40% | 52% |
|---|---|---|
| *Aggregate Achievement/Payout* | | *54%* |

**2017–2019 Annual Incentive Plan Achievement**



337.   As a result of Defendants' aggressive cost-cutting and understaffing efforts, Defendants received significant incentive bonuses, as set forth in the following chart:

|  | **2019** | **2018** | **2017** | **2016** |
|---|---|---|---|---|
| **Baier** | | | | |
| - Annual Salary | $910,000 | $782,248[53] | $550,000[54] | $552,115 |
| - Incentive Bonus | $657,295 | $281,023 | $196,150 | $222,750 |
| - Total Compensation | $2,236,266 | $1,389,787 | $2,407,188 | $2,492,367 |
| - Incentive Bonus as % of Salary | 72% | 36% | 35% | 40% |
| - Incentive Bonuses as % of Total Compensation | 29% | 20% | 8.1% | 9% |
| **Swain** | | | | |
| - Annual Salary | $515,000 | $161,538 | | |
| - Incentive Bonus | $275,545 | $46,038 | | |
| - Total Compensation | $884,927 | $207,576 | | |

---

[53] PRE 14A, filed with the SEC on September 10, 2019.
[54] DEF 14A, filed with the SEC on August 21, 2018.

| | | | | |
|---|---|---|---|---|
| - Incentive Bonus as % of Salary | 54% | 28% | | |
| - Incentive Bonuses as % of Total Compensation | 31% | 22% | | |
| **T. Andrew Smith**[55] | | | | |
| - Annual Salary | | | $950,000 | $953,654 |
| - Incentive Bonus | | | $356,709 | $418,594 |
| - Total Compensation | | | $1,315,829 | $6,608,593 |
| - Incentive Bonus as % of Salary | | | 38% | 44% |
| - Incentive Bonuses as % of Total Compensation | | | 27% | 6.3% |

338.     Defendants incentivized *employees* to acquiesce to their chronic understaffing by paying bonuses to Executive Directors, Directors of Nursing, and individuals at the Vice President level in charge of managing the individual facilities based on whether they met the FOI budget. As discussed above (Section IV.F.iii, *supra*), according to confidential witnesses, their entire annual bonuses throughout the Class Period were directly tied to whether the facility they managed met the Company's FOI budget.  CW2 explained that either you met your NOI and got a percentage of your bonus, or you got nothing.

### iii.     Defendants Were Motivated to Secure and Protect Their Positions From Shareholder Activists

339.     With the Company's value shrinking after the Emeritus acquisition, activist shareholders were not satisfied with the Company's declining stock price and began demanding that Brookdale extract its real estate as a separate entity from operations in order to increase stockholder value. After activist shareholder Sandell Asset Management ("Sandell") achieved its goal of getting its representatives appointed to Brookdale's Board in 2015, the Individual

---

[55] T. Andrew Smith left the Company in February 2018.

Defendant's positions with the Company became jeopardized. When Land & Buildings started waging another proxy contest in 2019, the Individual Defendants positions became threatened because if the activist appointees were to be elected to the Board and controlled a majority, the Individual Defendants could be ousted from their positions.

340. Specifically, a February 9, 2016 article in Modern Healthcare[56] explained the backlash leading to shareholder activist Sandell gaining seats on the Board:

> Nashville-based Brookdale acquired Seattle-based Emeritus Corp. in a July 2014 deal that added 10 states to the company's portfolio. ***But the deal proved disruptive. Brookdale struggled with turnover of key employee and falling occupancy. Activist investors Sandell Asset Management, unhappy with the company's performance, last year pushed for a real estate transaction and eventually won seats on the board.***
>
> ***Brookdale directors—including two added to the board last year under an agreement with hedge fund Sandell Asset Management***—have reviewed operations and endorsed the company's existing organization and long-term strategy, Brookdale CEO Andy Smith said on the call.
>
> Investors reacted to the news with a selloff and Brookdale's stock fell took a "surprising" dive on the news no real estate deal is in the works, Frank Morgan, an analyst with RBC Capital Market, said in an investor note following the company's earnings call.
>
> In light of the stock's recent weak performance, "we believed the market was already pricing this in, and are surprised by the magnitude of the selloff," he wrote. Brookdale's stock was already down 50% in the last six months, a sharper decline than the S&P 500, which has fallen 12% during the period, Morgan noted.[57]

341. Then, in 2019, Land & Buildings began vigorously advocating for Brookdale to spinoff its real estate to increase stockholder value. Having not received an affirmative response from Brookdale, on July 3, 2019, Land & Buildings delivered notice to Brookdale of its

---

[56] Melanie Evans, Emeritus deal drags down Brookdale Senior Living results, Modern Healthcare, Feb. 9, 2016, *available at* https://www.modernhealthcare.com/article/20160209/NEWS/160209855/emeritus-deal-drags-down-brookdale-senior-living-results.
[57] *Id.*

139

nomination of James F. Flaherty II and Jonathan Litt for election the Company's Board at the 2019 Annual Meeting of Stockholders due to its dissatisfaction with Brookdale's current Board.

342. On July 16, 2019, Land & Buildings issued a press release inviting fellow Brookdale shareholders to vote in favor of its slate of directors, noting that since defendant Baier became CEO the Company's downward trend had not improved. Land & Buildings stated, in part:

> **We have tried to engage in constructive dialogue with the Brookdale Board of Directors (the "Board") and management team regarding the opportunities that we believe are available to unlock this value. However, despite our sincere efforts to reach a collaborative solution, we remain deeply disappointed that the Board does not appear to recognize the need for urgent and real change at Brookdale**.

> Brookdale's total shareholder return has consistently underperformed relative to Proxy Peers[i], Healthcare REITs[ii], and the broad market[iii] over the trailing 10-year, 5-year, 3-year, and 1-year time periods[iv]. **Since Cindy Baier** and Lee Wielansky **were appointed CEO and Chairman of the Board respectively in February 2018, this trend has not reversed.** We are deeply disappointed and fault a lack of urgency on the part of the Company, having not sought to maximize value for all shareholders through an asset monetization program since the majority of leases were restructured more than a year ago.

| Total Shareholder Returns | Trailing 10 Years | Trailing 5 Years | Trailing 3 Years | Trailing 1 Year |
|---|---|---|---|---|
| *Brookdale Senior Living* | *-16%* | *-77%* | *-51%* | *-18%* |
| BKD Underperformance vs. Proxy Peer Average | -486% | -150% | -93% | -22% |
| BKD Underperformance vs. Healthcare REIT Average | -314% | -129% | -72% | -53% |
| BKD Underperformance vs. S&P 500 | -327% | -144% | -102% | -30% |

343. Land & Buildings advocated for "outright asset sales as well as separating the real estate from the management company into two separate public companies." It further minimized Brookdale's restructuring in February 2018 as a reactionary move designed to entrench Brookdale management:

> Recent steps taken by the Company to enhance governance have, in our view, been reactionary and in direct response to our strident criticisms as well as our director

140

nomination, including an accelerated de-staggering of the Board (which the Company initially resisted and fell well short of our expectations) and two recent resignations by long-tenured Brookdale directors. We are concerned these actions, and potential future actions, are a means to entrenchment as opposed to genuine positive change.

344.    On July 30, Land & Buildings issued another letter to Brookdale stockers, indicating its frustration with management and advocating for change:

> **However, we have reached a point where the facts are simply too overwhelming to ignore: <u>the current Board and management team have abjectly failed to reverse the Company's track record of alarming operational underperformance and poor shareholder returns</u>**. We can no longer stand idly by while shareholder value is destroyed, and the Company continues to window dress the real issues facing Brookdale.
>
> Meaningful change is clearly – and urgently – needed. That is why we have nominated two highly qualified and experienced director candidates, Jay Flaherty and Jonathan Litt, for election to the Board at the Company's 2019 Annual Meeting of Shareholders (the "Annual Meeting").
> ….
> Importantly, this sustained underperformance is not an aberration or a trend that can be blamed on external market conditions. It is the result of consistently poor decision-making and a failure of oversight that we believe is symptomatic of a deeply under-qualified and out of touch Board. And we are past the point where it is prudent to trust the patients to adequately perform surgery on themselves.
> (emphasis in original)

345.    Over the next few months, Land & Buildings continued to demand change among Brookdale's Board while Brookdale denied such requests. In response to Land & Buildings' requests, defendant Baier remarked during the 2Q19 Call that Land & Buildings suggestion was imprudent:

> I want to touch on the recent public letters from one of our shareholders, Land & Buildings that you might have seen. I'd like to reiterate that at Brookdale, we are always open to constructive feedback from all of our shareholders and appreciate engaging in a dialogue toward a common goal of value creation.
>
> Earlier this year, the Investment Committee of the Board, made up of three independent directors, one of whom was appointed as part of a prior agreement with Land & Buildings, carefully evaluated Land & Buildings' ideas with the assistance of BofA Merrill Lynch, which was the independent advisory firm suggested by Land & Buildings. ***Based on that review, and as discussed in our February 2019***

141

*earnings call, we determined, at the unanimous recommendation of the Investment Committee, after consultation with BofA Merrill Lynch, not to proceed with the actions advocated by Land & Buildings, as they would be unlikely to generate additional shareholder value.*

More recently, the Board asked BofA Merrill Lynch to assist with the Board's further evaluation of Land and Buildings' proposal, and also asked a second independent financial advisor, Morgan Stanley, to evaluate a range of potential Prop Co/Op Co structures. Following that review and discussions with each of the advisors, the Board concluded that pursuing a Prop Co/Op Co transaction would be imprudent at this time and that there were fundamental flaws in Green Street Advisors' theoretical assessment of a Prop Co/Op Co structure. Those flaws include disregard of numerous critical practical and market considerations and execution risk, and the use of unrealistic assumptions.

There is no question that we have tremendous value in our owned real estate portfolio. *At this time, we believe there is sizable upside to the portfolio by maximizing net operating income, and with our operational turnaround and increased capital investments, we are making strides to realize that value*.

We don't intend to say anything more on this matter today, as the purpose of this call is to discuss our strong results and the progress we are demonstrating with our turnaround plan.

346.     Accordingly, to ensure that the Individual Defendants maintained their positions as CEO and CFO, it was imperative that they prevented activist shareholders from infiltrating the Board and removing them from office.

## VIII.    <u>LOSS CAUSATION</u>

347.     At all relevant times, the market for Brookdale securities was open, well-developed, and efficient. During the Class Period, Defendants named in this Action materially misled the investing public by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their statements, as set forth herein, not false and/or misleading, thereby inflating the price of Brookdale securities.  These material misstatements and omissions concerned (i) staffing levels and the quality of care of resident services; (ii) compliance with internal policies and local, state, and federal laws and regulations; and (iii) increased occupancy.

142

Defendants' materially false or misleading statements and omissions of material fact, alleged above in Section V, caused the price of Brookdale's securities to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Plaintiff and other Class Period purchasers of Brookdale securities.

348.     Plaintiff and other members of the Class purchased or otherwise acquired Brookdale securities relying upon the integrity of the market of Brookdale and market information related to the Company and have been damaged thereby.

349.     When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Brookdale securities was removed, and the price of Brookdale shares fell.

350.     Specifically, on April 30, 2020, the *Nashville Business Journal*[58] published an article titled "*Lawsuit accuses Brentwood health care giant of deception, understaffing*," which publicly reported for the first time that a proposed class action lawsuit had been filed by a Brookdale resident against Brookdale accusing the Company of, among other things, purposeful "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks since at least April 24, 2016.

351.     Plaintiff Gunza in this action was a resident of Brookdale's Reynolds Road facility and experienced first-hand the Company's grossly inadequate staffing.

352.     The *Gunza* lawsuit caught the attention of multiple news sources including McKnight's Senior Living, a national media brand, which published an April 30, 2020 article titled

---

[58] The Nashville Business Journal is a widely disseminated publication available in print and digital media with thousands of subscribers. The Journal has been in business for over 25 years and has up to 50 employees.

"Brookdale says lawsuit questioning marketing materials, residency agreements 'completely without merit" and the NashvillePost, which also reported on the *Gunza* lawsuit on April 30, 2020.

353. Upon the reporting of the filing of the *Gunza* complaint and its allegations of understaffing, Brookdale's stock price fell from a closing price of $3.68 on April 29, 2020 to a closing price of $3.61 per share on April 30, 2020, and continued to drop until reaching a closing price of $2.92 on May 5, 2020.

354. As a result of their purchases of Brookdale stock during the Class Period at artificially inflated prices, Plaintiff, and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. The timing and magnitude of the price decline in Brookdale stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct.

## IX.    PRESUMPTION OF RELIANCE: THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

355. At all relevant times, the market for Brookdale securities was efficient for the following reasons:

    a. Brookdale common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    b. As a regular issuer, Brookdale filed periodic reports with the SEC and NYSE;

    c. Brookdale regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

144

d. Brookdale was followed by eight securities analysts employed by major brokerage firms (including Wells Fargo Securities, LLC; Bank of America Merrill Lynch, RBC Capital Markets; Stifel, Nicolaus & Company, Incorporated; Jefferies LLC; Barclays Bank PLC; Stephens Inc.; and Nephron Research LLC) who participated in the Company's Class Period earnings calls and wrote reports which were distributed to those brokerage firms' sales force and certain customers and each of these reports was publicly available and entered the public marketplace;

e. Brookdale had approximately 184 million shares outstanding as of February 14, 2020, with an average of 2.35 million shares trading daily on the NYSE;

f. During the Class Period, Brookdale common stock averaged a weekly trading volume of 13.5 million shares, translating to an average weekly turnover of 7.3% of the outstanding shares;

g. During the Class Period, the Company was eligible to register and sell its common stock pursuant to a Form S-3 shelf registration statement; and

h. During the Class Period, the Company's public float ranged from 98.3% to 98.5%, indicating market efficiency.

356. As a result of the foregoing, the market for Brookdale securities promptly digested current material information regarding Brookdale from all publicly available sources and reflected such information in Brookdale's stock price. Under these circumstances, all purchasers of Brookdale securities during the Class Period suffered similar injury through their purchase of Brookdale securities at artificially inflated prices, and a presumption of reliance applies.

357.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## X.      THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

358.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

359.     None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

360.     To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As alleged above in detail, then-existing facts contradicted Defendants' statements regarding, *inter alia*, (i) the quality of care and level of staffing provided to residents; (ii) Brookdale's compliance with internal policies and local and state laws and regulations; and (iii) Brookdale's occupancy rates.   Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Brookdale were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

361.     To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading.

146

## XI. CLASS ACTION ALLEGATIONS

362.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Brookdale securities during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").

363.    Excluded from the Class are Brookdale and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

364.    Because Brookdale had approximately 184.3 million shares of common stock outstanding during the Class Period, and because its securities were actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiff believes that there are, at a minimum, thousands of Class members. Members of the Class may be identified from records maintained by Brookdale or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

365.    Plaintiff's claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

366.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.

367.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

147

a. Whether Defendants violated the federal securities laws as alleged herein;

b. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Brookdale's business and operations;

c. Whether the price of Brookdale's securities was artificially inflated during the Class Period; and

d. The extent to which members of the Class have sustained damages and the proper measure of damages.

368. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## <u>COUNT I</u>

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Brookdale and the Individual Defendants

369. Plaintiff realleges each allegation as if fully set forth herein.

370. This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Brookdale and the Individual Defendants (the "Count I Defendants").

371. The Count I Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which

148

operated as a fraud and deceit upon Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

372.    The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

373.    The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

374.    As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

375.    Brookdale is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Brookdale in taking the actions alleged herein.

376.    Plaintiff and the Class purchased Brookdale securities, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's financial performance or prospects.  In so doing, Plaintiff and the Class relied directly or indirectly on false and misleading statements made by the Count I Defendants, and/or an absence of material adverse

information that was known to the Count I Defendants or recklessly disregarded by them but not disclosed in the Count I Defendants' public statements. Plaintiff and the Class were damaged as a result of their reliance on the Count I Defendants' false statements and misrepresentations and omissions of material facts.

377.    At the time of the Count I Defendants' false statements, misrepresentations and omissions, Plaintiff and the Class were unaware of their falsity and believed them to be true. Plaintiff and the Class would not otherwise have purchased Brookdale securities had they known the truth about the matters discussed above.

378.    By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

379.    As a direct and proximate result of the Count I Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchase of Brookdale securities.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

380.    Plaintiff realleges each allegation as if fully set forth herein.

381.    This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants (the "Count II Defendants").

382.    Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of Brookdale, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act.  The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff and the Class' investments in

Brookdale securities within the meaning of §20(a) of the Exchange Act. Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

383. The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

384. The Count II Defendants knew or recklessly disregarded the fact that Brookdale's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

385. By virtue of their high-level positions and their participation in and awareness of Brookdale's operations and public statements, the Count II Defendants were able to and did influence and control Brookdale's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

386. The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

387. As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act.

388. As a direct and proximate result of the Count II Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Brookdale securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class;

B.      Awarding Plaintiff and the members of the Class damages, including interest;

C.      Awarding Plaintiff reasonable costs and attorneys' fees; and

D.      Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

Dated:  November 17, 2020                         Respectfully Submitted,

                                         */s/  Al Holifield*
                                         _____

                                         HOLIFIELD & JANICH, PLLC
                                         Al Holifield (BPR # 015494)
                                         Sarah R. Johnson (BPR # 030781)
                                         11907 Kingston Pike, Suite 201
                                         Knoxville, TN 37934
                                         Telephone: (865) 566-0115
                                         Facsimile: (865) 566-0119
                                         aholifield@holifieldlaw.com
                                         sjohnson@holifieldlaw.com

                                         *Liaison Counsel*

                                         */s/ Shannon L. Hopkins*
                                         _____
                                         Shannon L. Hopkins
                                         LEVI & KORSINSKY LLP
                                         1111 Summer Street, Suite 403
                                         Stamford, Connecticut 06905
                                         Tel.: (203) 992-4523
                                         Fax: (212) 363-7171
                                         shopkins@zlk.com

                                         *Attorneys for Plaintiff*

152

## CERTIFICATE OF SERVICE

I, hereby certify that this document was filed through the CM/ECF system and will be served pursuant to the Civil Docket for Case #: 3:20-cv-00543 on this 17th day of November 2020, as follows:

**Electronic Mail Notice List**
The following are those who are currently on the CM/ECF list to receive email notices for this case:

**Britt K. Latham**
blatham@bassberry.com     bmccaskill@bassberry.com     briana.sprick.schuster@bassberry.com
lbilbrey@bassberry.com

**Geoffrey J. Ritts**
gjritts@jonesday.com

**J. Alexander Hood, II**
ahood@pomlaw.com

**James A. Holifield, Jr.**
aholifield@holifieldlaw.com

**Jeremy A. Lieberman**
jalieberman@pomlaw.com disaacson@pomlaw.com lpvega@pomlaw.com

**Patrick V. Dahlstrom**
pdahlstrom@pomlaw.com

**Paul Kent Bramlett**
pknashlaw@aol.com

**Robert P. Bramlett**
robert@bramlettlawoffices.com

**Manual Notice List:**
No manual recipients

/s/ Al Holifield
Al Holifield