# EXHIBIT 15

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

GEORGE GUNZA, by and through his sister
PEGGY FISHER, as power of attorney, on his
own behalf and all others similarly situated,

        Plaintiff,

v.

BROOKDALE SENIOR LIVING, INC.,

        Defendant.

_____/

Case No.

JURY DEMAND

CLASS REPRESENTATION

## CLASS ACTION COMPLAINT
### (JURY TRIAL DEMANDED)

Plaintiff, George Gunza, by and through his sister Peggy Fisher, as power of attorney ("Plaintiff"), brings this action for declaratory and injunctive relief and damages on his own behalf and on behalf of the proposed Class against the Defendant, Brookdale Senior Living, Inc. also known as Brookdale Senior Solutions ("Defendant" or "BROOKDALE"), to stop the unlawful and fraudulent practices described more fully herein.

# TABLE OF CONTENTS

I. NATURE OF THE ACTION .................................................................................................... 1

II. PARTIES, JURISDICTION & VENUE................................................................................ 10

III. GENERAL ALLEGATIONS ................................................................................................ 12

    A. BROOKDALE Determines, Limits, and Controls the
    Day-to-Day Staffing Levels ...................................................................................... 12

    B. BROOKDALE Determines and Enforces the Operating
    and Staffing Budgets................................................................................................. 13

    C. BROOKDALE Exercises Exclusive Control of Facility
    Staffing Policies, Procedures, and Practices at all Facilities .............................. 15

    D. BROOKDALE Exercises Exclusive Control Over the
    Revenues Generated and the Use of Funds............................................................. 16

    E. BROOKDALE Operates Its Assisted Living Facilities
    as a Single Enterprise............................................................................................... 17

    F. In Order to Meet its Nationwide Debt and Lease Obligations,
    BROOKDALE Tightly Controls the Day-to-Day Staffing
    Levels, Staffing Expenses, and Operations at All of its Facilities........................ 19

    G. Uniform Misrepresentations in BROOKDALE's
    Standard Form Contracts ........................................................................................ 23

    H. Uniform Misrepresentations in BROOKDALE's
    Marketing Materials and Representations ............................................................. 25

    I. BROOKDALE Failed to Disclose and Actively Concealed its
    Systemic Failure to Provide Staffing Sufficient to Meet the Care
    Needs of its Residents ............................................................................................... 29

    J. BROOKDALE'S Misrepresentations and Concealment Are
    Material ...................................................................................................................... 30

    K. BROOKDALE Knowingly Understaffed Its Facilities ......................................... 32

IV. PLAINTIFF GEORGE GUNZA ......................................................................................... 33

V. CLASS ACTION AND CLASS REPRESENTATION ALLEGATIONS ......................... 35

    A. NUMEROSITY ........................................................................................................ 36

    B. COMMONALITY AND TYPICALITY ................................................................. 37

    C. FAIR AND ADEQUATE REPRESENTATION OF THE CLASS....................... 39

    D. PREDOMINANCE................................................................................................... 39

VI. SPECIFIC PROVISIONS UNDER RULE 23 UNDER WHICH
CERTIFICATION IS SOUGHT............................................................................................ 39

    A. RULE 23(b)(1).......................................................................................................... 39

    B. RULE 23(b)(2).......................................................................................................... 40

i

Case 3:20-cv-00543 Document 44-5 Filed 04/12/21 Page 2 of 62 PageID #: 863

C. RULE 23(b)(3) ................................................................................................. 41

D. RULE 23(c)(4) ................................................................................................. 41

COUNT I - Declaratory and Injunctive Relief Under North Carolina
Uniform Declaratory Judgment Act and N.C. Gen. Stat. §131D-28 ................... 42

COUNT II - Violation of the North Carolina Unfair and Deceptive
Trade Practices Act ............................................................................................. 45

COUNT III - Breach of Contract ............................................................................................. 52

COUNT IV - Unjust Enrichment ............................................................................................. 53

COUNT V - Tortious Interference with a Contractual Relationship ....................................... 55

DEMAND FOR JURY TRIAL ............................................................................................. 57

ii

Case 3:20-cv-00543-DCC Document 44-5 Filed 04/12/21 Page 4 of 62 PageID #: 864

## I.  NATURE OF THE ACTION

1.  This is a class action for monetary damages, declaratory and injunctive relief and penalties to redress systemic unfair and deceptive trade practices and breaches of contract committed by BROOKDALE between April 24, 2016 through the filing of a Motion for Class Certification (the "Class Period") against Named Plaintiff and the members of the proposed Class, which are defined as all current and former residents of the at least 56 BROOKDALE adult care homes (a/k/a assisted living facilities) that BROOKDALE  operated, managed and/or controlled in North Carolina  (the "North Carolina Class").

2.  Plaintiff and proposed Class Members are elderly, disabled, or dependent individuals, who due to physical and/or cognitive impairments require basic care services and assistance in performing daily functions of life. Plaintiff and the proposed Class turned to BROOKDALE who promised that it could and would provide the care and daily living services they required.[1]

3.  BROOKDALE, which is the largest operator of assisted living facilities and memory care units in the United States, targets elderly, disabled, or dependent individuals for admission into its facilities in order to grow its resident census and to continue to generate enormous revenues that are available in the senior living market:

> "Our target assisted living residents are predominately senior citizens, age 80 and older, who require daily assistance with 2 or 3 ADLs [activities of daily living]."[2]

---

[1] All allegations made in this complaint relate to conduct occurring within the Class Period, defined as the period between April 24, 2020 and the date of the filing of a Motion for Class Certification.  Where an allegation is stated in the past tense with respect to BROOKDALE'S conduct, such allegation includes the entire Class Period, continuing into the present, unless otherwise specified.

[2] *See* BROOKDALE's 10K Annual Report for the period ending December 31, 2015 filed with the Securities and Exchange Commission.

1

***

"Our assisted living and memory care communities offer housing and 24-hour assistance with ADLs to mid-acuity, frail and elderly residents."[3]

4.       Promising tailored services that meet the individualized and personal needs of residents, and touting an army of "passionate associates ready to work for you," BROOKDALE has made and continues to make the following online marketing representations in order to induce this targeted group of vulnerable individuals to move into and to stay in its North Carolina assisted living facilities:

> "[a]t Brookdale, we believe in delivering senior care that's **tailored to you** and your loved one based on those **unique needs** and desires. That's why we provide a variety of options. This **personalized approach ensures that you and your family get exactly what you need without paying for what you don't.**" (*emphasis added*).[4]

*** 

> "When it comes to certain **daily tasks**, like bathing, getting dressed or personal grooming, is your loved one able to accomplish them safely? If they struggle to perform daily tasks, then assisted living might just be the right fit. At an assisted living community, **caring staff members are available to help them accomplish these tasks**, making life a lot easier than if they were living alone. **This service provides peace of mind** for them, as well as you. **There's no need to take a chance on their health and safety, because our team of medical professionals can lend the right level of support that they need throughout the day**." (*emphasis added*).[5]

---

[3] See BROOKDALE's 10K Annual Report for the period ending December 31, 2018 filed with the Securities and Exchange Commission.

[4] Brookdale Website - https://www.brookdale.com/en/where-to-begin/understanding-your-needs.html - "Understanding Your Needs … Discover What's Right for You"

[5] Brookdale Website - https://www.brookdale.com/en/our-services/assisted-living/when-is-it-the-right-time-for-assisted-living.html - "When is it the Right Time for Assisted Living? ... Needs Assistance Throughout the Day"

2

CaseCase 3:20-cv-00543-05-03-53odDocmentumenT-4-15   FFiled 04/12/45/221 PaRagee6 of 6162 PageID #: 866

5.      In summary, deliberately woven through Defendant's sales and marketing materials is language assuring elderly and dependent individuals and their families that caring for and meeting the needs of residents was of paramount importance to BROOKDALE.

6.      Further, through its sales and marketing materials and uniform Residency Agreements, BROOKDALE leads reasonable consumers to believe that it would meet the needs of residents by providing enough staff in each of its facilities to deliver all the basic care and daily living services that residents required as determined by BROOKDALE's own assessment program.

7.      Further, implicit within the Residency Agreements, BROOKDALE promised the Plaintiff and the North Carolina Class that it would comply with all North Carolina adult care home rules and regulations, including those that required BROOKDALE to staff its facilities to meet the collective needs of the residents, to comply with minimum staffing requirements, and to follow the Resident's Bill of Rights.

8.      More specifically, BROOKDALE requires its facilities to conduct individualized assessments (called Personal Service Assessments or "PSAs") of each resident's care and service needs upon admission and periodically thereafter.  Based on their needs, residents are placed within "Care Groups" which BROOKDALE represents corresponds to the amount of caregiver time required to meet the resident's needs. Further, in its uniform Resident Agreements that BROOKDALE mandates must be used by each facility, BROOKDALE promises to provide the services and assistance required for each resident as specified by their PSAs.  Monthly charges for these services are purportedly based on the quantity of services and the amount of the staff time required to deliver them.

Case 3:20-cv-00543-boc Document 44-5   Filed 04/12/21  Page 7 of 62  PageID #: 867

9.      BROOKDALE promises residents and their families that its use of the Personal Service Assessments enables it to deliver "exceptional care and service" by finding out "exactly what your loved one needs" and determining the amount of staff required to deliver those care services.  Anchoring consumers' reasonable belief that BROOKDALE would have staff sufficient to provide these contracted services was the claim set forth in BROOKDALE's uniform Residency Agreement that "associates are available 24 hours a day, 7 days a week."

10.     Contractually, BROOKDALE promised Plaintiff and the proposed Class Members to provide the following primary services in its uniform Residency Agreements in return for a monthly fee:

      a.     *Basic Services* including dining services, housekeeping services, laundry and linen services, activities programs, transportation, and wellness assessments;

      b.     *Personal Service Assessments* "to determine the personal services you require," and

      c.     *Personal Services* for which BROOKDALE charged additional monthly fees, including but not limited to physical assistance or staff supervision with medications, nutrition (including tray service, dietary restrictions, and feeding assistance), dressing and grooming, personal hygiene, bathing/showering, toileting, and/or transferring out of bed or chair.

11.     In order to deliver the contractual services identified above to residents in each of BROOKDALE's North Carolina facilities, including Plaintiff and the proposed Class Members, BROOKDALE must, by definition and pursuant to its promise to comply with North Carolina adult care home rules and regulations, allocate sufficient staff.  In particular:

4

a. each resident, including Plaintiff and the proposed Class Members, by reason of their frailty, physical and/or cognitive impairments, required daily assistance and labor time from a limited pool of staff (shared by the resident population) in each respective facility,

b. in each BROOKDALE facility there was a finite amount of daily staff and labor time available to meet the daily aggregate basic care and daily life services needed by residents,

c. BROOKDALE determined and tightly limited the daily numbers and hours of staff on duty at its facilities,

d. all residents shared a common dependence on BROOKDALE to provide sufficient amount of staff and labor time to meet the daily cumulative basic care and daily life services needed by residents as determined by BROOKDALE's resident assessment system, and,

e. every day that the hours of time required to provide all basic care and daily life services to residents in a BROOKDALE facility exceeded the amount of actual staff time available to provide these services, residents could not have received the promised levels of care and daily living services.

12. Plaintiff, the members of the proposed Class and their families chose a BROOKDALE facility, or have chosen to remain in a BROOKDALE facility, because they were and continued to be deceived by BROOKDALE's repeated and ongoing promises and misstatements that it will provide the basic care assistance and daily living services needed, as assessed in PSAs, and paid for. Instead, Plaintiff, their families and the members of the proposed Class have all encountered and continue to encounter in BROOKDALE a system of chronically

5

Case 3:20-cv-00543 Document 44-5 Filed 04/12/21 Page 9 of 62 PageID #: 869

understaffed assisted living facilities that routinely and as a matter of practice fail to provide sufficient staffing that correlates to the service needs of its resident populations in order to provide the most basic level of promised care and daily living services.

13.     Plaintiff, the proposed Class Members, and their families have reasonably expected and have been misled to believe that BROOKDALE will staff each facility to meet the aggregate basic care needs and daily living services required by residents, as determined by the PSAs of each and every resident in the resident population. Instead, BROOKDALE has systemically and willfully understaffed its facilities to boost its profitability. As a result, BROOKDALE could not meet the aggregate care needs of Plaintiff and Class Members, which have not received the care and services they paid for.

14.     Plaintiff, the proposed Class Members, and their families have reasonably expected that the PSA system and the personalized care plans generated by it will control the determination of the staffing levels at its facilities so that these facilities would have the capacity to deliver all the collective services needed and paid for by the residents on a daily basis. In addition, Plaintiff, the proposed Class Members, and their families reasonably expected that BROOKDALE would have in place safety rules, policies, and procedures to ensure that BROOKDALE's facilities have the staff time necessary to meet the aggregate needs of BROOKDALE's residents.  Moreover, Plaintiff and the proposed Class Members reasonably expected that BROOKDALE's facilities would operate in compliance with the laws of their states.

15.     In North Carolina, all licensed adult care homes, including BROOKDALE, are statutorily required to provide sufficient staff to meet the needs of the residents.  Inasmuch as the law in North Carolina requires BROOKDALE to provide sufficient staff to meet the collective

6

needs of its residents, Plaintiff and proposed Class Members reasonably believed that BROOKDALE would comply with the law and provide sufficient staff. [6]

16.     During the Class Period, BROOKDALE engaged in a scheme of understaffing and coverup through misrepresentations, misleading statements, omissions and concealment of material facts, and the inherently flawed and deceptive staffing practices described more fully below. Plaintiff and the proposed Class Members were misled by the scheme into believing that BROOKDALE would properly determine and staff its assisted living facilities at a level sufficient to meet the assessed care and service needs of its residents.

17.     At the heart of this scheme was BROOKDALE's method of determining and limiting staffing levels at its facilities.  Rather than providing the amount of staff and labor hours required to meet resident service needs as determined by its PSA system, BROOKDALE used a staffing algorithm known as its Service Alignment Software to dilute and underestimate the staffing time actually needed.

18.     As described by BROOKDALE, its Service Alignment Software consists of two main categories of data.  First, it includes assumptions regarding the amount of time required to perform daily living services which are purportedly based on time studies BROOKDALE itself conducted; and the aggregate assess care needs of all residents.  Second, the Service Alignment Software consists of algorithms and a source code which "takes the results of the time studies, as well as the assessed needs of the residents and other parameters and factors" to set the number of staffing hours on a daily basis.  In other words, the Service Alignment Software determines the

---

[6] *See* N.C. Gen. Stat. Section 131D-4.2(a)(5) ("The facility **shall provide staff to meet the needs of the facility's residents.**"); and 10A N.C. Admin Code 13F .0604(e)(1) ("The home **shall have staff on duty to meet the needs of the residents**."). Accordingly, state law requires a direct correlation between BROOKDALE's staffing and the service needs of its resident populations.

7

number of staffing hours in each of its facilities by multiplying (1) the aggregate assessed care needs to be delivered by staff to residents by (2) the associated task times BROOKDALE claims are required for each assessed care need.

19.     BROOKDALE's design, methodology, and use of its Service Alignment Software are faulty and flawed. Because BROOKDALE'S insufficient staffing is the product of the two critical variables described in the paragraph above, namely (1) the number and types of services to be provided to each of its collective resident populations and (2) the time required to deliver each type of service, BROOKDALE reduced either or both of these variables to reduce labor costs and achieve a staffing output to hit its financial performance thresholds and profit benchmarks.  In other words, BROOKDALE's Service Alignment Software systematically underestimates the staffing needs at each facility by, *inter alia*, deliberately embedding false and inaccurate assumptions about the time required to carry out personal need services and/or the amount of services to be provided to its collective resident populations.  Moreover, to accurately and reliably determine the number of staff and labor time required to deliver services in industries like BROOKDALE's, industrial engineers recognize that certain engineering principles and critical variables must be taken into account and applied.  Plaintiff believes that the Service Alignment Software is also flawed and faulty because it fails to take into account these engineering principles and critical variables, thereby resulting in chronically insufficient staffing.

20.     BROOKDALE's use of its Service Alignment Software results in willfully and chronically understaffed facilities.  BROOKDALE purposefully uses its Service Alignment Software to justify understaffing in order to meet pre-determined labor budgets designed to achieve corporate profit objectives and predetermined financial performance thresholds. Moreover, knowing the impact that its understaffing has on the delivery of required services, BROOKDALE

8

deliberately fails to properly, accurately and fully document the services actually provided to its residents so as to avoid a paper trail that would reveal the extent of its false and misleading claims. BROOKDALE failed to disclose and concealed these material facts from the Plaintiff and the members of the Proposed Class.

21. From its corporate headquarters in Brentwood, Tennessee, BROOKDALE exercises absolute and exclusive control over staffing determinations at its facilities, monitoring each facility's staffing and budgetary compliance and measuring any variance in the corporate-determined budget on a frequent or daily basis. Moreover, BROOKDALE prohibits its facilities from making staffing decisions at the local level or modifying BROOKDALE's corporate-determined staffing levels without corporate approval. BROOKDALE did not disclose and has affirmatively concealed these crucial and material facts from residents, including Plaintiff, the proposed Class Members, their family members, and the members of the consuming public who may consider admission to a Brookdale facility.

22. The misrepresentations, misleading statements, and omissions by BROOKDALE which are summarized above and which are described in more detail in the remainder of this Complaint were material to reasonable consumers, including the Plaintiff, the proposed Class Members, and their family members. It was a matter of fundamental importance to the reasonable consumer that BROOKDALE did not staff, does not staff, and has no intention of providing enough staff to meet the aggregate assessed care needs of its resident populations.

23. If the named Plaintiff and proposed Class Members had known that BROOKDALE did not intend to comply with North Carolina adult care home rules and regulations and the North Carolina Bill of Rights, or did not intend to staff its facilities to meet the collective assessed needs of the residents, or that the Service Alignment algorithm methodically set staffing levels and labor

9

hours far below that required to meet residents' needs, they would not have agreed to enter BROOKDALE or to have paid BROOKDALE the significant amounts of money they paid in new Community Fees and monthly charges, or would have paid BROOKDALE less money. Indeed, no reasonable consumer would have agreed to enter BROOKDALE or to continue to pay BROOKDALE significant amounts of money in new Community Fees and monthly charges if that consumer knew the true facts about BROOKDALE's corporate staffing practices.

24. This action seeks to require BROOKDALE to disclose to prospective and current residents, their family members, and/or responsible parties that BROOKDALE does not staff its facilities sufficiently to meet its residents' needs as identified by the PSA system and the aggregate personal service plans. In addition to injunctive relief, this action seeks class-wide damages based on BROOKDALE's misrepresentations, misleading statements, material omissions and failure to staff its facilities sufficient to meet the collective needs of its resident populations. This action does not seek recovery for personal injuries, emotional distress, death, or bodily harm that may have been caused by Defendant's conduct alleged herein.

## II.     **PARTIES, JURISDICTION & VENUE**

25. Plaintiff resides in North Carolina and was at all material times a resident at an assisted living facility owned, operated, managed and controlled by BROOKDALE.

26. Defendant BROOKDALE is the largest owner and operator of assisted living facilities with 900 locations across the country, including at least 56 assisted living facilities in North Carolina. BROOKDALE is incorporated under the laws of Tennessee, with its principal executive offices located in Brentwood, Tennessee.

27. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1332(d). Plaintiff is a citizen of North Carolina and seeks to represent a putative North

Carolina Class. The Defendant is a corporate citizen of the State of Tennessee. The amount sought exceeds $5,000,000.00.

28.     Operations of all BROOKDALE assisted living facilities, including the facility in which Plaintiff resided, are conducted under a single umbrella and operate at the direction and control of BROOKDALE.

29.     The practices, policies, and procedures of BROOKDALE assisted living facilities are established, implemented, and monitored by a single management team either from Brookdale Senior Living, Inc. or acting on behalf of Brookdale Senior Living, Inc.

30.     The documents, forms, data, software, promises, and representations related to resident admissions, pricing structure, resident assessments, and staffing at all BROOKDALE assisted living facilities are uniform and were developed, dictated, monitored, controlled, and enforced by the BROOKDALE home office in Brentwood, Tennessee.

31.     The individual facilities comprising the Brookdale Senior Living, Inc.'s assisted living facilities are not permitted to establish separate practices, policies, and procedures for the admission, pricing, assessment and staffing, but instead use practices, policies, and procedures established and dictated by or on behalf of BROOKDALE.

32.     At all times material hereto, all BROOKDALE assisted living facilities, including the facility in which Plaintiff resided, have held themselves out to the public, to their residents and families, to state regulatory agencies and to the community as a single organization: "BROOKDALE."

33.     Financials, including revenue earned, expenses paid, overhead, and risk factors across all of BROOKDALE's assisted living facilities are combined into a single overarching financial statement for the publicly-traded Brookdale Senior Living, Inc.

11

34.     All conditions precedent to the bringing of this action have either occurred or have been excused by the Defendant.

35.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because the Defendant resides in and does business in this District.  Furthermore, a substantial part of the events and/or omissions giving rise to this claim occurred in this District.

## III.     GENERAL ALLEGATIONS

### A.     BROOKDALE Determines, Limits, and Controls Day-to-Day Staffing Levels

36.     BROOKDALE determines, limits, and controls the day-to-day staffing levels at its assisted living facilities from its corporate headquarters in Brentwood, Tennessee and, thus, determined, limited, and controlled the amount of care/service time available and provided to residents on a day-to-day basis at its facilities.

37.     BROOKDALE uses a computer program it designed, developed and controls, the Service Alignment Software, to determine, limit, and control the amount of care/service time available and provided to residents on a day-to-day basis at its facilities. As described above, the Service Alignment Software determines the number of staffing hours on a per-day basis in each of its facilities that are purportedly required to deliver the collective care services to residents by quantifying the total daily counts of each type of care service and multiplying each total count by an assumed average amount of labor task time BROOKDALE claims is required for each respective service.

38.     BROOKDALE's exercise of control and domination over the day-to-day staffing and budgeted hours at its facilities is further evidenced by the fact that it keeps its method and labor task time inputs for computing daily staffing levels secret from assisted living facility level employees. BROOKDALE does not even allow its executive directors at each facility to know its method and labor time inputs used to compute daily staffing levels or to access the Service

12

Alignment Software algorithms or source code.  Furthermore, executive directors and facility level staff cannot modify the corporate-determined staffing levels without express permission from several layers of BROOKDALE corporate management.  Any such request for permission to modify or customize must be documented.

39.     Only the highest corporate officers at BROOKDALE have access to or authority to modify the logic, algorithms, source code, task counts, and task times used in its Service Alignment Software.

40.     As a result, BROOKDALE has systematically short-staffed its assisted living facilities on a day-to-day basis, employing a fundamentally flawed and automated process, purposefully created and mandated to achieve budget objectives and to satisfy predetermined financial performance thresholds rather than meeting residents' needs by, among other things, embedding flawed assumptions into its staffing software to underestimate required staffing levels.

**B.     <u>BROOKDALE Determines and Enforces the Operating and Staffing Budgets</u>**

41.     BROOKDALE determines and enforces the operating budgets at its assisted living facilities, including the allowed maximum limits for staffing and expenses, from its corporate headquarters in Brentwood, Tennessee.

> We seek to increase our average monthly revenue per unit each year and **seek to increase facility operating margins** through a combination of the implementation of efficient operating procedures and the economies of scale associated with the size and number of our communities. Our operating procedures include … **implementing effective budgeting and financial controls at each community**.[7]

42.     BROOKDALE begins the budgeting process with its corporate financial planning and analysis team members ("FP&A"), determining and preloading the budgets on its internal

---

[7] *See* BROOKDALE's 10K Annual Report for the period ending December 31, 2014 filed with the Securities and Exchange Commission, page 14, and BROOKDALE's 10K Annual Report for the period ending December 31, 2015, page 13.

server with near final amounts. Once preloading is complete, each assisted living facility has one week to review the budget and respond to the BROOKDALE Regional Vice President, Regional Director of Operations and corporate FP&A with comments and any requests for change. The employees working at each assisted living facility only have read-only access to the budgets, meaning they cannot change any of the preloaded amounts. All changes and final approval of the budgets are made by BROOKDALE.

43. Once the budgets have been approved by BROOKDALE, they have been locked in for the entire year. The employees working at each assisted living facility have not been able to make changes to the budget.

44. BROOKDALE has strictly enforced its budgets, including the staffing expense limits, at its facilities through frequent emails, telephone calls, conference calls, and meetings. Upon information and belief, the executive directors at each of BROOKDALE's assisted living facilities have been routinely admonished by corporate officers in emails[8] demanding that:

    a.    they strictly comply with the staffing budget,

    b.    they make reductions in staffing needed to eliminate budget variances,

    c.    they comply with each facility's staffing expense savings commitment,

    d.    they "do a better job managing our labor, as this is by far our largest expense,"

    e.    they make the necessary adjustments to get staffing within budget or be forced to make reductions,

    f.    everyone will be held accountable for labor control,

---

[8] Produced by BROOKDALE pursuant to Court Order in other litigation with no confidentiality restriction.

Case 3:20-cv-00054-JPM Document 44-5 Filed 04/24/21 Page 17 of 61 PageID #7878

g. BROOKDALE does not tolerate an assisted living facility running over its approved staffing budget,

h. BROOKDALE management strenuously emphasizes the importance of managing labor and eliminating overtime, and

i. BROOKDALE does not tolerate an assisted living facility "dropping the ball" on labor controls.

45. To entice its employees to stay at or below BROOKDALE's limits for staffing and expenses, BROOKDALE created and implemented lucrative bonus and incentive programs tied to meeting or exceeding BROOKDALE'S financial performance targets. These programs provided facility department heads and BROOKDALE's senior management significant bonuses for staying at or below BROOKDALE's budgeted expense limits—the largest of which was staffing.

**C. BROOKDALE Exercises Exclusive Control of Facility Staffing Policies, Procedures, and Practices at all Facilities**

46. To further ensure compliance with its budgeted staffing and expense targets, BROOKDALE has created, implemented, and enforced comprehensive, company-wide standardized policies and procedures out of its home office in Brentwood, Tennessee for: facility operations, facility management, billing, accounting, finance, marketing, risk management, employee training, marketing, hiring of personnel, compliance with laws, employee behavior, resident behavior, resident assessment and resident care at its facilities.[9]

---

[9] *See* BROOKDALE's 10K Annual Report ending 2014, page 14; BROOKDALE's 10K Annual Report ending 2015, page 13; BROOKDALE's 10K Annual Report ending 2016, page 13; BROOKDALE's 10K Annual Report ending 2017, page 14; and BROOKDALE's 10K Annual Report ending 2018, page 12.

15

47. Likewise, the documents, forms, data and software related to the admission, pricing, assessment and staffing at all BROOKDALE assisted living facilities are virtually identical and were developed, implemented, and dictated by BROOKDALE out of its home office in Brentwood, Tennessee.

48. Facility employees and executive directors do not have authority to change or modify BROOKDALE's established policies and procedures.

49. As a result, at its facilities, BROOKDALE controlled not only the day-to-day job duties of its staff and specific steps and methods by which these staff were to provide care, but also the labor resources available.

**D.** **BROOKDALE Exercises Exclusive Control Over the Revenues Generated and the Use of Funds**

50. BROOKDALE captured the fiscal resources generated by each of its assisted living facilities and controlled the amount of money used on a day-to-day basis at its assisted living facilities for resident care and staffing.

51. On a daily basis, BROOKDALE swept the cash generated by its facilities into accounts owned and managed by BROOKDALE. BROOKDALE pooled the revenue generated by its facilities in these accounts so that BROOKDALE could use the aggregate funds to satisfy the rights and financial obligations of BROOKDALE and its subsidiaries and facilities.

52. No one working at the assisted living facilities had control over the revenue or cash generated by the assisted living facilities.

53. No one working at the assisted living facilities had check-writing authority for BROOKDALE's accounts.

54. BROOKDALE's collection and pooling of the revenue from multiple facilities into aggregate accounts allowed BROOKDALE to cross-collateralize its facilities. In other words,

16

BROOKDALE encumbered and subjected the revenues generated at each of its facilities to loan, lease, guarantee covenants, and default provisions in order to secure the debts and liabilities of all its individual facilities and subsidiaries.

### E. **BROOKDALE Operates Its Assisted Living Facilities as a Single Enterprise**

55. BROOKDALE operates its assisted living facilities, including the facilities in which Plaintiff resided, under a single umbrella out of Brentwood, Tennessee. Indeed, in a notice of removal filed in an unrelated federal action, BROOKDALE states, "Brookdale's corporate officers, based out of Brentwood, TN, direct, control and coordinate Brookdale's services and overall business operations for its locations throughout the United States."[10]

56. BROOKDALE represented to the public, including Plaintiff, the proposed Class Members, and their families, as well as state regulatory agencies and investors that its facilities were operated as a single organization: "BROOKDALE."

57. BROOKDALE highlighted its centralized control over its assisted living facilities in its annual reports (10-Ks) filed with the SEC. BROOKDALE defined the terms "we," "us," "our" or "the Company" to mean Brookdale Senior Living, Inc. together with its consolidated subsidiaries and affiliates. BROOKDALE further represented that:

> **We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials**, which we believe have contributed to high levels of customer service and to improved facility operating margins. **We have centralized accounting, finance and other operating functions** in our support centers so that, consistent with our operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations. **We have established company-wide policies and procedures** relating to, among other things: resident care; community design and community operations; billings and collections; accounts payable;

---

[10] *See* Case 2:16-cv-08191-BRO-JPR; *Edwards v. Brookdale Senior Living, Inc.*, In the United States District Court for the Central District of California, Defendants' Notice of Removal of Action to Federal Court, ¶ 11.

Case 2:20-cv-05483 Document 44-5 Filed 04/24/21 Page 21 of 62 PageID 20881

<u>finance</u> and accounting; risk management; development of <u>employee training</u> materials and programs; <u>marketing</u> activities; the hiring and training of <u>management</u> and other community-based <u>personnel</u>; compliance with applicable local and state regulatory requirements; and implementation of our acquisition, development and leasing plans.[11]

\*\*\*

In addition, **<u>we have and will continue to consolidate corporate functions</u>** <u>such as accounting, finance, human resources, legal, information technology and marketing.</u>[12]

\*\*\*

We have developed a **<u>centralized</u>** <u>support infrastructure and services platform,</u> which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as human resources, finance, accounting, legal, information technology and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established **<u>centralized</u>** <u>operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining and procurement.</u>[13]

58.     BROOKDALE emphasizes its domination of the operations and management of its assisted living facilities from Tennessee to courts across the United States. For example, BROOKDALE has repeatedly claimed that: (a) a majority of its executive and administrative functions are located in Tennessee; (b) executives such as the Chief Executive Officer, Chief

---

[11] *See* BROOKDALE's 10K Annual Report ending 2015, page 13; BROOKDALE's 10K Annual Report ending 2016, page 13; BROOKDALE's 10K Annual Report ending 2017, page 14; and BROOKDALE's 10K Annual Report ending 2018, page 12 (*emphasis added*).

[12] *See* BROOKDALE's 10K Annual Report ending 2014, page 13; BROOKDALE's 10K Annual Report ending 2015, page 12; BROOKDALE's 10K Annual Report ending 2016, page 12; BROOKDALE's 10K Annual Report ending 2017, page 12; and BROOKDALE's 10K Annual Report ending 2018, page 12 (*emphasis added*).

[13] *See* BROOKDALE's 10K Annual Report ending 2014, page 14; BROOKDALE's 10K Annual Report ending 2015, page 13; BROOKDALE's 10K Annual Report ending 2016, page 13; BROOKDALE's 10K Annual Report ending 2017, page 12; and BROOKDALE's 10K Annual Report ending 2018, page 12 (*emphasis added*).

18

Operating Officers, and Secretary maintain their principal offices in Tennessee; (c) all of BROOKDALE's Executive Vice Presidents are also located in Tennessee; and (d) final decisions regarding the following corporate-wide issues relating to operations of its facilities were made from BROOKDALE's corporate headquarters in Brentwood, Tennessee: corporate policy; decisions regarding the purchase, financing and leasing of real properties; legal decisions; significant decisions regarding contracts and other purchasing; decisions regarding press releases and public affairs; decisions regarding revenue management; and policies decisions regarding advertising and marketing.[14]

**F. In Order to Meet its Nationwide Debt and Lease Obligations, BROOKDALE Tightly Controls the Day-to-Day Staffing Levels, Staffing Expenses, and Operations at All of its Facilities**

59. BROOKDALE was formed in June 2005 for the purpose of combining two leading senior living operating companies, Brookdale Living Communities, Inc. and Alterra Healthcare Corporation. On November 22, 2005, BROOKDALE completed its initial public

---

[14] *See* Case 2:16-cv-08789-FMO-SK; *Briones v. Brookdale Senior Living Communities, Inc.*, In the United States District Court for the Central District of California, Defendants' Notice of Removal of Action to Federal Court, ¶ 21 and Declaration of Liberty Stansbury, SVP Human Resources for Brookdale Senior Living, Inc., ¶¶ 3-8; Case 2:13-cv-00933-GAF-DTB; *Therrien v. Brookdale Senior Living Communities, Inc.*, In the United States District Court for the Central District of California, Defendants' Notice of Removal of Action to Federal Court, ¶ 14 and Declaration of Chad White, ¶¶ 2-4; Case No 2:17-cv-04647-DSF-KS; *Rejuso v. Brookdale Senior Living, Inc.*, In the United States District Court for the Central District of California, Declaration of Liberty Stansbury, SVP Human Resources for Brookdale Senior Living, Inc., In Support of Defendants' Notice of Removal, ¶¶ 5-9; Case No 5:18-cv-01270-SVW-SP; *Schrenk v. Brookdale Senior Living Communities, Inc.*, In the United States District Court for the Central District of California, Declaration of Liberty Stansbury, SVP Human Resources for Brookdale Senior Living, Inc., In Support of Defendants' Notice of Removal, ¶¶ 5-7; Case No 8:14-cv-00223-JLS-AN; *Llamas v. Brookdale Senior Living Communities, Inc.*, In the United States District Court for the Central District of California, Declaration of Jack Leebron, Vice President Legal Services for Brookdale Senior Living, Inc., In Support of Defendants' Notice of Removal, ¶¶4-10.

Case 2:20-cv-05403-DOC-ADS Document 44-5 Filed 04/24/21 Page 23 of 62 Page ID #:2883

offering of common stock, and on July 25, 2006, BROOKDALE acquired American Retirement Corporation, another large senior living provider.

60.　　BROOKDALE's ascension to its position as the largest senior living operator in the United States was solidified by: a) its acquisition of Horizon Bay, the then-ninth largest operator of senior living communities in the United States, on September 1, 2011, and 2) its acquisition by merger of Emeritus Corporation, the then second largest operator of senior living communities in the United States, for $2.8 billion on July 31, 2014.

61.　　According to representations made by BROOKDALE in annual filings (10-K) with the United States Security and Exchange Commission ("SEC") between 2014 and 2018, BROOKDALE'S aggressive growth and purchase strategy required massive financing and infusions of cash. As a result, BROOKDALE shackled itself with enormous loan obligations, debt, and lease obligations to financing institutions and real estate investment companies.[15]

62.　　To secure such significant loans, financing agreements, and lease contracts, BROOKDALE agreed to designate profit and financial performance thresholds for its assisted living facilities both on an individual basis and on a consolidated, portfolio-wide and multi-community basis, as stated in Brookdale 10-K filings with the SEC between 2014 and 2018:

> **Our outstanding indebtedness and leases contain restrictions and covenants and require us to maintain or satisfy specified financial ratios and coverage tests, including maintaining prescribed net worth levels**, leverage ratios and debt service and lease coverage ratios **on a consolidated basis, and on a community or communities basis** based on the debt or lease securing the communities. In addition, certain of our leases **require us to maintain lease coverage ratios on a**

---

[15] *See* BROOKDALE's 10K Annual Report ending 2014, page 62; BROOKDALE's 10K Annual Report ending 2015, page 61; BROOKDALE's 10K Annual Report ending 2016, pages 63-64; BROOKDALE's 10K Annual Report ending 2017, page 62; BROOKDALE's 10K Annual Report ending 2018, page 64.

**lease portfolio basis** (each as defined in the leases) and **maintain stockholders' equity or tangible net worth amounts**.[16]

\*\*\*

**Certain of our debt and lease documents contain restrictions and financial covenants, such as those requiring us to maintain prescribed minimum net worth and stockholders' equity levels** and debt service and lease coverage ratios, and requiring us not to exceed prescribed leverage ratios, in each case **on a consolidated, portfolio-wide, multi-community, single-community and/or entity basis**.[17]

\*\*\*

We operate certain of our communities pursuant to **management agreements**. In some cases, subject to our rights, if any, to cure deficiencies, **community owners may terminate us** as manager **if … we do not satisfy certain designated performance thresholds**.[18]

63. In addition, BROOKDALE guaranteed and pledged the individual and aggregate assets and revenues of its assisted living facilities as collateral for such loan and lease agreements, as confirmed by BROOKDALE 10-K filings between 2014 and 2018.[19] In addition,

---

[16] *See* BROOKDALE's 10K Annual Report ending 2014, page 26; and BROOKDALE's 10K Annual Report ending 2015, page 25, (*emphasis added*).

[17] *See* BROOKDALE's 10K Annual Report ending 2017, pages 22-23; BROOKDALE's 10K Annual Report ending 2018, page 23 (*emphasis added*).

[18] *See* BROOKDALE's 10K Annual Report ending 2014, page 30; BROOKDALE's 10K Annual Report ending 2015, page 30; BROOKDALE's 10K Annual Report ending 2016, page 29; BROOKDALE's 10K Annual Report ending 2017, page 27; and BROOKDALE's 10K Annual Report ending 2018, page 27 (*emphasis added*).

[19] *See* BROOKDALE's 10K Annual Report ending 2014, page 25; BROOKDALE's 10K Annual Report ending 2015, page 24; BROOKDALE's 10K Annual Report ending 2016, page 23' BROOKDALE's 10K Annual Report ending 2017, page 25; BROOKDALE's 10K Annual Report ending 2018, page 22; BROOKDALE's 10K Annual Report ending 2017, page 23; BROOKDALE's 10K Annual Report ending 2018, page 23; BROOKDALE's 10K Annual Report ending 2014, page 30; BROOKDALE's 10K Annual Report ending 2015, page 30; BROOKDALE's 10K Annual Report ending 2016, page 29; BROOKDALE's 10K Annual Report ending 2017, page 27; BROOKDALE's 10K Annual Report ending 2018, page 27

BROOKDALE contractually guaranteed the obligations, performance and operations of its facilities and subsidiaries as described by BROOKDALE in its 10-K filings with the SEC.[20]

> Because our **mortgages and leases** generally contain cross-default and **cross-collateralization** provisions, a default by us related to one community could affect a significant number of our communities and their corresponding financing arrangements and leases.[21]

> ***

> Furthermore, in some cases, indebtedness is secured by both a **mortgage** on a community (or communities) and a **guaranty** by us and/or one or more of our subsidiaries. In the event of a default under one of these scenarios, the lender could avoid judicial procedures required to foreclose on real property by declaring all amounts outstanding under the guaranty immediately due and payable, and requiring the respective guarantor to fulfill its obligations to make such payments.[22]

64. BROOKDALE'S contractual guarantees were material and necessary inducements for the execution of: a) the credit and lending agreements and b) the management agreements with various lessors. According to the Guarantees, BROOKDALE unconditionally and irrevocably guaranteed the full, faithful, and prompt performance when due of each and every one of the terms, conditions, and covenants to be kept and performed by its facilities and subsidiaries, and b) the payment, on demand, of any fees, costs, and charges of enforcement of the management agreements.

65. Therefore, in order to meet its enormous debt obligations, financial covenants, and financial performance thresholds and to minimize the risk of defaulting on widespread portions of

---

[20] *See* BROOKDALE's 10K Annual Report ending 2014, page 25; BROOKDALE's 10K Annual Report ending 2015, page 24; and BROOKDALE's 10K Annual Report ending 2016, page 23; BROOKDALE's 10K Annual Report ending 2017, page 23; and BROOKDALE's 10K Annual Report ending 2018, page 23.

[21] *See* BROOKDALE's 10K Annual Report ending 2014, page 25; BROOKDALE's 10K Annual Report ending 2015, page 24; BROOKDALE's 10K Annual Report ending 2016, page 23' BROOKDALE's 10K Annual Report ending 2017, page 25; BROOKDALE's 10K Annual Report ending 2018, page 22 (*emphasis added*).

Case 3:20-cv-00353 Document 44-5 Filed 04/24/21 Page 26 of 62 PageID 886

its portfolio of assisted living facilities and other communities, BROOKDALE closely monitored and tightly controlled every aspect of the operations and management of its assisted living facilities, including the largest line-item expense—day-to-day staffing.

### G.  Uniform Misrepresentations in BROOKDALE's Standard Form Contracts

66.  Defendant BROOKDALE represents to residents that it will use its PSA system to determine the level of care required by residents and that it will provide enough staff to deliver that care. Through its sales and marketing materials and uniform Residency Agreements, BROOKDALE leads reasonable consumers to believe that it will meet the needs of residents by providing enough staff in each of its facilities to deliver all the basic care and daily living services that residents require as determined by BROOKDALE's own PSA assessment program.

67.  Specifically, BROOKDALE makes the affirmative representation in each uniform Residency Agreement that, in addition to the "basic services" it provides in exchange for the monthly base rent, it evaluates each resident and provides additional "personal services" described in the assessment and made part of a "Personal Service Plan":

> Prior to moving in and periodically throughout your residency, we will use a **personal service assessment to determine the personal services you require**. The personal service assessment will be used to develop your Personal Service Plan.  The **results of the assessment** and **the cost of** *providing you* **the additional personal services** (the "Personal Service Rate") will be shared with you.  Your initial Personal Service Rate is set forth in <u>Exhibit A</u>. (*emphasis added*)

68.  Based on the resident's "assessed care needs," BROOKDALE establishes a price for two separate categories of care referred to as "Care Groups":  "Choice Personal Services" and "Comprehensive Care Options."  "Choice Personal Services" include providing for needs related to medication, nutrition, dressing and grooming, showering or bathing, bathroom assistance, escort and mobility and service coordination.  Each of these categories is broken down in detail.  For example, the category "showering and bathing" is broken down to capture and charge for 8 specific

23

showering and bathing needs as shown on the assessment, including: the need for showering "set-up," the need for bathing "set-up," the need for "showering help," the need for "bathing help," and the frequency of these needs on a weekly basis.

69. "Comprehensive Care Options" include providing services to meet more serious assessed needs that are "utilized by fewer residents," including chronic condition management, respiratory equipment, nebulizer, nutrition, dressing and grooming needs for residents who cannot stand, bathroom assistance needs for residents who are catheterized, incontinent or cannot stand, two person or mechanical lifts, cognitive/psychosocial needs caused by memory loss, cognitive impairment and dangerous behavior, reluctance to accept care, behavior management, wound care, smoking assistance and pet care. These need categories are described and/or broken down in detail. For example, a resident's need for a nebulizer is broken down to capture and charge for two specific needs: the need for scheduled nebulizer treatment set-up and cleaning, and the more serious need for "staff attention or physical assistance" during nebulizer treatments.

70. BROOKDALE assigns a price to each assessed need in the "Choice Personal Services" and "Comprehensive Care" "Care Group" categories and charges the lesser of (1) the total cost for meeting each assessed need with each category, or (2) a "Predictable Maximum Total" BROOKDALE establishes for each "Care Group." These charges added together comprise the "Personal Service Rate," which when added to the "Basic Service Rate" becomes the resident's monthly charge for residing at a BROOKDALE facility. BROOKDALE agrees to provide the services necessary to meet the assessed needs identified in the Personal Service Plan.

71. BROOKDALE reinforces the misleading representation that its staffing will be controlled by and determined from resident needs identified through the use of its Resident Assessment System. Specifically, in its form contract, BROOKDALE promises to periodically

24

re-evaluate residents' health to update the Personal Service Plan. If so, BROOKDALE states that it shall be entitled to increases in the Personal Services Rate when a Personal Service Plan is amended because additional services are shown to be needed in an interim assessment.

72. In addition, at various times during the Class Period, BROOKDALE has sent out standard letters notifying facility residents of rate increases. Among other things, these letters emphasize the increased costs of providing the residents' quality care, including staffing costs to "take care of your senior living needs."

73. As a result of BROOKDALE's misrepresentations, misleading statements, and material omissions alleged herein, reasonable consumers, including the named Plaintiff, the putative Class, and the general consuming public, reasonably expect that BROOKDALE will provide staffing levels sufficient to meet its aggregate residents' assessed needs. Seniors and/or their family members choose an "assisted" living facility because they need assistance, which is provided by the staff of that facility. BROOKDALE promises that the "personalized care" made possible by the Resident Assessment System "is the one thing that sets BROOKDALE apart," and that BROOKDALE "will provide the most comprehensive and consistent personal care." It is a matter of fundamental importance to the reasonable consumer that BROOKDALE does not staff and has no intention of staffing its facilities sufficiently to meet the collective assessed care and service needs of the residents that BROOKDALE has itself determined and for which it is charging its residents.

**H. Uniform Misrepresentations in BROOKDALE's Marketing Materials and Representations**

74. Through its corporate website, marketing brochures, scripted marketing presentations, and other standardized corporate-issued marketing materials, BROOKDALE reinforces the misrepresentations and misleading statements made in every uniform Residency

25

Agreement—that BROOKDALE will provide sufficient numbers of qualified staff based upon BROOKDALE'S assessment of the collective needs of the residents.

75.     For example, BROOKDALE'S public website, www.brookdale.com features online marketing materials and representations directed at prospective residents which: a) tout the sufficiency of the staff at BROOKDALE's assisted living facilities and b) promote BROOKDALE's individualized Resident Assessment System as a key component of BROOKDALE's promise to deliver "high standards of care."  As BROOKDALE's website explains:

(a)     [W]e make every effort to ease your loved one into a comfortable and enjoyable lifestyle, *offering individually tailored personal care options to perfectly suit their needs.*

(b)     Your health is our top priority, and we have programs in place to help you maintain and stay on top of your health. Here are some care services you'd likely find at our assisted living communities: A *personalized service assessment and plan* where we evaluate *your individual needs and then create a custom care plan tailored to you.*

(c)     Brookdale will *assess your needs* and help you chose the **services you need**.

(d)     Our **trained caregivers provide attention and assistance** with medication support, bathing, dressing, cooking and other tasks **throughout the day**. Our staff will also coordinate services with outside healthcare providers and monitor residents to ensure they are healthy. **So your loved one gets the care they need** while enjoying the quality of life they've earned.

(e)     **Trained caregivers provide assisted living care by providing assistance** with medication management, activities of daily living, engaging programming, and coordination with outside healthcare providers.

(f)     At an assisted living community, *caring staff members* **are available to help them accomplish these tasks**, making life a lot easier than if they were living alone. This service provides *peace of mind* for them, as well as you. There's no need to take a chance on their health and safety, because *our team of medical professionals can lend the right level of support that they need throughout the day*.

(g)     The Brookdale approach provides *services that are tailored to each individual's unique needs*, a way of life created to enrich the lives of others – with compassion,

26

respect, excellence and integrity. In this way, we can make daily life easier for our residents, by *offering the desired service and care as their needs and preferences dictate*. By *customizing personal care offerings for the individual*, we help to ease assisted living residents through lifestyle transitions that complement their vision for all the places they would still like their lives to go.

(h)     At Brookdale, we are **committed to listening to your needs**, understanding the life you want for yourself or your loved one, and *then partnering with you to customize a solution* for all the places you still want your life to go.

(i)      The first step towards determining the right senior living option is *to understand you and your family's needs*.

(j)      [W]e believe in delivering senior care that's *tailored to you* and your loved one *based on those unique needs* and desires. That's why we provide a variety of options. *This personalized approach ensures that you* and your family *get exactly what you need....*

(k)     [We] cannot provide *exceptional care and service* until we find out exactly what it is that your *loved one needs.*

(l)      *We start with a detailed assessment,* listing the specifics of your loved one's level of care.

[emphasis added]

76.     The BROOKDALE website specifically promises to "Recognize and Integrate" the findings of each resident's detailed assessment by assuring that its "professional staff is trained to recognize the specific needs...of each individual." The website goes further to claim that a "continuous assessment process" "ensures" that BROOKDALE can continue to meet each resident's unique needs.

77.     BROOKDALE makes similar representations in its standardized marketing materials it distributes to prospective and incoming residents. In these marketing materials, BROOKDALE represents that at its facilities:

> **"Carefully selected and trained associates do more than assist with activities of daily living** such as dressing, bathing and dispensing of medications; **they implement custom care plans designed to meet the individual needs of each resident** … It all begins with a Personal Service Assessment. We take the time to

listen to our residents so that **we understand how to establish clinical, dining and program support that works for them in a meaningful way**. We recognize their individual needs and preferences and respond to them accordingly." (*emphasis added*)

78. Elsewhere in its marketing materials, BROOKDALE represents that it:

"provide[s] customized care solutions to meet residents' unique needs and complement their vision for all the places they would still like their lives to go. From our trained staff to our wide variety of amenities and activities, we strive to offer personalized care and exceptional service at competitive and affordable rates. **Fees for care and services are based on each resident's needs** and preferences, as determined by the Living Accommodation selected **and their Personal Service Plan** (*emphasis added*) …

\*\*\*\*

This provides customer value because **our residents only pay for what they need and want**." (*emphasis in original*).

79. Similar representations were made in promotional videos available on BROOKDALE's social media platforms. For example, in a YouTube video by BROOKDALE uploaded on December 1, 2017, Brookdale states:

"We know it's hard to talk about the next chapter, so we make every effort to make it easy for you. We start by asking, what does compassion, excellence, respect and integrity mean to you? Well, it means everything to us here at Brookdale and we listen. Listening helps us answer any question or concerns you may have about senior living. Together, we team up and plan the best way for you to enjoy life. This trusted relationship is maintained in over 1000 communities nationwide so you can live just about anywhere you want and have **80,000 passionate associates ready to work for you**. They've made Brookdale the industry leader in dedicated senior care. Every day they'll connect with you in a personal way and make sure that you're engaged and included. I want you to know that Brookdale is more than a progressive community, we're a community with a vision. A vision that is continually improving senior care at all levels for you. I know that senior care decisions can be difficult which is why we're dedicated to making it easy for you....

80. On the basis of these claims by Brookdale, reasonable consumers, including Plaintiff and the proposed Class Members, expected that BROOKDALE would ensure that its

facilities were staffed sufficient to meet the collective assessed needs of its resident populations and to comply with North Carolina adult care home rules and regulations.

## I. BROOKDALE Failed to Disclose and Actively Concealed Its Systemic Failure to Provide Staffing Sufficient to Meet the Care Needs of its Residents

81. Contrary to the express and implied representations, including those that are found in its uniform Residency Agreements, uniform marketing materials, and other uniform written documents (described above), BROOKDALE systematically and methodically failed to staff each facility sufficient to meet the collective assessed needs of the residents and in accordance with North Carolina adult care home rules and regulations. BROOKDALE failed to disclose and concealed these material facts from Plaintiff, the proposed Class Members, and their families.

82. Moreover, contrary to these expressed and implied representations, BROOKDALE systematically implemented and enforced a corporate staffing policy, methodology, and practice (described above) which set staffing numbers and hours far below the levels necessary to meet the collective needs of the residents at its assisted living facilities. BROOKDALE failed to disclose and concealed these material facts from Plaintiff, the proposed Class Members, and their families.

83. Further, based on information on belief, BROOKDALE failed to allow for facility level adjustments to staffing to account for increases in basic care and daily services, thereby further causing its staff to be unable to meet the aggregate assessed care needs of its resident populations.

84. Moreover, BROOKDALE failed to provide sufficient staffing at its facilities that correlated with the service needs of its residents, as required by the laws of North Carolina. BROOKDALE did not disclose and concealed these material facts from Plaintiff, the proposed Class Members, and their families.

29

85.     Defendant BROOKDALE was aware of the facts alleged above but did not at any time disclose these facts to residents or their family members.  Nor has Defendant BROOKDALE issued to all of the residents of its BROOKDALE facilities new contracts that remove the Care Group charges, which are allegedly based on the staff required to meet the assessed personal care needs determined to be necessary by resident assessments at BROOKDALE.  In fact, Defendant continues to charge residents and/or their family members at their BROOKDALE facilities for levels of care purportedly based on the amount of care time determined by BROOKDALE's materially flawed system and method for calculating staffing, as described above.

## J.      BROOKDALE's Misrepresentations and Concealment of Facts Are Material

86.     The aforementioned misrepresentations, misleading statements, non-disclosures and concealment of facts by BROOKDALE are material to the reasonable consumer, including Plaintiff and members of the proposed Class. As BROOKDALE expressly and impliedly represented, an important and significant factor in choosing to move oneself or one's relative to a BROOKDALE facility is that BROOKDALE would keep its promises to comply with North Carolina adult care home rules and regulations and its promise to staff each of its facilities sufficiently to meet the aggregate assessed care needs of its resident populations. Moreover, assurances to continually provide sufficient staff to meet care and service needs are material, and once elderly residents are admitted in reliance on these representations, transfer to other facilities is often cost-prohibitive and physically impossible.

87.     The named Plaintiff would not have entered a BROOKDALE facility or would have paid a lower price (by paying for the services they actually received and not paying for the services they did not receive), if he had known BROOKDALE used its Service Alignment System to systemically set staffing at levels far below the levels required to meet the assessed needs of its residents. Likewise, members of the putative Class would not have entered BROOKDALE's

30

facilities, or would have insisted upon a lower price, if they had known that BROOKDALE systematically and methodically underestimated its staffing at each facility through the use of its materially flawed staffing software (as discussed above). Additionally, had BROOKDALE disclosed to the named Plaintiff and members of the proposed Class the material, false, and misleading facts and representations described above, said individuals would not have continued to stay in or pay BROOKDALE full price for short-changed care and services.

88. These misrepresentations, non-disclosures, and concealment of facts were material to all of BROOKDALE's assisted living residents, even those who did not require staff assistance with one or more activities of daily living (ADLs), as many non-ADL-dependent residents of BROOKDALE require assistance with medication or therapeutic services from BROOKDALE staff. Accordingly, when the collective amount of labor time required to deliver the daily services for a resident population exceeded the daily amount of staff time that BROOKDALE allotted to its facilities, every resident, regardless of need level, was deprived of services that were needed and paid for.

89. By reason of those facts detailed above, BROOKDALE at all times material to this case had a duty to disclose to the consuming public that:

> a. Its corporate staffing software systemically sets staffing numbers and hours far below the staffing levels required to meet the needs identified by BROOKDALE's Resident Assessment System and Personal Service Plans;
>
> b. Despite the fact that residents are charged by BROOKDALE on the basis, quantity, and frequency of specific services provided, BROOKDALE keeps no record or documentation of the day-to-day services that were actually provided to residents;

31

c. BROOKDALE's staffing practices expose residents at its assisted living facilities to excessive and unacceptable wait times for services and/or places them at substantial risk for not receiving required and paid for services;

d. BROOKDALE's staffing practices violate North Carolina laws that require assisted living facilities to provide enough staff to meet the needs of facility residents;

e. BROOKDALE does not adjust the staffing in its facilities to meet the needs of its residents when the aggregate patient population needs in its facilities require such adjustments;

f. Decisions regarding the amount of staffing are not made locally in BROOKDALE's facilities, but rather are made at corporate headquarters; and,

g. Facility staff at BROOKDALE's assisted living facilities have no authority to modify corporate-determined staffing levels or the critical factors used by the Service Alignment Software (including task counts, task times, logic, algorithms, and source code) to determine staffing at each of its facilities.

## K. BROOKDALE Knowingly Understaffed Its Facilities

90. As detailed above BROOKDALE operated its assisted living facilities with insufficient numbers and hours of staff. As a consequence of BROOKDALE's staffing decisions, its assisted living facilities lacked the labor resource capacity to meet the aggregate care needs of its resident populations.

91. BROOKDALE knowingly decided to systematically understaff its facilities, which in turn made it physically impossible for its limited staff to meet the aggregate assessed supervision, care, and life needs of its resident populations.

32

92. BROOKDALE steadfastly refused to change its insufficient staffing practices because of the various covenants, default provisions, and financial performance thresholds that BROOKDALE agreed to in order to obtain financing. In short, when faced with the decision of whether to comply with restrictive financial performance thresholds or to comply with North Carolina staffing laws and the promises it made to the residents, BROOKDALE chose to violate the law and breach its promises.

93. As a consequence of its systemic understaffing, BROOKDALE was inundated by complaints at its facilities from residents, families, and even its own staff. Unwilling to change its staffing or risk defaulting on its loan covenants, BROOKDALE persisted in its course of conduct, ignoring the complaints and the resulting service deprivations to its dependent, disabled, and/or vulnerable elderly residents.

94. Further, ignoring complaints and warnings from others, BROOKDALE was aware of the extent of understaffing and service deprivation problems through various reports generated by its own assisted living facilities, its own corporate audits of the facilities' performance, and internal emails and communications. Yet, despite knowledge that its facilities lacked sufficient staff to provide the services BROOKDALE promised to Plaintiff, the proposed Class Members, and their families, BROOKDALE refused to increase its staffing levels.

## IV. PLAINTIFF GEORGE GUNZA

95. Mr. Gunza's Power of Attorney appoints his sister, Ms. Peggy Fisher, as attorney-in-fact. The Power of Attorney, attached as Exhibit A, explicitly denies the attorney-in-fact authorization to agree to arbitrate any claims, or to waive his right to trial. Specifically, Article V, ¶ 1 states:

> I do not grant my agent the power to waive my rights to have any dispute settled in a court of law. In particular, I do not grant my agent the power to consent to any compulsory arbitration agreement on my behalf. My agent shall not have the power

to waive my right to trial or to agree to any contractual provision which purports to waive my right to trial. This does not, however, preclude non-binding alternative dispute resolution processes such as mediation.

96. Plaintiff George Gunza was a resident of Reynolda Park, a BROOKDALE facility located at 2980 Reynolda Road, Winston-Salem, North Carolina.

97. Ms. Fisher, as power of attorney for Mr. Gunza, executed various intake forms, including a standard contract under which BROOKDALE promised to provide certain "basic services" in exchange for a monthly base rate. Additionally, the contract stated that BROOKDALE would be responsible for providing any additional "Personal Care Services" Mr. Gunza would need as determined by BROOKDALE's Resident Assessment and any subsequent determinations by BROOKDALE staff that his level of care needs had changed.

98. BROOKDALE represented to Mr. Gunza and his representative that BROOKDALE would provide adequate staffing to deliver assisted living care to Mr. Gunza to meet his assessed needs, and Mr. Gunza and his representative relied on these representations in making their decision for Mr. Gunza to become and remain a resident at the BROOKDALE facility.

99. During his time at BROOKDALE, Mr. Gunza continued to pay monthly residency charges based on BROOKDALE's Resident Assessment System.

100. BROOKDALE failed to disclose and concealed from Mr. Gunza and his representative that the facility was not staffed sufficiently to meet resident needs identified by the resident assessments, but instead staffs its facilities based on profit and financial performance thresholds BROOKDALE agreed to in loans, financing agreements, and lease contracts.

101. Mr. Gunza's responsible party would not have agreed to allow Mr. Gunza to enter and remain at BROOKDALE, or would have paid less money, if she had known the true facts

about BROOKDALE's staffing software and staffing practices and the Resident Assessment System.

102.	Ms. Fisher withdrew Mr. Gunza from the BROOKDALE facility in May 2018 as a result of insufficient staff being provided to meet the collective care needs of the facility's residents including Mr. Gunza.

## V.	CLASS ACTION AND CLASS REPRESENTATION ALLEGATIONS

103.	The causes of action alleged below, for declaratory and injunctive relief and for actual and other damages, are appropriate for class action treatment and class certification pursuant to the governing and applicable rules of civil procedure, including Federal Rules of Civil Procedure 23(b)(1)(a), 23(b)(2), 23(b)(3) and 23(c)(4).

104.	More specifically, this action is uniquely appropriate as a class action pursuant to Rule 23(b)(2) because Plaintiff seek declaratory and injunctive relief for all Class Members arising out of a common course of conduct and actions undertaken by BROOKDALE, or failures to act, on grounds generally applicable to the Class as a whole.

105.	In addition to injunctive relief, this action seeks class-wide damages for the Defendant's deceptive business practices, misleading statements and omissions alleged herein. This action is appropriate for class certification under Rule 23(b)(3) because the questions of law and fact common with respect to liability and damages as to Plaintiff and the Class predominate over any issues affecting individual members of the Class.  Resolution of these issues within a class action is the superior and manageable method to achieve fair and efficient adjudication of this controversy.

106.	This action does not seek recovery for personal injuries, emotional distress, or bodily harm that may have been caused by misrepresentations and misleading statements made by Defendant or by inadequate staffing at Defendant's facilities.

Case 3:20-cv-00543 Document 44-5 Filed 04/24/21 Page 39 of 62 PageID 899

107. The entitlement of Plaintiff and the Class to the monetary and equitable relief sought will turn on application of readily identifiable and objectively determinable facts and standards that derive from data and documents maintained by or on behalf of BROOKDALE, including but not limited to, objective comparison of the assessed needs of BROOKDALE's resident facility populations to BROOKDALE's actual staffing levels at its facilities.

108. Plaintiff is a member of the Class described in paragraph 110 below, (collectively referred to as "the Class" or "Class Members") and properly alleges these claims on his own behalf, and on behalf of the Class Members who are similarly situated, against the Defendant.

109. The members of each proposed Class are readily identifiable from documents maintained by or on behalf of the BROOKDALE, thus permitting any appropriate notice to the Class and convenient case management by the Court.

110. Plaintiff Gunza brings this action on behalf of himself and all similarly situated persons (the "North Carolina Class" or "Class Members") who resided or continue to reside at a BROOKDALE assisted living facility within the State of North Carolina between April 24, 2016 and the date of the filing of a Motion for Class Certification (the "Class Period").

A. **NUMEROSITY**

111. The precise number of Class Members is presently unknown to Plaintiff. BROOKDALE's website represents that during the Class Period it owned and/or operated at least 56 facilities in North Carolina. The number of residents at those facilities during the Class Period will likely well exceed 5,000. The precise number of persons in the Class and their identities and addresses may be ascertained from BROOKDALE's business records, which identify all putative Class Members.

112. The Members in the Class alleged are, therefore, so numerous that joinder of individual Class Members is impracticable and inconsistent with the orderly and efficient

36

administration of justice, the efficient use of scarce judicial resources, and contrary to the public good.

**B.**     **COMMONALITY AND TYPICALITY**

113.    The overriding claim presented by Plaintiff and the Class is founded on the question of whether BROOKDALE Senior Living, Inc.'s policy, practice, and common course of conduct of charging its residents based on their assessed needs, as determined by BROOKDALE's Resident Assessment System, but instead, making staffing determinations based on corporate profit goals and financial performance thresholds, constitutes an unfair or deceptive trade practice, violates applicable statutes, and violates public policy.

114.    The overriding claims raise the following common issues of fact and law for the Class:

        a.    whether BROOKDALE failed to disclose and concealed from Plaintiff and the Class that it staffed BROOKDALE facilities based on corporate profit goals and financial performance thresholds instead of the results of its Resident Assessment System;

        b.    whether the fact that BROOKDALE staffs its facilities based on profit goals and financial performance thresholds as opposed to the results of the residents' assessments is material, and whether Defendant had and has a duty to disclose the foregoing concealment and omission;

        c.    whether Plaintiff, the Class and the consuming public were likely to be deceived by the foregoing concealment and omission;

        d.    whether Plaintiff, the Class and the consuming public have a reasonable expectation that BROOKDALE will use the Resident Assessment System and the Levels of Care generated by it to determine and provide staffing at

its facilities and, among other charges, paid Community Fees based upon this reasonable expectation;

e. whether BROOKDALE breached the promises it made to Plaintiff and the Class by failing to determine and actually provide staffing levels required by North Carolina rules and regulations and sufficient to meet the collective assessed needs of its resident populations;

f. whether Plaintiff and the members of the Class are entitled to damages, and the nature of such damages; and,

g. whether Plaintiff and the Class are entitled to declaratory and injunctive relief and/or other relief, and the nature of such relief.

h. whether BROOKDALE's violations are likely to deceive the reasonable consumer, and constitute an unfair method of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of N.C. Gen. Stat Section 75-1.1 in that such actions offend the established public policy of the State of North Carolina.

115. The claims asserted herein by Plaintiff are typical of the claims possessed by each Class Member and are capable of being asserted by each Class Member against the Defendant.

116. Plaintiff's claims are typical of the claims of the proposed Class in the following ways: a) Plaintiff is a member of the proposed Class; b) Plaintiff's claims arise from the same uniform corporate policies, procedures, practices and course of conduct on the part of BROOKDALE; c) Plaintiff's claims are based on the same legal and remedial theories as those of the proposed Class and involve similar factual circumstances; d) the injuries suffered by Plaintiff

Case 3:20-cv-00353 Document 44-5 Filed 04/24/21 Page 42 of 62 PageID 1902

are similar to the injuries suffered by the members of the proposed Class; and e) Plaintiff seeks a common form of relief for himself and the members of the proposed Class.

## C. FAIR AND ADEQUATE REPRESENTATION OF THE CLASS

117. Plaintiff has a true stake in this case and will fairly and adequately represent, protect, and prosecute the interests of each Class Member and likewise has the willingness and capacity to do so.

118. Plaintiff is capable of fairly representing the interests of the Class Members, who have been similarly impacted. Furthermore, Plaintiff has engaged competent counsel knowledgeable in class actions and litigation of consumer issues.

119. Plaintiff has no interests actually or potentially adverse to those of the putative Class Members. Due to the alignment of interests, Plaintiff will also ensure the same degree of prosecution of the commonly held claims of the Class Members.

## D. PREDOMINANCE

120. With respect to Plaintiff's claims, certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members of the proposed Class.

## VI. SPECIFIC PROVISIONS OF RULE 23 UNDER WHICH CERTIFICATION IS SOUGHT

## A. RULE 23(b)(1)

121. Given the nature of the Class claims for declaratory and injunctive relief and monetary damages, separate actions by each individual class member create a real risk of inconsistent and varying adjudications. Inconsistent results from different trial courts would provide incompatible and differing signals as to ongoing conduct by BROOKDALE related to its assisted living facilities.

Case 3:20-cv-00543 Document 44-5 Filed 04/24/21 Page 43 of 62 PageID 2903

122. Differing rulings from different trial courts interpreting whether BROOKDALE's business practices related to resident assessments and staffing are deceptive or unfair would not lend themselves to certainty in conduct for the Plaintiff, for Class Members, or for BROOKDALE.

123. If the proposed class claims are litigated separately, Plaintiff and the individual Class Members run the risk of being bound by an adverse ruling, which might become dispositive of the interests of the individual Class Members or would be used as an argument to impede individual claims.

### B. RULE 23(b)(2)

124. BROOKDALE Senior Living, Inc. has acted or refused to act on grounds or in a manner generally applicable to all Class Members. Judicial economy is served by concentrating the litigation and resolving this question in a single action.

125. The resident assessment programs and staffing standards dictated and utilized by BROOKDALE are uniform throughout its assisted living facilities, thereby making declaratory and injunctive relief appropriate to the Class as a whole.

126. The interests of the Class Members are homogenous because all Class Members would want to obtain the care for which they have paid and are continuing to pay.

127. Plaintiff, for himself and members of the Class, is seeking to correct a pervasive and ongoing wrong committed by BROOKDALE in a manner that will allow a definite and binding resolution that does not require continual re-litigation of the same issues in individual lawsuits. This will benefit everyone involved.

128. Plaintiff seeks declaratory and injunctive relief requiring BROOKDALE to stop the intentional practice of staffing its facilities based on corporate profit goals and financial performance thresholds rather than in accordance with North Carolina law and the resident's assessed needs. Plaintiff also seeks injunctive relief requiring the Defendant to disgorge

40

Community Fees paid by residents to gain admission to BROOKDALE's facilities upon the reasonable expectation that BROOKDALE would staff its facilities based on the collective assessed needs of a facility's resident population rather than based on corporate profit goals and financial performance thresholds.

**C.     RULE 23(b)(3)**

129.    The questions of fact and law that are common to the Plaintiff and Class Members include the common issues identified in paragraphs 113  through 114 above.

130.    The issues common to each proposed Class predominate. The defined Class avoids individualized determinations as the Class is comprised of all everyone who resided in BROOKDALE assisted living facilities located in North Carolina during the class period, a fact which can be objectively determined by reference to BROOKDALE's own books and records.

131.    The damages sought on behalf of the Class also avoid individualized determinations in that Plaintiff will seek amounts which can be objectively determined by reference to BROOKDALE's own books and records, including but not limited to reimbursement of Community Fees paid by Class Members and Plaintiff.

132.    A class action is superior to other methods for fairly and efficiently adjudicating this controversy.  Absent a ruling from this Court with class-wide implications, BROOKDALE will continue its unfair and deceptive patterns and practices.

**D.     RULE 23(c)(4)**

133.    Class certification is also appropriate because this Court can designate particular claims or issues for class-wide treatment and may designate one or more subclasses pursuant to Fed. R. Civ. P. 23(c)(4).  For instance, this Court may certify a class for the purpose of resolving the question of liability, and the legality of the complained-of conduct, and thereafter proceed to address damages on a manageable individual basis.

41

134.    No unusual difficulties are likely to be encountered in the management of this action as a class action.

**COUNT I**
**DECLARATORY AND INJUNCTIVE RELIEF UNDER**
**NORTH CAROLINA UNIFORM DECLARATORY JUDGMENT ACT and N.C. GEN.**
**STAT. §131D-28.**

135.    Plaintiff, for himself and for the members of the Class, re-alleges and incorporates herein paragraphs 1 through 134, as if set forth fully herein.

136.    This is an action for declaratory relief pursuant to N.C. Gen. Stat. Sections 1-253, *et seq.*, also known as the North Carolina Uniform Declaratory Judgment Act, which is substantive law, and N.C. Gen. Stat. §131D-28.

137.    This Court has jurisdiction to issue a declaration as to the legality of the complained-of conduct, under North Carolina's Uniform Declaratory Judgment Act, N.C. Gen. Stat. Sections 1-253, *et seq*.  More specifically, the Court has jurisdiction to construe the form admission contracts at issue in this action pursuant to N.C. Gen. Stat. Section 1-254, both before and after breaches of its contracts with Plaintiff and the Class ("A contract may be construed either before or after there has been of breach thereof.").

138.    This Court also has jurisdiction to issue injunctive relief pursuant to N.C. Gen. Stat. § 131D-28, which grants any resident of an adult care home the right to institute a civil action for injunctive relief to enforce the provisions of North Carolina Adult Care Home Residents' Bill of Rights ("Bill of Rights").  The North Carolina Bill of Rights requires every BROOKDALE facility to ensure that its residents "receive care and services which are adequate, appropriate, and in compliance with relevant federal and State laws and rules and regulations."  The Bill of Rights further requires every BROOKDALE facility to ensure that its residents are free from neglect ("the failure to provide the services necessary to maintain the physical or mental health of a resident").

42

139.     Plaintiff, for himself and on behalf of the Class, alleges that there exists a bona fide, actual, present, and practical need for a declaration as to the rights of the parties under the form admission contracts entered into with Plaintiff and each Class Member concerning BROOKDALE's obligation to use its Resident Assessment System and the Personal Care Plans generated by it to determine and actually provide care and services which are adequate, appropriate, and in compliance with relevant and North Carolina laws and rules and regulations and to ensure that its residents are not neglected.

140.     Plaintiff, and members of the Class, in a present, actual, and practical sense, have been affected by BROOKDALE's failure to provide staffing levels at its facilities to deliver the level of care assessed by BROOKDALE and paid for by its residents.

141.     Plaintiff seeks a declaration that the form admission contracts obligate BROOKDALE to provide staffing levels sufficient to deliver the level of care assessed by the Resident Assessment System and paid for by its residents.

142.     Plaintiff further seeks to enjoin BROOKDALE from failing to provide care and services which are adequate, appropriate, and in compliance with relevant North Carolina laws, rules, and regulations and from failing to ensure that its residents are not neglected.

143.     Plaintiff for himself and on behalf of the North Carolina Class, has a power, privilege, or right that is dependent on the result of this declaration, including the right to monetary and other relief, once the conduct of BROOKDALE is determined to violate the form admission agreement and/or the North Carolina Bill of Rights.

144.     All antagonistic and adverse interests are currently before this Court or will be after a class is certified.

Case 3:20-cv-00543 Document 44-5 Filed 04/24/21 Page 47 of 62 PageID 46907

145. The declaratory relief sought by the Plaintiff, for himself and for Class Members, is not propounded for curiosity and is not seeking mere legal advice from the Court but is a declaration that, if provided, would establish that BROOKDALE's conduct violates the form admission contract, the North Carolina Bill of Rights and North Carolina consumer protection laws.

146. As a form of supplemental relief authorized by N.C. Gen. Stat. Section 1-259 and N.C. Gen. Stat. §131D-21, Plaintiff also seeks injunctive relief requiring that BROOKDALE immediately cease the acts complained of herein, enjoining BROOKDALE from continuing to engage in any such acts or practices in the future.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests an order certifying that the action may be maintained as a class and appointing him as representative for the Class and counsel below as class counsel, and also requests entry of a judgment against BROOKDALE Senior Living, Inc.:

a. declaring that the form admission contracts and the North Carolina Bill of Rights obligate BROOKDALE to provide staffing levels sufficient to deliver the level of care assessed by the Resident Assessment System and paid for by its residents;

b. enjoining BROOKDALE from failing to provide care and services which are adequate, appropriate, and in compliance with relevant federal and North Carolina laws, rules, and regulations and from failing to ensure that its residents are not neglected;

c. for an order requiring BROOKDALE immediately cease the acts complained of herein, and to enjoin BROOKDALE from continuing to engage in any such acts or practices in the future;

d. for an award of costs and attorneys' fees made necessary by seeking this relief; and

e. for such other and further relief as the Court may deem just and proper.

<u>COUNT II</u>
<u>VIOLATION OF THE NORTH CAROLINA</u>
<u>UNFAIR AND DECEPTIVE TRADE PRACTICES ACT</u>
(**N.C. Gen. Stat. Section 75-1.1,** *et seq.*)

147. Plaintiff, for himself and for the members of the Class, re-allege and incorporate herein paragraphs 1 through 134, as if set forth fully herein.

148. Plaintiff and members of the Class are natural persons who are citizens of, and consumers residing in, the State of North Carolina.

149. N.C. Gen. Stat. Section 75-1.1 states:

**Methods of competition, acts and practices regulated; legislative policy.**

(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

(b) For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

150. Defendant, in violation of the Unfair and Deceptive Trade Practices Act, utilized means, methods, and measures, the natural consequences of which were to mislead and deceive Plaintiff.

151. The unscrupulous, deceptive, unfair, misleading, immoral, and oppressive actions and conduct of Defendant set forth herein, proximately caused economic injury to Plaintiff and the

45

Class, are in and affecting commerce, and have the capacity to deceive ordinary North Carolina consumers.

152. In BROOKDALE's uniform resident contracts presented to prospective residents and their family members, BROOKDALE represented and continues to represent that it will meet residents' assessed needs, thus giving rise to a reasonable expectation on the part of the members of the putative Class that staff sufficient to meet the collective assessed needs generated by the Resident Assessment System will be provided. That same representation was made in BROOKDALE's re-assessments of residents, rate increase letters, corporate website statements and other standardized corporate promotional material; and, BROOKDALE similarly promised Plaintiff and the Class that its BROOKDALE facilities would comply with the North Carolina Bill of Rights and with the North Carolina Adult Care Home Licensing rules and regulations that require BROOKDALE to staff all BROODALE adult care homes to meet the assessed needs of the residents and at minimum statutory staffing levels. As alleged herein, these uniform corporate representations are false and misleading, are likely to deceive the reasonable consumer, and constitute an unfair method of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of N.C. Gen. Stat. Section 75-1.1 in that such actions offend the established public policy of the State of North Carolina.

153. Contrary to BROOKDALE's uniform misrepresentations and misleading statements, staffing at BROOKDALE facilities is driven by predetermined labor budgets designed to meet corporate profit targets, goals, margins, and financial performance thresholds. BROOKDALE does not disclose and actively conceals this corporate policy and procedure from current and prospective residents and their family members. BROOKDALE had exclusive and

46

superior knowledge of material facts not known to Plaintiff, the Class, or the general public at the time of the subject transactions, and BROOKDALE actively concealed these material facts.  As alleged herein, BROOKDALE's failure to disclose and actively concealing this corporate policy from consumers constitutes an unfair method of competition, an unconscionable act or practice, and an unfair or deceptive act or practice in the conduct of any trade or commerce in violation of N.C. Gen. Stat. Section 75-1.1.

154.	BROOKDALE had exclusive and superior knowledge of their corporate policy in setting staffing levels.  Further, BROOKDALE's officers, directors and managers were repeatedly advised by its own staff that BROOKDALE facilities were not adequately staffed to meet resident needs. BROOKDALE also knew that its failure to provide staffing based on the amount of time that BROOKDALE had itself determined was necessary to provide the care and services for which it charged its residents had a propensity to pose a heightened health and safety risk to Plaintiff and Class Members.  BROOKDALE intentionally concealed, suppressed and/or failed to disclose the true facts with the intent to deceive Plaintiff and the Class Members, and by doing so violated N.C. Gen. Stat. Section 75-1.1.

155.	BROOKDALE's business practices alleged herein constitute deceptive acts and practices because they consist of material representations, practices and omissions that were likely to mislead and did mislead Plaintiff and the Class. As reasonable consumers, Plaintiff and the Class Members have the reasonable expectation that BROOKDALE would staff its facilities to meet the assessed needs of its residents in violation of N.C. Gen. Stat. Section 75-1.1.

156.	BROOKDALE's business practices alleged herein also constitute unfair acts because these acts caused or were likely to cause substantial injury to Plaintiff and the Class as

47

consumers, which they could not by themselves reasonably avoid, and were not outweighed by countervailing benefits to consumers or to competition.

157. Plaintiff and the Class Members had the reasonable expectation that BROOKDALE would comply with North Carolina adult care home rules and regulations and the North Carolina Bill of Rights and would use the Resident Assessment System to set and provide facility staffing sufficient to provide the care required for care needs established by its resident assessments. If Plaintiff had known the true facts, he would not have agreed to enter a BROOKDALE facility or would have only agreed to enter a BROOKDALE facility for less money than they paid. If the Class Members had known the true facts, they would also not have agreed to enter a BROOKDALE facility, or would have only agreed to enter for less money than they paid BROOKDALE.

158. From its corporate headquarters, BROOKDALE misrepresents, fails to disclose, and actively conceals facts that are material and likely to deceive the reasonable consumer. This conduct constitutes an unfair method of competition, an unconscionable act or practice, and an unfair or deceptive act or practice in the conduct of any trade or commerce in violation of N.C. Gen. Stat. Section 75-1.1. Consumers choose an assisted living facility because they need care and/or wish to age in a place as their care needs change. Consumers, including the residents and their family members herein, reasonably consider the staffing levels provided by the assisted living facility they select of great importance and attach great importance to BROOKDALE's claims regarding the benefits of its resident care assessment system.

159. Defendant's uniform corporate policy and procedure of basing its staffing on fixed budgets and corporate profit margins and financial performance thresholds, rather than in compliance with North Carolina law and the assessed needs of its residents, constitutes an unfair

48

and deceptive business practice because, among other matters, BROOKDALE represents that the assisted living care it provides will meet a high standard of care, namely the assessed needs of its residents rather than, instead, a lower standard of care designed to generate maximum profitability for BROOKDALE. BROOKDALE actively conceals this unfortunate reality.

160. Defendant has violated and continues to violate the North Carolina Unfair and Deceptive Trade Practices Act as alleged herein and in at least the following respects:

    a.    BROOKDALE's misrepresentations, failures to disclose, and concealment of the true characteristics and/or quantities of services provided at BROOKDALE facilities constitute unfair and deceptive business practices;

    b.    BROOKDALE has misrepresented, failed to disclose, and concealed the true standard, quality and/or grade of services provided at BROOKDALE assisted living facilities;

    c.    BROOKDALE's standard resident admissions contracts falsely represent that it will provide the assistance specified by each resident's assessment knowing that BROOKDALE does not intend to provide the services as represented; and falsely represent that the resident agreement, under which they pay Community Fees and monthly rates, confers on residents the right to reside in a facility that provides services based staffing required to meet the needs that its own Resident Assessment System has determined is necessary to provide the services for which the residents are charged; and

    d.    BROOKDALE misrepresented that it would comply with North Carolina's adult care home rules and regulations and the Bill of Rights.

161.    As a direct and proximate result of the BROOKDALE's conduct, Plaintiff and the putative Class are aggrieved and have suffered actual damages.  Plaintiff and Class Members paid money to BROOKDALE in the form of new resident Community Fees and monthly fees, and many Class Members continue to pay monthly fees.

162.    Plaintiff and the Class are entitled to actual damages for BROOKDALE's violations of N.C. Gen. Stat. Section 75-1.1 under N.C. Gen. Stat. Section 75-16 ("If any person shall be injured . . . in violation of the provisions of this Chapter, such person . . . so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict") and N.C. Gen. Stat. Section 75-16.1 ("In any suit instituted by a person who alleges that the defendant violated G.S. 75-1.1, the presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party, such attorney fee to be taxed as a part of the court costs and payable by the losing party, upon a finding by the presiding judge that: (1) The party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit").

163.    Excluded from Plaintiff's request for actual damages are any damages arising from or related to any personal injuries, emotional distress or wrongful death suffered by Plaintiff or by any member of the Class.

164.    Defendant's conduct presents a continuing threat of substantial harm to the public in that, among other things, BROOKDALE continues to misrepresent that it will comply with North Carolina adult care home rules and regulations and the Bill of Rights and how they use the Resident Assessment System and how they determine and provide staffing at their BROOKDALE

50

facilities in North Carolina. Despite the knowledge that BROOKDALE staffs based on corporate profit goals, margins, and predetermined financial performance thresholds, BROOKDALE continues to induce elderly and vulnerable citizens to enter their facilities. Accordingly, Plaintiff and North Carolina Class Members have been aggrieved by BROOKDALE's violations of N.C. Gen. Stat. Section 75-1.1, as set forth herein and seek an injunction that requires that BROOKDALE immediately cease the deceptive and unfair business practices alleged herein and to enjoin them from continuing to engage in any such acts or practices in the future.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated respectfully requests an order certifying that the action may be maintained as a class and appointing him as representative for the Class and counsel below as class counsel, and also requests entry of a judgment against BROOKDALE Senior Living, Inc.:

a. for monetary damages, including but not limited to actual damages according to proof, excepting any damages for personal injury, emotional distress and/or wrongful death suffered by the named Plaintiff or any Class Member;

b. for treble damages for its unfair trade practices as provided in N.C. Gen. Stat. §75-16;

c. for restitution and any other monetary relief permitted by law;

d. for pre-judgment and post-judgment interest, according to law;

e. for an order requiring that BROOKDALE immediately cease acts that constitute deceptive and unfair trade practices under the North Carolina Unfair and Deceptive Trade Practices Act as alleged herein with respect to Defendant's misrepresentations, misleading statements, and material

51

omissions, and to enjoin Defendant from continuing to engage in any such acts or practices in the future;

f.     for an award of costs and attorneys' fees made necessary by seeking this relief; and

g.     for such other and further relief as the Court may deem just and proper.

## COUNT III
## BREACH OF CONTRACT

165. Plaintiff, for himself and the Class, re-allege paragraphs 1 through 134, as if fully restated herein. In the form admission contracts entered into with Plaintiff and each Class Member, BROOKDALE made uniform promises to Plaintiff and each Class Member to provide the assistance required and specified by the resident assessment and which corresponds to that resident's assessed care needs. BROOKDALE bases its monthly charges for these "Care" needs on the staff time necessary to deliver those personal care services.

166. These express uniform promises obligate BROOKDALE to use its Resident Assessment System and the Personal Care Plans generated by it, not only to charge for assessed level of care, but also to determine and provide staffing levels at its facilities sufficient to deliver the level of care assessed by BROOKDALE and paid for by the resident.

167. Implicit within the Residency Agreement is that promise that all BROOKDALE facilities will comply with the North Carolina Bill of Rights and with the North Carolina Adult Care Home rules and regulations that required BROOKDALE to staff all BROOKDALE facilities to meet the assessed needs of the residents and at minimum North Carolina statutory staffing levels.

168. BROOKDALE breached the express and implied promises set forth in the Residency Agreements by failing to staff its facilities in accordance with North Carolina adult care home rules and regulations and by failing to determine and actually provide staffing levels

52

sufficient to deliver the level of care assessed by BROOKDALE and paid for by its residents. As a direct and proximate result of BROOKDALE's conduct, Plaintiff and the Class Members suffered actual damages. Plaintiff and Class Members paid money to BROOKDALE in the form of new resident Community Fees and monthly fees. Plaintiff and the Class Members each suffered substantial economic harm in that they paid BROOKDALE for services that they did not receive.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests an order certifying that the action may be maintained as a class and appointing him as representative for the Class and counsel below as class counsel, and also requests entry of a judgment against BROOKDALE Senior Living, Inc.:

   a.   for monetary damages, including but not limited to damages according to proof, excepting any damages for personal injury, emotional distress and/or wrongful death suffered by Plaintiff or any Class Member;

   b.   for pre-judgment and post-judgment interest, according to law;

   c.   for an award of costs and attorneys' fees made necessary by seeking this relief, and,

   d.   for such other and further relief as the Court may deem just and proper.

### COUNT IV
### UNJUST ENRICHMENT

169.   Plaintiff, for himself and for the Class, re-allege paragraphs 1 through 134, as if fully restated herein.

170.   Defendant BROOKDALE has been unjustly enriched as Plaintiff and the Class Members conferred a benefit on BROOKDALE by paying BROOKDALE for services, the Plaintiff and the Class Members did not pay BROOKDALE officiously, BROOKDALE

consciously accepted the payment of a measurable amount of money, and the Plaintiff and the Class Members did not pay the benefit gratuitously.

171. These acts and omissions allowed BROOKDALE to save millions of dollars in costs they should have expended to properly staff its facilities.

172. Plaintiff and the Class have suffered monetary damages due to BROOKDALE's acts and omissions as alleged herein.

173. BROOKDALE lacks any legal justification for chronically and systematically understaffing its facilities as alleged herein.

174. Under the circumstances described herein, it would be inequitable for BROOKDALE to retain the benefits of its chronic and systematic failure to properly staff its facilities while at the same time collecting and keeping money paid by the Plaintiff and the Class to sufficiently staff the facilities. .

175. No other remedy at law can adequately compensate Plaintiff and Class Members for the damages occasioned by BROOKDALE's conscious choice to systematically and chronically understaff its facilities to further its profit motives while at the same time collecting and keeping money paid by the Plaintiff and the Class to sufficiently staff the facilities.

176. At all relevant times BROOKDALE caused and causes injury and damages to Plaintiff and the Class through acts and omissions actuated by malice and/or accompanied by a wanton, reckless, and willful disregard of the persons who foreseeably would be harmed by such acts or omissions.

177. By reason of BROOKDALE's conduct, Plaintiff and the Class are entitled to recover damages to be determined by the amount of all money BROOKDALE saved by not

Case 3:20-cv-00353 Document 44-5 Filed 04/24/21 Page 58 of 62 PageID 7918

properly staffing its facilities in a manner sufficient to meet the assessed needs of its resident populations.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests an order certifying that the action may be maintained as a class and appointing him as representative for the Class and counsel below as class counsel, and also requests entry of a judgment against BROOKDALE Senior Living, Inc.:

a. for monetary damages, including but not limited to damages according to proof, excepting any damages for personal injury, emotional distress and/or wrongful death suffered by Plaintiff or any Class Member;

b. for pre-judgment and post-judgment interest, according to law;

c. for an award of costs and attorneys' fees made necessary by seeking this relief, and,

d. for such other and further relief as the Court may deem just and proper.

## COUNT V
## TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP

178. Plaintiff, for himself and the Class, re-allege paragraphs 1 through 134, as if fully restated herein.

179. In the alternative, and to the extent BROOKDALE contends it has no contractual relationship with Plaintiff and the Class because BROOKDALE made no promises to Plaintiff or the Class or that BROOKDALE is not a party to the Resident Agreements, BROOKDALE intentionally interfered with the contractual relationship that Plaintiff and the Class have with the licensed owners of the North Carolina BROOKDALE-branded adult care homes by forcing all BROOKDALE facilities to engage in chronic and systematic understaffing practices, including requiring all BROOKDALE-branded facilities to use the Service Alignment Software over which

55

BROOKDALE exercises exclusive control including the weights, variables, assumptions and staffing outputs generated by the Software, all in violation of the contracts with BROOKDALE residents.

180. BROOKDALE has knowledge of the contractual relationship the owners of the BROOKDALE-branded facilities have with Plaintiff and the Class.

181. BROOKDALE intentionally and without justification induced the owners of the BROOKDALE-branded North Carolina facilities not to comply with the material terms of the Residency Agreements and not to comply with the promise to staff the BROOKDALE-branded North Carolina facilities in accordance with the North Carolina adult care home rules and regulations.

182. As a direct and proximate result of BROOKDALE's tortious interference with Plaintiff's and the Class's contractual relationship with the owners of the BROOKDALE-branded North Carolina facilities, Plaintiff and the Class suffered actual pecuniary harm.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests an order certifying that the action may be maintained as a class and appointing him as representative for the Class and counsel below as class counsel, and also requests entry of a judgment against BROOKDALE Senior Living, Inc.:

    a. for monetary damages, including but not limited to damages according to proof, excepting any damages for personal injury, emotional distress and/or wrongful death suffered by Plaintiff or any Class Member;

    b. for pre-judgment and post-judgment interest, according to law;

    c. for an award of costs and attorneys' fees made necessary by seeking this relief, and,

d.      for such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff for himself, and on behalf of all Class Members, demands a trial by jury of all matters so triable.

Dated:  April 24, 2020                              Respectfully submitted,


*/s Michael S. Kelley*
Michael S. Kelley
TN BPR No. 014378
KENNERLY, MONTGOMERY & FINLEY, P.C.
550 Main Street, Fourth Floor
Knoxville, Tennessee 37902
P.O. Box 442
Knoxville, Tennessee 37901
(865) 546-7311 (Telephone)
(865) 524-1773 (Facsimile)
mkelley@kmfpc.com
***Local Counsel for Plaintiff***

CHRISTA L. COLLINS
Florida Bar # 0381829
(*Pro Hac Vice* forthcoming)
HARMON PARKER, P.A.
110 North 11th Street - 2nd Floor
Tampa, Florida 33602
(813) 222-3600 (Telephone)
(813) 222-3616 (Facsimile)
service.clc@harmonparkerlaw.com
clc@harmonparkerlaw.com
***Lead Counsel for Plaintiff***

Kelly Bagby (*Pro Hac Vice* forthcoming)
kbagby@aarp.org
M. Geron Gadd ((*Pro Hac Vice* forthcoming)
AL Bar No. 0601-J98S
mgadd@aarp.org
Elizabeth Aniskevich (*Pro Hac Vice* forthcoming)
Virginia Bar # 81809
eaniskevich@aarp.org

Case 3:20-cv-00543 Document 44-5 Filed 04/24/21 Page 60 of 62 PageID 60921

Ali Naini (*Pro Hac Vice* forthcoming)
DC Bar No. 998331
anaini@aarp.org

AARP FOUNDATION
601 E. Street, NW
Washington, DC, 20049
(202) 434-2072 (Telephone)
(202) 434-6424 (Facsimile)

Stephen J. Gugenheim (*Pro Hac Vice* forthcoming)
NC State Bar No. 029776
GUGENHEIM LAW
118 St. Mary's Street
Raleigh, NC 27605
(919) 836-5551 (Telephone)
(919) 836-5550 (Facsimile)
steve@gugenheimlaw.com

***Co-Counsel for Plaintiff***

58