# EXHIBIT 18

| Exhibit 18 – Chart Comparing Allegations of *Bright* and *Gunza* | | | |
|---|---|---|---|
| Paragraph (*Bright*) | Allegation (*Bright*) | Paragraph (*Gunza*) | Allegation (*Gunza*) |
| ¶ 1 | This is a class action for monetary damages, declaratory and injunctive relief and penalties to redress systemic unfair and deceptive trade practices and breaches of contract committed between May 3, 2015 through the filing of a Motion for Class Certification (the "Class Period") against Named Plaintiffs and the members of the proposed Classes which are defined as (a) current and former residents of the at least 120 assisted living facilities1 operated by BROOKDALE in Florida and who contracted with BROOKDALE for services for which BROOKDALE was paid money (the "Florida Class") and (b) current and former residents of the at least 56 assisted living facilities it operated in North Carolina and who contracted with BROOKDALE for services for which BROOKDALE was paid money (the "North Carolina Class"). | ¶ 1 | This is a class action for monetary damages, declaratory and injunctive relief and penalties to redress systemic unfair and deceptive trade practices and breaches of contract committed by BROOKDALE between April 24, 2016 through the filing of a Motion for Class Certification (the "Class Period") against Named Plaintiff and the members of the proposed Class, which are defined as all current and former residents of the at least 56 BROOKDALE adult care homes (a/k/a assisted living facilities) that BROOKDALE operated, managed and/or controlled in North Carolina (the "North Carolina Class"). |
| ¶ 11 | Plaintiffs, the members of the proposed Classes and their families have chosen a BROOKDALE facility, or have chosen to stay and remain in a BROOKDALE facility, because they were and have continued to be deceived by BROOKDALE's repeated and ongoing promises and misstatements that it will provide the basic care assistance and daily living services needed to residents. Instead, Plaintiffs, their families and the members of the proposed Classes have all encountered and continue to encounter in BROOKDALE a system of chronically understaffed assisted living facilities that routinely and as a matter of practice fail to provide sufficient staffing that correlates to the service needs of its resident populations in order to provide the most basic level of promised care and daily living services. | ¶ 12 | Plaintiff, the members of the proposed Class and their families chose a BROOKDALE facility, or have chosen to remain in a BROOKDALE facility, because they were and continued to be deceived by BROOKDALE's repeated and ongoing promises and misstatements that it will provide the basic care assistance and daily living services needed, as assessed in PSAs, and paid for. Instead, Plaintiff, their families and the members of the proposed Class have all encountered and continue to encounter in BROOKDALE a system of chronically understaffed assisted living facilities that routinely and as a matter of practice fail to provide sufficient staffing that correlates to the service needs of its resident populations in order to provide the most basic level of promised care and daily living services. |
| ¶ 14 | During the Class Period, BROOKDALE has engaged in a scheme of understaffing and coverup through misrepresentations, misleading statements, and concealment of material facts for purposes of financial gain and the inherently flawed and deceptive staffing practices described more fully below. Plaintiffs and the | ¶ 16 | During the Class Period, BROOKDALE engaged in a scheme of understaffing and coverup through misrepresentations, misleading statements, omissions and concealment of material facts, and the inherently flawed and deceptive staffing practices described more fully below. Plaintiff and the proposed Class |

1

| | | | |
|---|---|---|---|
| | proposed Class Members were misled by the scheme into believing that BROOKDALE would properly determine and provide staffing at its assisted living facilities at a level sufficient to meet the assessed care and service needs of its residents. | | Members were misled by the scheme into believing that BROOKDALE would properly determine and staff its assisted living facilities at a level sufficient to meet the assessed care and service needs of its residents. |
| ¶ 15 | At the very heart of this scheme was BROOKDALE's method of determining and limiting staffing levels at its facilities. Rather than providing the amount of staff and labor hours required to meet resident service needs as determined by its PSA system, BROOKDALE used a staffing algorithm known as its Service Alignment Software, to dilute and underestimate the staffing time actually needed. | ¶ 17 | At the heart of this scheme was BROOKDALE's method of determining and limiting staffing levels at its facilities. Rather than providing the amount of staff and labor hours required to meet resident service needs as determined by its PSA system, BROOKDALE used a staffing algorithm known as its Service Alignment Software to dilute and underestimate the staffing time actually needed. |
| ¶ 16 | As described by BROOKDALE, its Service Alignment Software consists of two main categories of data. First, it includes assumptions regarding the amount of time required to perform daily living services which are purportedly based on time studies BROOKDALE itself conducted; and the number and type of daily living services required by all residents. Second, the Service Alignment Software consists of algorithms and a source code which "takes the results of the time studies, as well as the assessed needs of the residents and other parameters and factors" to set the number of staffing hours on a daily basis. In other words, the Service Alignment Software determines the number of staffing hours in each of its facilities by multiplying the number of services required to be delivered by staff to residents by the associated task times BROOKDALE claims are required for each respective service. | ¶ 18 | As described by BROOKDALE, its Service Alignment Software consists of two main categories of data. First, it includes assumptions regarding the amount of time required to perform daily living services which are purportedly based on time studies BROOKDALE itself conducted; and the aggregate assess care needs of all residents. Second, the Service Alignment Software consists of algorithms and a source code which "takes the results of the time studies, as well as the assessed needs of the residents and other parameters and factors" to set the number of staffing hours on a daily basis. In other words, the Service Alignment Software determines the number of staffing hours in each of its facilities by multiplying (1) the aggregate assessed care needs to be delivered by staff to residents by (2) the associated task times BROOKDALE claims are required for each assessed care need. |
| ¶ 17 | But BROOKDALE's design, methodology, and use of its Service Alignment Software is faulty and flawed. More specifically, because BROOKDALE'S insufficient staffing is the product of the two critical variables described in the paragraph above, namely (1) the number and types of services to be provided to each of its collective resident populations and (2) the time required to deliver each type of service, BROOKDALE reduced either or both of these variables to reduce labor costs and achieve a staffing output to hit its financial performance thresholds and profit | ¶ 19 | BROOKDALE's design, methodology, and use of its Service Alignment Software are faulty and flawed. Because BROOKDALE'S insufficient staffing is the product of the two critical variables described in the paragraph above, namely (1) the number and types of services to be provided to each of its collective resident populations and (2) the time required to deliver each type of service, BROOKDALE reduced either or both of these variables to reduce labor costs and achieve a staffing output to hit its financial performance thresholds and profit benchmarks. In other words, |

2

| | | | |
|---|---|---|---|
| | benchmarks. In other words, BROOKDALE's Service Alignment Software systematically underestimates the staffing needs at each facility by, inter alia, deliberately embedding false and inaccurate assumptions about the time required to carry out personal need services and/or the amount of services to be provided to its collective resident populations. | | BROOKDALE's Service Alignment Software systematically underestimates the staffing needs at each facility by, inter alia, deliberately embedding false and inaccurate assumptions about the time required to carry out personal need services and/or the amount of services to be provided to its collective resident populations. |
| ¶ 18 | BROOKDALE's use of its Service Alignment Software results in willfully and chronically understaffed facilities. BROOKDALE purposefully uses it Service Alignment Software to justify understaffing in order to meet pre-determined labor budgets designed to meet corporate profit objectives and predetermined financial performance thresholds. Moreover, knowing the impact that its understaffing has on the delivery of required services, BROOKDALE deliberately fails to properly, accurately and fully document the services actually provided to its residents so as to avoid a paper trail that would reveal the extent of its false and misleading claims. BROOKDALE failed to disclose and concealed these material facts from the Plaintiffs and the members of the Proposed Classes. | ¶ 20 | BROOKDALE's use of its Service Alignment Software results in willfully and chronically understaffed facilities. BROOKDALE purposefully uses its Service Alignment Software to justify understaffing in order to meet pre-determined labor budgets designed to achieve corporate profit objectives and predetermined financial performance thresholds. Moreover, knowing the impact that its understaffing has on the delivery of required services, BROOKDALE deliberately fails to properly, accurately and fully document the services actually provided to its residents so as to avoid a paper trail that would reveal the extent of its false and misleading claims. BROOKDALE failed to disclose and concealed these material facts from the Plaintiff and the members of the Proposed Class |
| ¶ 19 | From its corporate headquarters in Brentwood, Tennessee, BROOKDALE exercises absolute and exclusive control over staffing determinations at its facilities, monitoring each facility's staffing and budgetary compliance and measuring any variance in the corporate-determined budget on a frequent or daily basis. Moreover, BROOKDALE prohibits its facilities from making staffing decisions at the local level or modifying BROOKDALE's corporate-determined staffing levels without corporate approval. BROOKDALE did not disclose and has affirmatively concealed these crucial and material facts from residents, including Plaintiffs, the proposed Class Members, their family members, and the members of the consuming public who may consider admission to a Brookdale facility. | ¶ 21 | From its corporate headquarters in Brentwood, Tennessee, BROOKDALE exercises absolute and exclusive control over staffing determinations at its facilities, monitoring each facility's staffing and budgetary compliance and measuring any variance in the corporate-determined budget on a frequent or daily basis. Moreover, BROOKDALE prohibits its facilities from making staffing decisions at the local level or modifying BROOKDALE's corporate-determined staffing levels without corporate approval. BROOKDALE did not disclose and has affirmatively concealed these crucial and material facts from residents, including Plaintiff, the proposed Class Members, their family members, and the members of the consuming public who may consider admission to a Brookdale facility. |
| ¶ 21 | If the named Plaintiffs and proposed Class Members had known that BROOKDALE's Service Alignment algorithm methodically set staffing levels | ¶ 23 | If the named Plaintiff and proposed Class Members had known that BROOKDALE did not intend to comply with North Carolina adult care home rules and |

3

| | | | |
|---|---|---|---|
| | and labor hours far below that required to meet residents' needs, they would not have agreed to enter BROOKDALE or to have paid BROOKDALE the significant amounts of money they paid in new Community Fees and monthly charges, or would have paid BROOKDALE less money. Indeed, no reasonable consumer would have agreed to enter BROOKDALE or to continue to pay BROOKDALE significant amounts of money in new Community Fees and monthly charges if that consumer knew the true facts about BROOKDALE's corporate staffing practices. | | regulations and the North Carolina Bill of Rights, or did not intend to staff its facilities to meet the collective assessed needs of the residents, or that the Service Alignment algorithm methodically set staffing levels and labor hours far below that required to meet residents' needs, they would not have agreed to enter BROOKDALE or to have paid BROOKDALE the significant amounts of money they paid in new Community Fees and monthly charges, or would have paid BROOKDALE less money. Indeed, no reasonable consumer would have agreed to enter BROOKDALE or to continue to pay BROOKDALE significant amounts of money in new Community Fees and monthly charges if that consumer knew the true facts about BROOKDALE's corporate staffing practices. |
| ¶ 35 | BROOKDALE determines, limits, and controls the day-to-day staffing levels at its assisted living facilities from its corporate headquarters in Brentwood, Tennessee and, thus, determined, limited, and controlled the amount of care/service time available and provided to residents on a day-to-day basis at its facilities. | ¶ 36 | BROOKDALE determines, limits, and controls the day-to-day staffing levels at its assisted living facilities from its corporate headquarters in Brentwood, Tennessee and, thus, determined, limited, and controlled the amount of care/service time available and provided to residents on a day-to-day basis at its facilities. |
| ¶ 36 | BROOKDALE uses a computer program it designed, developed and controls known as the Service Alignment Software to determine, limit, and control the amount of care/service time available and provided to residents on a day-to-day basis at its facilities. As described above, this Service Alignment Software determines the number of staffing hours on a per-day basis in each of its facilities that are purportedly required to deliver the collective care services to residents by quantifying the total daily counts of each type of care service and multiplying each total count by an assumed average amount of labor task time BROOKDALE claims is required for each respective service. | ¶ 37 | BROOKDALE uses a computer program it designed, developed and controls, the Service Alignment Software, to determine, limit, and control the amount of care/service time available and provided to residents on a day-to-day basis at its facilities. As described above, the Service Alignment Software determines the number of staffing hours on a per-day basis in each of its facilities that are purportedly required to deliver the collective care services to residents by quantifying the total daily counts of each type of care service and multiplying each total count by an assumed average amount of labor task time BROOKDALE claims is required for each respective service. |
| ¶ 37 | BROOKDALE's exercise of control and domination over the day-to-day staffing and budgeted hours at its facilities is further evidenced by the fact that it keeps its method and labor task time inputs for computing daily staffing levels secret from assisted living facility level employees. BROOKDALE does not even allow its executive directors at each | ¶ 38 | BROOKDALE's exercise of control and domination over the day-to-day staffing and budgeted hours at its facilities is further evidenced by the fact that it keeps its method and labor task time inputs for computing daily staffing levels secret from assisted living facility level employees. BROOKDALE does not even allow its executive directors at each |

4

| | | | |
|---|---|---|---|
| | facility to know its method and labor time inputs used to compute daily staffing levels or to access the Service Alignment Software algorithms or source code. Furthermore, executive directors and facility level staff cannot modify the corporate-determined staffing levels without express permission from several layers of BROOKDALE corporate management. Any such request for permission to modify or customize must be documented. | | facility to know its method and labor time inputs used to compute daily staffing levels or to access the Service Alignment Software algorithms or source code. Furthermore, executive directors and facility level staff cannot modify the corporate-determined staffing levels without express permission from several layers of BROOKDALE corporate management. Any such request for permission to modify or customize must be documented. |
| ¶ 38 | Only the highest corporate officers at BROOKDALE have access to or authority to modify the logic, algorithms, source code, task counts, and task times used in its Service Alignment Software. | ¶ 39 | Only the highest corporate officers at BROOKDALE have access to or authority to modify the logic, algorithms, source code, task counts, and task times used in its Service Alignment Software. |
| ¶ 39 | As a result, BROOKDALE has systematically short-staffed its assisted living facilities on a day-to-day basis, employing a fundamentally flawed and automated process, purposefully created and mandated to achieve budget objectives and to satisfy predetermined financial performance thresholds rather than meeting residents' needs by, among other things, embedding flawed assumptions into its staffing software to underestimate required staffing levels. | ¶ 40 | As a result, BROOKDALE has systematically short-staffed its assisted living facilities on a day-to-day basis, employing a fundamentally flawed and automated process, purposefully created and mandated to achieve budget objectives and to satisfy predetermined financial performance thresholds rather than meeting residents' needs by, among other things, embedding flawed assumptions into its staffing software to underestimate required staffing levels. |
| ¶ 40 | BROOKDALE determines and enforces the operating budgets at its assisted living facilities, including the allowed maximum limits for staffing and expenses, from its corporate headquarters in Brentwood, Tennessee. | ¶ 41 | BROOKDALE determines and enforces the operating budgets at its assisted living facilities, including the allowed maximum limits for staffing and expenses, from its corporate headquarters in Brentwood, Tennessee. |
| ¶ 41 | BROOKDALE begins the budgeting process with its corporate financial planning and analysis team members ("FP&A"), determining and preloading the budgets on its internal server with near final amounts. Once preloading is complete, each assisted living facility has one week to review the budget and respond to the BROOKDALE Regional Vice President, Regional Director of Operations and corporate FP&A with comments and any requests for change. The employees working at each assisted living facility only have read-only access to the budgets, meaning they cannot change any of the preloaded amounts. All changes and final approval of the budgets are made by BROOKDALE. | ¶ 42 | BROOKDALE begins the budgeting process with its corporate financial planning and analysis team members ("FP&A"), determining and preloading the budgets on its internal server with near final amounts. Once preloading is complete, each assisted living facility has one week to review the budget and respond to the BROOKDALE Regional Vice President, Regional Director of Operations and corporate FP&A with comments and any requests for change. The employees working at each assisted living facility only have read-only access to the budgets, meaning they cannot change any of the preloaded amounts. All changes and final approval of the budgets are made by BROOKDALE. |
| ¶ 42 | Once the budgets have been approved by BROOKDALE, they have been locked in for the entire year. The employees | ¶ 43 | Once the budgets have been approved by BROOKDALE, they have been locked in for the entire year. The employees |

5

| | | | |
|---|---|---|---|
| | working at each assisted living facility have not been able to make changes to the budget. | | working at each assisted living facility have not been able to make changes to the budget. |
| ¶ 43 | BROOKDALE has strictly enforced its budgets, including the staffing expense limits, at its facilities through frequent emails, telephone calls, conference calls, and meetings. Upon information and belief, the executive directors at each of BROOKDALE's assisted living facilities have been routinely admonished by corporate officers in emails9 demanding that:<br>a. they strictly comply with the staffing budget,<br>b. they make reductions in staffing needed to eliminate budget variances,<br>c. they comply with each facility's staffing expense savings commitment,<br>d. they "do a better job managing our labor, as this is by far our largest expense,"<br>e. they make the necessary adjustments to get staffing within budget or be forced to make reductions,<br>f. everyone will be held accountable for labor control,<br>g. BROOKDALE does not tolerate an assisted living facility running over its approved staffing budget,<br>h. BROOKDALE management strenuously emphasizes the importance of managing labor and eliminating overtime, and<br>i. BROOKDALE does not tolerate an assisted living facility "dropping the ball" on labor controls. | ¶ 44 | BROOKDALE has strictly enforced its budgets, including the staffing expense limits, at its facilities through frequent emails, telephone calls, conference calls, and meetings. Upon information and belief, the executive directors at each of BROOKDALE's assisted living facilities have been routinely admonished by corporate officers in emails demanding that:<br>a. they strictly comply with the staffing budget,<br>b. they make reductions in staffing needed to eliminate budget variances,<br>c. they comply with each facility's staffing expense savings commitment,<br>d. they "do a better job managing our labor, as this is by far our largest expense,"<br>e. they make the necessary adjustments to get staffing within budget or be forced to make reductions,<br>f. everyone will be held accountable for labor control,<br>g. BROOKDALE does not tolerate an assisted living facility running over its approved staffing budget,<br>h. BROOKDALE management strenuously emphasizes the importance of managing labor and eliminating overtime, and<br>i. BROOKDALE does not tolerate an assisted living facility "dropping the ball" on labor controls. |
| ¶ 44 | To entice its employees to stay at or below BROOKDALE's limits for staffing and expenses, BROOKDALE created and implemented lucrative bonus and incentive programs tied to meeting or exceeding BROOKDALE'S financial performance targets. These programs provided facility department heads and BROOKDALE's senior management significant bonuses for staying at or below BROOKDALE's budgeted expense limits – the largest of which was staffing. | ¶ 45 | To entice its employees to stay at or below BROOKDALE's limits for staffing and expenses, BROOKDALE created and implemented lucrative bonus and incentive programs tied to meeting or exceeding BROOKDALE'S financial performance targets. These programs provided facility department heads and BROOKDALE's senior management significant bonuses for staying at or below BROOKDALE's budgeted expense limits—the largest of which was staffing. |
| ¶ 45 | To further ensure compliance with its budgeted staffing and expense targets, BROOKDALE has created, implemented, and enforced comprehensive, company-wide standardized policies and procedures out of its home office in Brentwood, | ¶ 46 | To further ensure compliance with its budgeted staffing and expense targets, BROOKDALE has created, implemented, and enforced comprehensive, company-wide standardized policies and procedures out |

6

|  | | | |
|---|---|---|---|
|  | Tennessee for: facility operations, facility management, billing, accounting, finance, marketing, risk management, employee training, marketing, hiring of personnel, compliance with laws, employee behavior, resident behavior, resident assessment and resident care at its facilities. |  | of its home office in Brentwood, Tennessee for: facility operations, facility management, billing, accounting, finance, marketing, risk management, employee training, marketing, hiring of personnel, compliance with laws, employee behavior, resident behavior, resident assessment and resident care at its facilities. |
| ¶ 46 | Likewise, the documents, forms, data and software related to the admission, pricing, assessment and staffing at all BROOKDALE assisted living facilities are virtually identical and were developed, implemented, and dictated by BROOKDALE out of its home office in Brentwood, Tennessee. | ¶ 47 | Likewise, the documents, forms, data and software related to the admission, pricing, assessment and staffing at all BROOKDALE assisted living facilities are virtually identical and were developed, implemented, and dictated by BROOKDALE out of its home office in Brentwood, Tennessee. |
| ¶ 47 | Facility employees and executive directors did not have authority to change or modify BROOKDALE's established policies and procedures. | ¶ 48 | Facility employees and executive directors do not have authority to change or modify BROOKDALE's established policies and procedures. |
| ¶ 48 | As a result, at its facilities, BROOKDALE controlled not only the day-to-day job duties of its staff and specific steps and methods by which these staff were to provide care, but BROOKDALE also controlled the labor resources available. | ¶ 49 | As a result, at its facilities, BROOKDALE controlled not only the day-to-day job duties of its staff and specific steps and methods by which these staff were to provide care, but also the labor resources available. |
| ¶ 54 | BROOKDALE operates its assisted living facilities, including the facilities in which Plaintiffs resided, under a single umbrella out of Brentwood, Tennessee. Indeed, in a notice of removal filed in an unrelated federal action, BROOKDALE states, "Brookdale's corporate officers, based out of Brentwood, TN, direct, control and coordinate Brookdale's services and overall business operations for its locations throughout the United States." | ¶ 55 | BROOKDALE operates its assisted living facilities, including the facilities in which Plaintiff resided, under a single umbrella out of Brentwood, Tennessee. Indeed, in a notice of removal filed in an unrelated federal action, BROOKDALE states, "Brookdale's corporate officers, based out of Brentwood, TN, direct, control and coordinate Brookdale's services and overall business operations for its locations throughout the United States." |
| ¶ 56 | BROOKDALE highlighted its centralized control over its assisted living facilities in its annual reports (10-Ks) filed with the SEC. BROOKDALE defined the terms "we," "us," "our" or "the Company" to mean Brookdale Senior Living, Inc. together with its consolidated subsidiaries. BROOKDALE further represented that:<br><br>**We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials**, which we believe have contributed to high levels of customer service and to improved facility operating margins. **We have** | ¶ 57 | BROOKDALE highlighted its centralized control over its assisted living facilities in its annual reports (10-Ks) filed with the SEC. BROOKDALE defined the terms "we," "us," "our" or "the Company" to mean Brookdale Senior Living, Inc. together with its consolidated subsidiaries and affiliates. BROOKDALE further represented that:<br><br>**We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials**, which we believe have contributed to high levels of customer service and to improved facility operating margins. **We** |

7

| | | | |
|---|---|---|---|
| | **centralized accounting, finance and other operating functions** in our support centers so that, consistent with our operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations. **We have established company-wide policies and procedures** relating to, among other things: resident care; community design and community operations; billings and collections; accounts payable; finance and accounting; risk management; development of employee training materials and programs; marketing activities; the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements; and implementation of our acquisition, development and leasing plans.<br><br>In addition, **we have and will continue to consolidate corporate functions** such as accounting, finance, human resources, legal, information technology and marketing.<br><br>We have developed a **centralized** support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as human resources, finance, accounting, legal, information technology and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established **centralized** operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining and procurement. | | **have centralized accounting, finance and other operating functions** in our support centers so that, consistent with our operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations. **We have established company-wide policies and procedures** relating to, among other things: resident care; community design and community operations; billings and collections; accounts payable;<br><br>In addition, **we have and will continue to consolidate corporate functions** such as accounting, finance, human resources, legal, information technology and marketing.<br><br>We have developed a **centralized** support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as human resources, finance, accounting, legal, information technology and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established **centralized** operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining and procurement. |
| ¶ 80 | Contrary to the express and implied representations which are found in its uniform Residency Agreements, uniform marketing materials, and other uniform written documents (described above), BROOKDALE has systematically and methodically failed to provide the staffing that was essential for Plaintiffs and the | ¶ 81 | Contrary to the express and implied representations, including those that are found in its uniform Residency Agreements, uniform marketing materials, and other uniform written documents (described above), BROOKDALE systematically and methodically failed to staff each facility |

8

| | | | |
|---|---|---|---|
| | proposed Class Members to receive needed services. BROOKDALE failed to disclose and concealed this material fact from Plaintiffs, the proposed Class Members, and their families. | | sufficient to meet the collective assessed needs of the residents and in accordance with North Carolina adult care home rules and regulations. BROOKDALE failed to disclose and concealed these material facts from Plaintiff, the proposed Class Members, and their families. |
| ¶ 81 | Moreover, contrary to these expressed and implied representations, BROOKDALE systematically implemented and enforced a corporate staffing policy, methodology, and practice (described above) which set staffing numbers and hours far below the levels necessary to meet resident needs at its assisted living facilities, thereby ensuring that Plaintiffs and members of the proposed Classes were exposed to a substantial and continuing risk of daily care and service deprivation. BROOKDALE failed to disclose and concealed this material fact from Plaintiffs, the proposed Class Members, and their families. | ¶ 82 | Moreover, contrary to these expressed and implied representations, BROOKDALE systematically implemented and enforced a corporate staffing policy, methodology, and practice (described above) which set staffing numbers and hours far below the levels necessary to meet the collective needs of the residents at its assisted living facilities. BROOKDALE failed to disclose and concealed these material facts from Plaintiff, the proposed Class Members, and their families. |
| ¶ 82 | Further, based on information on belief, BROOKDALE has failed to allow for facility level adjustments to staffing to account for increases in basic care and daily services, thereby causing its staff to be unable to deliver required services or resulting in residents routinely experiencing excessive and unacceptable waits for both scheduled services and unscheduled requests for help. Moreover, BROOKDALE failed to provide sufficient staffing at its facilities that correlated with service needs of its residents, as required by the laws of Florida and North Carolina. BROOKDALE did not disclose and concealed these material facts from Plaintiffs, the proposed Class Members, and their families. | ¶ 83 | Further, based on information on belief, BROOKDALE failed to allow for facility level adjustments to staffing to account for increases in basic care and daily services, thereby further causing its staff to be unable to meet the aggregate assessed care needs of its resident populations. |
| ¶ 86 | The named Plaintiffs would not have entered a BROOKDALE facility or would have paid a lower price (by paying for the services they received and not paying for the services they did not receive), if they had known BROOKDALE used its Service Alignment System to systemically set staffing at levels far below the levels required to meet the assessed needs of its residents. Likewise, members of the putative Classes would not have entered BROOKDALE's facilities, or would have insisted upon a lower price, if they had | ¶ 87 | The named Plaintiff would not have entered a BROOKDALE facility or would have paid a lower price (by paying for the services they actually received and not paying for the services they did not receive), if he had known BROOKDALE used its Service Alignment System to systemically set staffing at levels far below the levels required to meet the assessed needs of its residents. Likewise, members of the putative Class would not have entered BROOKDALE's facilities, or would |

9

| | | | |
|---|---|---|---|
| | known that BROOKDALE systematically and methodically underestimated its staffing at each facility through use of its materially flawed staffing software (as discussed above). Additionally, had BROOKDALE disclosed to named Plaintiffs and members of the proposed Classes the material, false and misleading facts and representation described above, said individuals would not have continued to stay in or pay BROOKDALE full price for short-changed care and services. | | have insisted upon a lower price, if they had known that BROOKDALE systematically and methodically underestimated its staffing at each facility through the use of its materially flawed staffing software (as discussed above). Additionally, had BROOKDALE disclosed to the named Plaintiff and members of the proposed Class the material, false, and misleading facts and representations described above, said individuals would not have continued to stay in or pay BROOKDALE full price for short-changed care and services. |
| ¶ 90 | As detailed above BROOKDALE operated its assisted living facilities with insufficient numbers and hours of staff. As a consequence of BROOKDALE'S staffing decisions, its assisted living facilities lacked the labor resource capacity to provide the care and life services required by and paid for by residents. | ¶ 90 | As detailed above BROOKDALE operated its assisted living facilities with insufficient numbers and hours of staff. As a consequence of BROOKDALE's staffing decisions, its assisted living facilities lacked the labor resource capacity to meet the aggregate care needs of its resident populations. |
| ¶ 91 | BROOKDALE knowingly decided to systematically understaff its facilities which in turn made it physically impossible for its limited staff to provide the assistance and supervision that BROOKDALE promised to deliver. | ¶ 91 | BROOKDALE knowingly decided to systematically understaff its facilities, which in turn made it physically impossible for its limited staff to meet the aggregate assessed supervision, care, and life needs of its resident populations. |
| ¶ 92 | BROOKDALE steadfastly refused to change its insufficient staffing practices because of the various covenants, default provisions, and financial performance thresholds that BROOKDALE agreed to in order to obtain financing. In short, when faced with the decision of whether to comply with restrictive financial performance thresholds or to comply with Florida and North Carolina staffing laws, BROOKDALE chose to violate the law. | ¶ 92 | BROOKDALE steadfastly refused to change its insufficient staffing practices because of the various covenants, default provisions, and financial performance thresholds that BROOKDALE agreed to in order to obtain financing. In short, when faced with the decision of whether to comply with restrictive financial performance thresholds or to comply with North Carolina staffing laws and the promises it made to the residents, BROOKDALE chose to violate the law and breach its promises. |
| ¶ 93 | As a consequence of its systemic understaffing, BROOKDALE was inundated by complaints at its facilities from residents, families, and even its own staff. Unwilling to change its staffing or risk defaulting on its loan covenants, BROOKDALE persisted in its course of conduct ignoring these complaints and the resulting service deprivations to its dependent, disabled, and/or vulnerable elderly residents. | ¶ 93 | As a consequence of its systemic understaffing, BROOKDALE was inundated by complaints at its facilities from residents, families, and even its own staff. Unwilling to change its staffing or risk defaulting on its loan covenants, BROOKDALE persisted in its course of conduct, ignoring the complaints and the resulting service deprivations to its dependent, disabled, and/or vulnerable elderly residents. |
| ¶ 94 | Further, ignoring complaints and warnings from others, BROOKDALE | ¶ 94 | Further, ignoring complaints and warnings from others, BROOKDALE |

10

| | | | |
|---|---|---|---|
| | was aware of the extent of understaffing and service deprivation problems through various reports generated by its own assisted living facilities, its own corporate audits of the facilities' performance and internal emails and communications. Yet, despite knowledge that its facilities lacked sufficient staff to provide the services BROOKDALE promised to Plaintiffs, the proposed Class Members, and their families, BROOKDALE refused to increase its staffing levels in compliance with Florida and North Carolina law. | | was aware of the extent of understaffing and service deprivation problems through various reports generated by its own assisted living facilities, its own corporate audits of the facilities' performance, and internal emails and communications. Yet, despite knowledge that its facilities lacked sufficient staff to provide the services BROOKDALE promised to Plaintiff, the proposed Class Members, and their families, BROOKDALE refused to increase its staffing levels. |
| ¶ 217 | BROOKDALE lacks any legal justification for chronically and systematically understaffing its facilities as alleged herein. | ¶ 173 | BROOKDALE lacks any legal justification for chronically and systematically understaffing its facilities as alleged herein. |
| ¶ 219 | No other remedy at law can adequately compensate Plaintiffs and Class Members for the damages occasioned by BROOKDALE's conscious choice to systematically and chronically understaff its facilities to further its profit motives. | ¶ 175 | No other remedy at law can adequately compensate Plaintiff and Class Members for the damages occasioned by BROOKDALE's conscious choice to systematically and chronically understaff its facilities to further its profit motives while at the same time collecting and keeping money paid by the Plaintiff and the Class to sufficiently staff the facilities |