# EXHIBIT
# 34

Case 3:20-cv-00543    Document 46-4    Filed 01/15/21    Page 1 of 4 PageID #: 1360

**The New York Times** | https://nyti.ms/31Sw4vp

THE NEW OLD AGE

# Some Assisted-Living Residents Don't Get Promised Care, Suit Charges

Court decisions in California may shed light on how large chains make staffing decisions.

**By Paula Span**

Feb. 14, 2020

The letter went out to about 1,900 Californians a few weeks ago from law firms bringing a class-action suit against one of the country's largest assisted-living chains.

If the recipients, or their family members, had lived in a community operated by Sunrise Senior Living in recent years, "we would like to speak with you regarding your residency and experience," the letter said.

It was the latest action in an ongoing campaign: Since 2013, a group of law firms has systematically sued several major chains operating in the state, employing an unusual strategy.

"It all boils down to the use of assessments, or lack thereof," said Kathryn Stebner, the trial counsel in the case. "These are à la carte facilities — the more needs you have, the more you have to pay. So, they assess you."

The plaintiffs' complaint, filed in 2017 and now before the U.S. District Court for Central California, argues that when staff members conduct such periodic assessments — to determine whether a resident needs help bathing or dressing, for example, or suffers from dementia — the facilities don't use the results to determine an adequate number of staff members.

Instead, the plaintiffs argue, administrators make staffing decisions financially, based on budgets and return on investment. When assessments show increasing needs, the suit alleges, fees rise but staffing ratios may not change.

"People pay more, but they're not getting more care," Ms. Stebner said.

The suit claims that Sunrise is misrepresenting its practices and deceiving customers, in violation of state business statutes, and lacks enough trained staff members to deliver the care specified in resident contracts and marketing materials.

"The business model is fraudulent, and it's putting people at risk," Ms. Stebner said.

Sunrise's practices are unlawful in another way, as well, the suit charges. "If you take an elder's property, knowing it could harm them, that's financial elder abuse," Ms. Stebner said. "In this case, they're taking their money."

In an emailed statement, Sunrise denounced "baseless lawsuits like these, in which the plaintiffs' lawyers file copycat allegations," a reference to the firms having brought four previous suits using essentially the same tactics. Sunrise called the claims "categorically false."

The lawyers' scorecard to date: two settlements reached in 2016, totaling $13 million from Emeritus Corporation (since merged with Brookdale Senior Living) and $6.4 million from Atria Senior Living.

Suits against two other chains, Aegis Living and Oakmont Senior Living, will proceed when and if courts certify them as class actions. The Sunrise case, with a "purported class" of 13,000 current and former residents in California, also awaits certification. (A smaller group received the letters asking for information.)

Case 3:20-cv-00543    Document 46-4    Filed 01/15/21    Page 2 of 4 PageID #: 1361

**COOKING:** *Daily inspiration, delicious recipes and other updates from Sam Sifton and NYT Cooking.*

Sign Up

But in the meantime, the plaintiffs have compelled the chain, with 268 facilities across the country and 52 in California, to turn over a trove of documents showing how it determines staffing levels.

Sunrise argued that those were "protected trade secrets." The judge disagreed. Given that this is an industry whose practices often remain opaque, that might constitute a victory in itself for the plaintiffs.

"It gets at internal systemic issues," said Eric Carlson, a directing attorney at Justice in Aging, a legal advocacy group not involved in the lawsuits. When facilities disclose information like how much time staff members spend on tasks, "it gets at what's happening behind closed doors."

Are assisted-living facilities understaffed? It's a common complaint from residents and families, but one difficult to document.

"We don't have a very clear picture of what staff looks like in assisted living," said Kali Thomas, a health services researcher at the Brown University School of Public Health.

"We don't know what an individual assisted living's staff ratios are. Many states don't even require them to track or report them."

Offering a less institutional environment for seniors who require help with the so-called activities of daily living — but don't need round-the-clock care in a nursing home — the assisted-living industry can house close to a million people in almost 30,000 facilities nationwide.

It includes both small four-bed care homes and complexes with more than 100 residents, but chains dominate the field. And the industry has staved off the kind of regulations that make it much easier to see what's going on — for better or worse — in nursing homes.

Though Medicaid pays for a small but growing proportion of residents, assisted living remains primarily a private-pay option. (The average cost last year, in one annual survey: $4,051 a month nationally, and $4,500 in California.)

The lack of federal dollars helps explain why assisted living is subject not to federal oversight, like nursing homes, but to state regulations, which vary wildly.

Colorado, for instance, requires that an assisted-living facility employs one aide per 10 residents during the day, and one to 16 at night. In Missouri, it's one to 15, and one to 25. Only 19 states specify minimum staffing ratios at all.

Families can find it difficult to make informed decisions about assisted living; there's no equivalent of the federal inspection findings and quality rankings at Nursing Home Compare. State websites are inadequate substitutes, a recent study found.

Yet the people moving into these complexes need more help than they did years ago.

"They're older," Ms. Thomas pointed out. "They're entering with more chronic diseases." More than 40 percent have moderate or severe dementia, a study in the journal Health Affairs reported.

The California lawsuits don't seek individual damages, and because the classes involved contain thousands of individuals, their checks from settlements so far have been paltry — a few hundred dollars each.

But the suits also seek "injunctive relief," a court-ordered requirement that the defendants change their practices.

"They'd be told to be transparent," Ms. Stebner said. "We want them to use the assessments properly and to tell people what they're doing. And to have sufficient staff."

Veteran researchers sounded more skeptical about the lawsuits' impact. Understaffing represents "a complaint about long-term care in general," said Dr. Philip Sloane, a geriatrician at the University of North Carolina School of Medicine. "Of course it's true. The question is, what is realistic?"

"These places do set very high expectations," said Sheryl Zimmerman, a health services researcher at the University of North Carolina School of Social Work. "Everyone's website sounds like Utopia."

But she added, "These group settings cannot individualize everything for every person." Being forced to add staff members could make assisted living even more expensive, unreachable for many older adults, she said.

Dr. Sloane said facilities might respond to the suits by adding disclaimers to their marketing: "They'll probably address the promises, rather than the care."

After Florida increased staffing requirements for nursing home aides in 2001, Ms. Thomas recalled, she led a study showing that the homes complied, then cut hours for their housekeeping and activities staffs.

Assisted-living providers targeted by lawsuits might respond similarly, she noted.

Mr. Carlson saw it differently. It's tough to compel substantial changes in long-term care facilities, he acknowledged. But, he said, "You get pressure from residents, from surveyors, from plaintiffs' counsel, and it all pushes providers to be more accountable to residents."

If the court certifies Sunrise residents as a class, a resolution of the case probably lies two years away, Ms. Stebner estimated. And if the plaintiffs win further settlements, lawyers in other states may start taking notes.