# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER MICHAEL POSEY, SR.,** | ) | |
| **individually and on behalf of all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-0543** |
| | ) | **Judge Aleta A. Trauger** |
| **BROOKDALE SENIOR LIVING, INC.,** | ) | |
| **LUCINDA M. BAIER, ANDREW SMITH,** | ) | |
| **and STEVEN E. SWAIN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Defendants Brookdale Senior Living, Inc. ("Brookdale"), Lucinda M. Baier, Andrew

Smith, and Steven E. Swain have filed a Motion to Dismiss the Amended Complaint (Doc. No.

42), to which lead plaintiff Daniel Martin Struve has filed a Response (Doc. No. 49), and the

defendants have filed a Reply (Doc. No. 50). For the reasons set out herein, the motion will be

granted.

## I. BACKGROUND[1]

### A. Introduction

Brookdale is the "largest operator of senior living communities in the United States,"

with a portfolio of over 700 communities, some of which it owns outright and some of which it

merely leases and operates. (Doc. No. 35 ¶¶ 1, 31.) The individual defendants are current and

former Brookdale executives. (*Id.* ¶¶ 18–21.) For many years, Brookdale enjoyed a strong—

---

[1] The facts are taken primarily from Struve's Amended Complaint for Violations of the Federal Securities Laws. (Docket No. 35.) Except where otherwise noted, the facts are accepted as true for the purpose of deciding the merits of the Motion to Dismiss.

arguably even dominant—position in the market for senior living communities. Around 2016, however, a confluence of factors began to weaken that market position. As Brookdale's occupancy levels declined, the company's leadership searched for a new strategy to maintain Brookdale's ongoing level of profitability. According to Struve, the approach that Brookdale settled on was a "[c]ompany-wide strategy to reduce staffing in an effort to reduce expenses and improve the bottom line." (*Id.* ¶ 3.)

Central to Brookdale's strategy was the Service Alignment System—referred to by the company as "SAS"—a proprietary software tool used to "calculate[] a total number of labor hours required for each community" based on patient information put into the system. (*Id.* ¶ 4.) Of course, a software system that made staffing decisions for every Brookdale community carried the risk of passing the system's flaws along to every or nearly every Brookdale community, which is exactly what Struve alleges was intended to—and did—occur, with SAS playing a central role in understaffing facilities company-wide. (*Id.*)

Brookdale's chronic understaffing, if real, risked negative responses from a number of people and entities—patients, patients' families, state regulatory authorities, and government healthcare programs, to name a few. And indeed Brookdale has, in fact, faced accusations from at least some of those sources, as the court will discuss. This case, however, does not involve any patients, insurers, or regulatory authorities, at least not directly. Brookdale is a publicly traded company, meaning that securities representing partial ownership of Brookdale—that is to say, Brookdale stocks—are frequently exchanged by individuals and entities with no direct, hands-on knowledge about Brookdale's operations. In order for those investors to make decisions about buying and selling the stock, they had to rely on publicly available information, including statements by Brookdale and its executives. Struve alleges that various of those statements were

false or misleading with regard to the company's chronic understaffing, which artificially inflated the price at which Brookdale stock was bought and sold. Struve argues that he and other investors who traded at those inflated prices were injured when, in late April of 2020, the understaffing was revealed in a lawsuit and subsequent reporting.

## B. Core Features of Brookdale's Business

Brookdale classifies its operations into five distinct "business segments": "(1) Independent Living; (2) Assisted Living and Memory Care; (3) Continuing Care Retirement Communities . . . ; (4) Health Care Services; and (5) Management Services." (*Id.* ¶ 32.) The Assisted Living and Memory Care segment, however, accounts for more than half of the company's profits. (*Id.*) Facilities classified as offering assisted living and memory care offer "housing and 24-hour assistance," as well as "ongoing health assessments, three meals per day and snacks, . . . coordination of special diets planned by a registered dietitian, assistance with coordination of physician care, social and recreational activities, housekeeping, and personal laundry services." (*Id.* ¶ 32.) Brookdale charges rates based on the level of care required by each resident, with residents who require a higher level of care typically being charged more. (*Id.* ¶ 34.) Between August 9, 2016 and April 29, 2020—the "Class Period" for the purposes of this litigation—80% of Brookdale's resident fee revenue was from "private pay" customers, with 16% coming from government healthcare programs and the rest coming from other sources. (*Id.* ¶ 36.)

Brookdale oversees its communities from its headquarters in Brentwood, Tennessee. (*Id.* ¶ 38.) Its annual reports have emphasized the centralized nature of its operations and the benefits associated with that centralization:

> We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have

3

contributed to high levels of customer service and to improved facility operating margins. We have centralized accounting, finance and other operating functions in our support centers so that, consistent with our operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations. We have established company-wide policies and procedures relating to, among other things: resident care; community design and community operations; billings and collections; accounts payable; finance and accounting; risk management; development of employee training materials and programs; marketing activities; the hiring and training of management and other community based personnel; compliance with applicable local and state regulatory requirements; and implementation of our acquisition, development and leasing plans. . . . In addition, we have and will continue to consolidate corporate functions such as accounting, finance, human resources, legal, information technology and marketing. . . . We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities.

(*Id.* (emphasis omitted).) Additionally, Struve alleges that "the budget for each community was set by the corporate financial planning and analysis teams . . . , which determined and preloaded the budgets onto its internal server." (*Id.* ¶ 41.)

## C. Issues Related to Quality and Understaffing

### 1. Brookdale Enters a Period of Underperformance and Seeks a "Turnaround"

According to Struve, the quality of Brookdale's services began to suffer—if it was not suffering already—in the wake of its 2014 acquisition of a competitor, Emeritus Corporation ("Emeritus"). (*Id.* ¶ 57.) Emeritus, it turned out, had allegedly maintained facilities in a "number of outdated, dilapidated buildings" that "required significant capital investment." (*Id.* ¶ 57.) Brookdale, however, failed to make the improvements necessary, resulting in facilities that offered, in the words of one apparently anonymous critic, "[c]ruise ship pricing with [a budget motel] environment." (*Id.* ¶ 58.)

Struve has provided accounts from five confidential witnesses regarding Brookdale's operations. Although the witnesses are not named, Struve describes their backgrounds, and each

4

confidential witness is allegedly a former Brookdale employee who served in a management capacity, albeit not in the upper echelon of management that included the individual defendants. (*Id.* ¶¶ 25–28.) Although the court will not recount every detail divulged by the witnesses, those allegations do generally support Struve's account that Brookdale grappled with poor facility quality in the wake of the Emeritus acquisition. (*See, e.g.*, *id.* ¶ 59.)

The investing public appears to have noticed at least some of the post-acquisition problems. A February 9, 2016 article in Modern Healthcare discussed the situation, noting the "disruptive" nature of the Emeritus acquisition, including "falling occupancy." (*Id.* ¶ 60.) The article discussed investors' negative reaction to the events, including a sharp decline in the value of Brookdale's stock in late 2015 and early 2016. (*Id.*)

While Brookdale was struggling with the aftermath of the Emeritus acquisition, the senior living industry "experienced an unprecedented number of new facilities being opened" in response to expected increases in the population of Americans 65 years old or older. (*Id.* ¶ 69.) Brookdale's occupancy declined, which it acknowledged in SEC filings and in at least one earnings call. (*Id.* ¶¶ 70–74.) According to one of Struve's confidential witnesses, Brookdale responded to the decline of its population by exerting internal "pressure to . . . move residents in at all costs." (*Id.* ¶ 76.) For example, Brookdale would allegedly move residents into facilities unable to provide the level of care required merely to meet monthly occupancy goals. (*Id.*) Brookdale's upper management also "pushed move-ins to occur by the end of the month"—even if those move-ins were not into appropriate facilities and the resident would likely leave shortly thereafter—in order to create high monthly occupancy numbers. (*Id.* ¶ 77.)

5

## 2. SAS and Alleged Understaffing

Faced with increasing competition and the ongoing fallout of the Emeritus acquisition, Brookdale's leadership implemented—and publicly acknowledged that it was implementing—a "turnaround strategy" that included changing senior leadership and selling some of its communities. (*Id.* ¶¶ 62–65.) None of its publicly acknowledged efforts, however, was wholly sufficient to right the ship in terms of profitability. Another option, however, presented itself: aggressive cost control. According to Struve, "it is well known that staffing is the highest expense at any [senior living] facility." (*Id.* ¶ 80.) Accordingly, if a company can serve the same number of residents at the same rates of payment—but with fewer staff—the effect on profitability can be substantial. Recognizing that fact and concerned about the company's underperformance—but aware of concerns that residents and others might have if Brookdale became known for low staffing levels—Brookdale's senior leadership "orchestrated a comprehensive, undisclosed Company-wide policy to reduce salary expense by materially reducing staffing at its communities." (*Id.* ¶ 81.)

Central to that effort was the SAS software. (*Id.* ¶ 82.) SAS, as the court has noted, was a software system that calculated staffing levels. According to Struve, SAS was "supposed to" do so based on "two categories of information: (1) assumptions regarding the amount of time required to perform daily living services, which were purportedly based on time studies Brookdale conducted; and (2) algorithms and a source code to purportedly take the results of the time studies, as well as the assessed needs of the residents and other parameters and factors, to set the number of required staffing hours on a daily basis." (*Id.* ¶ 84.) SAS was not only proprietary to Brookdale, but also opaque to most employees *within* Brookdale; only relatively

high-ranking executives had access to all of the information on which the software relied. (*Id.* ¶¶ 87–88.)

Among SAS's features was its ability to produce "labor detail reports" that "compare[d] the staffing benchmarks generated by [SAS] . . . to actual staffing levels derived directly from staff timecards." (*Id.* ¶ 89 (citation omitted).) This allowed Brookdale to monitor each facility's staffing levels in real time and limit staffing accordingly. (*Id.* ¶ 91.) Such a practice would not necessarily be problematic, as long as SAS made sound recommendations and facilities had the flexibility to exceed those recommendations in response to unique issues not considered by SAS. According to Struve, however, the defendants "manipulated the inputs to SAS to cause SAS to generate underestimated staffing needs for every community and/or ignored SAS output and understaffed the communities." (*Id.* ¶ 90.)

Struve, citing a confidential witness, claims that "SAS was programed to undercalculate the number of labor hours needed to provide adequate resident care because the system failed to account for everyday variables, such as patient falls . . . , extra trips to the bathrooms[,] or providing residents with cups of coffee and other services," which "resulted in understaffing at nearly every Brookdale community." (*Id.* ¶ 4 (emphasis omitted).) In other words, SAS was, at best, designed to calculate the bare-minimum staffing level necessary for a facility to function as long as everything at the facility went according to optimistic expectations. But because events in supportive senior living facilities often do *not* go according to the rosiest expectations, the facilities found themselves understaffed. (*Id.* ¶ 97.)

Struve's confidential witnesses provide examples of the alleged understaffing. The witness known as "CW2" describes working in a high-acuity facility in which there was only one caregiver for every 40 residents. (*Id.* ¶ 96.) The witness known as "CW1"complains that SAS

would set inadequate staffing numbers and that facility employees had no effective way to overrule SAS's errors. Because SAS was an opaque, proprietary system that only upper management could change, staff had no way to account for variables that SAS was not equipped to consider. If a facility tried to bypass SAS and request more staff anyway, the facility's director was forced to seek approval from corporate leadership, which would scrutinize any request to find alternatives to staffing increases. According to CW1, the response from Brookdale's headquarters "was never to get more staffing, it was only how to tweak things and justify the SAS numbers." (*Id.* ¶ 100.) According to CW1, Brookdale leadership was aware of the company's understaffing problems, and defendant Lucinda M. Baier—the company's CEO since early 2018—visited facilities to observe the problem. (*Id.* ¶¶ 18, 102.) Other high-ranking leaders were involved in conference calls in which the issue of alleged understaffing was acknowledged. (*Id.* ¶ 105.)

Facility budgets were set once a year by Brookdale's corporate headquarters, with a limited amount of time for facility administrators to request revisions. (*Id.* ¶ 107–08.) Brookdale executives monitored facilities' compliance and exerted extreme pressure—including repeated demands for explanations and sometimes even "screaming"—if a facility exceeded or sought permission to exceed its budget. (*Id.* ¶¶ 110–16.) The rigid adherence to budgets, however, created dangers for patients with needs beyond what the corporate headquarters had anticipated. For example, CW2 has stated that a number of Emeritus buildings acquired by Brookdale contained Medicaid patients who had high-acuity needs but who, because of Medicaid's payment structure, only brought in payments at a relatively low fixed rate. Brookdale addressed the situation by demanding that the facilities adhere to budgetary restrictions that were "not

8

realistic." (*Id.* ¶ 113.) As a result, the facilities "needed more staff to adequately care for [the residents,] but the communities were not allowed to hire" the personnel needed. (*Id.*)

Brookdale also relied on its employee bonus structure to exert downward pressure on staffing levels. Certain Brookdale employees, including executive directors of facilities, were eligible for bonuses calculated based on a range of factors, including facility revenues. (*Id.* ¶ 126.) In particular, the bonus structure rewarded management-level employees based on their facilities' net operating income, or "NOI." In order to hit the company's NOI targets, a facility would, among other things, need to limit staffing expenses such as overtime. (*Id.* ¶¶ 115, 125–30.)

## D. Public Litigation Regarding Brookdale During the Class Period

Although this case is ostensibly about Brookdale's systematic understaffing being concealed and then "revealed" at the end of the Class Period, Struve acknowledges that, "throughout the Class Period, Brookdale faced accusations of understaffing in numerous lawsuits highlighting Brookdale's [allegedly] common practice of charging residents for services they do not receive."[2] (*Id.* ¶¶ 11, 140.) For example, a 2017 lawsuit in California state court—*Rejuso v. Brookdale Senior Living Communities, Inc.*, Case No. BC655101 (Cal. Super. Ct. 2017)— alleged that a Brookdale facility had failed to provide necessary one-on-one care to a patient and that a Brookdale supervisor had "stated she had no choice but to help multiple patients at the same time because the facility was understaffed." (*Id.* ¶ 141.)

---

[2] As the court will explain, the existence of these earlier lawsuits airing complaints similar to Struve's is problematic for Struve's theory of the case, which may, at first blush, make it seem odd that he pleaded facts about the earlier cases at all. Struve's inclusion of this information, however, appears to have been done in an effort to satisfy the strict requirements for pleading a strong inference of scienter in a securities fraud case—reflecting an understandable, if unenviable, strategic decision by Struve's counsel to trade one problem for another.

The lawsuits and associated allegations were not limited to complaints about the treatment of a single patient. A Florida-based class action suit in federal court—*Runton v. Brookdale Senior Living, Inc.*, No. 17-CV-60664 (S.D. Fla. 2017)—was filed the same year, based on allegations "primarily concerned [with] understaffing in Florida senior living facilities that were operated by Brookdale." (*Id.* ¶ 142.) The allegations in *Runton*, as Struve has described them, expressly touched on the issue of understaffing caused by policies implemented at the corporate level:

> The plaintiff in *Runton* alleged that Brookdale misrepresented the level of care that a resident would receive by not having the level of staffing that the residents required. Gloria Runton, the named plaintiff, alleged that she was charged extra fees for personal care, with the amount increasing drastically for increased personalized care throughout her residency at a Brookdale facility. Ms. Runton alleged that she did not receive increased care despite being charged more by Brookdale and that Brookdale ignored or refused her repeated requests to provide her personal documentation to her. Among other things, Runton alleges that Brookdale controlled the staffing levels from their corporate headquarters in Brentwood, Tennessee, implementing a uniform corporate policy of controlling staffing levels based solely on corporate profits as opposed to the individualized staffing needs at each facility.

(*Id.*) That case was settled prior to trial. (*Id.* ¶ 143.)

A separate class action suit, *Stiner v. Brookdale Senior Living*, No. 4:17-cv-03962, was filed in federal court in California. The complaint, brought by nine named plaintiffs, expressly alleged that "corporate policy and procedure of providing pre-determined staffing at its facilities precludes BROOKDALE from providing the care and services residents have been promised and places all residents at substantial risk that they will not receive the care and services that they have paid for on any given day." (*Id.* ¶ 144.)

Struve also draws the court's attention to two cases filed in this circuit against Brookdale in 2018 and 2019, including *Bright v. Brookdale Senior Living, Inc.*, 3:19-cv-374 (M.D. Tenn. 2019), which was filed in this district. (*Id.* ¶¶ 146–47.) *Bright* alleges "a scheme of understaffing

and coverup through misrepresentations, misleading statements, and concealment of material facts." (*Id.* ¶ 147.) That still-pending case also specifically takes aim at the SAS system, alleging "that SAS was based on false assumptions, including [assumptions about] the time required for tasks [that were] based on faulty time studies," and claims that "Brookdale deliberately underestimated the time required by each service which allowed Brookdale to reduce labor costs and achieve its financial performance thresholds." (*Id.*; see, e.g., *Bright*, Case No. 3:19-cv-374, Doc. No. 1 ¶ 21 ("BROOKDALE's Service Alignment algorithm methodically set staffing levels and labor hours far below that required to meet residents' needs . . . .").)

Finally, Struve points out that, in addition to that private litigation, there were also actions taken by state regulatory authorities against Brookdale during the Class Period. In particular, Struve cites several "reports of inadequate staffing . . . issued by the California Department of Social Services' Community Care Licensing Division" in 2016, 2017, and 2018. (Doc. No. 35 ¶ 132.) According to Struve, "[s]imilar violations were reported throughout the country and by other regulatory bodies, some of which resulted in civil fines and penalties." (*Id.* ¶ 133.)

**E. The Defendants' Public Statements**

Struve classifies the allegedly false or misleading statements at issue in this case into three general categories: (1) statements about quality of services; (2) statements about compliance; and (3) statements about occupancy. The statements identified by Struve on these topics frequently echoed each other, and the court will not belabor the details of each one. Instead, the court will provide characteristic examples of the statements made and topics addressed.

1. Quality of Services

**a. Personalization.** Struve identifies a number of public statements in which Brookdale touted its ability to provide residents with personalized services "tailored to you and your loved one based on [your] unique needs and desires." (*Id.* ¶ 47 (emphasis omitted).) Often, those statements were accompanied by assurances that the personalization offered by Brookdale resulted in quality services that could, for example, "put[] the life you want within reach." (*Id.* ¶ 53.) Statements regarding Brookdale's personalization of services were made by defendants repeatedly during the Class Period. (*See id.* ¶¶ 219–40.) Struve argues that Brookdale's persistent emphasis on personalization belied the fact that decisions were being made in a rigid way by SAS and that, if anything, SAS functioned by ignoring unique patient needs.

**b. Staffing.** Some statements specifically addressed the issue of staffing. For example, in a conference call with investors in November of 2016, Baier, who was the company's CFO at the time, stated:

> We are continuing to work on our service alignment labor model which help[s] us make sure that we've got the right labor in the communities to match to the acuity of the residents' needs and that helps us offset some of the labor pressure, to make sure that you're matching labor appropriately to need.

(*Id.* ¶ 165 (emphasis omitted).) In a February 2017 investor conference call, defendant T. Andrew Smith, then the CEO, specifically stated that Brookdale was "adding community level support staff to lighten the burden of . . . job responsibilities," and Baier made similar claims. (*Id.* ¶¶ 168–69.)

Other statements addressed the issue of staffing by, for example, citing Brookdale's ability to provide "24-hour assistance with activities of daily life" or otherwise making positive statements regarding the services that were possible based on Brookdale's staff availability. (*Id.* ¶ 241 (emphasis omitted).) Brookdale suggested that this comprehensive staff coverage allowed the company to, among other things, offer a "supportive home-like setting" to residents. (*Id.* ¶

251.) Struve suggests that these statements either were directly contrary to, or required qualification in light of, the truth regarding the company's systematic understaffing.

**c. Power of Executive Directors.** Other statements, Struve argues, gave the false impression that executive directors of facilities exercised authority that had, in fact, been taken or withheld from them in favor of corporate control. For example, the annual report filed in February of 2017 stated that Brookdale was "simplifying the role of the executive directors of our communities to allow them to focus on our customers and associates." (*Id.* ¶ 172.) The report claimed that Brookdale had "reduced spans and layers in our organization to increase accountability and bring decision making closer to our customers." (*Id.*)

**d. General Statements of Quality.** In addition to the more specific statements that the court has discussed, Brookdale and individual defendants repeatedly boasted to investors and the public about the high quality of Brookdale's services. (*See id.* ¶¶ 155(a)–(l); 175–77; 181–218.) Struve alleges that, "[b]ased on Brookdale's representations, residents and their families are led to believe that Brookdale offers high quality care and staffing to meet the needs of its residents." (*Id.* ¶ 56.)

### 2. Compliance

Struve next identifies a number of statements made by Brookdale and its executives regarding its compliance with internal and/or external rules and policies. For example, a number of SEC filings included the claim that "[w]e have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service." (*Id.* ¶¶ 264–67.) The company repeatedly cited its internal quality assurance programs and suggested that those programs were successfully contributing to resident satisfaction. (*Id.* ¶¶ 269–70.)

13

Struve alleges that the defendants "made material misrepresentations that occupancy had increased at Brookdale's facilities but failed to disclose that the occupancy only increased because Defendants induced new residents with false promises of high quality care with sufficient staffing to allow the resident to age in place." (*Id.* ¶ 272.) For example, in a May 8, 2017 press release, the company provided a series of statistics suggesting growth in Brookdale's patient population. (*Id.* ¶ 274.) Struve does not suggest that those particular numbers were fabricated. Rather, he alleges that Brookdale's claims regarding occupancy

> were materially false and misleading when made because: (i) Defendants failed to disclose that Brookdale increased occupancy by inducing residents to come to Brookdale's facilities with false promises of a high quality of services and care . . . ; (ii) Brookdale rushed residents into its facilities with the wrong and usually insufficient level of care in order to report higher occupancy; (iii) the residents that were rushed in only lasted a couple weeks before having to move out because their level of acuity could not be met; and, as a result, (iv) Brookdale was not experiencing an increase in occupancy.

(*Id.* ¶ 275.)

## F. The *Gunza* Case, Reporting of the Case, and Drop in Stock Price

On April 24, 2020, George Gunza filed a putative consumer class action against Brookdale in this court. *See Gunza v. Brookdale Senior Living*, No. 3:20-cv-00353 (M.D. Tenn.). Gunza alleged that Brookdale had been operating a "system of chronically understaffed assisted living facilities that routinely and as a matter of practice fail[ed] to provide sufficient staffing that correlate[d] to the service needs of its resident populations in order to provide the most basic level of promised care and daily living services." (Doc. No. 35 ¶ 157 (emphasis omitted).) In particular, Gunza alleged that Brookdale facilities were making staffing decisions based on SAS, not on the personalized services assessments of its residents. (*Id.* ¶ 158.) Finally, Gunza alleged that Brookdale, "[f]rom its corporate headquarters in Brentwood Tennessee, . . . exercises

absolute and exclusive control over staffing determinations at its facilities, monitoring each facility's staffing and budgetary compliance and measuring any variance [from the budget set by the headquarters] on a frequent or daily basis." (*Id.* ¶ 160.)

On April 30, 2020, the *Nashville Business Journal* published an article under the headline "Lawsuit accuses Brentwood health care giant of deception, understaffing." (*Id.* ¶ 281.) Because that article and others related to the *Gunza* litigation are central to Struve's theory of the case, the court will reproduce the language in the article that Struve reproduced in the Amended Complaint in full:

> Weeks after announcing plans to hire thousands of workers, Brookdale Senior Living Inc. is facing allegations of understaffing.
>
> In a proposed class-action lawsuit filed in the U.S. District Court of Middle Tennessee, the Brentwood-based senior-living operator is accused of purposeful "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks. According to the filing, Brookdale misled residents and their families when it promised basic care and daily living services.
>
> The lawsuit claims that the proposed class of plaintiffs—who are current and former residents of 56 Brookdale facilities in North Carolina—"have not received the care and services they paid for." The lawsuit asks for damages and for Brookdale to "stop the unlawful and fraudulent practices."
>
> Brookdale has yet to file a response but denied the claims in an emailed statement:
>
> > "The health and wellbeing of our residents is Brookdale's top priority. We absolutely disagree with the allegations in the suit and believe the complaint is completely without merit."
>
> Brookdale (NYSE: BKD) is the nation's largest senior-living community operator, with more than 750 facilities in 45 states. The company reported $4 billion of revenue in 2019, making it one of Nashville's largest publicly traded health care companies, according to Nashville Business Journal research.
>
> The company has approximately 38,400 full-time employees nationwide, according to its 2019 earnings report filed with the U.S. Securities and Exchange Commission.

(*Id.* ¶ 282 (emphasis omitted).)

Another April 30, 2020 article about the suit was published in *McKnight's Senior Living*.

That article stated:

> The country's largest senior living company is facing a potential class-action lawsuit over alleged unfair trade practices and alleged failure to provide promised services at dozens of its assisted living communities.

> The complaint, filed April 24 in the U.S. District Court of the Middle District of Tennessee, Nashville Division, claims that Brentwood, TN-based Brookdale Senior Living misled residents and their families about personalized services and staffing levels at its assisted living communities through its marketing materials and residency agreements. Brookdale disagrees.

> "The health and wellbeing of our residents is Brookdale's top priority," Heather Hunter, a senior public relations specialist at Brookdale, told McKnight's Senior Living. "We absolutely disagree with the allegations in the suit and believe the complaint is completely without merit."

> The company operated at least 56 communities in North Carolina during the time period covered by the lawsuit. The complaint anticipates that more than 5,000 current and former residents could be part of the class action status if it is certified.

> The suit is being brought under the North Carolina Uniform Declaratory Judgment Act and the North Carolina Unfair and Deceptive Trade Practices Act.

> It alleges that Brookdale participated in "systemic unfair and deceptive" trade practices and breaches of contract beginning in April 2016 by engaging in "inherently flawed and deceptive" staffing practices, and then misleading residents and families through misrepresentations and misleading statements in marketing materials and residency agreements. The suit further alleges that "every resident, regardless of need level, was deprived of services that were needed and paid for based on inadequate staffing levels.

> The complaint was filed by Peggy Fisher on behalf of her brother George Gunza, a resident of Brookdale Reynolda Road, an assisted living community in Winston-Salem, NC. Fisher, acting power of attorney, withdrew Gunza from the community in May 2018 as a result of staffing she said was insufficient to meet her brother's needs.

> The complaint states that Brookdale, through its marketing and sales materials, promised tailored services to meet the individualized needs of its residents but "systematically and willfully understaffed its facility to boost its profitability."

Residents and families, the complaint states, were misled that communities would meet basic care needs and daily living services.

According to the complaint, Brookdale used its own service agreement software algorithm to enforce corporate-determined staffing levels rather than using personal service assessments of each resident's care and service needs. Residents and families allegedly were misled by resident agreements that indicated facilities would meet basic care needs and daily living services—some for additional fees—based on those PSAs.

The suit asserts that Brookdale determines, limits and controls day-to-day staffing levels at its communities from its corporate headquarters. Executive directors at each facility are not permitted to modify those staffing levels without permission "from several layers of Brookdale corporate management," the complaint maintains.

"As a result, Brookdale has systematically short-staffed its assisted living facilities on a day-to-day basis, employing a fundamentally flawed and automated process, purposefully created and mandated to achieve budget objectives and to satisfy predetermined financial performance thresholds rather than meeting residents' needs by, among other things, embedding flawed assumptions into its staffing software to underestimate required staffing levels," the complaint reads.

Christa L. Collins, lead counsel for Gunza and Fisher, cited strict court rules in declining comment on the suit.

This is the second recent lawsuit accusing the company of understaffing. Another suit, filed in 2017 in California, was thought to be the first class-action lawsuit against an assisted living operator to be brought under the ADA. Potential damages in that case could exceed $45 million, as the lawsuit is seeking a minimum of $9,000 for each affected resident and more than 5,000 residents of Brookdale communities in California could become part of the class.

(*Id.* ¶ 283 (emphasis omitted).)

Finally, the *Nashville Post* ran an article about the lawsuit, also dated April 30, 2020. The article stated:

A putative class-action lawsuit has been filed against Brookdale Senior Living alleging its leaders have willfully understaffed facilities to boost profits.

A group of elderly and disabled residents from nearly 56 Brookdale facilities are members of the proposed class claiming the Brentwood-based company "engaged in a scheme of understaffing and coverup through misrepresentations, misleading statements, omissions and concealment of material facts, and the inherently flawed and deceptive staffing practices" from April 2016 to now.

17

The group accuses the company of limiting care levels through a staffing algorithm from its corporate headquarters rather than using an individualized approach from patient assessments to determine how many workers are needed to provide care at each facility.

"As described by Brookdale, its Service Alignment Software consists of two main categories of data. First, it includes assumptions regarding the amount of time required to perform daily living services which are purportedly based on time studies Brookdale itself conducted; and the aggregate . . . care needs of all residents. Second, the Service Alignment Software consists of algorithms and a source code 'which takes the results of the time studies, as well as the assessed needs of the residents and other parameters and factors' to set the number of staffing hours on a daily basis," the complaint reads, saying the use of the algorithm is faulty and flawed.

The lawsuit was filed last week in federal court and class certification has not yet been granted. The case has been referred to the magistrate judge for case management and Brookdale has not yet filed a response. In a comment to the Post, Brookdale vice president of communications Julie Davis said:

"We were pleased with the court's overall decision to enforce arbitration. We firmly believe this case is completely without merit and will continue to defend ourselves vigorously."

(*Id.* ¶ 284.)

According to Struve, "[u]pon the reporting of the filing of the *Gunza* complaint and its allegations of understaffing, Brookdale's stock price fell from a closing price of $3.68 on April 29, 2020 to a closing price of $3.61 per share on April 30, 2020, and continued to drop until reaching a closing price of $2.92 on May 5, 2020." (*Id.* ¶ 285.)

**G. This Litigation**

On June 25, an investor named Christopher Michael Posey, Sr., filed a Complaint against Brookdale and three individual defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated under that Act. (Doc. No. 1.) The Complaint alleged that the defendants had "made materially false and misleading statements regarding the Company's business, operational and compliance policies," particularly

18

regarding the issue of understaffing. (*Id.* ¶ 4.) A number of investors sought to be named as lead plaintiff, and, on September 14, 2020, the court appointed Struve. (Doc. No. 27.) On November 17, 2020, Struve filed an Amended Complaint for Violations of the Federal Securities Laws.[3] (Doc. No. 35.)

On January 15, 2021, the defendants filed a Motion to Dismiss. (Doc. No. 42.) The defendants raise three arguments for dismissing the claims:

> ***First***, the Complaint fails to plead with particularity that Brookdale intentionally and systematically understaffed its facilities, let alone that it lied to investors about doing so. . . . ***Second***, the Complaint does not state particularized facts giving rise to a "strong inference of scienter," as required by the [Private Securities Litigation Reform Act ('PSLRA')]. . . . ***Third***, the Complaint's theory of loss causation makes no sense. In a Section 10(b) case, a plaintiff must plead that disclosure of the facts concealed by the defendant's alleged misrepresentations caused his losses. . . . The Complaint pretends that news articles on April 30, 2020 about the *Gunza* suit disclosed the existence of understaffing allegations against Brookdale "for the first time." But the Complaint itself concedes that understaffing allegations were repeatedly disclosed to the market before April 30.

(Doc. No. 42-1 at 1–2.) Struve opposes dismissal. (Doc. No. 49.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff" and "accept its allegations as true." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Unless additional pleading requirements specific to the plaintiff's claims state otherwise, the Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence

---

[3] Struve had filed a version of that complaint the previous day (Doc. No. 26), but the corrected November 17, 2020 version is now the operative complaint.

to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

In addition to satisfying the ordinary Fed. R. Civ. P. 8 pleading standard, claims that, like Struve's, allege fraud must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Frank v. Dana Corp.*, 547 F.3d 564, 569–70 (6th Cir. 2008). Rule 9(b) states that "a party must state with particularity the circumstances constituting fraud." The Sixth Circuit has explained:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from

the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.*

"Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)). "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

In addition to the requirements of Rule 8 and Rule 9(b), the PSLRA imposes further requirements for the pleading of certain elements of Struve's claims, which the court will discuss in more detail below. *See Frank*, 547 F.3d at 570. These requirements—unique to the securities fraud field—impose standards that differ substantially from what is required even of ordinary fraud claims at the motion to dismiss stage.

## III. ANALYSIS

"Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder prohibit 'fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank*, 547 F.3d at 569). "To state a securities fraud claim under Section 10(b), a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and

21

which proximately caused the plaintiff's injury." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) (quoting *Frank*, 547 F.3d at 569).

Securities fraud can occur regarding any type of business, as long as the business itself is the subject of a transferable security. As a result, many types of wrongdoing or poor performance may provide the background facts for a securities fraud case. A claim for securities fraud, however, is still, above all else, about securities fraud. No amount of wrongdoing, poor performance, or other bad acts can support a claim under the Exchange Act without a connection to an injury related to the sale or purchase of securities. The court, therefore, will begin its analysis, not with the detailed allegations that Struve has set out regarding Brookdale's operations, but with the story at the heart of these claims: that of Brookdale's stock, in the context of the issue of causation.

## A. Principles of Loss Causation in Fraud-on-the-Market Cases

Closely related to the issue of causation in a securities fraud case is the concept of reliance. "Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263 (2014). For example, in a conventional securities fraud case, an individual might show, via documentary or testimonial evidence, that he personally relied on a particular misrepresentation in making the decision to buy or sell at a specific price. *See Chelsea Assocs. v. Rapanos*, 527 F.2d 1266, 1271 (6th Cir. 1975) ("In the usual fraud case or case brought for misrepresentation in violation of Rule 10b-5, proof of reliance upon the misstated or false fact is required.") (citing *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2nd Cir. 1974), *cert. denied*, 421 U.S. 976 (1975)). If the investor relied on the misrepresentation to buy the stock at a certain price, but the truth rendered

the stock worth less than that, then the misrepresentation caused an injury in the amount of the difference between the two prices.

However, "modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases." *Basic Inc. v. Levinson*, 485 U.S. 224, 243–44 (1988). As the Supreme Court has explained:

> In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

*Id.* at 244 (quoting *In re LTV Secs. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980)). If, for example, an executive of a company makes a false statement affecting the market price of the company's stock, and a buyer purchases the stock at that market price, the buyer has, as a practical matter, relied on the executive's false statement in deciding what price to pay for his shares—even if the buyer was personally unaware of the statement. This theory—known as the "fraud-on-the-market" theory of reliance—acknowledges that a modern investor acting on an open and efficient securities exchange is relying on the market itself to be his eyes and ears with regard to publicly available information. *Id.*

The way that causation functions in a fraud-on-the-market case is different from the way that it functions in a conventional securities fraud case, although the underlying principles are fundamentally the same. In either type of case, the plaintiff must plead facts showing a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)). In a conventional

23

securities fraud case—based on representations made directly to the plaintiff—that causal link occurs through the plaintiff's internal decisionmaking process. A fraud-on-the-market case lacks that internal, subjective step; there is no requirement that the plaintiff ever actually even heard or read the allegedly deceptive statement at issue, so there is no question of the statement's direct effect on the plaintiff's thought processes. The reason for that difference, though, is that a fraud-on-the-market case treats the efficient market as, in effect, an extension of the plaintiff himself. In a fraud-on-the-market case, the market determines what the plaintiff is willing to pay, just as, in the court's example of a hypothetical conventional case, the misrepresentation itself determined what the plaintiff was willing to pay. The causal link in the fraud-on-the-market case, therefore, depends on showing that the statements or omissions at issue fooled the market in the same way that a misrepresentation might fool a single investor.

However, one final element is necessary to establish causation of an injury by fraud: a connection between the predicate falsehood and a specific, identifiable loss. The notion of causation in the securities fraud context takes account of the fact that it is not usually the defendant's false statement or omission, in and of itself, that "cause[s] a security to drop in value, but rather, 'the underlying circumstance that [was] concealed or misstated'" *Ohio Pub. Employees Ret. Sys.,* 830 F.3d at 384 (quoting *Lentell*, 396 F.3d at 173). If, for an example, an individual bought a stock at a price inflated by a lie and then later sold that stock at a second price that, though different, was still inflated to the *same* degree by the *same* lie, then the lie did not cause any harm to the investor—even though the investor was, in fact, affected by the lie in that it set the two prices at which he traded. However, if, after that investor had bought his stock, the truth were revealed and the stock collapsed in value, then that same investor would, in fact,

have suffered an injury caused by the lie. In securities law, a revelation of the truth that harms individuals who had relied on a falsehood is referred to as a "corrective disclosure."

Sometimes a corrective disclosure—or the equivalent thereof—comes, not in the form of a statement, but in the form of the real-world realization of a risk that the company's executives concealed or denied. For example, in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, the plaintiff alleged that the defendant had concealed the extent of its risk of foreseeable losses in the event of a substantial downturn in the housing market, particularly as related to subprime mortgages. *Ohio Pub. Employees Ret. Sys.*, 830 F.3d at 381–82. When those risks materialized (and the public became aware of the company's losses), the stock price fell—even though there had not yet been a corrective disclosure in the form of the company's admitting to its false statements. *Id.* at 388. The district court dismissed the plaintiff's securities fraud claim on the ground that, because there was no "corrective revelation," the plaintiff could not establish loss causation with regard to the allegedly concealed risk. *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV160, 2014 WL 5516374, at *10 (N.D. Ohio Oct. 31, 2014). The Sixth Circuit reversed, concluding that a plaintiff can rely on materialization of risk in the same manner as it would have relied on a conventional corrective disclosure. *Ohio Pub. Employees Ret. Sys.*, 830 F.3d at 385.

"A corollary of the efficient market hypothesis"—that is, the hypothesis that the market incorporates all publicly available material information, which is necessary for a fraud-on-the-market claim to succeed—"is that disclosure of . . . information already known by the market . . . will not cause a change in the stock price. This is so because the market has already digested that information and incorporated it into the price." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011) (citing *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665–66

(5th Cir.2004)). As a result, an event can only serve the role of a corrective disclosure if it "reveal[s] some [previously]-undisclosed fact with regard to the specific misrepresentations alleged." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40–41 (2d Cir. 2009)). There is no basis for treating the materialization of a risk as the equivalent of a corrective disclosure if the materialization occurred only *after* the truth had already been revealed. If the market learns the truth about an underlying risk to a company prior to the risk's materializing, then materialization has no concealed truth to reveal. The value of the company's shares still might go down when the risk materialized, but that reduction in value would be due to the damage done by the materialized risk itself, not the market's having been in the dark about the risk's existence or severity. That loss, then, could not be said to have been caused by a fraudulent statement or omission, and any claim based on such a theory would fail.

## B. Application to Struve's Allegations

"Loss causation is not subject to heightened pleading standards; rather, allegations of loss causation must be supported only by a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *In re Miller Energy Res. Sec. Litig.*, No. 3:11-CV-386-TAV-CCS, 2014 WL 415730, at *21 (E.D. Tenn. Feb. 4, 2014) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). Even the baseline Rule 8 pleading standard, however, requires that a plaintiff do more than simply set out facts and declare them sufficient; the plaintiff must, at the very least, set forth a theory of the case that is "plausible on its face." *Iqbal*, 556 U.S. at 678. In order for the putative class's claims to survive, therefore, the Amended Complaint must contain facts supporting at least a plausible inference that the statements and omissions at issue caused

26

the price drop of late April and early May 2020 through a corrective disclosure that immediately, or at least closely, preceded the drop.

There is no dispute that the allegations in *Gunza*, if believed, reflect poorly on Brookdale. Even quite damning allegations, however, cannot serve as a corrective disclosure for causation purposes in a fraud-on-the-market case if those allegations were already "old news" to the market prior to the ostensible revelation that preceded the relevant drop in stock price. *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014). The defendants argue that, although Struve has identified a number of allegedly false or misleading statements followed by an eventual decline in stock price, his alleged connection between the two is implausible and belied by his own assertions. Specifically, the defendants argue that Struve has not plausibly alleged that the *Gunza* lawsuit or the news articles that followed were actually corrective of any previously concealed truth.

Indeed, Struve's Amended Complaint and briefing practically invite such an argument. Struve himself points out that, well before *Gunza*, "lawsuits [had] alleged time and time again that Brookdale's SAS system was manipulated to intentionally understaff its facilities." (Doc. No. 35 ¶ 310.) What, then, did *Gunza* or the stories that came after it reveal? The court cannot assume that, merely because the price of Brookdale stock went down, some truth that the defendants had previously hidden had newly come to light. As the court has discussed, an adverse event related to a company may negatively affect a stock's price whether or not the event served as a corrective disclosure, because the dip might just represent the reaction to the event itself. Moreover, the timing of a decrease in a stock's value could simply be a coincidence altogether. In order for Struve to have plausibly alleged causation, then, he must have alleged some way in which *Gunza* and/or the articles about it connected the defendants' predicate

27

statements to the drop in the stock price by, for example, revealing a particular fact that the plaintiffs' statements had concealed and that investors then incorporated into their view of a fair price for the stock.

Struve, however, has been unable to identify any such previously concealed fact that could plausibly have led to the decline. He argues that "the April 30 Articles publicly exposed for the first time Brookdale's systemic unfair and deceptive trade practices and breaches of contract during the preceding four years and its use of SAS and internal policies to chronically understaff facilities at the expense of care quality." (Doc. No. 49 at 27 (internal quotation marks omitted).) But that is not true, even by Struve's own account. The April 30 articles stated that Brookdale faced *accusations* of systematic understaffing and misleading trade practices, but that was already known; highly similar allegations had already been raised numerous times before, as Struve himself has described.

Prior to *Gunza* and the articles describing it, a reasonable investor who was paying close attention to Brookdale's business would have known that Brookdale faced numerous accusations of understaffing; that that understaffing was allegedly a result of corporate policy, not isolated happenstance; and, specifically, that SAS played a central role in the staffing decisions at issue. After *Gunza* was filed and the articles had been published, the investor's understanding would be the same, except with the addition of knowing that another potentially expensive and damaging lawsuit had been filed. That news might cause the investor to change his view of Brookdale's appropriate share price, but not because any fraud had been revealed. Rather, the price might go down because the lawsuit itself was a meaningful event bearing on that price.

Admittedly, there were some details in *Gunza* and the articles that discussed it that had not been public knowledge beforehand. None of the predicate statements at issue in this case,

however, actually concealed those particular details. Struve's attempt to isolate unique revelations from *Gunza* and the articles merely highlights how slight that new information apparently was. For example, Struve points to fairly unremarkable comments that Brookdale gave to reporters as new information revealed by the articles. (Doc. No. 49 at 27.) Those statements, however—about how Brookdale denied the allegations against it and welcomed arbitration—could not plausibly have driven the drop in the price of Brookdale's stock and, moreover, did not contain any information about understaffing that earlier statements or omissions misrepresented or concealed.

"To rely on [an ostensible] corrective disclosure that is based on publicly available information, a plaintiff must plead . . . facts plausibly explaining why the information was not yet reflected in the company's stock price." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). To that end, Struve argues that the court should ignore the numerous allegations in lawsuits that preceded *Gunza* because the filings in those cases were "only available by combing through various court dockets and analyzing filings to adjudge their credibility." (Doc. No. 49 at 33.) The problem with that argument, however, is that the claims in this case require the court to accept that Brookdale stock was priced and traded on an efficient market. (*See, e.g.*, Doc. No. 35 ¶ 14.) "The fraud-on-the-market premise is that the price of a security traded in an efficient market will reflect *all publicly available information* about a company." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 458 (2013) (emphasis added); *see also Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198 (6th Cir. 1990) ("The fraud on the market theory cannot be applied logically to securities that are not traded in efficient markets."). Nothing about that premise suggests that it applies to all publicly available information except information that is slightly difficult to notice or locate. Moreover, as a practical matter, the idea that the entire

29

market of actual or potential investors in a healthcare company would simply not realize that they should be monitoring potential litigation defies all plausibility. If the market for Brookdale stock was efficient—which Struve claims it was—then it reflected all of the earlier public accusations that preceded the end of the Class Period. It is therefore difficult to see how the decline in stock price could be tied to fraud on the market—as opposed to merely the culmination of a risk that the market already knew about.

Struve argues, in the alternative, that, even if the defendants may ultimately be right that the market already knew about the kind of allegations included in *Gunza*, a defense such as the defendants'[4] is "necessarily fact-intensive and therefore inappropriate for consideration on a motion to dismiss." (Doc. No. 49 at 30.) While it may *often* be true that such defenses cannot be resolved on the pleadings, that does not change the fact that, under the Federal Rules of Civil Procedure, Struve's pleading of each element of the putative class's claims—including causation—is subject to Rule 8 and the plausibility requirement. Moreover, it is presumably not usually the case that a plaintiff will have pleaded so many facts in support of such a defense, as Struve did here in his attempts to bolster the required inference of scienter. In any event, all that the court can do is apply Rule 12(b)(6) to this case, and, in this case, Struve has failed to plausibly plead causation.[5]

The court stresses that none of this should be construed as exonerating Brookdale from the accusation that it systematically understaffed its facilities. To the contrary, Brookdale's victory with regard to these claims is, if anything, a function of the fact that Brookdale has

---

[4] Struve uses the term "truth-on-the-market defense" in this argument, but the defendants dispute whether Struve is using that term correctly. (Doc. No. 50 at 11.) The parties' disagreement regarding terminology is immaterial to the court's analysis.

[5] The court notes, for the record, that, because it is applying Rule 12(b)(6), it has not considered any sources of information outside of the Amended Complaint, such as news articles or other documents not discussed therein but cited in the defendants' briefing and offered as attachments.

simply been publicly accused of understaffing *so openly and so many times* that the particular revelations here were simply additions to the pile. There may well be individuals and entities with valid claims against Brookdale that would get to the heart of any bad practices that it adopted; after all, the stakes implicated by these allegations are far higher than simple monetary losses for investors. This case, however, is about whether one particular, isolated decline in the value of Brookdale's stock was the result of fraud. Because Struve has not plausibly pleaded that it was, the court must dismiss the claims of the putative class unless a superseding complaint rectifies that flaw.

## C. Alternative Grounds for Dismissal

The court will, in the interests of efficiency, briefly address the other two potential grounds for dismissal: the argument that Struve did not plead understaffing with sufficient particularity and the argument that the facts, as pleaded, are insufficient to support a strong inference of scienter. In short, neither argument would be alone sufficient to warrant dismissing the claims.

### 1. Pleading of Understaffing Allegations

The defendants' decision to pursue the argument that Struve failed to adequately plead understaffing is somewhat strange, given that, as the court has noted, Struve's obligation was not merely to plead *understaffing* with particularity but to plead *fraud* with particularity. The alleged understaffing is, of course, part of the factual basis for the putative class's fraud claims, because the truth is always relevant to the question of whether a statement was false or misleading. But the truth—that is, the understaffing—is just one part of what Struve was required to plead. By focusing so heavily on that issue, the defendants have, in effect, simply elected not to

meaningfully contest certain key components of Struve's claims, despite the fact that those components certainly seem, on first blush, to be contestable.[6]

In any event, the argument that the understaffing was inadequately pleaded is meritless. Struve has provided concrete examples of alleged understaffing. He has explained how understaffing was encouraged and enforced at the corporate level. He has clearly set forth how SAS could and did render understaffing systemic. He has explained why Brookdale was driven to pursue such a strategy, and he has pleaded allegations by employees that corroborate his version of events. There is simply nothing more that he needs to say in this regard, at least when it comes to the narrow issue—which the defendants selected to rely upon—of whether the understaffing itself has been sufficiently pleaded.

The defendants fault Struve for failing to provide detailed numbers regarding what staffing levels were and what they should have been, but answering that question for a company with several hundred facilities would be extraordinarily complex. That is particularly true given that aggregate employee numbers are not, in and of themselves, necessarily sufficient to determine whether a facility is understaffed, because an adequately staffed facility would require, not merely a certain total number of employees, but an appropriate number of each *type* of employee. One could not simply, for example, replace all of a facility's nurses with groundskeepers or IT staff and say that the facility was adequately staffed because the numbers

---

[6] The court notes, for example, that a number of courts have suggested that a company's general boasts of quality services or products will typically not be sufficient to establish liability under Section 10(b), because such statements usually "lack[] a standard against which a reasonable investor could expect them to be pegged." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 683 (6th Cir. 2005); *see also Ashland*, 648 F.3d at 468 (observing that a finding of fraud under Section 10(b) cannot be premised on a statement that is "too vague to qualify as material," such as a claim that is so "soft" that it "escapes 'objective verification" (quoting *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004))). On the other hand, the Sixth Circuit has recognized that "[w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *City of Monroe*, 399 F.3d at 672 (quoting *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)).

stayed the same. Similarly, raw numbers of employees would be nearly meaningless without corresponding information about the actual hours worked. Struve's detailed pleading of systematic understaffing is clear and sufficient without the need for giving specific numbers; indeed, the court is skeptical that those numbers would have been particularly useful anyway. *See St. Clair Cty. Employees' Ret. Sys. v. Acadia Healthcare Co., Inc.*, No. 3:18-CV-00988, 2021 WL 195370, at *5 (M.D. Tenn. Jan. 20, 2021) (recognizing that disclosure of raw staff numbers alone is distinguishable from question of whether staffing was adequate or not).

At least on this issue, the defendants have repeatedly resorted to inventing hurdles that have little, if any, support in the caselaw and then faulting Struve for not anticipating and jumping over those hurdles. The supposed requirement that Struve plead specific staffing levels is one example of such an invented hurdle. Another is the defendants' argument that "[p]leading falsity with particularity requires identifying which documents or which reports showed ***which specific facts*** that contradicted the challenged statements ***at the times those statements were made***." (Doc. No. 42-1 at 5 (emphasis in original).) As far as the court can tell, the defendants are suggesting that a plaintiff cannot adequately allege fraud unless he pleads the existence of a specific, contemporary document that contained the truth that the defendant concealed or misrepresented. If that were the case, then *no* statement could be fraudulent as long as the truth was not written down at the time of the alleged fraud. Such a rule would have no basis in the Exchange Act, the PSLRA, or conventional fraud principles—in addition to simply not making sense. There is no the-truth-was-not-written-down exception to fraud.

The pleading standards of the PSLRA are high, but they are not designed to be insurmountable in a legitimate, potentially meritorious case; nor are they designed to set forth a litany of particular, highly specific types of evidence that a plaintiff simply must have in order to

proceed, regardless of the strength of his allegations otherwise. Struve has adequately alleged that systematic understaffing occurred, and none of the artificial barriers suggested by the defendants change that. Accordingly, if that had been the only issue raised by the present motion, the court would not dismiss the claims.

2. Scienter

 "In the securities-fraud context, scienter includes [1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness.'" *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (quoting *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008)). "Recklessness is defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Frank*, 646 F.3d at 959 (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)). The Sixth Circuit has suggested that, where an actionable statement involves a matter of opinion—which some of the statements at issue arguably do—the subjective nature of the statement "rais[es] the bar for alleging scienter" to a requirement of actual knowledge. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 471 (6th Cir. 2014).

In a fraud case involving something other than securities, pleading scienter is typically one of the easiest parts of the plaintiff's task, because Rule 9(b) explicitly exempts "[m]alice, intent, knowledge, and other conditions of a person's mind" from its heightened pleading requirements and allows those facts to "be alleged generally." Fed. R. Civ. P. 9(b). The PSLRA, however, rejects that approach and instead "imposes '[e]xacting . . . requirements for pleading scienter.'" *Ashland, Inc.*, 648 F.3d at 469 (quoting *Frank*, 547 F.3d at 570). The plaintiff must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a

34

strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "'Strong inferences' . . . involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 683 (6th Cir. 2005) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001)). "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Ashland, Inc.*, 648 F.3d at 469 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

Struve argues that he has pleaded sufficient facts to support a strong inference of scienter because he has alleged that Brookdale executives, including the individual defendants, were hands-on in their oversight and that the company's understaffing problem did not simply arise spontaneously in individual communities, but rather was the direct result of a consciously selected corporate strategy. The defendants respond that Struve is, in effect, arguing that the court should simply assume that upper-level executives would be aware of certain information, which would run afoul of the Sixth Circuit's edict that "fraudulent intent cannot be inferred merely from [defendant executives'] positions in the Company and alleged access to information." *PR Diamonds*, 364 F.3d at 688, *abrogated on other grounds*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 49 (2011).

The defendants are correct that a plaintiff typically cannot satisfy the PSLRA simply by alleging that executives had access to the relevant information. For example, the Sixth Circuit has rejected the argument that an executive can be presumed, based on his position and access to information, to have knowledge of "accounting issues [that are] relatively arcane in nature and scope" and that did not "pertain[] to central, day-to-day operational matters." *Id.* On the other

35

hand, however, "high-level executives *can* be presumed to be aware of matters central to their business's operation," at least to some degree and depending on the particular information involved. *Id.* (citing *In re Complete Mgmt., Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-36 (S.D.N.Y. 2001)) (emphasis added). Accordingly, while alleging access to information is not alone sufficient, a plaintiff can support a strong inference of scienter by pleading additional facts explaining why that information was so central to the relevant underlying business that an executive could, in fact, be reasonably assumed to have kept himself abreast of it.

Struve has not simply alleged that understaffing was a problem that the defendants can be assumed to have known about; he has alleged that understaffing was a conscious strategy and that the core mechanism for enforcing understaffing was SAS—a tool that easily satisfies the description of "central to the business's operation." It may be possible that Brookdale's executives nevertheless remained ignorant of the problem. The PSLRA, though, does not require a plaintiff to definitively rule out non-fraudulent explanations for a defendant's behavior or even to establish, at the complaint stage, that the scales tip decidedly in favor of a finding of scienter. Rather, the court must simply consider all possible inferences and determine whether "the inference of scienter [is] at least as strong as any opposing inference." *Tellabs, Inc.*, 551 U.S. at 326. Struve has alleged facts sufficient to meet that requirement.

The defendants nevertheless argue that the court should hold that Struve has not sufficiently supported an inference of scienter because he has not satisfied enough items on the non-exhaustive list of factors that the Sixth Circuit has identified as potentially relevant to that inquiry:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company

36

official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi*, 823 F.3d at 1039–40 (quoting *Helwig*, 251 F.3d at 552). Those factors, though, simply do not work as a rote checklist that a court can go down, separating those that apply from those that do not and tallying up the score to pick a winner. Some of the factors are flatly irrelevant to many types of fraud, meaning that, while their presence may support an inference of scienter, their absence would not weigh meaningfully against it. It would make little sense, for example, to hold it against a plaintiff that he did not plead "evidence of bribery" in a case where the underlying fraud had no connection to bribery whatsoever. Nor would it make sense to base the court's determination regarding scienter on whether "accounting information" was disclosed in a confusing manner in a case that does not involve complex accounting information.[7]

Ultimately, many of the same facts that support dismissing these claims on the issue of causation are also reasons to reject the defendants' argument regarding scienter. The facts, as pleaded, do not support the conclusion that fraud caused the stock price decrease that began on April 30, 2020, in significant part because those facts show that there was ample reason for the investing public already to be aware of allegations highly similar to those ostensibly revealed on that date. By the same token, however, there was ample reason for Brookdale executives to be aware of those problems as well. Struve, therefore, has sufficiently supported a strong inference of scienter, and the claims would not be dismissed on that ground if otherwise supported.

---

[7] Moreover, insofar as the data relevant to this case can be considered "accounting information," Struve has, in fact, alleged that it was released in a confusing way—specifically, by reporting misleading monthly occupancy figures.

Struve states that he "requests leave to amend" the Complaint in the event that the court is inclined to grant the Motion to Dismiss (Doc. No. 49 at 35 n.29), but he has not yet filed a motion seeking to do so that complies with L.R. 15.01. This is a complex case and, because it is a putative class action, it implicates rights other than merely Struve's and the defendants'. The court therefore will stay the entry of any judgment in the defendants' favor for 21 days, to give Struve the opportunity, if he so chooses, to file a properly supported motion to amend.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss the Amended Complaint (Doc. No. 42) will be granted, and the court will dismiss all claims, if Struve does not file a motion to amend the complaint within 21 days.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge